UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
SPRINGFIELD DIVISION

_____

SEXUAL MINORITIES UGANDA

*Plaintiff*,

v.

SCOTT LIVELY, individually and as President
of Abiding Truth Ministries

*Defendant*.

_____

Civil Action
3:12-CV-30051 (MAP)

FIRST AMENDED
COMPLAINT
PURSUANT TO
FED. R. CIV. P. 15(a)(1)(B)
FOR CRIME
AGAINST
HUMANITY OF
PERSECUTION

DEMAND
FOR JURY TRIAL

**INTRODUCTION**

1.    This case is brought by SEXUAL MINORITIES UGANDA , an umbrella
organization located in Kampala, Uganda, which represents the interests of its constituent
member organizations in advocating for the rights of lesbian, gay, bisexual, transgender
and intersex people ("LGBTI") in Uganda. It is brought against defendant Scott LIVELY,
a U.S.-based attorney, author, evangelical minister and self-described world-leading
expert on the "gay movement," for the decade-long campaign he has waged, in
agreement and coordination with his Ugandan counterparts, to persecute persons on the
basis of their gender and/or sexual orientation and gender identity.

2.    The case is brought under the Alien Tort Statute ("ATS"), 28 U.S.C.
§1350, which provides federal jurisdiction for "any civil action by an alien, for a tort
only, committed in violation of the law of nations or a treaty of the United States."  The

United States Supreme Court has affirmed the use of the ATS as a remedy for serious violations of international law norms that are widely accepted and clearly defined.  *Sosa v. Alvarez-Machain,* 542 U.S. 692 (2004).

3.      Persecution, as a crime against humanity that is universally proscribed and clearly defined in international law, is such a violation.   Persecution is defined in international law as the "intentional and severe deprivation of fundamental rights contrary to international law by reason of the identity of the group or collectivity."  *Rome Statute of the International Criminal Court,* Art. 7(2)(G).  The prohibition on persecution protects individuals on the basis of their identity and punishes those who act in concert to deprive the rights of others on the basis of that identity.[1]  Persecution, by definition, is a group crime; it cannot be committed by one person acting alone.

4.      Plaintiff also asserts tort claims which are cognizable under Massachusetts state law.

5.      In very large part due to defendant LIVELY's contributions to the conspiracy to persecute LGBTI persons in Uganda, plaintiff SEXUAL MINORITIES UGANDA, as an entity, as well as its individual staff-members and member organizations, have suffered severe deprivations of fundamental rights.  Their very existence has been criminalized and their physical safety threatened through a coordinated campaign, which LIVELY has largely initiated, instigated and directed, to strip way basic fundamental rights from people on the basis of their sexual orientation and gender identity and those who advocate on their behalf. To aid in doing so, LIVELY

---

[1] Although Plaintiff's claims are directly cognizable under the ATS, the claims find strong domestic-law parallel in the Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), which punishes private conspiracies to deprive citizens of the equal protection of the law or of certain privileges and immunities, such as freedom of expression or association, if it is motivated by a group-based animus.

frequently attributes to the "genocidal" "gay movement" an irrepressible predilection to commit rape and child sexual abuse.

6.      As set out in more detail below, SEXUAL MINORITIES UGANDA and the community they represent have endured severe discrimination in virtually every meaningful aspect of their civil and political lives; their association has been criminalized; their advocacy on issues central to their health and political participation has been suppressed and punished; and they have been subjected to cruel, inhuman and degrading treatment.  Plaintiff's meetings and trainings have been raided and disbanded and its staff members have been arrested, subjected to humiliating and degrading treatment. Sexual Minorities Uganda has had to devote substantial resources and time in dealing with precarious and emergent situations in  response to crises of individual LGBTI persons in the community who have been threatened, assaulted, harassed, falsely arrested and/or made homeless because of their real or perceived status as lesbian, gay, bisexual, trangender or intersex.  Many individual members of SMUG and its constituent organizations live in persistent fear of harassment, arbitrary arrest and physical harm, even death.

7.      According to LIVELY'S own admissions, his influence and work in Uganda date back at least a decade when he visited Uganda twice in 2002 to coordinate with his Ugandan counterparts, Stephen LANGA, a prominent and extremist anti-gay community leader and pastor, and Martin SSEMPA, also an anti-gay extremist activist and minister, to implement his strategies to dehumanize, demonize, silence, and further criminalize the LGBTI community.  While their efforts were largely effective between 2002 and 2009, LIVELY's work took on a whole new level of urgency after a December

2008 court victory for LGBTI advocates which affirmed that they are entitled to the basic protections of law.

8.      Spurred to action to counter the prospect of basic legal protections for LGBTI individuals, LIVELY and his co-conspirators, LANGA, SSEMPA, Minister of Ethics and Integrity James BUTURO and Member of Parliament David BAHATI, coordinated a dramatic, far-reaching response, which LIVELY and LANGA would later boast had the "effect of a nuclear bomb."  LIVELY'S 2009 work in Uganda and his call to arms to fight against an "evil" and "genocidal," "pedophilic" "gay movement," which he likened to the Nazis and Rwandan murderers, ignited a cultural panic and atmosphere of terror that radically intensified the climate of hatred in which LIVELY's goals of persecution could advance.  Shortly after LIVELY'S pivotal 2009 work in Uganda, one Member of Parliament expressed, "We must exterminate homosexuals before they exterminate society."[2]

9.      Among the shocking, repressive measures undertaken after 2009, is the introduction of the Anti-Homosexuality Bill (also referred to as the "Kill the Gays Bill"), which proposed the *death penalty* for a second conviction of consensual sex between adults of the same gender, and imprisonment for failure to report on others suspected of being "homosexual," and for advocacy in any way on issues related to homosexuality. While LIVELY has half-heartedly tried to distance himself from the death penalty

---

[2] Statement of Shadow Minister of Information and National Guidance, Mr. Christopher Kibansanga, Hansard, Proceedings of the Parliament of Uganda (Apr. 15, 2009), *available at* http://www.parliament.go.ug/hansard/hans_view_date.jsp?dateYYYY=2009&dateMM=04&dateDD=16 (last visited Mar. 13, 2012).

provision of the bill, he still considers it the "lesser of two evils" as compared to recognizing the humanity of LGBTI individuals or permitting their speech or advocacy.[3]

10.     In 2010, a tabloid newspaper – parroting characterizations of gays and lesbians repeatedly made to Ugandan officials by LIVELY – published an article "outing" SEXUAL MINORITIES UGANDA Advocacy Officer David Kato (and others), under the headline, "HANG THEM."[4]  Some of the advocates featured in that article received heightened death threats, and one of them, Mr. Kato, is now dead.  In February and June of 2012, trainings on human rights for LGBTI organizations were raided by Ugandan government officials who declared the gatherings "illegal." In February 2012, the Minister of Ethics and Integrity called those gathered there "terrorists."  One of the organizers had to flee in order to avoid arrest and detention.

11.     This case seeks to challenge LIVELY'S conduct through his involvement in a conspiracy to severely deprive people of their fundamental rights on the basis of their identity.  It is not, therefore, premised on his anti-gay speech or writings.   LIVELY'S prolific, willfully misinformed and inflammatory rhetoric about the "evil" gay movement with his frequent depictions of gay people as "genocidal," "psychopathic," "exceptionally brutal and savage" and as child predators in Uganda and elsewhere, are relevant pieces of evidence insofar as they demonstrate his overall discriminatory purpose and the shared intent of the conspiracy to persecute in which he is intimately involved.  They do not form an independent basis for a cause of action.

---

[3] *Vanguard: Missionaries of Hate*, (Current TV broadcast Jun. 3, 2010) *, available at* http://current.com/shows/vanguard/92468669_missionaries-of-hate.htm (last visited Mar. 12, 2012).
[4] *Hang Them: They Are After Our Children*, Rolling Stone, Oct. 2-9, 2010, at 6.  This publication is unrelated to the U.S. publication.

12.     The context of LIVELY's actions is important.  His insidious rhetoric and attempts at overt discrimination against, and ultimately eradication of, a minority community might not take hold in many places not also struggling in the way Uganda has been in the battle against the spread of HIV/AIDS, poverty and armed conflict.  Yet, it is specifically because he knew Uganda presented fertile ground and – through his willing accomplices with access to political power – a realistic opportunity to meaningfully provoke and bring about the persecution of the LGBTI community, that he focused much of his decade-long efforts there.

13.     SEXUAL MINORITIES UGANDA seeks a judgment declaring that LIVELY's actions are illegal, in violation of international law and Plaintiff's fundamental human rights.  SEXUAL MINORITIES UGANDA also seeks compensatory and punitive damages for violations of their fundamental rights, and injunctive relief enjoining the Defendant from undertaking further actions to strip away and/or deprive Plaintiff and LGBTI community in Uganda of their fundamental rights, including their rights to freedom of expression, association and assembly, to be free from torture and other cruel, inhuman and degrading treatment, and arbitrary arrest and detention, as part of his effort to enshrine and legalize discrimination on the basis of sexual orientation and gender identity.

14.     By seeking to enjoin, punish, and deter LIVELY's actions, SEXUAL MINORITIES UGANDA acts now to prevent the further escalation of persecution in Uganda before it reaches an even more lethal stage.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over Plaintiff's claims under 28 U.S.C. §1331

(federal question jurisdiction) and 28 U.S.C. §1350 (the Alien Tort Statute) which

provides federal jurisdiction for "any civil action by an alien, for a tort only, committed

in violation of the law of nations or a treaty of the United States." This Court also has

jurisdiction over Plaintiff's claims under 28 U.S.C. §1332 (diversity jurisdiction) because

there is complete diversity among the parties who are citizens of different states and the

amount in controversy exceeds $75,000, exclusive of costs and interests.  Plaintiff also

invokes supplemental jurisdiction under 28 U.S.C. §1367 over claims based upon the

laws of the state of Massachusetts.

16.     Venue is proper in the Springfield Division of the District of

Massachusetts pursuant to 28 U.S.C. §1391(b)(1) and (2), and this Court has personal

jurisdiction over Defendant who resides and does business in the district.

## JURY DEMAND

17.     Plaintiff demands a trial by jury on each and every one of its claims.

## THE PARTIES

**Plaintiff**

18.     Plaintiff, SEXUAL MINORITIES UGANDA  is an umbrella organization

that was founded in 2004 by a coalition of Ugandan organizations advocating on behalf

of lesbian, gay, bisexual, transgender, and intersex ("LGBTI") communities, to unify and

support sexual minority groups in Uganda.

19.     Plaintiff and its member organizations and staff members have Ugandan

citizenship.

20.     Plaintiff's objectives are to advocate and lobby for equality for all, to bolster LGBTI visibility through media and literature, and to empower activists through leadership and social entrepreneurship trainings.  The organization also fights against HIV/AIDS in LGBTI communities and speaks out against discrimination and violence based on sexual orientation and/or gender identity.

21.     SEXUAL MINORITIES UGANDA and its individual staff members have suffered persecution, and associated harms as a result of LIVELY's actions, as have individual members of its constituent organizations.

**Defendant**

22.     Scott LIVELY is a writer, attorney, evangelical minister and extremist anti-gay activist who resides in Springfield, Massachusetts and is a citizen of the United States.  He is a founder and President of Abiding Truth Ministries ("ATM"), which operates DefendtheFamily.com and the Pro-Family Resource Center – entities that publish and disseminate LIVELY'S writings and speeches on the internet.  LIVELY also lists himself as President of Defend the Family International, which is in turn referred to as a subsidiary of ATM.  Defend the Family also has an affiliate in Latvia co-founded by LIVELY.

23.     LIVELY proclaims himself one of the world's leading experts on "the gay movement," which he describes as an "evil," "highly organized army of social engineers with a single purpose" and "the most dangerous social and political movement of our

time."[5]  He has written a number of books in support of his goal to deny the humanity of

gays and lesbians and to strip them of their fundamental rights.  While describing himself

as an "international human rights consultant," his efforts are geared to advising and

working with political leaders in different countries  to deprive LGBTI communities of

fundamental human rights and the title appears to be more of a euphemism for what is

more aptly described as a "persecution consultant."

        24.      In *The Pink Swastika: Homosexuality in the Nazi Party*, he and his co-

author argue that the rise of Nazism – with its resultant horrors – was engineered and

driven by a violent and fascistic gay movement in Germany.  In *The Poisoned Stream,* he

claims to have discovered, "through various leads, a dark and powerful homosexual

presence in other historical periods: the Spanish Inquisition, the French 'Reign of Terror,'

the era of South African apartheid, and the two centuries of American slavery."[6]  He has

also written and published *Redeeming the Rainbow*, which he describes as a

comprehensive textbook that explains, among other things, "the urgent, escalating and

imminent danger this movement represents to all aspects of Christian civilization

throughout the world" and identifies comprehensive strategies for how to combat it.[7]

Elsewhere, he has blithely attributed the genocide in Rwanda to "monster" homosexuals.

---

[5] Scott Lively, *Defend the Family: Activist Handbook*  at p. 5 (2007), *available at*
http://www.defendthefamily.com/_docs/resources/1096737.pdf (last visited Mar. 12, 2012) [hereinafter
*Lively Activist Handbook*].
[6] Scott Lively, *The Poisoned Stream: "Gay" Influence in Human History, Volume 1: Germany 1890-1945,
at*  i (Founders Publishing 1997).
[7] Scott Lively, *Redeeming the Rainbow: A Christian Response to the Gay Agenda* (Veritas Aeterna Press
2009).

## FACTUAL ALLEGATIONS

### An Overview of Persecution in Uganda

25.     Over the past decade, there has been a coordinated and sustained

campaign to target and demonize the LGBTI community in Uganda that has in many

cases successfully removed and isolated LGBTI people from basic human rights

protections, counter to the foundational principle of the Universal Declaration of Human

Rights that the "inherent dignity and equal and inalienable rights" belong to all as

members of the human family.  Defendant LIVELY and his Ugandan co-conspirators

have been the principle strategists and actors behind this decade-long persecutory

campaign.

26.     In 2002, coinciding with LIVELY's first visits to Uganda to participate in

the first national anti-gay conference, substantial media attention began to report on and

further sensationalize LIVELY's characterization of pornography as a "tool of 'gay'

social engineering" designed to advance its goal of sexual anarchy.[8]

27.     Thereafter, LIVELY'S cohorts STEPHEN LANGA and MARTIN

SSEMPA, continue to develop their anti-gay strategies and tactics.

28.     In 2003, SSEMPA became involved in helping to develop the country's

HIV/AIDS policies and approaches which intentionally exclude LGBTI persons. He is

joined in his efforts over the next few years by another co-conspirator  and Minister of

Information James BUTURO .  These efforts denied individuals critical public health

education and awareness around LGBTI-specific HIV/AIDS transmission and

prevention, and access to critical health services, resulting in heightened risk and

incidence of exposure, illness and death.

---

[8] Scott Lively, *The Pink Swastika: Homosexuality in the Nazi Party* 307 (Veritas Aeterna Press 1995).

29.     On July 6, 2005, the state-owned newspaper, *New Vision*, ran an article urging that "[t]he police should visit the holes *[sic]* mentioned in the press, spy on the perverts, arrest and prosecute them.  Relevant government departments must outlaw or restrict websites, magazines, newspapers and television channels promoting immorality – including homosexuality, lesbianism, pornography, etc."[9]

30.     Two weeks later, on July 20, 2005, the police raided the home of Victor Mukasa, a transgender LGBTI rights advocate and a founder of SEXUAL MINORITIES UGANDA. The authorities unlawfully forced their way into Mukasa's home, arrested his guest, Yvonne Oyo, and seized a number of documents and hard-copy and electronic files.  Oyo was then taken to the police station where she was forced to strip naked in front of the male authorities to "prove her sex."  Police then sexually assaulted her, by touching and fondling her breasts.

31.     In 2006, Ugandan anti-gay leaders defeated an initiative proposed to include basic anti-discrimination protections for sexual orientation and gender identity in a bill under consideration intended to provide protections for minorities.  LIVELY'S co-conspirator LANGA took credit for defeating this effort.

32.     In 2007, LIVELY'S associate, Martin SSEMPA, a minister and special representative of the government on HIV/AIDS policy, began to publicize the names, photos and address information of LGBTI advocates in a climate in which they would be considered targets – a practice that is picked up by different media outlets.

---

[9] Human Rights Watch, *Uganda: State Homophobia Threatens Health and Human Rights, Government Persecution Contributing to HIV Pandemic*, Aug. 23, 2007, *available at* http://www.hrw.org/news/2007/08/21/uganda-state-homophobia-threatens-health-and-human-rights (last visited Mar. 12, 2012).

Also in 2007, Minister of Ethics and Integrity James BUTURO, another LIVELY associate, called for government to maintain "catalogues of people we [the government] think are involved in perpetuating the vice of homosexuality" and later acknowledged on a radio program "We know them; we have details of who they are."[10]

33.      In June 2008, three LGBTI activists are arrested for peacefully protesting the exclusion of LGBTI people from the government's HIV/AIDS policies and programs. While in detention they were subject to cruel, inhuman and degrading treatment.

34.      On December 22, 2008, the High Court of Uganda issued a high-profile ruling arising out of the unlawful arrest and abuse of Victor Mukasa and Yvonne Oyo.  In *Victor Mukasa and Yvonne Oyo v. Attorney General,* the Court held that gays and lesbians – like anyone else – could challenge the unlawful conduct of the authorities – *i.e.*, that they simply enjoyed the basic protections of law.  The Court awarded damages to Oyo for the violation of her right to protection from torture, cruel, inhuman and degrading treatment under Art. 24 of the Ugandan Constitution.  The Court also awarded damages to Mukasa for the violation of his right to privacy of person, home and property guaranteed by Art. 27 of the Constitution.

35.      Rather than usher in protections to the LGBTI community from wanton denials of their fundamental rights, the decision had the *opposite* effect.  It spurred LIVELY's closest associate and ministry partner, Stephen LANGA, to sound an alarm and dramatically escalate the campaign of persecution – with the critical assistance of defendant LIVELY.

---

[10] *See* Sunday Vision, *Tough Anti-Gay Law Due,* Aug. 26, 2007, and The Guardian, *Ugandan Gays Demand Freedom: The Quest for Gay Rights Is a Challenge to Uganda's Increasingly Authoritarian Church and State,* Sept. 17 2007.

36.     Less than three months after the High Court's ruling, LANGA hosted the March 2009, anti-gay conference entitled "Seminar on Exposing the Homosexual Agenda" (the "Conference" or "Anti-Gay Conference").  As described in more detail below, this Conference prominently featured LIVELY, where based on his self-proclaimed world-leading expertise on the "gay movement," he consistently attributed to gays and lesbians genocidal tendencies, a predilection for child sexual abuse and a campaign to "recruit" Ugandan children.  LANGA also coordinated meetings with parliamentarians and members of government as well as seminars at schools and churches, and high-profile media appearances all of which LIVELY headlined and used as a platform to promote strategies aimed at further depriving the LGBTI community of their basic human rights and remedies for violations thereof.

37.     On April 29, 2009, little more than one month after the Anti-Gay Conference at which LIVELY equated homosexuality with sexual violence against children, the Anti-Homosexuality Bill was introduced in the Ugandan Parliament.  The bill proposes the *death penalty* for crimes of "aggravated homosexuality," including for "repeat offenders" of "homosexuality."  Under the bill, adults who engaged in consensual sex with someone of the same gender could be executed.  Consistent with LIVELY's strategy espoused in the Anti-Gay Conference and elsewhere, the bill also proposed criminalizing LGBTI advocacy, as the "promotion of homosexuality."

38.     The April 2009 Anti-Homosexuality Bill was revised and expanded, and on October 14, 2009, Member of Parliament David BAHATI introduced the version of the bill that has been in play since then, which retains the punishment of death but expands the criminalization of association with or advocacy for LGBTI individuals.

LIVELY'S work was so effective that advocates of the bill routinely invoked concerns about protecting Ugandan children from rape and sexual violence.

39.     Subsequent to the Anti-Gay Conference and the introduction of the Bill, sensationalistic media outings became more frequent along with incendiary claims that LGBTI people posed a danger and threat to children, with one Ugandan tabloid calling to "Hang Them," resulting in repeated death threats against several of those named in the tabloid.

40.     Even without the Anti-Homosexuality Bill becoming law, the situation continued to escalate.  In 2012, for example, at least two gatherings of LGBTI advocates were raided and disbanded.

41.     Both raids were ordered by Uganda's current Minister of Ethics and Integrity Simon Lokodo who has also repeatedly threatened advocates with arrest for "promotion of homosexuality." On the occasion of a raid on February 14, 2012, Lokodo referred to the advocates as "terrorists." Subsequent to a June 2012 raid, Lokodo stated he ordered the raid and arrests of advocates so that "everybody else will know that at least in Uganda we have no room here for homosexuals and lesbians."

42.     Lokodo also announced that he had finalized arrangements to de-register 38 non-governmental organizations, including human rights and humanitarian organizations, on the basis that they also support LGBTI rights.

## The Conspiracy/Joint Criminal Enterprise to Commit Persecution
### A Group of Persons Acting with a Common Purpose

43.     LIVELY has worked extensively with key anti-gay political and religious leaders in Uganda with the overall purpose and objective of depriving LGBTI persons of

their fundamental rights, contributing intentionally to the commission of the crime of

persecution by a group of persons acting with that common purpose.

44.     Defendant LIVELY entered into an unlawful agreement with others to

intentionally and severely deprive persons of fundamental rights on the basis of their

sexual orientation and gender identity.  Among the key people with whom LIVELY has

worked in these efforts are Stephen LANGA, Martin SSEMPA, James BUTURO and

David BAHITI, all of whom have committed overt acts in furtherance of the conspiracy

which have resulted in the deprivation of Plaintiff's fundamental rights.

45.     With LIVELY, these persons, described more fully below, have formed

the core of the conspiracy and/or joint criminal enterprise in which they plotted, planned

and pursued the persecution of LGBTI persons in Uganda, though they have involved and

engaged with others who have also helped carry that mantle forward.

### Scott Lively

46.     LIVELY has worked and schemed with others in Uganda for at least the

past ten years, during which time he has aligned and plotted with the persons who would

eventually surface as key players and close associates in the anti-gay efforts and

persecution that continue to deprive LGBTI individuals of their fundamental rights and

put them in persistent danger of physical harm – in particular Stephen LANGA and

Martin SSEMPA.

Lively's Foundational Contributions to the Persecution Campaign

47.     In 2002, LIVELY traveled to Uganda twice – in March and in June – at

the behest of co-conspirator Stephen LANGA.  During both visits, he espoused and

promoted his theories about the purported dangerousness of the "gay movement" and its

strategic use of pornography as a way to soften society's resistance to the sexual anarchy he said the movement sought to impose.  He also promoted strategies, including censorship of LGBTI activists, to combat it.

48.     During his March 2002 visit, he spoke at length at a conference organized by LANGA about pornography and homosexuality because he views pornography as a distinctive tool of gay social engineering and as a "gateway into the 'gay' lifestyle."[11]

49.     In furtherance of their plan, LIVELY returned to Uganda in June 2002, to participate in additional speaking events and media appearances for organized by LANGA on the anti-gay/anti-porn topic.

50.     Also, during the June 2002 trip, LIVELY and LANGA held an all-day pastors' conference which was a "closed-door meeting with no media or guests who had not been specifically invited."  LIVELY did boast, however, that the pastors in attendance "were very grateful for the insights I was able to give them about the way in which America was brought low by homosexual activism. . . ."[12]

51.     LIVELY also addressed students at Nkumbe University, led a service at the Ugandan Christian University, and conducted a seminar for about 550 students and staff of local high schools where he again attributed dangerous effects of a "porn culture" exclusively to the gay movement.

52.     During LIVELY's June visit, LIVELY also met with the Kampala City Council and notes that they had a "very frank and profitable discussion" during which he

---

[11] *Redeeming the Rainbow, supra* note 7, at 60.
[12] Scott Lively, *Witness to Revival in Africa: A Report of the Ministry of Scott and Anne Lively in Uganda, Kenya and Egypt,* June 12-25, 2002, pp. 2-9. Available at http://www.defendthefamily.com/_docs/resources/3038513.pdf.

"offered a number of practical suggestions" for dealing with porn, including use of Uganda's "power of censorship."[13]

53.     All of these activities were planned and arranged by co-conspirator LANGA, in furtherance of their strategy to build an infrastructure or climate in Uganda in which they could promote and bring about the persecution of the LGBTI community.

54.     By the time of his 2002 visits to Uganda, LIVELY had already written his book, *The Pink Swastika: Homosexuality in the Nazi Party*, in which he argues that the Nazi movement – and its consequent horrors – was essentially a gay movement. He notes having spoken to others about the book and making it available in Uganda.

55.     LIVELY described his visits as very successful and as having made a deep impact among key actors in Uganda, in furtherance of his campaign.  Subsequent to the June 2002 trips, LIVELY maintained his relationship to LANGA, whom LIVELY refers to as his "ministry partner," and with co-conspirator Martin SSEMPA and continued to assist, promote, encourage and consult with them about ways to further their agenda to deny fundamental rights to the LGBTI-identified community.[14]

56.     Subsequent to the filing of the original complaint in this matter (ECF Doc. 1), defendant LIVELY has since further admitted that his activities during the 2002 visits made him instrumental in helping LANGA and SSEMPA launch Uganda's anti-gay movement and strategies.[15]

---

[13] *Id.*

[14] Scott Lively, *Report from Uganda: Comments about March 3-9 Pro-Family Mission to Uganda*, Mar.17, 2009, *available at* http://www.defendthefamily.com/pfrc/archives.php?id=2345952 (last visited Mar. 13, 2012) [hereinafter *Lively Report from Uganda*].

[15] Scott Lively Interview, Roadkill Radio, Apr. 17, 2012. [hereinafter "Roadkill Radio"]

Lively's Strategic Vision for the Persecution of LGBTI Persons

57.     After 2002, LIVELY deepened and expanded his anti-gay efforts internationally and continued to develop and refine strategies for promoting discrimination against LGBTI communities and stripping away their rights.

58.     In 2007, LIVELY published *Defend the Family: Activist Handbook* ("Activist Handbook").  It presents a comprehensive plan for building a multi-pronged attack to repress the "gay movement," by employing governmental, media and social spheres.  According to LIVELY, the *Activist Handbook* was written for activists in Latvia where LIVELY had co-founded Watchmen on the Walls – an organization LIVELY describes as a global coalition that coordinates "opposition to the international homosexual movement," through strategies designed to remove basic rights from gay, lesbian, bisexual, transgender, and intersex people – strategies which LIVELY believes could be applied anywhere.

59.     In *Activist Handbook,* LIVELY describes the "gay movement" as a "highly organized army of social engineers with a single purpose" and as "the most dangerous social and political movement of our time."[16]  It is with this characterization that he justifies, broadly promotes, and intends to provoke or bring about the denial of fundamental rights to LGBTI individuals.

60.     In 2009, LIVELY expanded upon the *Activist Handbook* when he published *Redeeming the Rainbow*.  Foremost among his strategies to overcome the "gay movement" is broad-based and systematic discrimination against people on the basis of sexual orientation and gender identity.[17]

---

[16]*Lively Activist Handbook*, *supra* note 5.
[17] *Redeeming the Rainbow*, *supra* note 7, at 6.

61.     LIVELY regularly characterizes efforts of the LGBTI community to advocate equal rights as a nefarious, conspiratorial movement.  For example, he characterized efforts in Moldova to guarantee equal rights for LGBT people as, "the first move of a secret plan by the homosexual powers of the EU to push an anti-discrimination law based on sexual orientation through the Moldovan government."[18] Heightening the hysteria around guaranteeing fundamental rights to gays and lesbians, LIVELY explained to audiences in Moldova: "I guarantee you, if this bill passes, all the evil that struck the European Union, the collapse, will come to the Republic of Moldova."[19]

62.     In Moldova, LIVELY also elaborated on why he believes it is important to deny gays and lesbians equal protection of the laws:

> What I know now, and have taught the Moldovans, is that the anti-discrimination law is the seed that contains the entire tree of the homosexual agenda, with all of its poisonous fruit. It is the cornerstone of their legal and political strategy, putting the power of the governement [sic] behind the legal premise that the practice of homosexuality deserves public approval and that opposition to homosexuality, including that which is rooted in the biblical world view, must be discouraged.[20]

63.     In his report of his activities in Moldova, defendant LIVELY also acknowledged the great lengths to which he went and the crucial role he played in defeat the non-discrimination legislation pending at time.[21] More recently, and subsequent to the filing of the original complaint in this matter, LIVELY has again admitted that his

---

[18] Scott Lively, *Moldova's Homosexual War Against the Family: Report from Moldova, March 3, 2011.* Originally published at http://noapologies.ca/daily-news/moldovas-homosexual-war-against-the-family (last accessed Mar. 6, 2012 and no longer available) [hereinafter "Report from Moldova"];  *See also*, Jim Burroway, *Scott Lively Warns of 'Outbreak of Homosexuality' in Moldova, Part of a 'Secret Plan by the Homosexual Powers of the EU*,' Box Turtle Bulletin (Mar. 6, 2011), http://www.boxturtlebulletin.com/2011/03/06/31159.
[19] *Id.*
[20] *Id.*
[21] *Report from Moldova, supra* note 18.

purpose in Moldova was not simply to speak his mind or preach his beliefs, but to ensure that LGBTI Moldovans were fair game for blatant discrimination - a success he again claimed he was instrumental in achieving.[22]

64.     LIVELY'S actions in Moldova, Latvia, Russia, Lithuania and elsewhere reveal that his role in Uganda was not an aberration or something that came about by accident but part of his much larger scheme to promote and help enshrine discrimination against LGBTI persons around the world, proudly boasting that he has traveled to over 40 countries to push his agenda.

65.     In *Redeeming the Rainbow,* LIVELY identifies two primary tactics to be used in disposing of "the gay movement:" (1) criminalize advocacy undertaken by LGBTI rights advocates; and (2) sound alarms about supposed dangers to children posed by gays and the gay movement, and conflate sexual violence against children with LGBTI orientation or identity.

66.     In a January 2010 press statement, LIVELY acknowledged that his 2009 efforts and "teachings in Uganda were drawn from" *Redeeming the Rainbow*.[23]

*Criminalizing Advocacy*

67.     LIVELY identified the need to silence advocacy by LGBTI individuals in *Redeeming the Rainbow*.[24]  As early as 2006, he had begun to advocate more forcefully in Uganda and elsewhere for the criminalization of advocacy, as necessary for silencing individuals who support the rights of LGBTI individuals.  As he advised allies in Russia in 2007:

---

[22] Scott Lively, CHRISTIAN RED ALERT, Scott Lively Ministries, July 9, 2012, http://www.scottlively.net/2012/07/09/christian-red-alert/.
[23] Press Statement, Defend the Family Int'l Endorses Revised Uganda Bill (Jan. 10, 2010), *available at* http://www.defendthefamily.com/pfrc/newsarchives.php?id=4331082.
[24] *Redeeming the Rainbow, supra* note 7, at 9.

[C]riminalize the public advocacy of homosexuality . . . [H]omosexuality is destructive to individuals and to society and it should never *[sic]* publicly promoted. The easiest way to discourage "gay pride" parades and other homosexual advocacy is to make such activity illegal…[25]

68.     LIVELY again emphasized the need to employ his strategy when he was in Uganda in 2009.  Thus, the Anti-Homosexuality Bill proposed shortly after the March 2009 Anti-Gay Conference would render Plaintiff's work and mere existence illegal. Clause 13 of the Bill would criminalize and jail anyone who:

(a)  participates in the production, procuring, marketing, broadcasting, disseminating, publishing of pornographic materials for the purposes of promoting homosexuality;

(b)  funds or sponsors homosexuality or other related activities;

(c)  offers premises and other related fixed or movable assets for purposes of homosexuality or promoting homosexuality;

(d)  uses electronic devices which include internet, films, mobile phones for purposes of homosexuality or promoting homosexuality and;

(e)  who acts as an accomplice or attempts to promote or in any way abets homosexuality and related practices.

69.     Clause 13, paragraph 2 of the bill would shut down a corporate body, business, association or non-governmental organization if guilty of any "promoting," and the director or proprietor would face imprisonment for seven years.

70.     Since the filing of the original complaint in this matter, defendant LIVELY has further reiterated that he is "against advocacy" and that "homosexuality should be criminalized" so that advocacy can be criminalized as well.[26]

---

[25] Scott Lively, *Letter to the Russian People*, Oct. 15, 2007, *available at* http://www.defendthefamily.com/pfrc/archives.php?id=5225300 (last visited May 9, 2012) (emphasis added).
[26] Roadkill Radio, *supra* note 16.

71.     As set forth in more detail below, even without the bill becoming law, government officials have criminalized the advocacy of Plaintiff and allied organizations and advocates, including raiding trainings, meetings and workshops, threatening arrests and banning of organizations.

*Conflating Gay Sexual Identity with Predilection for Child Sexual Violence*

72.     In *Redeeming the Rainbow*, LIVELY records what has been the most effective and chilling of his contributions to the persecution in Uganda – a tactic he himself directly employs as part of the broader campaign of persecution there: to attribute to gays the goal of "recruitment" of children and a corresponding predisposition toward rape and sexual violence toward children.

> Public sympathy for "gays" as victims is not grounded in logic, but in emotion. This is one reason why more women (who tend to be interested in emotional and relationship factors) than men embrace the "gay" cause. ... Long ago I stopped trying to educate pro-"gay" sympathizers about the unpleasant particulars of "gay" behavior, because it only made them angrier.
>
> ***An effective strategy is to emphasize the issue of homosexual recruitment of children****. The protection of children trumps any argument for "gays" as societal victims.* **Once parents and grandparents accept that recruitment of children is possible, they become interested in seeing all the evidence against the idea of "gay" legitimacy**...[27] (emphasis added)

73.     In Uganda, LIVELY combined and expanded upon this theme with repeated references to and descriptions of sexual violence against children.

74.     The premise of LIVELY'S most effective and most-used strategy has been shown to be utterly baseless and without merit. Not only is there no evidence of a connection between adult homosexuality and child molestation, studies have shown that

---

[27] *Redeeming the Rainbow, supra* note 7 at 113.

adult males who identify as gay are actually less likely to commit acts of child molestation than adult males who identify as heterosexual.[28]   Nevertheless, demonizing this community and spreading sensationalistic myths about the violent dangers posed by the LGBTI community was necessary to the campaign of persecution and to instill sufficient fear to justify wholesale denial of rights to this community.

The 2009 Anti-Gay Conference and Its Aftermath

75.      The Anti-Gay Conference was organized by Stephen LANGA, the long-time associate of LIVELY and Executive Director of the Family Life Network.  It was held from March 5-7, 2009, at the Kampala Triangle Hotel.  The Conference was attended by high-profile religious and government leaders, parliamentarians, police officers, teachers, and parents.

76.      To promote his campaign with LANGA, LIVELY wrote a blog while in Kampala for the Anti-Gay Conference in which he advertised that he was "teaching about the 'gay' agenda in churches, schools, colleges, community groups and in parliament."[29]

77.      He noted that his time there began with a meeting of about fifty members of the Ugandan Christian Lawyers Association, then an address to members of the Parliament the following morning with about "fifty to one hundred persons in attendance, including numerous legislators and the Minister of Ethics and Integrity [James BUTURO]."

78.      At one point during this trip, he met with members of Parliament for over four hours.

---

[28] *See, e.g.,* Jim Burroway, *Testing the Premise: Are Gays a Threat to Our Children?*, Box Turtle Bulletin (Oct. 16, 2006), *available at* http://www.boxturtlebulletin.com/Articles/000,002.pdf.
[29] *Lively Report from Uganda, supra* note 14.

79.     LIVELY notes that, at the Anti-Gay Conference, he gave a series of three lectures, lasting most of the day and also "had private conversations with several influential leaders."  He ended his week there with a strategy and brainstorming session with a small group of key Christian activist leaders.

80.     LIVELY was the headliner at the Anti-Gay Conference and told the audience that he had been focusing on the topic of the gay movement for more than twenty years.  As a result, he claimed, he knew "more about this than almost anyone in the world."[30]

81.     Among other things, LIVELY implemented his central strategy to conflate LGBTI orientation and identity with sexual violence against children and attribute criminal, violent behavior to LGBTI individuals throughout his lectures. He argued:

> There are a number of people that are very **predatory**; they are very sexually oriented, that want to satisfy their sexual desires. And, often these are people that were molested themselves.  And they're turning it around and they are **looking for other people to be able to prey upon, and that they, when they see a child that's from a broken home, it's like they have a flashing neon sign over their head**.

and

> Male homosexuality has historically been not adult to adult; it's been adult to teenager.  It's called pederasty… […]
> [a]nd uh, this is not uncommon.  And it's very common.  That's the thing; I was hearing testimonies last night at the meeting that I was in of people standing up and saying the height of homosexuality that um that is often, **that we are dealing with in Uganda is pederasty, adults sodomizing teenage boys**.[31]

82.     At the Anti-Gay conference, LIVELY attempted to substantiate his assertion about a gay propensity toward sexual violence toward children with

---

[30] Transcript of Seminar on Exposing the Homosexual Agenda, Uganda (Mar. 5-7, 2009) (on file with counsel).
[31] *Id*.

authoritative references to his book, *The Pink Swastika*.  He attributed the genocides in

Germany and Rwanda to "supermacho" gays and thereby insinuated that Uganda may be

subject to similar genocidal fates unless it followed his strategy for the eradication of

LGBTI identity and advocacy:

> The Nazis were super macho… the storm troopers, the ones that
> helped Hitler come to power, the ones that would go and smash
> windows, jack booted thugs. You also see them in prisons.  The
> super machos are very often **brutish, brutish, animalistic,** uh **men
> that want to hurt other people**.  You know, there is no mercy in
> them… Men having sex with boys and other men usually in some
> sort of aggressive way….
>
> Lastly, you have what I call the monsters… They are so far from
> normalcy that they're **killers**, they're **serial killers, mass
> murderers**. They're **sociopaths**. There's no mercy at all, there's no
> nurturing, no caring about anybody else. **This is the kind of
> person it takes to run a gas chamber or to do a mass murder -
> you know like the Rwandan stuff,** probably involved these
> guys.[32] (emphasis added)

83.     Subsequent to the strategy laid out in the Anti-Gay conference, and as set

forth below, LANGA, SSEMPA, BUTURO, and BAHATI began to sensationalize the

purported threat gays posed to children as the primary reason for suppressing the rights of

LGBTI individuals.

84.     Consistent with LIVELY's strategy, the association of gays with

sexualized violence against children is picked up and amplified by others that join the

cause, both in Parliament and among civil society.  Several newspapers seize this

message to begin campaigns to "out" LGBTI individuals and run sensationalistic

headlines about the supposed dangers gays present to Ugandan children.

---

[32] *Scott Lively Fanning Anti-Gay Flames in Uganda* (Video),
http://www.youtube.com/watch?v=BTcI6YssQ1w (last access May 9, 2012).

85.     Subsequent to the filing of the original complaint in this matter, LIVELY acknowledged that he returned to Uganda in 2009 to help the efforts to strengthen the laws and embolden the leaders of society "so that when the law came out they'd have an easier time" implementing it.[33]

86.     LIVELY also acknowledged reviewing and commenting upon the draft of the bill before it was introduced.[34]

87.     In particular, LIVELY has admitted to urging the extremely coercive inclusion of "conversion therapy" – an effort geared to forcing sexual orientation change that has been widely discredited as extremely harmful and ineffective and in some cases amounting to torture.[35]

88.     Shortly after the Conference, LIVELY wrote about the impact of his time in Uganda in provocative terms:

> [M]y host and ministry partner in Kampala, Stephen LANGA, was overjoyed with the results of our efforts and predicted confidently that the coming weeks would see significant improvement in the moral climate of the nation, and a massive increase in pro-family activism in every social sphere. He said that a respected observer of society in Kampala had told him that our campaign was like a nuclear bomb against the "gay" agenda in Uganda. I pray that this, and the predictions, are true.[36]

89.     LIVELY later stated, "I'm proud of that, and I hope the nuclear bomb spreads across the whole world, against the gay movement."[37]

---

[33] Roadkill Radio, May 10, 2012.
[34] *Id.*
[35] *Id.*
[36] *Lively Report from Uganda, supra* note 16.
[37] *Anti-Homosexual Bill in Uganda causes Global Uproar,* ABC News/Nightline *(*Mar. 10, 2010*),* http://abcnews.go.com/Nightline/anti-homosexuality-bill-uganda-global-uproar/story?id=10045436&page=3#.T1Vw3IePXw0.

90.    LIVELY has said he is honored to be considered the "father" of what he characterizes as Uganda's "pro-family movement."  But, he also attributes "real" fatherhood to his co-conspirator – *i.e.*, "my good friend Stephen LANGA who organized the first national pro-family conference there in 2002 of which I was the keynote speaker."[38]

91.    LIVELY has continued to use violent fear-mongering and take affirmative steps after the Anti-Gay Conference in order to sustain and build support inside Uganda to criminalize advocacy and eliminate fundamental human rights protections for LGBTI individuals.

92.    In February 2011, LIVELY wrote a blog piece entitled "Murdering Uganda" where he provocatively challenged Ugandans to fight back against the "rape" and "murder" of their culture by the "lavender Marxists," *i.e.*, LGBTI people who advocate for their rights.[39]

93.    By repeatedly characterizing the LGBTI community as rapists and murderers and child abusers – not to mention possessing the genocidal tendencies of the Nazis and Rwandan conspirators – LIVELY deliberately invited, induced and encouraged a proportional response from Ugandans – *i.e.*, severe repression, arrest and certainly even violence.

## Stephen Langa

94.    STEPHEN LANGA is Executive Director of the Family Life Network in Uganda, and Director of the Ugandan branch of the Arizona-based Disciple Nations

---

[38] Scott Lively, *Father of Uganda's Pro-Family Movement*, Jul. 6 2010, *available at* http://www.defendthefamily.com/pfrc/newsarchives.php?id=1310183 (last visited Mar. 13, 2012).
[39] Defend the Family International, *Murdering Uganda¸* Feb. 5, 2011, *available at* http://www.defendthefamily.com/pfrc/newsarchives.php?id=5422609 (last visited Mar. 13, 2012).

Alliance. LIVELY has referred to LANGA as his "good friend" and "ministry partner."[40]

Since 2002, LANGA has worked in concert with LIVELY and other co-conspirators

named in this Complaint on a campaign to systematically persecute LGBTI individuals

and deny them fundamental human rights by attempting to criminalize their advocacy and

their very status, denying them equality under the law and intimidating them from

participation in civic life.

95.     Following LIVELY's strategic direction, LANGA and LIVELY and

others accomplished this goal in concert by demonizing gays and lesbians, attributing to

them criminal propensities to recruit and sexually abuse children.

96.     As set forth above, LANGA in concert with LIVELY and other co-

conspirators, has played a key role in setting and implementing the anti-gay agenda in

Uganda.

97.     In 2004, LANGA launched the Uganda National Parents Network

because, according to LANGA, "children are indiscriminately exposed to pornography"

which he described as a "silent deadly virus" which he equated with homosexuality,

alleging that "the damaging effects are already evidence in many schools...

homosexuality and lesbianism are spreading like wild fire in schools."[41]

98.     In 2006, LANGA worked very closely with James BUTURO to beat back

a Commonwealth Initiative as part of an Equality Bill aimed at providing protections for

---

[40] *Id.*; *Lively Report from Uganda, supra* note 16; Scott Lively, *Witness to Revival in Africa: A Report of the Ministry of Scott and Anne Lively in Uganda, Kenya and Egypt*, June 12-25, 2002 (Abiding Truth Ministries 2002), *available at* http://www.defendthefamily.com/_docs/resources/3038513.pdf (last visited Mar. 13, 2012).

[41] Denis Ocwich, *Children Exposed to Pornography: Is Your Child Safe from Pornography?*, New Vision (Kampala) (Sept. 22, 2004), *available at* http://tg-media.blogspot.com/2004/09/children-exposed-to-pornography.html.

minorities, including LGBTI persons, and boasted about his influence and effectiveness in doing so.

99.     In December 2008, when the Ugandan High Court ruled in the case of *Victor Mukasa and Yvonne Oyo v. Attorney General* that two individuals who were victims of outrageous police conduct were entitled to have *rights*, including the right to privacy and freedom from unlawful search and arbitrary detention and cruel treatment, despite being cast as "homosexual," LANGA sounded the alarm.

100.     Within three months of this ruling, LANGA organized the March 2009 Anti-Gay Conference in Kampala.  The Anti-Gay Conference emerged in reaction to the prospect that LGBTI members might receive the protection of law for the most basic of rights.

101.     In organizing the Anti-Gay Conference, LANGA equated the basic protection of law with what he described nefariously as "the gay agenda – that whole hidden and dark agenda."[42]  LANGA ensured that LIVELY and his strategies would be prominently featured to defeat this "dark agenda" to secure human rights for LGBTI individuals.

102.     To open the Conference, LANGA stated that existing Ugandan law, which provides the possibility of life imprisonment for those convicted of homosexual acts, was not strong enough. In other words, he was advocating for penalties *tougher* than life imprisonment.  LANGA repeatedly referred throughout the conference to the *Mukasa* case as illustrating why the law was not strong enough.

---

[42]Jeffrey Gettleman, *Americans' Role Seen in Uganda Anti-Gay Push,* NY Times, Jan. 3, 2010, *available at* http://www.nytimes.com/2010/01/04/world/africa/04uganda.html?_r=1.

103.     LANGA, along with LIVELY, met with parliamentarians at length, in conjunction with the Anti-Gay Conference, as well as other political leaders, schools and churches. LANGA also organized a media blitz while LIVELY was in town and some of the proceedings from the conference were aired on national television.

104.     At the conclusion of the Conference, LANGA stated that participants at the meeting were moved by what he termed shocking and worrying revelations LIVELY made about the level of defilement and recruitment of school boys and girls into homosexuality and lesbianism.

105.     Immediately after the Anti-Gay Conference, LANGA called for urgent follow-up meetings which were held on March 15 and March 22, 2009.

106.     In the meetings, LANGA drew in large part from LIVELY'S book, *The Pink Swastika*, as well as LIVELY'S talks at the Conference and emphasized LIVELY'S theory about the violent and fascist tendencies of the "gay movement" and the danger it poses to children and society.  LANGA led participants in identifying strategies and goals to strengthen laws on homosexuality to fight the "gay agenda," including pressuring the government to stop any funding to promote equality and human rights in Uganda.

107.     Members of Parliament attended and actively participated at the strategy meetings.  Members openly stated that they were deeply alarmed and affected by LIVELY'S interventions and that he made it clear they needed to strengthen their laws along the lines suggested by LIVELY.

108.     On March 25, 2009, LANGA held a press conference that was aired live on local television stations and covered in the print media to agitate concerns over what he claimed were increasing levels of homosexuality, defilement and sexual harassment of

children and to warn that there were agents involved in recruiting children into homosexuality and lesbianism.

109.    On or about April 21, 2009, LANGA and a group of his anti-gay supporters marched on Parliament and met with Deputy Speaker of Parliament Rebecca Kadaga.  LANGA and his followers demanded the government conduct an investigation into private lives to determine the prominence and impact of homosexuality in Uganda and pass severe laws to punish people involved in acts of homosexuality.

110.    LANGA reportedly took offense that homosexuals had "continued to roam the country freely" even where "homosexuality is illegal according to the Constitution and Penal Code."[43]

111.    LANGA also reportedly pointed out that while same-sex marriage was prohibited, the act of officiating or assisting with such marriages had not been criminalized, but needed to be. Kadaga reportedly commended LANGA and his followers for their solidarity against homosexuality and agreed that Parliament would strengthen current legislation.[44]

112.    On April 29, 2009, Member of Parliament David BAHATI sought and obtained approval to table the legislation LANGA and LIVELY had been advocating for and assisting with. The draft of the legislation, entitled the Anti-Homosexuality Bill, reflected much of LIVELY'S theory and content from the sessions at the conference and associated meetings.

---

[43] *Uganda Government News: Civil Society Petitions Parliament Over Homosexuality Vice*, Ultimate Media, (Apr. 23, 2009, 9:33:06 AM), http://www.ugpulse.com/uganda-news/government/civil-society-petitions-parliament-over-homosexuality-vice/9749.aspx.
[44] *Id.*

113.    LANGA was present in the parliamentary session when BAHATI introduced the bill, and his presence, along with that of Martin SSEMPA, was noted by the speaker and other parliamentarians and is reflected in the official report of the session.[45]

114.    Promoting LIVELY's strategy of criminalizing advocacy, LANGA was quoted in the press as saying:  "Providing literature, writing books about it, standing up and saying it is OK – you should be arrested.  Even if you are not in the act, you should be arrested.  Anybody who tries to promote it should be arrested. That's why we need a stronger law."[46]

115.    On May 6, 2011, LANGA testified before the Legal and Parliamentary Affairs committee of the Ugandan Parliament in support of passage of the bill and reportedly told the committee members to have it "passed immediately in order to protect children from being violated by what he called homosexual promoters."[47] LANGA stressed that the Committee should not "listen to gays who say the new bill will abuse their human rights" because "homosexuality has never been a human right."[48]

116.    In September 6, 2011, LANGA, spearheading a combined effort of the Family Life Network and the Uganda Coalition for Moral Values, launched another campaign demanding passage of the Bill. This effort was simply called "Pass the BILL

---

[45] Initial Parliamentary discussion about Uganda's Anti-Homosexuality Bill 2009, Parliament House, Kampala, Uganda ( Apr. 29, 2009), *available at* http://wthrockmorton.com/initial-parliamentary-discussion-about-ugandas-anti-homosexuality-bill-2009/.
[46] Gwen Thompkins, *Taboos Silence Opponents of Uganda Anti-Gay Bill*, NPR (Dec. 16, 2009), *available at* http://www.npr.org/templates/story/story.php?storyId=121485018.
[47] *Uganda Parliament Starts Public Hearings on Anti Homosexuality Bill*, Welenformers (May 6, 2011). *available at* http://www.weinformers.net/2011/05/06/uganda-parliament-starts-public-hearings-on-anti-homosexuality-bill/.
[48] *Id*.

Now."  At the launch of the campaign, LANGA stated: "We sound a serious warning that

we will recall any MP who betrays our children, our people and our nation."[49]

117.    On February 7, 2012, the bill was introduced again in its original form,

and punishes consensual, adult homosexual activity with life imprisonment or death.

118.    Subsequent to the filing of the original complaint in this matter, LANGA

again used the purported danger to children as justification for their persecutory efforts:

> It is now approaching three years since we first raised an alarm and made public the molesting, defilement and recruitment of our children into homosexuality in schools and institutions of higher learning. To date, our children are still vulnerable and no tangible deterrent action has been put in place to safeguard them and the nation from the vice of homosexuality.[50]

## Martin Ssempa

119.    Martin SSEMPA is an anti-gay extremist activist, pastor and founder of

the Makerere Community Church in Kampala. As with LANGA, LIVELY has known

and worked in concert and coordination with SSEMPA at least since 2002, when

SSEMPA co-sponsored the conference at which LIVELY was the keynote speaker.

LIVELY then described him "as one of the leading media figures in the nation."[51]

120.    SSEMPA is known for employing forced outings, "homosexual

exorcisms," and showing graphic pornography to his church congregation as well as for

other controversial, vitriolic and threatening actions, in order to further his efforts to deny

the humanity of LGBTI individuals.

---

[49] *Parents Launch Bid to Pass Shelved Gays Bill,* Daily Monitor (Dec. 5, 2011), *available at* http://www.monitor.co.ug/News/National/-/688334/1230484/-/bjcqkmz/-/.
[50] Rodney Muhumuza, Uganda's Gays See Progress in Public Opinion War, The Associated Press, Mar. 20, 2012.
[51] *Lively Report from Uganda, supra* note 16.

121.     As early as 2003, SSEMPA was involved in building government policy to exclude LGBTI persons from HIV/AIDS prevention programs and policies.

122.     On or about August 16, 2007, LGBTI groups attempted to counter the mounting denials of their rights and increasing private and public harassment.  They held a press conference to launch a campaign entitled "Let Us Live in Peace."

123.     SSEMPA answered their plea to "live in peace" by organizing a rally on or about August 21, 2007, as "a call for action on behalf of victims of homosexuality."

124.     Minister of Ethics and Integrity James BUTURO addressed those in attendance at the rally to show his support and stated, "Must press freedom be used to subvert one of our cardinal founding laws (prohibition of homosexuality)?"[52]

125.     SSEMPA, who had previously testified before the U.S. Congress on the HIV/AIDS situation in Uganda as a Special Representative of First Lady Janet Museveni's Task Force on AIDS and whose church received HIV-prevention funding through the U.S. Plan for AIDS Relief program (PEPFAR), further declared at the rally that, "Homosexuals should absolutely *not* be included in Uganda's HIV/AIDS framework.  It is a crime, and when you are trying to stamp out a crime you don't include it in your programmes."[53]

126.     In conjunction with the August 21, 2007 rally, SSEMPA issued a statement on behalf of the rally organizers that was posted on a website listing Ugandan

---

[52] Katherine Roubos, *Uganda: Rally Denounces Homosexuality,* The Monitor (Aug. 22, 2007).
[53] *Uganda: State Homophobia Putting Gays at HIV risk,*  PlusNews (Aug. 24, 2007), *available at* http://www.plusnews.org/report.aspx?ReportID=73931.

LGBTI rights advocates by name, along with their photos and contact information and labeling them "homosexual promoters."[54]

127.     Following SSEMPA's public identification of the activists, officials of the Museveni government, including BUTURO, condemned the activists and demanded their arrest.

128.     The combination of the forced outings, naming of the activists with photos and contact information, and the calls for arrests of LGBTI people had its intended effect – it terrified the LGBTI community and forced many LGBTI-rights advocates into hiding.

129.     SSEMPA took part in the March 2009 Anti-Gay Conference and meetings that LANGA organized to showcase LIVELY and his strategies to eradicate the rights of the LGBTI community.

130.     SSEMPA further took part in the planning and strategizing around the effort to further criminalize sexual orientation and gender identity in the aftermath of the meetings, including the march on Parliament organized by Stephen LANGA on April 24, 2009, when they demanded an investigation into homosexual practices and strengthening the laws.

131.     On or about February 15, 2010, SSEMPA and two other pastors led demonstrations in the town of Jinja.  At the rally, SSEMPA again stressed that children in

---

[54] Human Rights Watch,  Letter to Congressional Caucus about US support for Ugandan Homophobia (Oct 12, 2007), *available at* http://www.hrw.org/news/2007/10/10/letter-congressional-caucus-about-us-support-ugandan-homophobia [hereinafter HRW Letter to Congress].

schools were the biggest victims of gay acts.  He told an angry crowd: "They are raped violently by bullies in the school."[55]

132.    In February 2010, SSEMPA began showing graphic gay pornography to those congregated at his church. By way of justification, he stated: "The major argument homosexuals have is that what people do in the privacy of their bedrooms is nobody's business but do you know what they do in their bedrooms?"[56]

133.    During this first screening of porn at the church, SSEMPA also railed against human rights organizations for attempting to "convert people to lesbianism."[57]

134.    In October 2010, SSEMPA was featured in an exclusive interview in *The Rolling Stone* newspaper issue that displayed photos of SEXUAL MINORITIES UGANDA Advocacy Officer David Kato under the banner "HANG THEM."

135.    The tabloid was started up by two students at Makerere University who were affiliated with SSEMPA and who are also believed to belong to his church.  They continued the "outing" practices begun by SSEMPA and the "pedophilia scare" strategies of LIVELY.

136.    The centerfold of the tabloid contained the large headline: "HANG THEM; THEY ARE AFTER OUR KIDS!!"

137.    SSEMPA gave an "exclusive" interview which was published in the issue in which he was quoted as saying, "We shall fight on until we rescue our country from the hands of evil… This war has just started."[58]

---

[55] Jim Burroway, *Despite Protest Ban, Hundreds of Ugandans Call for Killing Gays,* Box Turtle Bulletin (Feb. 16, 2010), *available at* http://www.boxturtlebulletin.com/2010/02/16/20320.
[56] *Uganda Pastor Screens Gay Porn In Church*, AFP (Feb. 17, 2010), *available at* http://www.google.com/hostednews/afp/article/ALeqM5hyJex4vkO1MYbS3sVu8PBYCml2Lg.
[57] *Id*.
[58] Rolling Stone Article, *supra* note 4.

138.    Subsequently, the tabloid published its November 1-8, 2010, issue which was also devoted to outing more "homos" and included their photos. The sub-headings on the cover page this time asserted: "Homosexuality Escalates Cases of HIV/AIDS, Gonorhea [sic] and Syphilis," "Sodomy Honchos Plot Downfall of Catholic-Founded Schools," and "Chilling Confession: 'Heartless Lesbians Destroyed My Life At Age 16'."

139.    When asked about SSEMPA'S involvement in the anti-gay campaigns, LIVELY responded that he thinks SSEMPA is a "good man – he's trying to protect all of the children of his country from being homosexualized."[59]

140.    In late 2010, LIVELY also acknowledged that he has used SSEMPA to communicate with the leadership in the Uganda Parliament about the Anti-Homosexuality Bill by channeling correspondence through him.

### James Nsaba Buturo

141.    James BUTURO served as President Museveni's Minister for Information and Broadcasting from 2001 until 2006, at which time he was appointed Minister for Ethics and Integrity in the Office of the Vice-President.

142.    BUTURO had been one of the most prominent anti-gay voices in the government of President Museveni by the time of the 2009 Anti-Gay Conference that showcased LIVELY and was closely allied with LANGA and SSEMPA in their combined efforts to eradicate "homosexuality" before and after the Conference.

143.    LIVELY met with BUTURO at length when he was in Uganda in March, 2009.[60] Subsequent to the filing of the original complaint in this matter, LIVELY again

---

[59] *Missionaries of Hate*, *supra* note 3.
[60] Lively Report from Uganda, supra n. 16.

acknowledged his interactions with BUTURO in March 2009 when they both addressed members of the Ugandan Parliament in the Assembly Hall.[61]

144.    BUTURO, who was Minister of Ethics and Integrity at the time, told those in attendance at the conference that he would be submitting a bill on homosexuality and that the government would not end at making laws against homosexuality but would further engage schools and churches in the fight against this vice.

145.    Subsequently, BUTURO raised publicly in the media the possibility of adding a clause providing for forced conversion therapy, a measure first advocated by LIVELY.

146.    Following LIVELY's goals of criminalizing advocacy, BUTURO has used his positions as Minister of Information and Broadcasting and Minister of Ethics and Integrity to silence and censor media relating to LGBTI advocacy, as well as to block access to other government services.

147.    In 2004, as Minister of Information, BUTURO warned the UN AIDS and the Uganda AIDS Commission against including LGBTI members and messaging in HIV/AIDS initiatives and mechanisms, stating that homosexual conduct was illegal in Uganda.[62]

148.    Also in 2004, BUTURO ordered police to "take appropriate action against" a gay organization that had allegedly started up at Makerere University.[63]

---

[61] Janet Mefferd Show, May 4, 2012.
[62] HRW Letter to Congress, *supra* note 54; *Uganda: Stuck in the Closet: Gays Left out of HIV/AIDS Strategy*, Plus News, Mar. 17, 2006, *available at* http://www.plusnews.org/report.aspx?reportid=39429 (last visited Mar. 13, 2012).
[63] Mwanguhya Charles Mpagi and Hussein Bogere, *Police Told to Probe MUK Gays*, The Monitor, Oct. 29, 2004.

149.    BUTURO also severely criticized the media in 2004 for misusing press freedom to "promote pornography," which he claimed "breeds homosexuality." [64]

150.    In October of 2007, as Minister of Ethics, in response to recommendations by the Commonwealth Peoples' Forum to better address issues of minority rights, including those of LGBTI persons, he asserted, "The Government shall do whatever it takes to block the spread of homosexuality. . . . They are trying to impose a strange, ungodly, unhealthy, unnatural, and immoral way of life on the rest of our society. I will endeavor to block it. I can assure you on that. Let them go to another country, and not here."[65]

151.    In December, 2010, as Minister of Ethics, he blocked a showing of a documentary about gay rights which was sponsored by the United Nations Office of the High Commission for Human Rights, the Uganda Human Rights Commission and the Human Rights Centre, Uganda. The film, which BUTURO labeled "promotion of homosexuality," depicted some of the difficulties in dealing with anti-gay discrimination in Uganda

152.    In 2007, as Minister of Ethics and Integrity, BUTURO announced that there would be work on a tough new law aimed at criminalizing the "promotion of homosexuality" and that the government was "interested in having catalogues of people we think are involved in perpetuating the vice of homosexuality."[66]

---

[64] *Id.*

[65] Conan Businge, *Buturo Vows to Fight Homosexuality,* African Viel (Oct. 8, 2007), http://72.249.167.221/~ndanjiv/index.php?option=com_content&view=article&id=1008:buturo-vows-to-fight-homosexuality&catid=62:uganda (last visited Mar. 13, 2012); *see also Uganda Ethics Minister Advises Gays to Leave the Country,* Rod 2.0 (Sept. 4, 2007), *available at* http://rodonline.typepad.com/rodonline/2007/09/uganda-ethics-m.html (last visited Mar. 13, 2012).

[66] Tough Anti-Gay Law Due, Interview by Alfred Wasike with Minister for Ethics and Integrity, James Nsaba Butro, Sunday Vision (Aug. 25, 2007),

153.    In response to the launch of the "Let Us Live in Peace" campaign initiated by LGBTI groups, BUTURO denied that there had been harassment of the LGBTI community, but stated "We know them, we have details of who they are."[67]

154.    BUTURO also expressed outrage that "homosexuals are working through the electronic and print media" and advised that the government would "not hesitate to deal with those we think are part of the conspiracy [to infiltrate the media]."[68]

155.    Subsequent to the March 2009 Anti-Gay Conference, BUTURO appeared in tandem with LANGA to continue advocating for laws to further suppress the rights of LGBTI individuals.

156.    In September 2010, BUTURO stated to press that, "the days of homosexuals are over."[69]

### David Bahati

157.    David BAHATI is a Member of Parliament from the district of Ndorwa West in Uganda and belongs to the National Resistance Movement, the ruling party of Uganda founded by President Museveni.

158.    BAHATI attended the 2009 Anti-Gay Conference and met at length with LIVELY, LANGA, SSEMPA, and BUTURO.

159.    Approximately one month after the Anti-Gay Conference, BAHATI introduced the Anti-Homosexuality Bill as a private member's bill after making a special motion to introduce the legislation, at which time the first draft of the bill was tabled.

---

http://sundayvision.co.ug/detail.php?mainNewsCategoryId=7&newsCategoryId=130&newsId=583179 (last visited Mar. 13, 2012) [hereinafter Butro Interview].
[67] HRW Letter to Congress, *supra* note 54.
[68] Buturo Interview, *supra* note 65.
[69] Anna Smith and Geof Magga, *Uganda's Anti-Pornography Law to Fight Homosexual Vice*, Afrik News, Sep. 8, 2010, *available at* http://www.afrik-news.com/article18213.html (last visited Mar. 13, 2012).

160.    BAHATI did so with the full support and encouragement of BUTURO, LANGA, LIVELY and SSEMPA.

161.    LIVELY continued to correspond with BAHATI subsequent to the introduction of the bill to advise on the contents of the legislation.

162.     Following LIVELY'S lead, and like LANGA, SSEMPA and BUTURO, BAHATI too has repeatedly justified the Bill on the basis of the need to protect children from sexual predation and recruitment, and thereby conflating sexual orientation with sexual violence.

163.    To justify the Anti-Homosexuality Bill, BAHATI presented an 11-year-old boy who had been raped and was present in the gallery.  BAHATI did not bother to discuss whether the alleged perpetrator was actually gay but assumed it for purposes of his presentation of the Bill. He went on to state:

> Reports of this nature have come out in the recent past and I know that for each [name of victim][70] we read about, there are thousands whose stories are unexposed and never make it to the headlines. Many people have been crying for our help and no more should we be silent about this creeping threat of homosexuality to our children and our families.[71]

164.    In December 2011, BAHATI stated:  "This is a defining bill for our country, for our generation. You are either anti-homosexual or you're for homosexuals, because there's no middle point. Anybody who does not believe that homosexuality is a crime is a sympathizer."[72]

---

[70] Victim's name has been omitted by Plaintiff in order to protect him from further exposure and traumatization.
[71] Parliament of Uganda, Hansard, *supra* note 2.
[72] Thompkins, *supra* note 39.

**Severe Deprivation of Fundamental Rights**
**By Reason of the Identity of the Group or Collectivity**

June 18, 2012 Raid and Banning of Organizations
that Support LGBTI Rights

165.    On June 18, 2012, Ugandan police raided a skills-building workshop for

LGBTI rights advocates from East Africa that was being held at the Esella Country Hotel

outside Kampala.

166.    The workshop was organized by the East and Horn of Africa Human

Rights Defenders Project and brought together approximately 20 defenders of LGBTI

rights from Uganda, Kenya, Tanzania and Rwanda.

167.    The workshop was intended to be a three-day event but was raided shortly

after it began.

168.    Advocates and workshop organizers, as well as some hotel staff guests,

were held in police custody for over three hours while police attempted to identify and

detain the participants.

169.    Three people associated with the group that organized the workshop and

three other workshop participants were additionally detained in a police bus for

approximately one hour.

170.    Frank Mugisha, Executive Director of SEXUAL MINORITIES

UGANDA, was the opening speaker at the workshop on the morning of the raid and other

staff of SEXUAL MINORITIES UGANDA were present at the workshop and detained

along with other participants.

171.    Ugandan Minister of Ethics and Integrity Simon Lokodo acknowledged

publicly that he was involved in the decision-making to raid the workshop and stated

afterward that the government was seeking to have LGBTI activists arrested so that "everybody else will know that at least in Uganda we have no room here for homosexuals and lesbians."[73]

172.     The raid of the workshop, the detention and threat of arrests were in violation of Plaintiff's rights to freedom of expression, assembly and association and to be free from arbitrary arrest and detention. The raid, detention and threat of arrest of Plaintiff's staff have also directly harmed and impaired Plaintiff's ability to carry out its purpose, as it has hindered its works and requires additional precautions in Plaintiff's attempts to exercise its rights and advocate on behalf of the LGBT community in Uganda.

173.     On June 20, 2012, Lokodo announced that he had finalized arrangements to de-register 38 non-governmental organizations, including humanitarian and human rights organizations, to prevent them from operating in Uganda for allegedly promoting and recruiting children into homosexuality.

174.     The Minister's announcement of the Government's intention to deregister these organizations has had a chilling effect on these organizations and has also harmed and impaired Plaintiff its ability to work with these organizations in Uganda to combat discrimination against LGBTI people because of their fear of being associated with the Plaintiff and LGBTI issues and being forced to shut down. The move has further isolated and stigmatized Plaintiff in its work.

175.     Plaintiff SEXUAL MINORITIES UGANDA has not even been permitted to register as an non-governmental organization in the first place, which has directly

---

[73] *Gay Activists to be Charged After Investigations*, NTV, June 19, 2012. Available at: https://www.youtube.com/watch?feature=player_embedded&v=JIZpU04i7eM.

impaired and harmed its efforts to carry it out it legitimate purpose to advocate on behalf of the rights of LGBTI people in Uganda, and to fundraise for resources necessary to achieve that purpose.

<u>February 14, 2012 Raid</u>

176.     On February 14, 2012, SEXUAL MINORITIES UGANDA and one of its member organizations, Freedom and Roam Uganda, were wrapping up a two-week conference on LGBTI issues that drew together approximately thirty  participants at the Imperial Resort Hotel in Entebbe, a major city in Central Uganda, approximately forty minutes from Kampala, the Capital.

177.     The conference was not advertised and was by invitation only.  Organizers had requested that the hotel employees not send anyone to the conference room unless previously approved.

178.     The conference was aimed at empowering members with essential life skills and provided training on leadership skills, self-improvement, and human rights advocacy.

179.     Around noon on February 14, 2012, during a session that was being facilitated by Dr. Hilda Tadria, co-founder of the African Women's Development Fund, the Minister of Ethics and Integrity, Simon Lokodo, accompanied by the police, entered the conference room and declared the meeting "illegal."

180.     Lokodo demanded to see conference materials and seized what was there.

181.     When the conference organizer, Kasha Jacqueline Nabagasera, challenged Lokodo on the illegality of his actions, he ordered that she be arrested.

182.     Nabagasera had to flee the hotel to avoid the unlawful arrest and feared for

her safety.

183.     Lokodo justified his actions by asserting that the association among gays

and lesbians was illegal and by equating LGBTI individuals with terrorists:

> We found out the meeting was being organized by people from
> within and without… They were recruiting people to go out and
> divulge the ideology of LGBT. In Uganda, the culture, tradition
> and laws do not support bestiality and lesbianism. They were
> illegally associating.[74]

> You should not allow people to plan the destruction of your
> country. You cannot allow terrorists to organize to destroy your
> country.[75]

184.     In a worrying sign of future persecution in Uganda, Lokodo threatened:

"In the past they were stoned to death.  In my own culture they are fired on by the firing

squad, because that is total perversion."[76]

185.     The raid of the workshop, the detention and threat of arrests were in

violation of Plaintiff's rights to freedom of expression, assembly and association and to

be free from arbitrary arrest and detention. The raid, detention and threat of arrest of

Plaintiff's staff have also directly harmed and impaired Plaintiff's ability to carry out its

purpose, as it must take additional precautions in attempting to exercise its rights and

advocate on behalf of the LGBT community in Uganda.

---

[74] David Smith, *Ugandan minister Shuts Down Gay Rights Conference,* The Guardian, Feb. 15. 2012, *available at* http://www.guardian.co.uk/world/2012/feb/15/ugandan-minister-gay-rights-conference?newsfeed=true.

[75] *Id.*

[76] Josh Kron, *Resentment Toward the West Bolsters Uganda's New Anti-Gay Bill*, NY Times, Feb. 28, 2012, *available at* http://www.nytimes.com/2012/02/29/world/africa/ugandan-lawmakers-push-anti-homosexuality-bill-again.html?_r=1&pagewanted=all.

June 4, 2008 Arrest of LGBTI Rights Activists
And Ongoing Exclusion from HIV/AIDS Education, Outreach and Services

186.    On June 4, 2008, three LGBTI rights activists were arrested as they were attempting to peacefully protest at the 2008 HIV/AIDS Implementers Meeting in Kampala against the policy of the Uganda AIDS Commission excluding LGBTI persons from the commission's programs.

187.    SEXUAL MINORITIES UGANDA staff member Pepe Onziema and Val Kalende, a founding member of Freedom and Roam Uganda, were arrested and charged with trespass even though they had been invited to the meeting and hosts provided accreditation. The activists were detained for two days and then released on bail.

188.    While detained, Onziema's clothing was forcibly removed, and an officer touched Onziema's genitals "for confirmation."[77]

189.    The arrest of Plaintiff's staff member and staff of its constituent organization was in violation of the right to freedom of expression, assembly and association. The arrests of and harm done to its staff directly impaired and harmed Plaintiff in its ability to carry out its purpose and to advocate for the right to health and non-discrimination in the Government of Uganda's HIV/AIDS policies and practices.

190.    The advocates were trying to raise awareness about the discrimination against LGBTI persons inherent in Uganda's HIV/AIDS program in the wake of public comments by Director General of the Uganda AIDS Commission. Kihumuro Apuuli, who had stated "gays are one of the drivers of HIV in Uganda, but because of meagre resources we cannot direct our programmes at them at this time."

---

[77] Glenna Gordon, *Being Gay in Uganda: One Couple's Story,* Time World, Mar. 8, 2010, *available at* http://www.time.com/time/world/article/0,8599,1969667,00.html.

191.    Apuuli's comments were consistent with previous statements by a Uganda AIDS Commission spokesperson, who stated "There's no mention of gays and lesbians in the national strategic framework, because the practice of homosexuality is illegal."[78]

192.    Apuuli's statements followed those of Martin SSEMPA and James BUTURO the year before when they stated that because homosexuality was evil, state HIV/AIDS programs would not be available to them.

193.    The exclusion from the Government's HIV/AIDS policies and practices constitutes a violation of the right of LGBTI people to be free from discrimination, and a violation of the right to health.

Threats to Criminalize and Shut Down Health Services for LGBTI Persons

194.    Because of the exclusion of LGBTI people from the national HIV/AIDS strategies and rampant discrimination and fears of attacks, Plaintiff's staff  have had to devote time and resources to assisting HIV-positive LGBTI persons in crisis with finding appropriate medical care, housing and needed resources. The government's discriminatory policies and practices have directly impacted and harmed Plaintiff in its ability to carry out its mission as it has had to endeavor to help meet the needs of LGBTI persons seeking assistance.

195.    In light of the ongoing discrimination and stigma, in May 2012, Sexual Minorities Uganda staff and a member organization undertook efforts to open a health clinic for LGBTI people in Kampala to provide testing, counseling and treatment for HIV/AIDS and other sexually transmitted infections.

196.    The location of the clinic has not been made public due to fears of attacks by government actors and members of the general public.

---

[78] *Uganda: Stuck in the Closet, supra* note 60.

197.     On July 11, 2012, Minister of Ethics and Integrity Lokodo told a news agency that he intends to investigate the clinic for "promoting homosexuality:"

> If we find out that [the clinic is] related to promoting the culture which doesn't conform to our morals as a country, we shall instantly ban and close it. These people [LGBTI] are doing their operations under cover – it's not easy to track them. However, we shall not allow any social gathering, association, infrastructure or any activities that exist to promote homosexuality.[79]

198.     The blatant discrimination by the government in its HIV/AIDS strategies has directly impacted and harmed Plaintiff in that it has had to devote resources and time to assisting HIV-positive LGBTI persons in finding necessary medical assistance, and in supporting the work of a medical clinic which must operate under cover and in screening and referrals so that the location can remain secret and try to avoid arbitrary and discriminatory closure by Government officials.

### 2007 Crack-down on Media, Advocacy and Threats of Arrest

199.     On August 16, 2007, SEXUAL MINORITIES UGANDA and its member organizations held a press conference where they launched their "Let Us Live in Peace" campaign, seeking to counter the pervasive and virulent messaging about LGBTI people spouted by the likes of LIVELY, LANGA, SSEMPA, and BUTURO.

200.     Less than a week later, Deputy Attorney General Fred Ruhindi called upon "the relevant agencies to take appropriate action because homosexuality is an offence under the laws of Uganda. The penal code in no uncertain terms punishes homosexuality and other unnatural offenses."[80]

---

[79] *Uganda: New LGBTI Clinic Faces Fierce Government Criticism,* IRN Plus News, July 11, 2012. Available at: http://www.plusnews.org/Report/95844/UGANDA-New-LGBTI-clinic-faces-fierce-government-criticism#.T_2PClZ_p4k.facebook.
[80] HRW Letter to Congress, *supra* note 54.

201.    Minister of Ethics and Integrity BUTURO also stated that the government was "considering changing the laws so that promotion itself becomes a crime" and to have "catalogues of people we think are involved in perpetuating the vice of homosexuality."

202.    Martin SSEMPA called the "Let Us Live in Peace" campaign "a well-orchestrated effort by homosexuals to intimidate the government" and organized an anti-gay rally which was held on August 21, 2007, and which BUTURO joined to show his support.

203.    SSEMPA demanded stronger government actions against LGBTI people and called homosexual conduct "a criminal act against the laws of nature."

204.    In connection with the rally, SSEMPA released "The Official Statement of Inter Faith, Culture and Family Coalition Against Homosexuality in Uganda to the Uganda Government," which listed Uganda LGBTI rights activists by name and posted their photos and contact information and labeled them "homosexual promoters."[81]

205.    In August 2007, the Ugandan Broadcasting Council suspended Gaetano Kaggwa, the manager of Capital FM radio station, for interviewing a lesbian activist on air.  The Council alleged a violation of "minimum broadcasting standards" for unacceptable language used by the activist.[82]

206.    On September 9, 2007, the *Red Pepper* also published names and photos of LGBTI activists with the headline on the cover that stated "Homo Terror! We Name and Shame the Top Gays in the City."[83]

---

[81] *Id.*
[82] *Id.*
[83] *Id.*

207.    In the wake of the onslaught of outings, calls for harsher tactics on the part of the government, and information that police were actively looking for gay rights activists, a number of activists, including current SEXUAL MINORITIES UGANDA Executive Director Frank Mugisha, were forced to leave the country or go into hiding.

208.    As a result, the crackdown and ongoing discrimination, harassment and persecution have directly harmed the Plaintiff in its ability to carry out its purpose to advocate on behalf of the rights of LGBTI people in Uganda.

<u>2005 Raid of Activist's Home</u>

209.    As described above, on July 20, 2005, local Ugandan authorities unlawfully forced their way into the home of Victor Mukasa, a transgender activist and founding member of SEXUAL MINORITIES UGANDA.

210.    Mukasa was not present at the residence when authorities arrived, but they arrested his guest Yvonne Oyo and seized a number of documents and hard copy and electronic files.

211.    Oyo was then taken to the police station where she was forced to urinate on herself and then to strip naked in front of the male authorities to "prove her sex." She was then assaulted when they touched and fondled her breasts.  Eventually, Oyo was released the same day and no charges were ever filed against either Mukasa or Oyo.

212.    The raid of Mukasa's home took place only two weeks after an article ran in the July 6, 2005 edition of the state-owned newspaper, *New Vision*, urging that "[t]he police should visit the holes *[sic]* mentioned in the press, spy on the perverts, arrest and prosecute them. Relevant government departments must outlaw or restrict websites,

magazines, newspapers and television channels promoting immorality -- including homosexuality, lesbianism, pornography, etc."

213.    Plaintiff was directly harmed by the blatant violation of the rights of Mukasa, a founder and staff member of Sexual Minorities Uganda, and Oyo. Plaintiff was additionally harmed in that it was diverted from its work and was forced to assist in seeking redress and accountability for the violations and find ways of addressing the government harassment in the meantime.

214.    As the court case set the stage for the intensification of the war against the LGBTI community previously declared by SSEMPA, LANGA, LIVELY and BUTURO, leading to the emergency Anti-Gay Conference hastily organized by LANGA to develop strategies for ensuring that LGBTI persons would not be able to assert such basic rights, Plaintiff has been additionally harmed and impaired in its ability to carry out its purpose to advocate on behalf of LGBTI people in Uganda, in having to devote substantial time and resources to addressing the resulting and continuing crisis arising out of the conspirators' efforts to ensure LGBTI persons would not be beneficiaries along with everyone else of basic human rights.

<u>Arbitrary Interference with Privacy,</u>
<u>and Attacks Upon Honor and Reputation</u>

215.    The combination of anti-gay forces within and outside government have created a culture of impunity upon which different media representatives have been able to capitalize.

216.    Frequent and sensationalistic outings of LGBTI persons as well as lurid and sensationalistic stories about LGBTI rights activists, along with photos and information about their residences, have contributed to the climate.  The "outing" tactic

by newspapers has helped to escalate exponentially the degradation, intimidation and fear that SSEMPA's "outings" had initiated months earlier.

217.    The Uganda tabloid, the *Red Pepper*, has continuously run stories that signal alarm about the supposed dangers posed by LGBTI people to Uganda:

a)   In 2007, after Martin SSEMPA posted the names, photos and contact information of LGBTI activists, the *Red Pepper* followed suit in the September 9, 2007 issue with a cover stating "Homo Terror! We Name and Shame the Top Gays in the City."

b)   On April 19, 2009, ten days before the first draft of the Anti-Homosexuality Bill was introduced, the cover of the *Red Pepper* claimed "TOP HOMOS IN UGANDA NAMED."

c)   On April 26, 2009, the cover of the *Red Pepper* declared "MORE HOMOS IN UGANDA NAMED."  In this issue, the tabloid included coverage of Stephen LANGA'S press conference where he supposedly "outed" a rival catholic priest.

d)   On April 27, 2009, the cover headline was: "HOMOS WANT TO KILL ME: Sodomy Whistle-Blower Gets Death Threats, Wants To Flee Country."  This issue also covered another press conference organized by LANGA.

e)   On June 18, 2009, the *Red Pepper* ran a story entitled "Homos Invade Schools."

218.    As described above, in October 2010, a new Ugandan tabloid associated with SSEMPA, the *Rolling Stone*, was published.  It contained the most explicit call to

violence that had been made in a newspaper to that point, including a call to "HANG

THEM" – next to a picture of SEXUAL MINORITIES UGANDA Advocacy Director

David Kato. The paper published the names, identifying information and photos of

LGBTI rights activists, including Pepe Onziema, another SEXUAL MINORITIES

UGANDA staff member, and Kasha Jacqueline Nabagasera, director of Freedom and

Roam.

219.    Below the headlines, were sub-headlines that stated "We Shall Recruit

1000,000 *[sic]* Innocent Kids by 2012 – Homos" and "Parents Now Face Heart-breaks

As Homos Raid Schools."  The centerfold of the tabloid contained the large headline:

"HANG THEM; THEY ARE AFTER OUR KIDS!!"

220.    Kato, Onziema and Nabagasera and others named in the tabloid received

death threats and harassment subsequent to the release.

221.    In January 2011, the High Court issued a permanent injunction preventing

the newspaper from identifying LGBTI persons and ordering the tabloid to pay damages

to the plaintiffs. Kato, Onziema and Nabagasera continued to receive death threats.

222.    Kato was killed in his home, just over one year ago, on January 26, 2011.

223.    Plaintiff SEXUAL MINORITIES UGANDA has been directly harmed in

that its staff have been publicly identified and their contact details made public, have

been threatened, harassed and assaulted and at times have had to re-locate and/or go into

hiding.

224.    Plaintiff has had to seek out and obtain at various times the services of

security personnel and take additional security measures for its premises, and at times has

had to relocate its offices or operations, as have its member organizations. All of which

has served to impair and harm Plaintiff in its ability to carry its purpose to advocate on behalf of LGBTI people in Uganda.

225.    Plaintiff has additionally suffered harm to its standing and reputation in the community.

Invidious Discrimination

226.    The combination of legal proscriptions against and criminalization of homosexuality, along with discriminatory policies and practices relating to government services, media outings and statements and policies of government officials and their non-governmental counterparts have served to create a climate of hostility and prejudice against LGBTI persons in Uganda, that contributes to and reinforces discrimination by private actors in housing, employment, health and education.

227.    SEXUAL MINORITIES UGANDA has also had to devote a substantial amount of time and resources to assisting LGBTI persons who have been arbitrarily arrested and harassed and/or mistreated by the police, including responding to urgent calls about arrests or harassment and arranging for legal representation and advocating on their behalf.

228.    SEXUAL MINORITIES UGANDA has also been harmed and impaired in its mission as it has expended substantial time and resources in helping LGBTI persons to find safe places for them to reside in emergent situations, and also in assisting when LGBTI persons have been forcibly evicted from their homes by landlords who suspect them of being homosexual, as well as assisting those persons who have fled the persecution and seek asylum in other countries.

**GENERAL ALLEGATIONS**
**COMMON TO ALL COUNTS**

229.    Plaintiff re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 228 of this Complaint as if the same were fully set forth herein.

230.    Plaintiff, its member organizations, and their staff members suffered severe deprivations of fundamental rights, including the rights to:

-       equality and non-discrimination;

-       freedom of expression, association, assembly, and the press;

-       to be free from arbitrary arrest and detention;

-       to be free from torture, and other cruel, inhuman and degrading treatment;

-       the right to respect for human dignity;

-       the right to privacy of the person and home;

-       to be free from attacks upon one's honor and reputation;

231.    These deprivations of Plaintiff's fundamental rights were severe.

232.    Plaintiff, its member organizations, and staff were deprived of these rights on the basis of gender and/or sexual orientation and gender identity.

233.    The actions and/or omissions of Defendant were intentional.

234.    The actions and/or omissions of Defendant were committed as part of a widespread or systematic attack against a civilian population and were committed with knowledge of the attack.

235.    The conduct alleged violates customary international law and is actionable under the Alien Tort Statute.

**FIRST CLAIM FOR RELIEF**
**Crime Against Humanity of Persecution: Individual Responsibility**

236.    Plaintiff re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 235 of this Complaint as if the same were fully set forth herein.

237.    Defendant is liable for the aforementioned severe deprivation of Plaintiff's fundamental rights on the basis of gender and/or sexual orientation and gender identity in that he committed, solicited, and/or induced the commission or attempted commission of the crime of persecution.

238.    Defendant is further liable for the aforementioned severe deprivation of Plaintiff's fundamental rights on the basis of gender and/or sexual orientation and gender identity in that, for purposes of facilitating the commission or attempted commission of the crime of persecution, he aided, abetted or otherwise assisted in the commission or attempted commission of the crime, including by providing the means for its commission.

239.    As a result of Defendant's actions and/or omissions, Plaintiff, its member organizations, and staff members have suffered damages as a result in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF
### Crime Against Humanity of Persecution: Joint Criminal Enterprise

240.    Plaintiff re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 239 of this Complaint as if the same were fully set forth herein.

241.    Defendant is liable for the aforementioned severe deprivation of fundamental rights on the basis of gender and/or sexual orientation and gender identity in that he contributed to the commission or attempted commission of the crime of persecution by a group of persons acting with a common purpose, including Stephen LANGA, Martin SSEMPA, James BUTURO and David BAHATI.

242.    Defendant's contributions to the joint criminal enterprise were intentional and made with the aim of furthering the criminal activity or criminal purpose of the group comprised of LANGA, SSEMPA, BUTURO and BAHATI.

243.    The criminal activity or criminal purpose of the group of persons acting as alleged herein involved the commission of the crime of persecution, *i.e*., the intentional and severe deprivation of Plaintiff's fundamental rights, contrary to international law, by reason of the identity of the group or collectivity.

244.    Defendant's contribution to the joint criminal enterprise was made in the knowledge of the intention of the group to commit the crime of persecution, *i.e.*, to intentionally and severely deprive the group or collectivity of their fundamental rights on the basis of their gender and/or sexual orientation and gender identity.

245.    As a result of Defendant's actions and/or omissions, Plaintiff, its member organizations, and staff persons have suffered damages as a result in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF
### Crime Against Humanity of Persecution: Conspiracy

246.    Plaintiff re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 245 of this Complaint as if the same were fully set forth herein.

247.    Defendant is liable for the severe deprivation of fundamental rights on the basis of gender and/or sexual orientation and gender identity in that he conspired with others to commit the unlawful act of persecution.

248.    The Defendant entered into an unlawful agreement with LANGA, SSEMPA, BUTURO and BAHATI knowing that the goal of the conspiracy was to

severely deprive persons of fundamental rights on the basis of their gender and/or sexual orientation and gender identity and intended to help accomplish that end.

249.    Defendant and/or his co-conspirators LANGA, SSEMPA, BUTURO and BAHATI made overt acts in furtherance of the agreement or conspiracy and caused the deprivation of Plaintiff's fundamental rights alleged herein.

250.    As a result of Defendant's actions and/or omissions, Plaintiff, its member organizations, and staff persons have suffered damages as a result in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF
### Civil Conspiracy

251.    Plaintiff re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 250 of this Complaint as if the same were fully set forth herein.

252.    LIVELY and his co-conspirators LANGA, SSEMPA, BUTURO and BAHATI, acted in unison and, in doing so, exercised a peculiar power of coercion over the Plaintiff that they would not have had if they had acted alone.

253.    As described above, LIVELY and his co-conspirators combined to accomplish an unlawful purpose or other purpose by unlawful means.

254.    The actions of LIVELY and his co-conspirators described above have been willful and/or knowing at all times relevant hereto.

255.    The Defendant's actions along with those of his co-conspirators constitute a civil conspiracy which employed unlawful conduct or combined to accomplish an unlawful purpose which caused damage to Plaintiff.

256.    As a direct and proximate result of Defendant's actions and/or omissions in concert with his co-conspirators, Plaintiff, its member organizations and staff persons

have suffered, and continue to suffer, damages as a result in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF
### Negligence

257.    Plaintiff re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 256 of this Complaint as if the same were fully set forth herein.

258.    Defendant, through his aforementioned acts and omissions, created a dangerous situation for Plaintiff, its member organizations and staff members in creating a virulently hostile environment and in consulting and working with his co-conspirators to severely deprive Plaintiff, and the LGBTI community in Uganda, of basic fundamental rights.

259.    Defendant owed a duty to Plaintiff to prevent harm from the dangerous situation he created, whether he created the situation intentionally or negligently.

260.    Defendant breached the duty he owed to Plaintiff in failing to prevent harm resulting from the situation he created.

261.    As a direct and proximate result of Defendant's actions and/or omissions in concert with his co-conspirators, Plaintiff, its member organizations and staff persons have suffered, and continue to suffer, severe harm.

262.    Defendant's conduct constitutes negligence and Plaintiff is entitled to compensatory and punitive damages in amounts to be ascertained at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

a.   For compensatory damages in an amount to be proven at trial;

b.   For punitive and exemplary damages in an amount to be proven at trial;

c.  For reasonable attorneys' fees and costs of suit;

d.  For a declaratory judgment holding that Defendant's conduct was in violation of the law of nations;

e.  For injunctive relief enjoining the Defendant from undertaking further actions, and from plotting and conspiring with others, to persecute Plaintiff and the LGBTI community in Uganda on the basis of their sexual orientation and gender identity, and strip away and/or severely deprive Plaintiff and LGBTI community in Uganda of fundamental rights, including the rights to freedom of expression, association and assembly, to be free from torture and other cruel, inhuman and degrading treatment, and arbitrary arrest and detention;

f.  For all such other and further relief as the Court may deem just and proper.

A jury trial is demanded on all issues.


Dated: July 13, 2012                                   Respectfully submitted,


                                                       /s/Pamela Spees
                                                       Pamela C. Spees
                                                       *Admitted Pro Hac Vice*
Luke Ryan                                              Baher Azmy
(Bar No. 664999)                                       *Admitted Pro Hac Vice*
100 Main Street, Third Floor                           Center for Constitutional Rights
Northampton, MA 01060                                  666 Broadway, 7th Floor
Tel. (413) 586-4800                                    New York, NY  10012
Fax (413) 582-6419                                     212-614-6431 - Phone
lryan@strhlaw.com                                      212-614-6499 - Fax
                                                       pspees@ccrjustice.org
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing was filed electronically, that it will be served electronically upon all parties of record who are registered CM/ECF participants via the NEF, and that paper copies will be sent to any parties indicated on the NEF as non registered participants on July 13, 2012.

/s/Pamela Spees
Pamela Spees
Counsel for Plaintiff