## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| **SEXUAL MINORITIES UGANDA,** | **:** | **CIVIL ACTION** |
| | **:** | |
| **Plaintiff,** | **:** | **3:12-CV-30051-MAP** |
| | **:** | |
| **v.** | **:** | **JUDGE MICHAEL A. PONSOR** |
| | **:** | |
| **SCOTT LIVELY,** | **:** | **ORAL ARGUMENT REQUESTED** |
| | **:** | |
| **Defendant.** | **:** | **LEAVE TO FILE GRANTED 8/10/2012** |

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT SCOTT LIVELY'S
## MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

BACKGROUND FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

    A.     SMUG AND ITS CLAIMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . .   2

    B.     THE PERSECUTION ALLEGED BY SMUG. . . . . . . . . . . . . . . . . . . . . . . . .   4

    C.      THE ALLEGED "CONSPIRACY" BY MR. LIVELY. . . . . . . . . . . . . . . . . .   8

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

LAW AND ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

  I.    THE STANDARD FOR DISMISSAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

  II.   SMUG HAS FAILED TO STATE A CLAIM BECAUSE MR. LIVELY'S SPEECH
      AND "CONDUCT" ARE PROTECTED BY THE FIRST AMENDMENT . . . . . . . .   17

    A.     AS A UNITED STATES CITIZEN, MR. LIVELY HAS A FUNDAMENTAL
           RIGHT UNDER THE FIRST AMENDMENT TO ENGAGE IN NON-
           VIOLENT POLITICAL SPEECH ANYWHERE IN THE WORLD . . . . . . .   18

    B.     THE FIRST AMENDMENT TRUMPS "INTERNATIONAL LAW" AND IS
           NOT SUBSERVIENT TO IT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

    C.     MR. LIVELY'S NON-VIOLENT POLITICAL SPEECH OR "CONDUCT"
           IS PROTECTED BY THE FIRST AMENDMENT . . . . . . . . . . . . . . . . . . . . .   20

        1.     Mr. Lively's Opinions and Non-Violent Political Speech Regarding
             Homosexuals and Homosexuality are Fully Protected . . . . . . . . . . . . . .   21

        2.     SMUG has not Alleged any Actionable Conduct . . . . . . . . . . . . . . . . . .   23

  III.  THIS COURT LACKS SUBJECT-MATTER JURISDICTION BECAUSE
      SMUG HAS NOT ALLEGED CONDUCT IN VIOLATION OF
      UNIVERSALLY ACCEPTED AND CLEARLY DEFINED INTERNATIONAL
      LEGAL NORMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27

    A.     SMUG CANNOT ESTABLISH THAT THE TORT OF PERSECUTION IS
           UNIVERSALLY ACCEPTED AND CLEARLY DEFINED, BECAUSE THE
           ROME STATUTE IS A TREATY, NOT A NORM, AND WAS
           EXPRESSLY REJECTED BY THE UNITED STATES . . . . . . . . . . . . . . . . .   28

B.      SMUG CANNOT ESTABLISH THAT PROHIBITION OF PERSECUTION BASED ON SEXUAL ORIENTATION AND TRANSGENDER IDENTITY IS UNIVERSALLY ACCEPTED AND CLEARLY DEFINED . . . . . . . . . . . .     29

IV.  SMUG'S CLAIM FOR PERSECUTION FAILS TO STATE A CAUSE OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     36

A.      MR. LIVELY'S PROTECTED POLITICAL SPEECH IS NOT "PERSECUTION" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     37

B.      SMUG CANNOT STATE A CLAIM FOR PERSECUTION IN ITS OWN RIGHT, BECAUSE IT IS AN ORGANIZATION, NOT AN INDIVIDUAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     40

C.      SMUG HAS FAILED TO PLEAD AN ESSENTIAL ELEMENT OF PERSECUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     42

D.      SMUG CANNOT STATE A CLAIM FOR PERSECUTION BECAUSE MR. LIVELY IS NOT A STATE ACTOR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     45

E.      SMUG HAS NOT ALLEGED THAT MR. LIVELY HIMSELF COMMITTED ANY ACTS OF PERSECUTION . . . . . . . . . . . . . . . . . . . . . . .     48

V.   SMUG'S CLAIM FOR AIDING AND ABETTING PERSECUTION FAILS TO STATE A CLAIM BECAUSE PLAINTIFF HAS NOT ALLEGED THE REQUIRED ELEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     49

A.      SMUG FAILS TO ALLEGE ANY CONDUCT THAT CONSTITUTES AIDING AND ABETTING PERSECUTION . . . . . . . . . . . . . . . . . . . . . . . .     50

B.      SMUG'S CONCLUSORY ALLEGATIONS FAIL TO PLEAD THE REQUISITE INTENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     55

VI.  SMUG'S CLAIM FOR CONSPIRACY TO PERSECUTE FAILS BOTH BECAUSE THE COURT LACKS SUBJECT-MATTER JURISDICTION AND BECAUSE SMUG FAILS TO STATE A CAUSE OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . .     57

A.      THE COURT DOES NOT HAVE SUBJECT-MATTER JURISDICTION OVER SMUG'S CONSPIRACY CLAIM BECAUSE CONSPIRACY LIABILITY IS NOT UNIVERSALLY RECOGNIZED AND CLEARLY DEFINED UNDER INTERNATIONAL LAW . . . . . . . . . . . . . . . . . . . . . . .     58

B.      SMUG'S CLAIM FOR CONSPIRACY TO PERSECUTE FAILS TO STATE A CAUSE OF ACTION BECAUSE SMUG FAILS TO ALLEGE THE REQUISITE *MENS REA* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     61

VII.  SMUG'S CLAIM FOR JOINT CRIMINAL ENTERPRISE SHOULD BE
      DISMISSED FOR LACK OF SUBJECT-MATTER JURISDICTION AND
      FAILURE TO STATE A CAUSE OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   62

VIII. SMUG'S STATE LAW CLAIMS ARE TIME-BARRED AND FAIL TO STATE
      COGNIZABLE CLAIMS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   64

      A.      SMUG'S STATE LAW CLAIMS ARE TIME-BARRED . . . . . . . . . . . . . . . .   64

              1.      SMUG's Civil Conspiracy Claim is Time-Barred . . . . . . . . . . . . . . . .   65

              2.      SMUG's Negligence Claim is Time-Barred . . . . . . . . . . . . . . . . . . . . . .   68

      B.      SMUG'S STATE LAW CLAIMS FAIL UNDER UGANDA LAW . . . . . . . . .   69

      C.      SMUG FAILS TO STATE A CLAIM FOR CIVIL CONSPIRACY OR
              NEGLIGENCE UNDER MASSACHUSETTS LAW . . . . . . . . . . . . . . . . . . . .   70

IX.   SMUG LACKS ASSOCIATIONAL STANDING . . . . . . . . . . . . . . . . . . . . . . . . . . . .   73

      A.      SMUG LACKS ASSOCIATIONAL STANDING TO BRING THIS ACTION
              ON BEHALF OF ITS MEMBERS, EMPLOYEES OR THE "LGBTI
              COMMUNITY" BECAUSE ITS TORT CLAIMS REQUIRE
              INDIVIDUALIZED PARTICIPATION OR PROOF . . . . . . . . . . . . . . . . . . . . .   73

              1.      SMUG's Representative-Capacity Claims for Money Damages Are
                      Barred as a Matter of Well-Settled Law . . . . . . . . . . . . . . . . . . . . . . . . .   74

              2.      SMUG Lacks Associational Standing to Bring a
                      Representative-Capacity Claim for Declaratory or Injunctive Relief
                      Sounding in Tort, Because the Claim Requires Individualized
                      Participation or Proof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   77

                      a.      SMUG Does Not Seek a Purely Legal Ruling . . . . . . . . . . . . . .   78

                      b.      SMUG's Claims for Declaratory and Injunctive Relief Sound in
                              Tort and Necessarily Require Individualized Proof . . . . . . . . . .   79

      B.      SMUG LACKS ASSOCIATIONAL STANDING TO BRING CLAIMS FOR
              DECLARATORY AND INJUNCTIVE RELIEF BECAUSE THEY ARE
              NOT REDRESSABLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   82

      C.      SMUG LACKS ASSOCIATIONAL STANDING BECAUSE IT CANNOT
              PLEAD SUFFICIENT CAUSATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   85

      D.      SMUG LACKS ASSOCIATIONAL STANDING BECAUSE IT HAS NOT
              ALLEGED ASSOCIATIONAL AUTHORITY . . . . . . . . . . . . . . . . . . . . . . . . .   88

X.   SMUG LACKS STANDING TO BRING THIS ACTION ON ITS
     OWN BEHALF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   89

XI.  THIS COURT LACKS SUBJECT-MATTER JURISDICTION OVER SMUG'S
     PERSECUTION CLAIMS BECAUSE THE ALIEN TORT STATUTE DOES NOT
     REACH EXTRATERRITORIAL CONDUCT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   91

     A.   THE SUPREME COURT, THE FIRST CIRCUIT AND THIS DISTRICT
          ALL RECOGNIZE AND ENFORCE THE LONGSTANDING AND
          STRONG PRESUMPTION AGAINST EXTRATERRITORIAL
          APPLICATION OF FEDERAL STATUTES . . . . . . . . . . . . . . . . . . . . . . . . .   92

     B.   NOTHING IN THE TEXT, CONTEXT, STRUCTURE OR LEGISLATIVE
          HISTORY OF THE ALIEN TORT STATUTE AFFIRMATIVELY AND
          CLEARLY INDICATES THAT CONGRESS INTENDED
          EXTRATERRITORIAL APPLICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . .   93

          1.   The Text of the Alien Tort Statute Does Not Affirmatively and Clearly
               Evidence Extraterritorial Intent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   94

          2.   The Context of the Alien Tort Statute Does Not Affirmatively and
               Clearly Evidence Extraterritorial Intent . . . . . . . . . . . . . . . . . . . . . . . .   95

          3.   The Structure of the Alien Tort Statute Does Not Affirmatively and
               Clearly Evidence Extraterritorial Intent . . . . . . . . . . . . . . . . . . . . . . . .   98

          4.   The Legislative History of the Alien Tort Statute Does Not
               Affirmatively and Clearly Evidence Extraterritorial Intent . . . . . . . . . . .   98

     C.   THIS COURT SHOULD NOT FOLLOW THE DECISIONS
          OF OTHER COURTS THAT HAVE OVERLOOKED OR
          DISREGARDED THE STRONG PRESUMPTION AGAINST
          EXTRATERRITORIALITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   99

     D.   SMUG DOES NOT ALLEGE ANY DOMESTIC ACTIONABLE
          CONDUCT BY MR. LIVELY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   103

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   104

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   104

### INTRODUCTION

> "*[T]he [Alien Tort Statute] is not a blanket delegation of lawmaking to the democratically unaccountable international community of custom creators.*" [1]

In this action brought under the Alien Tort Statute, Sexual Minorities Uganda ("SMUG"), an alien organization, launches a direct assault on the supremacy and portability of the United States Constitution, seeking to render the bedrock protections of the First Amendment subservient to the inchoate and amorphous dictates of "international law." SMUG asks this United States Court to punish one of its citizens, Mr. Lively, for "crimes against humanity" under an international treaty that **the United States has expressly rejected**. Moreover, what SMUG cavalierly labels as "crimes against humanity" – the most heinous of crimes – is actually nothing more than civil, non-violent political discourse in the public square on a subject of great public concern, which occupies the highest rung of First Amendment protections.

SMUG does not and cannot allege that Mr. Lively has ever incited anyone to imminent violence. The eight specific acts of "persecution" that SMUG alleges in its sixty-one (61) page Amended Complaint were, according to SMUG's own allegations, committed solely by **other individuals** not before this Court. SMUG alleges no plausible connection between Mr. Lively and the actual perpetrators of those alleged violent acts. While SMUG tries to turn those eight events allegedly perpetrated by **other people** into a "widespread and systematic attack against a civilian population," SMUG does not tell this Court that, according to its own chairman, it has already "received justice" in Ugandan courts, where SMUG and its constituents have been awarded damages against police, damages against tabloid publications and permanent injunctions against incitements to violence. Those legal victories have caused SMUG's chairman to proclaim publicly that "[w]e are no longer afraid of anything."

---

[1] *Flomo v. Firestone Nat. Rubber Co., LLC*, 643 F.3d 1013, 1016 (7th Cir. 2011) (emphasis added).

SMUG also does not tell the Court that David Kato – the Ugandan homosexual activist whose murder SMUG trumpets in this lawsuit – was killed not by an enraged homophobe incited by Mr. Lively's protected speech, but by a homosexual prostitute upset over a failed business transaction. Neither does SMUG tell the Court that the confessed perpetrator of this horrible crime was tried and convicted in Ugandan courts, and is now serving a **thirty-year** prison sentence. And, finally, SMUG does not tell the Court that, far from inciting violence, Mr. Lively has consistently condemned acts of violence and calls to violence in the strongest possible terms, and has praised the Ugandan courts for imparting justice.

SMUG's admitted motive for bringing this lawsuit is that it "felt really insulted" by Mr. Lively's speech. Its admitted purpose is even more sinister, namely, to "make it too costly" to exercise protected speech. Rather than clogging up a United States Court with a frivolous lawsuit designed only to shut down peaceful public discourse, SMUG should continue to seek and receive justice in its home country, against individuals who actually perpetrate crimes. SMUG has no cause of action against Mr. Lively. This improper lawsuit should be dismissed.

## BACKGROUND FACTS

### A.    SMUG AND ITS CLAIMS.

Sexual Minorities Uganda calls itself "SMUG." (Dkt. 1, ¶ 1). SMUG claims that it is an alien "umbrella organization" "which represents the interests of its constituent member organizations" in "advocating on behalf of" lesbians, homosexuals, bisexuals, transgender and intersex persons. (Amended Complaint, dkt. 27, ¶¶ 1, 18). In response to Mr. Lively's Motion to Dismiss (dkts. 21-22) the original Complaint, SMUG filed an Amended Complaint without leave of Court. (Dkt. 27). However, SMUG's second manifesto suffers from all of the same defects as its first, as well as several new ones, and should be dismissed with prejudice.

SMUG now attempts to state three **tort** claims against Mr. Lively, a private United States citizen, including: (1) the "tort" of "crime against humanity of persecution" ("First," "Second" and "Third" "Claims for Relief") (dkt. 27, ¶¶ 236-250)[2]; (2) "civil conspiracy" ("Fourth Claim for Relief") (*id*. at ¶¶ 251-256); and (3) "negligence" ("Fifth Claim for Relief") (*id*. at ¶¶ 257-262). SMUG invokes the Court's subject-matter jurisdiction over the "persecution" claims (Counts I, II and III) through the Alien Tort Statute, 28 U.S.C. § 1350. (Dkt. 27, ¶¶ 2-3, 15). SMUG alleges that its claims for civil conspiracy (Count IV) and negligence (Count V) "are cognizable under Massachusetts state law" (*id*. at ¶ 4), and are subject to diversity and supplemental jurisdiction under 28 U.S.C. §§ 1332 and 1367, respectively. (*Id*. at ¶ 15).

The "persecution" claimed by SMUG is both to itself, and to its "staff members," "individual members of SMUG and its constituent organizations," and "the LGBTI community." (Dkt. 27, ¶¶ 6, 21). SMUG therefore purports to bring this international tort action not only on its own behalf, but also in a representative capacity. (*Id*.) SMUG seeks primarily money damages, including "compensatory damages," "punitive and exemplary damages," and "reasonable attorneys' fees and costs." (*Id*. at pp. 59-60, Prayer for Relief (a), (b) and (c)). In a fourth Prayer for Relief, SMUG also purports to seek "a declaratory judgment holding that [Mr. Lively's] conduct was in violation of the law of nations." (*Id*. at Prayer for Relief (d)). Although it omitted injunctive relief entirely from its original Complaint (dkt. 1, p. 47), SMUG now requests, as an afterthought, "injunctive relief enjoining [Mr. Lively] from … persecut[ing] [SMUG] and the LGBTI community in Uganda." (Dkt. 27, p. 60, Prayer for Relief (e)).

---

[2] Although SMUG purports to assert three separate "Claims for Relief" for "persecution," they are different facets of the same underlying "tort," specifically: "**Persecution**: Individual Responsibility" (Count I); "**Persecution**: Joint Criminal Enterprise" (Count II); and "**Persecution**: Conspiracy" (Count III). (Dkt. 27, ¶¶ 236-250) (emphasis added).

### B.   THE PERSECUTION ALLEGED BY SMUG.

SMUG claims that it and its individual employees and members were persecuted "on the basis of their gender and/or sexual orientation and gender identity." (Dkt. 27, ¶ 1). SMUG alleges eight instances of alleged persecution, **none of which were perpetrated by Mr. Lively**, and **all of which took place entirely outside the sovereign borders of the United States, specifically in Uganda**. (*Id*. at ¶¶ 165-228). The eight alleged incidents of persecution are:

(1)     A June 2012 "raid" of a "skills-building workshop for [homosexual] rights advocates" outside **Kampala, Uganda,** allegedly **perpetrated by "Ugandan police" and the "Ugandan Minister of Ethics and Integrity Simon Lokodo**," during which a handful of people were "detained" between one and three hours. (*Id*. at ¶¶ 165-175) (emphasis added). **Mr. Lively's name is not mentioned at all in connection with this incident**. (*Id*.) Neither the "Ugandan police," nor Minister Lokodo are alleged to be among the four (4) "co-conspirators" of Mr. Lively. (*Id*. at ¶¶ 43-45, 94-164).[3] Thus, SMUG pleads no connection between Mr. Lively and the Ugandan police, Minister Lokodo or the June 2012 "raid." (*Id*.)

(2)     A February 2012 "raid" of a "conference on LGBTI issues" **in Kampala, Uganda**, also allegedly **perpetrated by "the police" and Minister Lokodo,** during which "conference materials [were] seized," and as a result of which the conference organizer "had to flee the hotel to avoid the unlawful arrest and feared for her safety." (*Id*. at ¶¶ 176-185) (emphasis added). Once again, **Mr. Lively's name is wholly absent from this incident**. (*Id*.) And neither of the two alleged bad actors – the police or Minister Lokodo – are alleged to be co-conspirators of Mr. Lively. (*Id*. at ¶¶ 43-45, 94-164).

---

[3] SMUG alleges that Mr. Lively "entered into an unlawful agreement with others" to persecute homosexuals in Uganda, and identifies four (4) alleged "co-conspirators:" Stephen Langa, Martin Ssempa, James Buturo and David Bahiti, all of whom are citizens of Uganda. (Dkt. 27, ¶¶ 43-45, 94-164).

(3)    A June 2008 "arrest" of "three LGBTI rights activists," **in Kampala, Uganda**, allegedly **perpetrated by Ugandan police**, which allegedly detained the activists "for two days," and during which one activist was "forcibly" unclothed and "touched" **by a Ugandan "officer."** (*Id*. at ¶¶ 186-193) (emphasis added). **Mr. Lively's name is not mentioned** here either (*id*.), and neither the police in general, nor the unidentified police officer who allegedly "touched" the activist, are alleged to be co-conspirators of Mr. Lively. (*Id*. at ¶¶ 43-45, 94-164).

(4)    A May 2012 statement **by Minister Lokodo** to a "news agency" that he "**intends to investigate the clinic**" that "[SMUG] and a member organization undertook … to open … in **Kampala** to provide testing, counseling and treatment for HIV/AIDS and other sexually transmitted infections." (*Id*. at ¶¶ 194-198) (emphasis added). **SMUG does not mention Mr. Lively's name in connection with this "incident."** (*Id*.) Minister Lokodo is not one of the four alleged co-conspirators of Mr. Lively. (*Id*. at ¶¶ 43-45, 94-164). Moreover, SMUG does not allege that the promised "investigation" ever took place, and the source document it relies upon refutes its allegations of discrimination in healthcare. (*Id*.) [4]

(5)    An August-September 2007 "crack-down on media [and] advocacy" **in Uganda**, allegedly **perpetrated by "Deputy Attorney General Fred Ruhindi," "the Ugandan Broadcasting Council" and "the *Red Pepper*" Ugandan tabloid**, which resulted in (a) the suspension of a radio station manager "for interviewing a lesbian activist," and (b) the publication

---

[4] The same source document on which SMUG relies to substantiate the supposed "threats to criminalize and shut down health services for LGBTI persons" quotes Uganda's Minister for Health as stating, "**We don't discriminate and marginalize when it comes to offering health services. When people come for treatment at our health facilities, we can't ask for their sexual orientation.**" *Uganda: New LGBTI Clinic Faces Fierce Government Criticism,* IRN Plus News, July 11, 2012 (emphasis added) (cited by SMUG at dkt. 27, ¶ 197 n.79) (available at http://www.irinnews.org/printreport.aspx?reportid=95844, last visited August 6, 2012). The document also quotes the Director General of the Uganda AIDS Commission: "**I have been a doctor for over 40 years. I have never heard where a patient has been asked about his or her sexual orientation.**" *Id.* (emphasis added). And, SMUG's own document quotes another prominent doctor as stating: "We swear an oath. It instructs us to treat patients without harm and injustice, so **we can't discriminate against anybody, based on sexual orientation. We treat all people without asking their orientation.**" *Id.* (emphasis added).

of "names and photos of LGBTI activists" in a tabloid. (*Id.* at ¶¶ 199-208). **Mr. Lively is not claimed to have participated in the "crack-down."** (*Id.*) None of the three Ugandan actors – Deputy A.G. Ruhindi, the Broadcasting Council or the Red Pepper – are alleged to be co-conspirators of Mr. Lively. (*Id.* at ¶¶ 43-45, 94-164). While SMUG mentions the names of two of Mr. Lively's alleged "co-conspirators" in connection with this incident – James Buturo and Martin Ssempa – it does not claim that they actually perpetrated the "crack-down." (*Id.* at ¶¶ 201-204). SMUG claims only that Mr. Ssempa, a private Uganda citizen, publicly **lobbied** and **advocated** for "stronger government actions against [homosexuals]" (*id.* at ¶ 203), and that Mr. Buturo, then a government official, "**stated** that **the government was considering**" criminalization of the "promotion" of homosexuality. (*Id.* at ¶ 201) (emphasis added).

(6)    A July 2005 "raid" of "the home of Victor Mukasa, a transgender activist and founding member of [SMUG]," allegedly **perpetrated by "local Ugandan authorities**," during which Mukasa's house guest, Yvonne Oyo, was arrested **by the "authorities"** and taken to the police station, where she was allegedly forced "to strip naked," "touched and fondled" and then "released the same day." (*Id.* at ¶¶ 209-214). **SMUG does not claim that Mr. Lively or any of his four alleged co-conspirators perpetrated or requested the "raid."** (*Id.*) The unidentified "local Ugandan authorities" are not among the alleged "co-conspirators" or Mr. Lively. (*Id.* at ¶¶ 43-45, 94-164). Moreover, SMUG advises elsewhere in its Amended Complaint that Mukasa and Oyo **successfully sued the police in Ugandan courts**, and were **"awarded damages"** by the "High Court of Uganda," which reaffirmed their rights under the Ugandan Constitution and "**held that gays and lesbians—like everyone else—could challenge the unlawful conduct of the authorities [and] enjoyed the basic protections of law**." (*Id.* at ¶ 34) (emphasis added).

6

(7)      "[F]requent and sensationalistic outings of LGBTI persons" **in Uganda by two Ugandan tabloids**, which allegedly ran articles in 2007 and 2009 seeking to "out" and "shame" homosexuals, and issuing "explicit call[s] to violence." (*Id.* at ¶¶ 215-225). SMUG does not claim that Mr. Lively himself "outed" anybody, or called for violence against anyone, and **does not even mention Mr. Lively's name**. (*Id.*) Neither tabloid is alleged to be a co-conspirator of Mr. Lively. (*Id.* at ¶¶ 43-45, 94-164). SMUG alleges that three individuals "outed" by these publications "received death threats," and that one of them, David Kato, "was killed in his home." (*Id.* at ¶¶ 220, 222). Having been called to task for omitting it from its original Complaint (*e.g.*, dkt. 22, p. 9), SMUG now reluctantly acknowledges that it successfully sued the tabloids in Ugandan courts, and that "[i]n January 2011, **the High Court issued a permanent injunction preventing the newspaper from identifying LGBTI persons and ordering the tabloid to pay damages**." (Dkt. 27, ¶ 221) (emphasis added). As for David Kato's murder, **a homosexual prostitute has confessed to bludgeoning him with a hammer, not because Mr. Kato was "outed" as a homosexual, but because he reneged on a sex-for-money transaction, and the perpetrator is now serving a thirty-year sentence in Uganda for this horrific crime**. Incredibly, SMUG **still** omits this critical fact, even though its own source documents[5], the mainstream media[6] and homosexual rights publications[7] have widely acknowledged it. Moreover,

---

[5] *Murdering Uganda*, Defend the Family International, Feb. 5, 2011 (cited by SMUG at dkt. 27, ¶ 92 & n.39) (available at http://www.defendthefamily.com/pfrc/newsarchives.php?id=5422609, last visited August 7, 2012) ("the **killer has now been caught and confessed that he was a live-in male prostitute who murdered Kato for failing to pay him as promised**"). The Court may consider this information on this Motion to Dismiss, because it is found in a source document referenced and relied upon by SMUG in its Amended Complaint. (*See* section I, pp. 15-16, *infra*).

[6] *Male prostitute killed Uganda gay activist: police*, Agence France-Presse (AFP), February 3, 2011 (reporting that "**A Ugandan gay rights activist was killed after reneging on an agreement to pay for sex**," and that "According to the suspect ... he negotiated with the deceased to be paid money as he was being used as a sexual partner, but that the promise was never fulfilled") (emphasis added) (available http://www.google.com/hostednews/afp/article/ALeqM5ihVH6Ahnbnhdo3CqrEDT3mCBknKg?docId=C NG.9057dbf4f3db02f92ea39216b26eb623.8a1, last visited June 18, 2012).

while SMUG selectively quotes Mr. Lively's website numerous times in its Amended Complaint (*e.g.*, dkt. 27, ¶¶ 23, 58, 59, 66, 92 & n.5, n.16, n.23, n.39), it leaves out his "strongest condemnation" of Mr. Kato's murder:

> Ugandan homosexual activist David Cato (sic) was recently beaten to death with a hammer in his home. **It was a terrible crime deserving of our strongest condemnation**. I extend my sincere condolences to his family and friends.[8]

(8)    "[D]iscrimination **by private actors** in housing, employment, health and education," allegedly occurring **in Uganda** as a result of "legal proscriptions" "criminalization of homosexuality," and "discriminatory policies and practices." (Dkt. 27, ¶¶ 226-228) (emphasis added). Once again, **neither Mr. Lively's name nor the names of any of his four alleged co-conspirators are mentioned in connection with the alleged "discrimination."** (*Id.*)

### C.    THE ALLEGED "CONSPIRACY" BY MR. LIVELY.

As detailed above, SMUG does **not** allege that any of the eight alleged acts of persecution were in fact perpetrated by Mr. Lively. (Dkt. 27, ¶¶ 165-228). SMUG does **not** allege that Mr. Lively himself participated in any way in any of the eight incidents, or that he was even **in** Uganda at the time they occurred. (*Id.*) SMUG also does **not** allege that Mr. Lively expressly solicited or encouraged any of the actors to do what they did. (*Id.*) SMUG does **not** allege, for example, that Mr. Lively asked the Ugandan police to conduct the alleged 2012 "raids," nor the alleged 2008 "arrests," nor the alleged 2005 home invasion. (*Id.*) SMUG does **not** allege that Mr. Lively solicited or encouraged the "Ugandan tabloids" to "out" anybody. (*Id.*) And SMUG does

---

[7] *Killer of David Kato receives 30 year prison sentence*, Pink News, November 10, 2011 (available at http://www.pinknews.co.uk/2011/11/10/killer-of-david-kato-receives-30-year-prison-sentence/, last visited August 7, 2012) ("David Kato['s killer] has been **sentenced to 30 years in prison**" after he "pleaded guilty to the murder" and "**claimed Mr. Kato agreed to pay him for sex, but refused to hand over any money after the act**") (emphasis added). Pink News calls itself "Europe's largest gay news service." (*Id.*)

[8] *Dr. Lively Comments on Uganda Murder*, Defend the Family International, January 28, 2011 (available at http://www.defendthefamily.com/pfrc/newsarchives.php?id=5842336, last visited June 20, 2012) (emphasis added).

**not** allege that Mr. Lively knew or ever communicated with the homosexual prostitute who admittedly killed David Kato, much less that Mr. Lively solicited or encouraged the murder. (*Id.*) Indeed, in the thirteen pages of the Amended Complaint that detail the eight alleged acts of persecution SMUG mentions **Mr. Lively's name only twice, in passing, and does not allege a single specific act by Mr. Lively**. (*Id.*)

Nevertheless, SMUG seeks to hold Mr. Lively, and Mr. Lively alone, liable for these eight alleged "crimes against humanity," not because of anything Mr. Lively has **done**, but because of what Mr. Lively has **said** about homosexuality and the homosexual rights movement, either in various books and writings, or **during visits to Uganda** in 2002 and 2009. SMUG claims early in the Amended Complaint that it is not seeking to punish Mr. Lively's "anti-gay speech or writings," and "seeks to challenge LIVELY's **conduct** through his involvement in a conspiracy to [persecute] people … on the basis of their identity." (*Id.* at ¶ 11) (capitalization in original; bold emphasis added). However, in the section of the Amended Complaint where it purports to set out Mr. Lively's alleged involvement in the so-called "Conspiracy/Joint Criminal Enterprise to Commit Persecution" (*id.* at ¶¶ 46-93), **SMUG alleges only speech by Mr. Lively**, including that: "he **espoused** and **promoted** his theories [and] strategies" (*id.* at ¶ 47); "he **spoke** at length" (*id.* at ¶ 48); he "**addressed students**" and "**led a [church] service**" (*id.*, at ¶ 51); "he offered a number of practical **suggestions**" to members of the Kampala City Council (*id.* at ¶ 52); he "**spok[e]** to others about [his] book and [made] it available in Uganda" (*id.* at ¶ 54); and he "**published**" a handbook in which he "**describes** the gay movement." (*Id.* at ¶¶ 58-59) (emphasis added throughout).

The crux of the so-called "conspiracy," according to SMUG, is that Mr. Lively **espoused** and **promoted** two principal views about homosexuals or homosexuality to various government members and private citizens in Uganda, through his books and writings and orally at various

9

meetings and conferences he held in Uganda in 2002 and early 2009. (*Id*. at ¶¶ 65-93). Those two alleged opinions are: (1) that "advocacy undertaken by [homosexual] rights advocates" should be criminalized; and (2) that homosexual identity leads to "sexual violence against children." (*Id*. at ¶¶ 65-74).[9] SMUG does not like or agree with either of these two alleged opinions, and thinks they are "utterly baseless and without merit." (*Id*. at ¶¶ 68, 74).

SMUG alleges that four "co-conspirators" [*i.e.*, two private citizens (Stephen Langa and Martin Ssempa), one government official (James Buturo), and one member of the Ugandan Parliament (David Bahati)], were inspired by Mr. Lively's opinions, and made "overt acts" in conformity with those opinions. (*Id*. at ¶¶ 7-8, 249) **Critically, however, these so-called "overt acts" are not the same acts alleged by SMUG within the eight incidents of "persecution."** (*Id*. at ¶¶ 165-228). As with Mr. Lively, **SMUG does not allege that any of the eight incidents of persecution were perpetrated by any of the four alleged co-conspirators.** (*Id*.) Instead, the "overt acts" alleged by SMUG consist of political speech and public advocacy on an issue of public importance in Uganda. (*Id*. at ¶¶ 94-164). Among such political speech, SMUG's chief complaint is the introduction of a bill in the Ugandan Parliament that would criminalize advocacy on homosexual issues and impose the death penalty for certain aggravated offenses involving homosexuality. (*Id*. at ¶¶ 9, 68). **That bill has languished in the Ugandan Parliament for over three years, and was never enacted into law**. (*Id*. at p. 17, p. 52). Indeed, the same Associated Press news report referenced and relied upon by SMUG in its Amended Complaint reveals – based upon an interview with SMUG's chairman – that "**activists believe the controversial law**

---

[9] Mr. Lively recognizes that, for purposes of this Motion to Dismiss, the Court must accept SMUG's **factual** allegations as true. Therefore, Mr. Lively will not, for present purposes only, endeavor to show just how untruthful and deceptive are SMUG's mischaracterizations of his opinions.

**will never pass, [but] they are pursuing [this] legal action they expect will make it too costly for people to be hostile to gays**." [10]

SMUG also alleges that "[b]y repeatedly characterizing the LGBTI community as rapists and murderers and child abusers – not to mention possessing the genocidal tendencies of the Nazis and Rwandan conspirators – LIVELY deliberately invited, induced and encouraged a proportional response from Ugandans – *i.e.*, severe repression, arrest and certainly even violence." (Dkt. 27, ¶ 93). Essentially, according to SMUG, Mr. Lively is responsible for the eight "crimes against humanity" because his **opinions** and **rhetoric** "served to create a climate of hostility and prejudice against LGBTI persons in Uganda" in which those acts of persecution could take place. (*Id*. at ¶ 226).

Importantly, in its sixty-one (61) page Amended Complaint, SMUG does not identify a single specific quote or statement **from Mr. Lively** which it claims to have been a call to violence, let alone **imminent** violence, against anyone. SMUG does identify various statements **from other third parties** whom SMUG has not sued, and claims that these statements are calls for violence, including "we must exterminate homosexuals," (*id*. at ¶ 8); and "HANG THEM." (*Id*. ¶ 218) (capitalization in original). But SMUG does not attribute these alleged incitements to Mr. Lively in any way. (*Id*.)

As noted above, SMUG has now come around to admitting that it successfully sued the true inciters to violence in Ugandan courts, where SMUG obtained both a permanent injunction and damages. (*Id*. at ¶ 221). According to SMUG's own source document, the media regarded this

---

[10] *Uganda's Gays See Progress in Public Opinion War*, Associated Press, March 20, 2012 (emphasis added) (cited in SMUG's Amended Complaint at dkt. 27, ¶ 118 n.50) (available at http://ccrjustice.org/files/12.03.20_IHR_SMUGProgress_AP.pdf, last visited August 6, 2012). Because it was selectively quoted and relied upon in SMUG's Amended Complaint, the Court may consider this entire document. (*See* section I, pp. 15-16, *infra*).

as "a big victory," and the crippling damages **put one tabloid out of business**.[11] SMUG's own source document also quotes Frank Mugisha, SMUG's chairman, as stating that there is "a shift in public opinion" towards more tolerance of homosexuals.[12] As a result, SMUG has declared that "**we are no longer afraid of anything**."[13] Mr. Mugisha has boasted that SMUG now "even [has] a banner," which SMUG proudly and openly displays along with other "pro-gay posters" when its members "walk the streets of Kampala."[14] According to Mr. Mugisha, "**we [SMUG] have received justice**" in Uganda courts.[15] But SMUG does not tell the Court that Mr. Lively himself condemned the incitements to violence in the strongest possible terms, and praised the Ugandan court for punishing them:

> The Ugandan newspaper which 'outed' the Ugandan homosexual activists under a banner saying 'Hang Them,' clearly WAS an incitement to violence and **I join the rest of the civilized world in condemning it. The Ugandan court was right in declaring it illegal.**[16]

Although it has "received justice" in Ugandan courts, SMUG now files this suit against Mr. Lively in a United States court. Even if it had standing to bring this action, which it does not, and even if the Court had subject-matter jurisdiction over the alleged acts of persecution in Uganda, which it does not, on these facts SMUG has utterly failed to state any cause of action against Mr. Lively. SMUG's Amended Complaint should therefore be dismissed, with prejudice.

---

[11] *Uganda's Gays See Progress*, *supra* note 10.

[12] *Id.*

[13] *Id.*

[14] *Id.* (emphasis added).

[15] *Uganda court orders anti-gay paper to shut: rights group*, Reuters, November 1, 2010 (emphasis added) (available at http://www.reuters.com/article/2010/11/01/us-uganda-homosexuality-idUSTRE6A04XT20101101, last visited June 20, 2012).

[16] *Dr. Lively Comments on Uganda Murder*, *supra* note 8 (bold emphasis added; capitalization in original).

## <u>SUMMARY OF ARGUMENT</u>

After briefly discussing the pleading standard established by the Supreme Court (section I), this memorandum demonstrates that there are at least **ten** independent grounds that require the dismissal of this lawsuit.

Section II demonstrates that, as a United States citizen, Mr. Lively did not check his First Amendment rights at the airport on his way to Uganda. The United States Constitution reigns supreme over any "international law," and protects Mr. Lively anywhere in the world. The speech or "conduct" alleged by SMUG is nothing more than non-violent political speech and public discourse on matters of great public importance, and therefore cannot be punished.

Section III demonstrates that this Court lacks subject-matter jurisdiction over SMUG's Alien Tort Statute claims, because SMUG has failed to establish that the specific tort it alleges, namely "persecution" on the basis of sexual "orientation" or transgender "identity," is universally accepted and clearly defined under international law. The Rome Statute under which SMUG purports to sue is a treaty that has been expressly rejected by the United States. Even if the treaty were a customary binding international norm, which it is not, SMUG cannot establish that "persecution" based on sexual "orientation" or transgender "identity" is universally proscribed in a clearly defined way by the law of nations. A large number of nations view homosexuality as conduct and criminalize or "discriminate" against it. None of the major international human rights instruments prohibit discrimination or "persecution" based upon the grounds alleged by SMUG.

Section IV demonstrates that SMUG's claim for "persecution" fails to state a cause of action against Mr. Lively. Mr. Lively's non-violent political speech cannot constitute "persecution." Moreover, SMUG is an organization, not a human being with human rights, so it cannot be "persecuted." And Mr. Lively is a private citizen, not a state actor, so he cannot be a

"persecutor." Finally, SMUG does not allege that Mr. Lively himself committed any specific acts of persecution, and, in any event, SMUG has failed to alleged an essential element of the tort.

Section V demonstrates that SMUG has failed to state a claim for aiding and abetting persecution. SMUG has failed to allege any conduct that constitutes aiding and abetting, and its conclusory, naked assertions fail to show the required criminal intent.

Section VI demonstrates that the Court does not have subject-matter jurisdiction over SMUG's conspiracy to persecute claim, because conspiracy liability is not universally recognized and clearly defined under international law. In addition, SMUG has failed to state a cause of action for conspiracy to persecute, because its allegations do not show the required criminal intent.

Section VII demonstrates that SMUG's claim for joint criminal enterprise should be dismissed for the same reasons as its conspiracy to persecute claim.

Section VIII demonstrates that SMUG's newly-minted state law claims for civil conspiracy and negligence should be dismissed, because they are time-barred, they are not viable under Uganda law and they fail to state any claim for relief under Massachusetts law.

Section IX demonstrates that SMUG lacks associational standing to bring this case in a representative capacity on behalf of its members. SMUG's representative-capacity claims for money damages sounding in tort are barred as a matter of law because they require individualized participation or proof. SMUG's representative-capacity claims for declaratory and injunctive relief are likewise barred, because they too require individualized participation or proof, and, in any event, the claims are not redressable. SMUG also lacks associational standing because it has not alleged sufficient causation to satisfy the traceability prong of Article III standing. Finally, SMUG lacks associational standing because it has not alleged authority to bring this action.

14

Section X demonstrates that SMUG lacks standing to bring this action on its own behalf. SMUG has failed to allege sufficient causation to satisfy the traceability requirement of Article III standing, and SMUG's claims for equitable relief are not redressable.

Finally, Section XI demonstrates that this Court lacks subject-matter jurisdiction over SMUG's persecution claims because the Alien Tort Statute does not reach Mr. Lively's alleged conduct outside the sovereign territory of the United States. SMUG has a heavy burden of rebutting a strong presumption against extraterritorial application of an act of Congress. SMUG cannot overcome that presumption here because nothing in the text, context, structure or legislative history of the Alien Tort Statue provides clear evidence of an affirmative intent by Congress to encroach upon the sovereign jurisdiction of other nations. This very issue is currently being considered by the United States Supreme Court, and, in the meantime, this Court is not bound by the decisions of other courts that have merely assumed or exercised extraterritorial jurisdiction *sub silentio*.

For each of these reasons, SMUG's Amended Complaint should be dismissed with prejudice.

## LAW AND ARGUMENT

### I.     THE STANDARD FOR DISMISSAL.

SMUG attempts to substantiate the allegations in its Amended Complaint with over eighty (80) citations to outside materials. Although it relies extensively upon carefully selected and misleading portions of these materials, SMUG fails to attach any of them to its Amended Complaint. Nevertheless, this Court may review the entirety of these materials in deciding this Motion to Dismiss. *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993) ("documents sufficiently referred to in the complaint" may be considered on motion to dismiss, because "[w]here plaintiff has actual notice and has relied upon these documents in framing the complaint the necessity of

translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated") (internal alterations and citations omitted); *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996) ("In deciding a motion to dismiss … a court may properly consider the relevant entirety of a document … explicitly relied upon in the complaint, even though not attached to the complaint, without converting the motion into one for summary judgment").

To survive this Motion to Dismiss, SMUG is required to provide in its Amended Complaint a short and plain statement of the claims that show it is entitled to relief. Fed. R. Civ. P. 8(a)(2). This statement must be more than mere "labels and conclusions." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Although, at this stage of the proceedings, the Court must construe the Amended Complaint in the light most favorable to SMUG, and accept all factual allegations as true, the Court is not required to accept as true mere legal conclusions. *Id*. at 555.

Accordingly, Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). SMUG must allege "enough facts to state a claim to relief that is plausible on its face," *Twombly*, 550 U.S. at 555, but "a claim has facial plausibility [only] when the plaintiff pleads factual content that allows the court to draw the reasonable inference that **the defendant** is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (emphasis added).

In *Iqbal*, the Supreme Court examined a complaint against then-Attorney General John Ashcroft alleging that plaintiff was subjected to torture and that Mr. Ashcroft was the "principal architect of this invidious policy." *Iqbal*, 556 U.S. at 680. While plaintiff was fairly specific in his accusations and assertions, the Court nonetheless held that they were "bare assertions" and "nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim." *Id.* at 681 (*quoting Twombly*, 550 U.S. at 555). The Court, while recognizing that all factual elements must be read in the light most favorable to plaintiff, held that "**[t]hreadbare**

16

**recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice**." *Id*. at 678 (emphasis added). The Court further noted:

> Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but **it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions**. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But **where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief**.'

*Id.* at 678-79 (emphasis added) (*quoting* Fed. R. Civ. P. 8(a)(2)) (internal citations omitted). Thus, if a complaint contains only conclusions, it must be dismissed as failing to state a claim upon which relief can be granted. *Id*. Furthermore, even if the facts are well-pleaded, if they only show a "mere possibility of misconduct," the claim should likewise be dismissed. *Id.*

SMUG's Amended Complaint fails to meet this pleading standard and should be dismissed.

## II.   SMUG HAS FAILED TO STATE A CLAIM BECAUSE MR. LIVELY'S SPEECH AND "CONDUCT" ARE PROTECTED BY THE FIRST AMENDMENT.

SMUG's lawsuit is a brazen and direct assault on Mr. Lively's First Amendment rights.[17] As a United States citizen, Mr. Lively has a fundamental right to engage in non-violent political speech, not only in the United States but throughout the entire world. The First Amendment trumps "international law," and not the other way around, as SMUG would prefer. Mr. Lively's civil political discourse is thus immune from SMUG's lawsuit, even if (and especially because) it offends SMUG. This lawsuit should therefore be dismissed.

---

[17] This discussion assumes, for the sake of argument only, that SMUG has standing to bring this lawsuit and this Court has subject-matter jurisdiction over its claims. Neither premise is true, as demonstrated in sections III, VI, VII, IX, X and XI, *infra*.

A.     **AS A UNITED STATES CITIZEN, MR. LIVELY HAS A FUNDAMENTAL RIGHT UNDER THE FIRST AMENDMENT TO ENGAGE IN NON-VIOLENT POLITICAL SPEECH ANYWHERE IN THE WORLD.**

Well over one century ago, the Supreme Court held that "[t]he guaranties [the Constitution] affords … apply only to citizens and others within the United States, **or who are brought there for trial for alleged offenses committed elsewhere**." *Ross v. McIntyre*, 140 U.S. 453, 464 (1891) (emphasis added) (citing *Cook v. U. S.*, 138 U. S. 157, 181 (1891)). Subsequently, in *Reid v. Covert*, 354 U.S. 1 (1957), the Supreme Court reaffirmed this principle and extended it even to citizens tried by the United States in a foreign jurisdiction:

> [W]e reject the idea that when the United States acts against citizens abroad it can do so free of the Bill of Rights. The United States is entirely a creature of the Constitution. Its power and authority have no other source. It can only act in accordance with all the limitations imposed by the Constitution. **When the Government reaches out to punish a citizen who is abroad, the shield which the Bill of Rights and other parts of the Constitution provide to protect his life and liberty should not be stripped away just because he happens to be in another land**. This is not a novel concept. To the contrary, **it is as old as government**. It was recognized long before Paul successfully invoked his right as a Roman citizen to be tried in strict accordance with Roman law.

*Id.* at 5-6 (emphasis added).

This bedrock principle is fully recognized by the Restatement (Third) of Foreign Relations Law § 721 (1987), which states that, "[t]he Constitution governs the exercise of authority by the United States government over United States citizens outside United States territory, for example on the high seas, and even on foreign soil." *Id*. at cmt. b (emphasis added). More specifically, the Restatement recognizes that:

> The **freedoms of speech**, press, religion, and assembly, and the right not to be subject to an establishment of religion, **are protected against infringement in the exercise of foreign relations power** as in domestic affairs.

*Id*. at cmt. d (emphasis added).

Accordingly, it is beyond cavil that Mr. Lively did not check his First Amendment rights at the airport before departing for Uganda, so that they could be lost in transit and wind up somewhere with the lost luggage. Since this Court[18] could not punish Mr. Lively for the non-violent speech or "conduct" alleged by SMUG if it had occurred in the United States, the Court cannot punish that same speech or "conduct" because it took place in Uganda.[19]

### B.   THE FIRST AMENDMENT TRUMPS "INTERNATIONAL LAW" AND IS NOT SUBSERVIENT TO IT.

An equally firm and non-negotiable first principle is that Mr. Lively's First Amendment rights trump anything contrary in the amorphous and shifting world of "international law." "**No agreement with a foreign nation can confer power on the Congress, or on any other branch of Government, which is free from the restraints of the Constitution**." *Reid*, 354 U.S. at 16 (emphasis added) (emphasis added).

> It would be manifestly contrary to the objectives of those who created the Constitution, as well as those who were responsible for the Bill of Rights--let alone **alien to our entire constitutional history and tradition--to … permit[] the United States to exercise power under an international agreement without observing constitutional prohibitions**.

*Id.* at 17 (emphasis added) ("This Court has regularly and uniformly recognized the supremacy of the Constitution over a treaty"). The Restatement also recognizes this principle:

> A rule of **international law** or a provision of an international agreement of the United States **will not be given effect as law in the United States if it is inconsistent with the United States Constitution**.

Restatement (Third) of Foreign Relations Law § 115(3) (1987) (emphasis added).

---

[18] This lawsuit does not raise the issue of whether a Ugandan court could exercise any jurisdiction or control over Mr. Lively's speech or "conduct."

[19] On the contrary, the extraterritorial nature of Mr. Lively's speech or "conduct" presents a separate and insurmountable obstacle to SMUG's Amended Complaint because it deprives this Court of subject-matter jurisdiction. (*See* section XI, *infra*).

Thus, whatever the First Congress intended when it enacted the Alien Tort Statute in 1789, it could not have meant to render the First Amendment subservient to the dictates of "international law," because any "**law repugnant to the constitution is void**." *Marbury v. Madison*, 5 U.S. 137, 180 (1803) (emphasis added). "**[T]he [Alien Tort Statute] is not a blanket delegation of lawmaking to the democratically unaccountable international community of custom creators**." *Flomo v. Firestone Nat. Rubber Co., LLC*, 643 F.3d 1013, 1016 (7th Cir. 2011) (emphasis added).

The supremacy of the Constitution, coupled with its portability, mean that SMUG cannot hold Mr. Lively liable in this Court for any speech or "conduct" in Uganda which allegedly violated "international law," if that speech or "conduct" is constitutionally protected in the United States. Because Mr. Lively's non-violent political speech or "conduct" is fully protected in the United States, SMUG's lawsuit must be dismissed as a matter of law.

**C.      MR. LIVELY'S NON-VIOLENT POLITICAL SPEECH OR "CONDUCT" IS PROTECTED BY THE FIRST AMENDMENT.**

SMUG's sixty-one (61) page Amended Complaint against Mr. Lively can be fairly distilled down into two charges. SMUG is claiming that Mr. Lively committed "crimes against humanity" in violation of "international law," because he: (1) shared his purported **opinion** that all who engage in homosexual conduct are "evil" "genocidal," "rapists and murders" and have a "predilection for child sexual violence"; and (2) advocated, lobbied and otherwise tried to influence two members of the Ugandan government (and other private citizens) that they should propose and pursue laws that "criminalize advocacy undertaken by [homosexual] rights advocates." (Dkt. 27, ¶¶ 65-93). Even if these allegations were true (and they could not be further from truth), such speech or "conduct" is fully protected by the First Amendment.

1.      **Mr. Lively's Opinions and Non-Violent Political Speech Regarding Homosexuals and Homosexuality are Fully Protected.**

"The First Amendment reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Snyder v. Phelps*, 131 S. Ct. 1207, 1215, __ U.S. __ (2011) (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 270 (1964). "That is because 'speech concerning public affairs is more than self-expression; it is the essence of self-government.'" *Id.* at 1215 (quoting *Garrison v. Louisiana,* 379 U.S. 64, 74–75 (1964)). "Accordingly, '**speech on public issues occupies the highest rung of the hierarchy of First Amendment values**, and is entitled to special protection.'" *Id.* (emphasis added) (quoting *Connick v. Myers,* 461 U.S. 138, 145 (1983).

Clearly, SMUG is deeply offended by Mr. Lively's speech and opinions. This, however, does not give it a cause of action against a United States citizen in a United States court. Even assuming that SMUG's allegations are true, "citizens must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment." *Boos v. Barry*, 485 U.S. 312, 322 (1988) (quoting *Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 56 (1988)) (internal quotes omitted).

In *Snyder*, the Supreme Court afforded immunity from private suit to a religious group that opposed homosexuality in the military, and that held highly offensive signs and chanted equally offensive slurs outside a military funeral, including: "Fag Troops," "Semper Fi Fags," "God Hates Fags," "Fags Doom Nations," "Not Blessed Just Cursed," "You're Going to Hell," and "God Hates You." 131 S. Ct. at 1216-17. The Supreme Court agreed that this message was "particularly hurtful" and caused "incalculable grief." *Id.* at 1217-18. Nevertheless, the Court concluded that the speech was protected by the First Amendment and not actionable by the aggrieved parties in a United States court, because it was public discourse on a matter of public

21

concern. *Id*. at 1219. "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Id*. (quoting *Texas v. Johnson,* 491 U.S. 397, 414 (1989)). "Indeed, **the point of all speech protection** is to shield just those choices of content that in someone's eyes are misguided, or even hurtful." *Id*. (emphasis added) (quoting *Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston, Inc.,* 515 U.S. 557, 574 (1995)).

Even if SMUG's allegations about Mr. Lively's speech were true, SMUG's tort claims against Mr. Lively would fail for the same reason the claim failed in *Snyder*. SMUG's chief complaint against Mr. Lively – that he "repeatedly characterized the [homosexual population] as rapists and murderers and child abusers[,] not to mention possessing the genocidal tendencies of the Nazis and Rwandan conspirators" (dkt. 27, ¶ 93) – is qualitatively no different than the protected statements in *Snyder*, that homosexuals "doom nations," or that homosexuals are "cursed," or that homosexuals are "going to hell."

SMUG complains that Mr. Lively's words are powerful, and that they influenced other people to do bad things. The Supreme Court agrees that, "**[s]peech is powerful**. **It can stir people to action** … and—as it did here—inflict great pain. [But] we cannot react to that pain **by punishing the speaker**." *Snyder*, 131 S. Ct. at 1220 (emphasis added). Rather than ask this Court to "punish the speaker," SMUG should sue actual criminals who commit or incite imminent violence against its members in Ugandan courts, **just as it has successfully done on repeated occasions to date**. "As a Nation we have chosen a different course—to protect even hurtful speech on public issues to ensure that we do not stifle public debate." *Snyder*, 131 S. Ct. at 1220. "**That choice requires that we shield [Mr. Lively] from tort liability**." *Id*. (emphasis added).

## 2.   SMUG has not Alleged any Actionable Conduct.

SMUG apparently senses that its Amended Complaint is on a collision course with the Constitution, and thus at least pays lip service to First Amendment principles by claiming that it "seeks to challenge [Mr. Lively's] **conduct** through his involvement in a conspiracy to severely deprive people of their fundamental rights," and "not … his anti-gay speech or writings." (Dkt. 27, ¶ 11) (emphasis added). However, when SMUG attempts to describe Mr. Lively's so-called conspiratorial "conduct," all it can allege is, well, **speech**. (*Id*. at ¶¶ 43-93). "Just as putting a 'Horse' sign around a cow's neck does not make a bovine equine," *Donovan ex rel. Donovan v. Punxsutawney Area Sch. Bd.*, 336 F.3d 211, 224 (3d Cir. 2003), so labeling speech as "conduct" or "conspiracy" does not render that speech actionable. *Iqbal* "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." 556 U.S. at 678. SMUG's allegations of "conspiratorial conduct" are "bare assertions" and "nothing more than a 'formulaic recitation of the elements' of a [tort] claim." *Id.* at 681 (*quoting Twombly*, 550 U.S. at 555).

Here, the "conspiracy" alleged by SMUG is that (1) Mr. Lively saturated the public discourse on homosexuality in Uganda with his **opinions** about homosexuality and homosexuals in a manner that offended SMUG, and (2) Mr. Lively then worked with two other private Ugandan citizens to lobby and influence two members of the Ugandan government **to introduce legislation** which allegedly "would render [SMUG's] work and mere existence illegal." (Dkt. 27, ¶¶ 65-93). Aside from the fact that the legislation in question was never enacted, and that "activists believe the controversial law will never pass" (*Uganda's Gays See Progress*, *supra* note 10), Mr. Lively has a protected right to petition government to enact legislation, regardless of whether SMUG likes his proposals or even his motives.

"[A]ll persons, **regardless of motive**, are **guaranteed by the First Amendment the right to seek to influence the government or its officials to adopt a new policy, and they cannot be**

23

**required to compensate another for loss occasioned by a change in policy should they be successful**." *Sierra Club v. Butz*, 349 F. Supp. 934, 938 (N.D. Cal. 1972) (emphasis added) (applying *Eastern R.R. Conference v. Noerr Motor Freight*, 365 U.S. 127 (1961)). Accordingly, the First Circuit has made it clear that "**there is no remedy against private persons who urge the enactment of laws, regardless of their motives**." *Tomaiolo v. Mallinoff*, 281 F.3d 1, 11 (1st Cir. 2002) (emphasis added) (internal alterations omitted) (quoting *Munoz Vargas v. Romero Barcelo,* 532 F.2d 765, 766 (1st Cir. 1976), in turn citing *Noerr Motor Freight, Inc.*, 365 U.S. 127). Indeed, "[i]n numerous cases, the courts have rejected claims seeking damages for injuries allegedly caused by the defendants' actions directed to influencing government action." *Brownsville Golden Age Nursing Home, Inc. v. Wells*, 839 F.2d 155, 160 (3d Cir. 1988) (collecting cases). This case is no different. Mr. Lively cannot be liable for any "conspiracy" with members of the government to introduce or influence legislation, not only because the legislation was never enacted, but because he was exercising a protected First Amendment right.

Aside from disseminating his opinions and attempting to influence legislation, SMUG does not charge Mr. Lively with any speech or "conduct" that incited **imminent** violence against anyone. Sure, SMUG recites in a conclusory and "threadbare" fashion that Mr. Lively "invited, induced and encouraged a proportional response from Ugandans – *i.e.*, severe repression, arrest and certainly even violence." (Dkt. 27, ¶ 93). SMUG's allegation contains the seeds of its own destruction, because, in the same paragraph, SMUG reveals just **how** Mr. Lively supposedly made these incitements. (*Id.*) It was **not** by explicitly calling for any violence, let alone **imminent** violence, against homosexuals but merely by allegedly "repeatedly characterizing the [homosexual population] as rapists and murders and child abusers – not to mention possessing [] genocidal tendencies." (*Id.*) A protected opinion does not lose its protection merely because it is "repeated."

SMUG does not seem to appreciate that there is a world of difference between these two entirely hypothetical statements:

| | |
|---|---|
| "Homosexuals are rapists and murderers and child abusers with genocidal tendencies." | "Homosexuals are rapists and murderers and child abusers with genocidal tendencies, **and you need to meet me at SMUG's headquarters today at 5:00 p.m. so that we can hurt them**." |

While SMUG has alleged plenty of the type of statements such as the one on the left, it has alleged **none** such as the one on the right, certainly not by Mr. Lively.  As such, SMUG has not alleged the type of incitement to **imminent** violence by Mr. Lively that would suffice to pierce his First Amendment privilege. "[M]ere *advocacy* of the use of force or violence does not remove speech from the protection of the First Amendment." *N. A. A. C. P. v. Claiborne Hardware Co.*, 458 U.S. 886, 927 (1982) (italics in original) (citing *Brandenburg v. Ohio*, 395 U.S. 444 (1969)). Neither do "**threats of vilification or social ostracism**," which are likewise "**constitutionally protected and beyond the reach of a damages award**." *Claiborne*, 458 U.S. at 926 (emphasis added). Only "advocacy [which] is directed to inciting or producing **imminent** lawless action **and** is **likely** to incite or produce such action" is unprotected. *Id.* at 928 (citing *Brandenburg*, 395 U.S. at 447). But "the mere abstract teaching ... of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action." *Id.* (citing *Noto v. United States*, 367 U.S. 290, 297–298 (1961)). Speech that "amount[s] to nothing more than advocacy of illegal action **at some indefinite future time**," cannot be punished. *Hess v. Indiana*, 414 U.S. 105, 108 (1973) (state could not punish speaker who exclaimed to police that "we'll take the f----- street **later**," because lawless action being advocated for "later" was not imminent) (emphasis added).

In *Claiborne*, the Supreme Court held that "strong language" and "emotionally charged rhetoric" that arguably advocated racial violence was nonetheless protected, even though violence ultimately resulted, because "the acts of violence … occurred **weeks or months** after the … speech," and thus it was not imminent. 458 U.S. at 928 (emphasis added). Here, even if SMUG's allegations about Mr. Lively's speech were true, they could not even establish that Mr. Lively advocated any violence, much less "**imminent**" violence. And, if SMUG could establish that Mr. Lively's speech advocated violence in the abstract, which it cannot, that would clearly be insufficient to state a cause of action under *Brandenburg*, *Claiborne* and *Hess*.

To be sure, SMUG does allege that **other** individuals and organizations, whom it has not brought before this Court, have made statements that incite violence, such as the "HANG THEM" tabloid headline. But SMUG does not allege that **Mr. Lively** made such statements, or that he asked those third parties to make them. In fact, the very website articles that SMUG cites in its Amended Complaint demonstrate that Mr. Lively strongly **condemned** such statements. SMUG's litigation attention should therefore be focused on those third parties, not Mr. Lively. Indeed, SMUG has succeeded in obtaining both money damages and injunctions against such publications in Ugandan courts. SMUG has no cause action in this Court.

In sum, the First Amendment traveled with Mr. Lively to Uganda, and trumps any contrary provision in "international law" upon which SMUG seeks to premise liability. Because Mr. Lively's non-violent political speech is firmly and fundamentally protected, SMUG cannot state a cause of action and its Amended Complaint should be dismissed.

III. **THIS COURT LACKS SUBJECT-MATTER JURISDICTION BECAUSE SMUG HAS NOT ALLEGED CONDUCT IN VIOLATION OF UNIVERSALLY ACCEPTED AND CLEARLY DEFINED INTERNATIONAL LEGAL NORMS.**

"There is no federal subject-matter jurisdiction under the Alien Tort [Statute] unless the complaint adequately pleads a violation of the law of nations (or treaty of the United States)." *Kadic v. Karadzic*, 70 F.3d 232, 238 (2d Cir. 1995). But not every violation of **any** international law or norm comes under the subject-matter jurisdiction afforded by the Alien Tort Statute. *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732 (2004). Only those international norms that are "specific, universal and obligatory" come under its purview. *Id.* ("[a]ctionable violations of international law must be of a norm that is specific, **universal**, and obligatory") (emphasis added) (quoting *In re Estate of Marcos Human Rights Litigation,* 25 F.3d 1467, 1475 (9th Cir. 1994)). Lower courts are not free to continually recognize new international torts; instead, they must engage in "vigilant doorkeeping" to maintain only a "narrow class" of actionable torts. *Sosa*, 542 U.S. at 729.

Accordingly, "***Sosa* requires that this Court recognize only forms of liability that have been universally accepted by the community of developed nations**." *In re S. African Apartheid Litig.*, 617 F. Supp. 2d 228, 263 (S.D.N.Y. 2009) (emphasis added). Moreover, "[i]t is only where the nations of the world have demonstrated that the wrong is of mutual, and not merely several, concern, by means of **express international accords**, that a wrong generally recognized becomes an international law violation within the meaning of the statute." *Filartiga v. Pena-Irala*, 630 F.2d 876, 888 (2d Cir. 1980) (emphasis added). Thus, even if every nation of the world were to adopt a **domestic** prohibition against certain conduct, it would still only constitute an **international** norm where it affects "the relationship between states or between an individual and a foreign state." *Id.*; *see also*, *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 249 (2d Cir. 2003) ("Even if certain conduct is universally proscribed by States in their domestic law, that fact is not necessarily significant or relevant for purposes of customary international law").

27

A.   **SMUG CANNOT ESTABLISH THAT THE TORT OF PERSECUTION IS UNIVERSALLY ACCEPTED AND CLEARLY DEFINED, BECAUSE THE ROME STATUTE IS A TREATY, NOT A NORM, AND WAS EXPRESSLY REJECTED BY THE UNITED STATES.**

The **only** source of international law SMUG points to for its contention that the "tort" of "persecution" is "universally proscribed and clearly defined" is the Rome Statute of the International Criminal Court. (Dkt. 27, ¶ 3). However, "[t]he Rome Statute, which created the International Criminal Court ("ICC"), **is properly viewed in the nature of a treaty and not as customary international law**." *Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 35 (D.C. Cir. 2011) (emphasis added). The D.C. Circuit in *Exxon Mobil* found that, by its own terms, **the Rome Statute did not represent international law norms, and as such could not support a claim under the Alien Tort Statute**. *Id.* The D.C. Circuit further held that, even if the Rome Statute were sufficient as a source of international law norms, the reservation surrounding its ratification, indeed the fact that **the United States still refuses to ratify the treaty**, prevents its contents from attaining the status of universally recognized, binding international law, as required for Alien Tort Statute jurisdiction. *Id.* at 35-36.[20]

Indeed, the United States has not just **delayed** ratification of the Rome Statute, but **actually rejected it and withdrew its signature from the treaty**. *Id.* at 36, n.22. This outright rejection of the Rome Statute is conclusive evidence that the United States, a major world power, does not recognize it as a universally binding international norm. *Id.* Neither should this Court. Moreover, by withdrawing its signature and expressly rejecting this treaty, the intention of the United States government was to render its citizens beyond its reach. SMUG is now attempting an

---

[20] That other courts simply assumed that the Rome Statute constituted or embodied customary international law without squarely analyzing the question, and without even acknowledging its express rejection by the United States, is of little significance. *See, e.g., Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 259 (2d Cir. 2009) (quoting Rome Statute regarding the standard for liability for aiding and abetting).

end-run around that protection, by seeking to subject a United States citizen to the requirements of the very treaty that his government rejected, and in a United States court to boot. This Court should not countenance SMUG's subversion.

The D.C. Circuit's rejection of the Rome Statute as a basis for establishing subject-matter jurisdiction under the Alien Tort Statute is consistent with the Second Circuit's holding in *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104 (2d Cir. 2008). In *Vietnam Ass'n*, the Second Circuit held that the Geneva Protocol was not binding international law, even though it specifically sanctioned the conduct in question, because of the "nature and scope of the reservations to ratification." *Id.* at 118. In that case, the United States had ultimately ratified the treaty but, because of the initial reservations, the court nevertheless found that "it would be an impermissible stretch to find that the 1925 Geneva Protocol had acquired the status of binding customary international law during the Vietnam conflict." *Id.*

If mere reservations prior to eventual ratification are sufficient to remove an international "norm" from the purview of the Alien Tort Statute, then the failure to ratify a treaty should doubly suffice, and the express rejection of a treaty (through the withdrawal of the United States' signature) should triply suffice. SMUG cannot invoke the Court's subject-matter jurisdiction by reference to the Rome Statute, and thus its Amended Complaint should be dismissed.

**B.    SMUG CANNOT ESTABLISH THAT PROHIBITION OF PERSECUTION BASED ON SEXUAL ORIENTATION AND TRANSGENDER IDENTITY IS UNIVERSALLY ACCEPTED AND CLEARLY DEFINED.**

Even if the Rome Statute were universally accepted and clearly defined to come within the subject-matter jurisdiction conferred by the Alien Tort Statute, which it is not, that would not be the end of the inquiry, and SMUG's persecution claims would still have to be dismissed for lack of jurisdiction. This is because, as this District has recognized,

> A precept of "international law" cannot be recognized as such unless and until that recognition is universal. And **the requirement of universality goes not only to recognition of the norm in the abstract sense, but to agreement upon its content as well**.

*Xuncax v. Gramajo*, 886 F. Supp. 162, 187 (D. Mass. 1995) (WOODLOCK, J.) (emphasis added).

Thus, SMUG must show universal recognition not only of the Rome Statute in general, but also of the specific provision on which it relies, that is Article 7(1)(h)'s proscription of persecution, **and the specific interpretation and application which SMUG advances**. *Id.*

Consistent with the Supreme Court's eventual admonition in *Sosa*, this District in *Xuncax* required plaintiffs in an Alien Tort Statute case to demonstrate that:

> 1) **no state condone[s] the act** in question **and** there is a **recognizable 'universal' consensus of prohibition** against it; 2) there are **sufficient criteria** to determine whether a given action amounts to the prohibited act and thus violates the norm; [and] 3) the prohibition against it is non-derogable and therefore **binding at all times upon all actors**.

886 F. Supp. at 184 (emphasis added).

Even if this Court were to accept the Rome Statute as a universally binding international norm notwithstanding the United States' express rejection of it, SMUG would still flunk the jurisdictional test because it could not get past the first element in *Xuncax*. As shown below, there is no "recognizable universal consensus of prohibition against" persecution, meaning denial of "fundamental rights," based upon the grounds alleged by SMUG (*i.e.*, "sexual orientation" or "[trans]gender identity").[21]

---

[21] "Universal consensus" in this case is not only a jurisdictional concern mandated by *Sosa* and followed in *Xuncax*. The plain text of the Rome Statute itself provides that the crime of "persecution" includes only those actions against a group or collectivity based on "political, racial, national, ethnic, cultural, religious, gender as defined in paragraph 3**, or other grounds that are universally recognized as impermissible under international law**." Rome Statute of the International Criminal Court, Art. 7(1)(h) (emphasis added) (available at http://untreaty.un.org/cod/icc/statute/romefra.htm, last visited June 20, 2012). Therefore, to the extent that the alleged persecution is not on any of the specific grounds enumerated in the text, it is only actionable if premised on a ground "universally recognized as impermissible under international law." *Id.*

The chief ground upon which SMUG claims persecution is "sexual orientation." (Dkt. 27, ¶¶ 1, 5, 13, 44, 232, 237, 238, 241, 247, 248). However, "sexual orientation" is plainly not one of the grounds enumerated in the Rome Statute. SMUG cannot establish that "persecution" based upon "sexual orientation" is "universally recognized as impermissible under international law," because a large number of nations treat homosexuality as conduct, not an "identity," and ban, restrict or otherwise "discriminate" against or "persecute" homosexual conduct. The following findings by scholars and human rights organizations conclusively demonstrate that "persecution" of homosexual conduct (or "sexual orientation") is **not** universally proscribed in the international community, and therefore cannot serve as a basis for an action premised on "persecution":

- "[D]iscrimination on the basis of sexual orientation still persists throughout most of the developing world. Gay, lesbian, bisexual, or transgender (GLBT) relations are **criminalized in over eighty-two nations**, and **the penalty for being gay often includes public humiliation, hard labor, confinement, torture, harassment, blackmail, spurious trials with no right to appeal or death**."[22]

- "[A]t least **fifty-five countries across the world still criminalize homosexuality**, and **only a handful of countries have adopted legislation designed to prevent sexual orientation discrimination**."[23]

- According to a 2009 study by The International Lesbian, Gay, Bisexual, Trans and Intersex Association, "**no less than 80 countries around the world consider homosexuality illegal**."[24]

---

[22] Pratima Narayan, *Somewhere over the Rainbow. . . International Human Rights Protections for Sexual Minorities in the New Millennium*, 24 B.U. Int'l L.J. 313, 314 (2006) (emphasis added).

[23] Debra L. DeLaet, *Don't Ask, Don't Tell: Where Is the Protection Against Sexual Orientation Discrimination in International Human Rights Law?*, 7 Law & Sexuality 31, 33 (1997) (emphasis added).

[24] *Daniel* Ottosson, *State-sponsored homophobia: a world survey of laws criminalising same-sex sexual acts between consenting adults*, International Lesbian, Gay, Bisexual, Transgender and Intersex Association (ILGA), Brussels, May 2009, p. 5 (available at http://ilga.org/historic/Statehomophobia/ILGA_State_Sponsored_Homophobia_2009.pdf, last visited June 20, 2012).

- According to the 2012 World Report of Human Rights Watch, which calls itself "one of the world's leading independent organizations dedicated to defending and protecting human rights:"[25]

  o   In the **European Union**, "homophobic and transphobic biases persist in public opinion, **policies, and laws**."[26]

  o   "**U[nited] S[tates]** law offers **no protection against discrimination based on sexual orientation or gender identity**."[27]

- The 2011 World Report by the same organization reported that in the **European Union**, "Germany and other EU states blocked efforts to upgrade EU anti-discrimination laws to prohibit discrimination on grounds of … sexual orientation. **National obstacles to ending discrimination against lesbian, gay, bisexual, and transgender people also remained**, including in the Netherlands."[28]

Moreover, SMUG complains bitterly that the bill contemplated by the Ugandan Parliament, **if it is ever passed**, will criminalize its advocacy, and thus "would render [its] work and mere existence illegal." (Dkt. 27, ¶ 68). Setting aside the fact that SMUG's complaint is not ripe and should be addressed to the Ugandan Parliament, not Mr. Lively or this Court, the criminalization of advocacy on homosexual issues is by no means peculiar to Uganda, and is not universally condemned by the international community, or even the so-called "civilized" world:

- As of 1997, only a few years before SMUG alleges that Mr. Lively's "criminal" conduct began in Uganda, "**many states restrict gay, lesbian, and bisexual persons' freedom of speech and expression**. Notably, these restrictions are in place in 'democracies' as well as 'nondemocracies.' For example, **it is illegal in both Great Britain and Austria 'to publicly advocate, promote or encourage homosexuality.'** As these examples indicate, **sexual orientation discrimination is prevalent throughout most of the world**."[29]

---

[25] *World Report 2012*, Human Rights Watch, at Preface (available at http://www.hrw.org/sites/default/files/reports/wr2012.pdf, last visited June 20, 2012).

[26] *Id.* at 444 (emphasis added).

[27] *Id.* at 662-63 (emphasis added).

[28] *World Report 2011*, Human Rights Watch, p. 424 (emphasis added) (available at http://www.hrw.org/sites/default/files/reports/wr2011.pdf, last visited June 20, 2012).

[29] DeLaet, *supra* note 23, at 33.

- As of 2011, "**[O]fficial discrimination** against lesbian, gay, bisexual, and transgender people in China **limits them from realizing fundamental rights of expression and association**."[30]

- As of 2012 "[t]he **tendency in Russia is toward limiting freedom of speech and freedom to gather**, targeting any group that somehow stands up for its rights."[31] St. Petersburg has recently become the fourth city in Russia to pass a law criminalizing homosexual "propaganda."[32] "The law is part of **a wider government initiative**," "as **politicians** and Orthodox Church **push for laws to apply nationwide**."[33] "**Gay pride parades are regularly banned in Russia and violently broken up by police**."[34]

The fact that much of the rest of the world does not cherish the First Amendment freedoms of speech and expression that are fundamental to United States citizens can hardly come as a surprise to SMUG. "However dearly our country holds First Amendment rights, [the Court] must conclude that **a violation of the First Amendment right of free speech does not rise to the level of such universally recognized rights and so does not constitute a 'law of nations.'**" *Guinto v. Marcos*, 654 F. Supp. 276, 280 (S.D. Cal. 1986) (dismissing Alien Tort Statute claim for lack of subject-matter jurisdiction) (emphasis added) (quoted with approval in, *In re Estate of Ferdinand Marcos, Human Rights Litig.*, 25 F.3d 1467, 1475 (9th Cir. 1994)). *See also*, *Villeda Aldana v. Fresh Del Monte Produce, Inc.*, 305 F. Supp. 2d 1285, 1298 (S.D. Fla. 2003) ("abridgement of rights … like the freedom of speech, has been found not to constitute a violation of the law of nations") (dismissing Alien Tort Statute claim for lack of subject-matter jurisdiction

---

[30] *World Report 2011*, *supra* note 28, at p. 307.

[31] *St. Petersburg bans 'homosexual propaganda'*, The Guardian, March 12, 2012 (emphasis added) (available at http://www.guardian.co.uk/world/2012/mar/12/st-petersburg-bans-homosexual-propaganda, last visited June 20, 2012); *see also*, Michael Schwirtz, "Anti-Gay Law Stirs Fears in Russia", (available at http://www.nytimes.com/2012/03/01/world/asia/anti-gay-law-stirs-fears-in-russia.html, last visited June 20, 2012).

[32] *Id*.

[33] *Id*. (emphasis added).

[34] *Id*. (emphasis added).

because plaintiffs could not establish that First Amendment-type rights are universally recognized around the world) (citing *Guinto*, 654 F. Supp. at 280), *aff'd in part, vacated in part on other grounds*, 416 F.3d 1242 (11th Cir. 2005).

Since "sexual orientation" does not enjoy universally-recognized "fundamental rights" in much of the world, it is not surprising that international treaties, human rights documents and legal norms do not at all, much less "universally," proscribe or condemn even the outright criminalization of homosexual conduct, much less mere public or private speech against it. This fact is also borne out in scholarly surveys of international law on this subject:

- "**[N]one of these documents [**"**international human rights instruments**"**] explicitly outlaws discrimination on the basis of sexual orientation**. Sexual minorities continue to fear the overwhelming threats of **state-sanctioned persecution**, and stronger international protections for gays and lesbians are necessary to achieve **even the most fundamental human rights**."[35]

- "[T]he Universal Declaration of Human Rights … the International Covenant on Economic, Social and Cultural Rights… the International Covenant on Civil and Political Rights … most of the human rights documents adopted in the post-World War II era, including the 1951 Convention on the Prevention and Punishment of the Crime of Genocide, the 1951 Convention Relating to the Status of Refugees, and various regional human rights instruments, … **notably missing from the language in these human rights documents are clauses that specifically identify sexual orientation as an inappropriate basis for discrimination**."[36]

In addition to "sexual orientation," SMUG also claims persecution on the grounds of "gender" and "gender identity." (Dkt. 27, ¶¶ 1, 5, 13, 44, 232, 237, 238, 241, 247, 248). By these terms, SMUG cannot possibly mean that its members were persecuted because they were naturally male or female. There is not even one allegation in SMUG's Amended Complaint that could suggest that Mr. Lively (or any of his so-called "co-conspirators," or any of the alleged perpetrators of the eight acts of persecution) harbors animus towards men because they were born

---

[35] Narayan, *supra* note 22, at 315 (emphasis added).

[36] DeLaet, *supra* note 23, at 31-32 (emphasis added).

men, or towards women because they were born women. The only animus alleged is towards "lesbian, gay, bisexual, transgender and intersex people." (Dkt. 27, ¶ 1). Thus, to the extent SMUG intended to use "gender" or "gender identity" in the traditional sense of those terms, to claim persecution based on natural male or female status, that would be precisely the type of "[t]hreadbare recital[] of the elements of a cause of action, supported by mere conclusory statements, [that] do[es] not suffice." *Iqbal*, 556 U.S. at 678.[37]

What SMUG obviously alleges is **not** persecution based on traditional gender identity, but rather persecution based on "**trans**gender" or "intersex" "identity." However, those two grounds, like "sexual orientation," are not among the impermissible grounds enumerated in the Rome Statute. Art. 7(1)(h). The Statute expressly defines the term "gender" as "the two sexes, male and female," and provides that it "does not indicate any meaning different from [that]." *Id.* at Art. 7(3). Moreover, like "sexual orientation," SMUG cannot establish that discrimination based upon "transgender" or "intersex" "identity" is "universally recognized as impermissible under international law." As shown by the studies above, a great many nations do not recognize such "identities" and therefore do not afford them "fundamental rights." Even more specifically:

---

[37] SMUG also cannot claim traditional gender discrimination for two other reasons. First, SMUG is an organization, so it is neither male nor female, and does not have a "gender identity." Therefore, SMUG cannot state a claim for gender identity persecution on its own behalf. (*See* section IV(B), *infra*). Second, SMUG cannot state a claim for traditional "gender identity" persecution in a representative capacity, on behalf of its members, because such claim would fail the second prong of the *Hunt* test for associational standing. *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977) (association has standing to bring representative claims only when "the interests it seeks to protect are germane to the organization's purpose"). (*See* section IX, *infra*). Here, SMUG has not alleged that its purpose is to advocate for, or support, men or women against traditional gender discrimination or "persecution." (Dkt. 27, ¶¶ 1, 18, 20). It has alleged only that its purpose and mission is to "advocat[e] on behalf of lesbian, gay, bisexual, transgender, and intersex" people. (*Id.* at ¶ 18). Therefore, SMUG cannot bring a claim for persecution based upon traditional "gender identity" in either an individual or representative capacity.

- According to a 2009 study by The International Lesbian, Gay, Bisexual, Trans and Intersex Association, **only sixteen countries in the entire world** prohibit "discrimination in employment based on gender identity."[38]

- According to a 2012 study by Human Rights Watch, "[a]t least **sixteen EU countries, including the Netherlands,**" have laws "**requiring transgender people to undergo sex reassignment surgery and irreversible sterilization** to legally change their gender."[39]

In sum, "[t]here is no particular or universal understanding of the civil and political rights covered by [SMUG's] claim." *Kiobel v. Royal Dutch Petroleum Co.*, 456 F. Supp. 2d 457, 467 (S.D.N.Y. 2006), *aff'd in part, rev'd in part on other grounds,* 621 F.3d 111, 190 (2d Cir. 2010), *cert. granted*, 132 S. Ct. 472 (2011) (concluding that court lacked subject-matter jurisdiction over claims of denial of "life, liberty, security and association" under the Alien Tort Statute, because rights were not sufficiently specific and not universally recognized). SMUG cannot articulate any universally recognized international norms that Mr. Lively allegedly violated. As such, SMUG's Amended Complaint should be dismissed, with prejudice.

## IV.    SMUG'S CLAIM FOR PERSECUTION FAILS TO STATE A CAUSE OF ACTION.

Even if SMUG had standing, the Court had subject-matter jurisdiction, and the First Amendment was not immovably in SMUG's way, none of which is true, SMUG has still failed to state a cause of action for persecution, because: (A) Mr. Lively's protected political speech is not "persecution"; (B) SMUG is an organization, not an individual, and cannot be "persecuted"; (C) SMUG has failed to allege an essential element of persecution; (D) Mr. Lively is a private individual, not a state actor, and cannot be a "persecutor"; and (E) SMUG has not alleged that Mr. Lively himself committed any acts of persecution. Accordingly, SMUG's persecution claims (Count I, II and III) should be dismissed, with prejudice.

---

[38] Ottosson, *supra* note 24, p. 51.

[39] *World Report 2012*, *supra* note 25, at p. 444.

### A. MR. LIVELY'S PROTECTED POLITICAL SPEECH IS NOT "PERSECUTION."

"[T]he [Alien Tort Statute] 'applies only to **shockingly egregious** violations of universally recognized principles of international law.'" *Beanal v. Freeport-McMoran, Inc.*, 197 F.3d 161, 167 (5th Cir. 1999) (emphasis added) (quoting *Zapata v. Quinn,* 707 F.2d 691, 692 (2d Cir. 1983)). SMUG purports to charge Mr. Lively with the "crime against humanity of persecution," but "a crime against humanity … is reserved for **the most egregious violations of international law, such as genocide and slavery**." *Villeda Aldana v. Fresh Del Monte Produce, Inc.*, 305 F. Supp. 2d 1285, 1300 (S.D. Fla. 2003) (emphasis added), *aff'd in part, vacated in part on other grounds, remanded sub nom. Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242 (11th Cir. 2005). "Most [Alien Tort Statute] cases have determined liability for 'crimes against humanity' **only for the most heinous of crimes**, such as **murder and extermination, slavery, ethnic cleansing, and torture**, which are undertaken as part of a widespread or systematic attack against a civilian population." *Villeda Aldana*, 305 F. Supp. 2d at 1300 (emphasis added).

SMUG asks this United States Court to punish a United States citizen because he allegedly did two things, both of which are wholly protected by the First Amendment as core political speech: (1) allegedly shared his **opinion** that all who engage in homosexual conduct are "evil" and have a "predilection for child sexual violence"; and (2) advocated, lobbied and otherwise tried to influence two members of the Ugandan government (and other private citizens) to propose and pursue laws that "criminalize advocacy undertaken by [homosexual] rights advocates." (Dkt. 27, ¶¶ 65-93). Even if SMUG's allegations were true (and they could not be farther from truth), Mr. Lively's protected political speech cannot possibly constitute a "crime against humanity," "even by the wildest stretch of imagination." *Zapata v. Quinn*, 707 F.2d 691,

37

692 (2d Cir. 1983) (affirming dismissal of Alien Tort Statute claims, and awarding double costs as sanctions for bringing a frivolous lawsuit).

SMUG may vehemently disagree with Mr. Lively's opinions on homosexuality and homosexual conduct. SMUG may find those opinions offensive or hurtful. But SMUG has no right to invoke the jurisdiction of this Court against one of its citizens because SMUG was offended or insulted by Mr. Lively's speech and advocacy, and certainly not under the guise of a "crime against humanity," reserved "only for the most heinous of crimes." *Villeda Aldana*, 305 F. Supp. 2d at 1300.

Mr. Lively in no way endorses or approves of any violence that may have been perpetrated against anyone. He has strongly condemned the killing of David Kato, even after it was revealed that Mr. Kato was killed by a homosexual prostitute over a prostitution deal gone bad. (*See* p. 8, *supra*). Mr. Lively has also strongly condemned those who have incited others to imminent violence, and has praised Ugandan courts for punishing such incitements. (*See* p. 12, *supra*). While he has certainly criticized, sometimes with strong words, those who push for the normalization of homosexual conduct, Mr. Lively has never incited others to imminent violence, and SMUG does not allege otherwise.

SMUG has not alleged any direct connection between Mr. Lively and the alleged perpetrators of the eight acts of "persecution" in its Amended Complaint, other than to claim that Mr. Lively's opinions created a "climate of hostility and prejudice" against homosexuals. (Dkt. 27, ¶ 226). These allegations fall far short of the standard necessary to overcome the high wall of protection afforded for pure speech under the First Amendment. "[T]he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing **imminent lawless action** *and* is **likely** to incite or produce such action." *Brandenburg v. Ohio,*

395 U.S. 444, 447 (1969) (per curiam) (emphasis added). SMUG's allegations do not remotely meet this high standard here.

Moreover, whether the "climate" is hostile or not, whenever SMUG or its constituents have gone to court in Uganda to seek redress for unlawful arrests, acts of violence or even incitements to imminent violence, they have prevailed and their rights under Ugandan law were affirmed. SMUG and its constituents have won damages against the police, they have put offending tabloids out of business with damage awards, and they have obtained permanent injunctions against future incitements by other publications. (*See* pp. 6-7, 11-12, *supra*). SMUG's own chairman declared that "**we have received justice**," and "**we are no longer afraid of anything**." (*See* p. 12, *supra*). The homosexual prostitute who confessed to killing Mr. Kato is now rotting in jail. (*See* p. 7, *supra*). The "anti-homosexuality" bill has never been enacted into law, and "activists believe the controversial law will never pass." (*See* pp. 10-11, *supra*).

This is hardly the "intentional and severe deprivation of fundamental rights" and the "widespread or systematic attack against a civilian population" that SMUG alleges in a conclusory, "threadbare" fashion just to recite the elements of persecution, the "most heinous of crimes." (Dkt. 27, ¶¶ 229-235). And it certainly is not "persecution" **by Mr. Lively**, whom SMUG alleges to have done nothing but speak. Mr. Lively hopes that SMUG and its constituents are never subjected to violence, but if they are, they should continue to pursue the **real** perpetrators of such crimes **in Ugandan courts**, as they have repeatedly and successfully done thus far. SMUG should not clog up United States courts with meritless lawsuits against United States citizens exercising their fundamental right to non-violent political discourse, for the admitted purpose of "mak[ing] it too costly" to exercise those fundamental rights. (*See* pp. 10-11, *supra*).

SMUG's Amended Complaint should be dismissed, with prejudice.

### B. SMUG CANNOT STATE A CLAIM FOR PERSECUTION IN ITS OWN RIGHT, BECAUSE IT IS AN ORGANIZATION, NOT AN INDIVIDUAL.

In its "First Claim for Relief," SMUG attempts to assert a claim of persecution not only in a representative capacity, but also on its own behalf. (Dkt. 27, ¶¶ 236-239). However, to the extent it is even a "tort," persecution can only be claimed by natural persons, not organizations. SMUG defines "[p]ersecution as a crime against **humanity**" (*id.* at ¶ 3) (emphasis added), and repeatedly and exclusively refers to it as such in the Amended Complaint. SMUG, however, is obviously not a human being, so it cannot claim to be the victim of a "crime against **humanity**."

SMUG also defines persecution as "the intentional and severe deprivation of fundamental rights contrary to international law by reason of [] identity" (*id.*), and claims that it was itself "deprived of these rights **on the basis of gender and/or sexual orientation and gender identity**." (*Id.* at ¶¶ 232, 237-238). However, because it is not a human being, SMUG can have neither a "gender" nor "gender identity." Equally obvious, because SMUG is not a human being, it can have neither sexual relations, nor "sexual orientation" nor "sexual identity." Even SMUG apparently recognizes these irrefutable facts, because, notwithstanding its claim that it has been persecuted, it ultimately admits in its Amended Complaint that "[t]he prohibition on persecution protects **individuals** on the basis of their identity." (*Id.* at ¶ 3) (emphasis added). Since SMUG also admits that it is an "umbrella **organization**," and not an individual (*id.* at ¶ 1) (emphasis added), there is no dispute that SMUG has no standing to claim persecution on its own behalf.

Beyond unassailable logic, SMUG's inability to claim persecution as an organization is confirmed by the dictates of international law:

> The contemporary international law of human rights has developed largely since the Second World War. **It is concerned with natural persons only**, and **it applies to all human beings**, not to aliens alone. It reflects general acceptance that every **individual** should have rights in his or her society which the state should recognize, respect, and ensure.

Restatement (Third) of Foreign Relations Law VII, Introductory Note (1987) (emphasis added).

The Restatement specifically defines "Human Rights" as the "freedoms, immunities, and benefits which, according to widely accepted contemporary values, every **human being** should enjoy in the society in which he or she lives." Restatement (Third) of Foreign Relations Law § 701 cmt. a (1987) (emphasis added). And, while subsections (1) and (2) of § 703 of the Restatement provide that **States** may pursue certain remedies, the last subsection, (3), provides: "An **individual** victim of a violation of a human rights agreement may pursue any remedy provided by that agreement or by other applicable international agreements." Restatement § 703 (emphasis added). SMUG is neither a "state," nor an "individual." Nowhere are corporations, organizations or associations granted a similar right or remedy. (*Id.*)

The Second Circuit has recently reinforced the principle that only states and individuals have rights (and liabilities) in the international human rights arena. *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 118 (2d Cir. 2010) *reh'g denied,* 642 F.3d 268 (2d Cir. 2011) and *cert. granted,* 132 S. Ct. 472 (U.S. 2011) ("The singular achievement of international law since the Second World War has come in the area of human rights, where the subjects of customary international law – *i.e.*, those with international **rights**, duties, and liabilities – now include not merely *states,* but also *individuals*") (bold emphasis added; italics in original). In *Kiobel*, the Second Circuit affirmed the dismissal of human rights abuse claims brought under the Alien Tort Statute against corporate defendants, concluding that organizations are neither states nor individuals, and thus cannot violate international law. *Id*. at 148-149. While that court was focused on whether organizations could be **defendants** under the Alien Tort Statute, the reasoning for its decision – that only states and individuals have "**rights**, duties and liabilities" in

the international human rights arena – means that organizations also cannot be **plaintiffs** (in their own right), because they do not have "**human** rights." *Id*. at 118 (emphasis added).[40]

Even more on point, in *Chowdhury v. WorldTel Bangladesh Holding, Ltd.*, 588 F. Supp. 2d 375 (E.D.N.Y. 2008), two alien corporations sought to bring various tort claims against a United States citizen and others under the Alien Tort Statute. *Id*. at 378-79. The corporations alleged that one of their officers had been tortured and subjected to cruel, inhuman or degrading treatment. *Id*. at 378. The corporations pleaded the same claims as the individual officer, and sought to recover in their own right for damages they claimed to have incurred in connection with the ill treatment of their officer. *Id*. The court allowed some of the **individual** plaintiff's claims to proceed, but **dismissed with prejudice all of the claims brought by the corporation**:

> there is no viable theory under the [Alien Tort Statute] upon which the corporate plaintiffs here can recover. **Corporations are not tortured; they are not subject to cruel, inhuman or degrading treatment**. … There is no domestic law norm that would recognize such a claim, let alone an international law norm.

*Id.* at 387 (emphasis added).

If an organization cannot be tortured or subjected to cruel, inhuman or degrading treatment, then it cannot be persecuted. Accordingly, SMUG failed to state a persecution claim for itself, and Counts I, II and III of its Amended Complaint should be dismissed.

## C.   SMUG HAS FAILED TO PLEAD AN ESSENTIAL ELEMENT OF PERSECUTION.

Even if SMUG could be "persecuted" as an organization, which it cannot be, SMUG still has not stated a claim for persecution, either representatively or in its own right, because it has failed to plead an essential element of persecution.

---

[40] As detailed in Mr. Lively's Motion to Stay Proceedings, the *Kiobel* case is currently pending at the Supreme Court. (Dkts. 14, 17). The question of organizational rights and liabilities under international law is just one of several issues which will be examined by the High Court, and which has the potential to significantly impact or alter the course of this litigation. This Court denied Mr. Lively's Motion to Stay. (Endorsed Order, June 1, 2012).

SMUG purports to plead persecution under the Rome Statute of the International Criminal

Court ("ICC"). (Dkt. 27, ¶ 3).[41] The relevant part of the Rome Statute provides:

'crime against humanity' means any of the following acts when committed as part
of a widespread or systematic attack directed against any civilian population, with
knowledge of the attack:

(a) Murder;  (b) Extermination;  (c) Enslavement;  (d) Deportation  or  forcible
transfer of population; (e) Imprisonment or other severe deprivation of physical
liberty in violation of fundamental rules of international law; (f) Torture; (g) Rape,
sexual slavery, enforced prostitution, forced pregnancy, enforced sterilization, or
any other form of sexual violence of comparable gravity; (h) **Persecution** against
any identifiable group or collectivity on political, racial, national, ethnic, cultural,
religious, gender as defined in paragraph 3, or other grounds that are universally
recognized as impermissible under international law, **in connection with any act
referred to in this paragraph or any crime within the jurisdiction of the
Court**; (i) Enforced disappearance of persons; (j) The crime of apartheid; (k) Other
inhumane acts of a similar character intentionally causing great suffering, or
serious injury to body or to mental or physical health.

Rome      Statute,      Art.      7(1)      (emphasis      added)      (available      at
http://untreaty.un.org/cod/icc/statute/romefra.htm, last visited June 20, 2012). "Persecution" is

defined as "the intentional and severe deprivation of fundamental rights contrary to international

law by reason of the identity of the group or collectivity." *Id*., at Art. 7(2)(g).

The ICC, responsible for enforcing the Rome Statute, has cautioned:

Since article 7 pertains to international criminal law, its provisions, consistent with
article 22, **must be strictly construed**, taking into account that crimes against
humanity as defined in article 7 are among **the most serious crimes of concern to
the international community** as a whole.[42]

---

[41] This discussion assumes, for the sake of argument, that the Rome Statute is universally recognized and
thus an actionable international norm under the Alien Tort Statute. This is, in fact, not the case, as
demonstrated in section III(A), *supra*.

[42] *Rome Statute: Elements of Crimes*, p. 5, Art. 7, Crimes Against Humanity, Introduction #1 (emphasis
added) (published by the International Criminal Court and available at http://www.icc-
cpi.int/NR/rdonlyres/9CAEE830-38CF-41D6-AB0B-68E5F9082543/0/Element_of_Crimes_English.pdf,
last visited June 20, 2012).

By the plain terms of the Rome Statute, one cannot commit "persecution" in the abstract. Art. 7(1)(h). To be liable for "persecution," the persecutor must also commit "**any act referred to in this paragraph or any crime within the jurisdiction of the Court**." *Id.* (emphasis added). This is also made clear in the *Elements of Crimes* manual of the International Criminal Court, which provides six separate elements for the crime of "Persecution," the fourth of which is that "[t]he conduct was committed in connection with any act referred to in article 7, paragraph 1, of the Statute or any crime within the jurisdiction of the Court." *Rome Statute: Elements of Crimes*, p. 11, Art. 7(1)(h), Crime Against Humanity of Persecution: Elements.

Thus, if it could state a claim for "persecution" against Mr. Lively, SMUG would have to allege not only that sexual minorities constituted a protected class and that Mr. Lively severely and intentionally deprived that protected class of fundamental rights, **but also that he committed one of the other enumerated acts in Article 7(1), or one of the other three general crimes within the jurisdiction of the International Criminal Court (*i.e.*, genocide, war crimes or military aggression)**. *Id.* SMUG clearly fails to make such allegations, nor could it do so in good faith. SMUG does not allege, for example, that Mr. Lively committed genocide or war crimes, nor that he tortured, murdered, enslaved, raped or imprisoned anyone.

SMUG does allege that a handful of "activists" were arrested and **quickly** released (and that some of them obtained vindication and damages from Ugandan courts). SMUG also alleges that one activist, David Kato, "was killed in his home," although it does not reveal that the confessed perpetrator was a homosexual prostitute, and that his confessed motive was a botched sex-for-money transaction. Be that as it may, in neither instance does SMUG allege that Mr. Lively himself committed these acts, nor that he encouraged or assisted the alleged perpetrators. SMUG's spurious "aiding and abetting" and "conspiracy" allegations can be fairly read, at most, to claim that Mr. Lively lobbied the Ugandan government to enact certain laws which SMUG

considers discriminatory.[43] Nothing in SMUG's Amended Complaint can be interpreted to allege that Mr. Lively conspired with or aided **the perpetrators** of the alleged acts of persecution.

Accordingly, SMUG has failed to plead an essential element of "persecution," and, therefore, its Amended Complaint should be dismissed.[44]

### D.   SMUG CANNOT STATE A CLAIM FOR PERSECUTION BECAUSE MR. LIVELY IS NOT A STATE ACTOR.

In its "First Claim for Relief" ("Persecution: Individual Responsibility"), SMUG attempts to assert both a direct liability claim against Mr. Lively for allegedly committing persecution himself (dkt. 27, ¶ 237), as well as a secondary liability claim for "aiding and abetting" others to persecute. (*Id.* at ¶ 238). SMUG's direct liability claim is barred because Mr. Lively is a private citizen not a state actor (*id.* at ¶¶ 22-23), and thus he cannot commit "persecution."[45]

In *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732 & n.20 (2004), the Supreme Court emphasized that "the determination [of] whether a norm is sufficiently definite to support a cause of action [under the Alien Tort Statute]" includes the "related consideration [of] whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a **private** actor." *Id.* (emphasis added). Pre- and post-*Sosa* courts have held that **crimes against humanity are not actionable against non-state actors**.

"The general rule is that international law only binds state actors." *Estate of Rodriquez v. Drummond Co., Inc.*, 256 F. Supp. 2d 1250, 1260-61 (N.D. Ala. 2003). However, the Restatement

---

[43] SMUG's "aiding and abetting," "conspiracy" and "joint criminal enterprise" claims themselves fail to state causes of action, as demonstrated in sections V, VI and VII, respectively, *infra*.

[44] SMUG also fails to state a claim for persecution under the Rome Statute for another, independent reason: SMUG has failed to allege persecution based upon one of the enumerated impermissible grounds in Article 7(1)(h), and SMUG cannot establish that the grounds which it has alleged "are universally recognized as impermissible under international law," as required by that treaty. This fatal defect is examined fully in section III(B), *supra*.

[45] The insufficiency of SMUG's other claim, for aiding and abetting persecution, is demonstrated in section V, *infra*.

(Third) of Foreign Relations Law recognizes that, in certain limited circumstances, "[i]ndividuals may be held liable for offenses against international law, **such as piracy, war crimes, or genocide**." Restatement (Third) of Foreign Relations Law II, Introductory Note (1987) (emphasis added). As such, "there exists a 'handful of crimes to which the law of nations attributes individual responsibility.'" *Kadic v. Karadzic*, 70 F.3d 232, 240 (2d Cir. 1995) (quoting *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 795 (D.C. Cir. 1984) (EDWARDS, J. concurring)). "[B]ut **no court has found more in that 'handful' than war crimes, crimes committed in pursuit of genocide, slave trading, aircraft hijacking, and piracy**." *Doe v. Islamic Salvation Front*, 257 F. Supp. 2d 115, 120 (D.D.C. 2003) (emphasis added) (citing *Kadic,* 70 F.3d at 240).

Thus, "courts interpreting the [Alien Tort Statute] have found that certain forms of conduct – **piracy, the slave trade, slavery and forced labor, aircraft hijacking, genocide, and war crimes** – violate the law of nations 'whether undertaken by those acting under the auspices of a state or only as private individuals.'" *Estate of Rodriquez*, 256 F. Supp. 2d at 1260-61 (emphasis added) (allowing claims of extrajudicial killing to proceed against non-state actor under Alien Tort Statute only because killings were adequately alleged to be part of war crimes) (quoting *Kadic,* 70 F.3d at 239). In *Kadic*, the Second Circuit found that genocide and war crimes were within the "handful of crimes" actionable against non-state actors under the Alien Tort Statute, as were torture and summary execution **when committed in the course of genocide or war crimes**. 70 F.3d at 241-244. The Second Circuit permitted claims of torture and killing against a non-state actor, but only because they were adequately alleged to have been committed in the course of genocide or war crimes. *Id*. at 244.

Other courts have routinely dismissed claims against non-state actors under the Alien Tort Statute which do not fall within the limited "handful of [recognized] crimes," including, specifically, crimes against humanity. *See e.g.*, *Islamic Salvation Front*, 257 F. Supp. 2d at 120

(granting summary judgment on claim for crimes against humanity under Alien Tort Statute, because only plaintiff's airplane hijacking claim "can be found on that short list" of international torts actionable against non-state actors); *In re S. African Apartheid Litig.*, 617 F. Supp. 2d 228, 251-52 (S.D.N.Y. 2009) (dismissing direct liability claims under Alien Tort Statute, because "[a]lthough the establishment of state-sponsored apartheid and the commission of inhumane acts needed to sustain such a system is indisputably a tort under customary international law, the international legal system has not thus far definitively established liability for non-state actors") ("this Court declines to recognize a tort of apartheid by a non-state actor").

In *Beanal v. Freeport-McMoRan, Inc.*, the court dismissed an Alien Tort Statute claim for crimes against humanity brought against a private actor, concluding that "[c]ertain conduct … only violates the law of nations if committed by a state actor." 969 F. Supp. 362, 371 (E.D. La. 1997) *aff'd, Beanal v. Freeport-McMoran, Inc.*, 197 F.3d 161 (5th Cir. 1999). "[Plaintiff] **must allege state action in order to state a claim under § 1350 for non-genocide related human rights violations abuses**." *Id*. at 373 (emphasis added). "**State action is required to state a claim for violation of the international law of human rights**." *Id*. at 380 (emphasis added).

The same outcome must obtain here. SMUG attempts to bring a direct liability claim for the crime against humanity of persecution against Mr. Lively, who SMUG concedes is a private citizen, not a state actor. (Dkt. 27, ¶ 22). Because neither crimes against humanity in general, nor persecution in particular, is on the "short list" of "handful of crimes" actionable against non-state actors, SMUG's direct liability claims against Mr. Lively should be dismissed.[46]

---

[46] Even if SMUG is able to show that some nations or some courts have recognized direct liability claims for persecution against non-state actors, in light of the authorities above SMUG certainly cannot meet its burden of showing that such causes of action are "universally recognized" in the international community. As such, the Court lacks subject-matter jurisdiction over SMUG's claim (*see*, section III, *supra*), which is another, independent reason requiring dismissal.

**E.    SMUG HAS NOT ALLEGED THAT MR. LIVELY HIMSELF COMMITTED ANY ACTS OF PERSECUTION.**

Finally, SMUG's direct liability claim of persecution against Mr. Lively fails for still another, more basic reason: SMUG has failed to allege that Mr. Lively has committed any acts of persecution **himself**. SMUG's allegations that Mr. Lively aided and abetted or conspired with others to persecute SMUG are relevant, if at all, only to those secondary liability claims. They do not support SMUG's direct liability claim.

In *Liu Bo Shan v. China Const. Bank Corp.*, 421 F. App'x 89 (2d Cir. 2011), the Second Circuit affirmed the dismissal of a direct liability claim of torture and inhuman treatment under the Alien Tort Statute. *Id*. at 92. Like SMUG does here, Plaintiff in *Liu* alleged that the police committed various acts of unlawful unrest, torture and inhuman treatment. *Id*. Also like SMUG, Plaintiff in *Liu* did not sue the police, but sued a private bank, and it alleged that the bank provided the police with the false information leading to his unlawful arrest and eventual torture. *Id*. Also like SMUG, Plaintiff in *Liu* alleged inhuman treatment only by the police, not by the Bank. *Id*. Said the Second Circuit: "[l]ike the district court, we conclude that these allegations are insufficient to support a reasonable inference of direct liability by the Bank for conduct—torture, cruel treatment, and prolonged arbitrary detention—that the amended complaint repeatedly asserts was committed by the Chinese government police." *Id*.

SMUG has sued Mr. Lively for "persecution," but does not allege that he, himself, committed any of the eight acts of persecution alleged in its Amended Complaint. (*See* pp. 4-8, *supra*). SMUG's direct-liability claim of persecution against Mr. Lively therefore must fail.

In sum, SMUG has failed to state a claim for persecution. Without a cognizable tort upon which to premise its first three "Claims for Relief," SMUG has no cause of action, so those claims (Counts I, II and III) must be dismissed, with prejudice.

V.     **SMUG'S CLAIM FOR AIDING AND ABETTING PERSECUTION FAILS TO STATE A CLAIM BECAUSE PLAINTIFF HAS NOT ALLEGED THE REQUIRED ELEMENTS.**

In light of the foregoing arguments and authorities, SMUG may be tempted to abandon its **direct** liability claim for persecution against Mr. Lively, and shift the focus to its **secondary** liability claim, stated in the same Count I. Here, SMUG purports to assert a claim for purposefully "aid[ing], abet[ing], or otherwise assist[ing] in the commission or attempted commission of the crime [of persecution], including by providing the means for its commission." (Dkt. 27, ¶ 238). However, this claim fares no better than the direct liability claim, and it should also be dismissed, for two reasons: (A) SMUG has failed to allege any conduct that constitutes aiding and abetting persecution; and (B) SMUG's conclusory allegations fail to demonstrate the requisite intent.

SMUG's allegations about Mr. Lively's speech (or alleged "conduct") can be condensed into two points: (1) that he advocated for the criminalization of homosexual advocacy, and (2) that he conflated homosexual identity with a propensity to commit violent acts. (Dkt. 27, ¶¶ 65-93). SMUG's claim suggests that engaging in the marketplace of ideas itself somehow constitutes the *actus reus* of aiding and abetting and manifests a purposeful *mens rea*. Using this false premise as a foundation, SMUG then summarily concludes that Mr. Lively has therefore aided and abetted the commission of persecution by third parties. (*Id.* at ¶ 238). However, this is a "naked assertion" devoid of "further factual enhancement," which was expressly found insufficient in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557). Even if true, Mr. Lively's alleged statements are merely opinions he holds and expresses, not conduct furthering persecution or the manifestation of an intent to persecute.

*Twombly*, as interpreted by *Iqbal*, is particularly pertinent to this case because plaintiffs in *Twombly* alleged a form of secondary liability (conspiracy) that the Supreme Court found

49

inadequate because the allegations were either conclusory or not plausible. *Id.* at 680. In *Iqbal*, the

Supreme Court summarized this part of *Twombly* as follows:

> The Court held the plaintiffs' complaint deficient under Rule 8. In doing so it first
> noted that the plaintiffs' assertion of an unlawful agreement was a "'legal
> conclusion'" and, as such, was not entitled to the assumption of truth. . . . The
> Court next addressed the "nub" of the plaintiffs' complaint—the well-pleaded,
> nonconclusory factual allegation of parallel behavior—to determine whether it
> gave rise to a "plausible suggestion of conspiracy." Acknowledging that parallel
> conduct was consistent with an unlawful agreement, the Court nevertheless
> concluded that it did not plausibly suggest an illicit accord **because it was . . .
> compatible with . . . lawful, [] free-market behavior**. Because the well-pleaded
> fact of parallel conduct, accepted as true, did not plausibly suggest an unlawful
> agreement, the Court held the plaintiffs' complaint must be dismissed.

*Id.* (internal citations omitted) (emphasis added).

Similarly, here SMUG alleges that Mr. Lively is part of a conspiracy and that he aided and

abetted the perpetrators of the alleged persecution. Also like *Twombly* and *Iqbal*, but perhaps to

an even greater degree, conclusory and implausible allegations are littered throughout SMUG's

Amended Complaint, especially with regard to the claim of aiding and abetting persecution.

Given this plethora of cardinal pleading sins, this claim should be dismissed.

### A.    SMUG FAILS TO ALLEGE ANY CONDUCT THAT CONSTITUTES AIDING AND ABETTING PERSECUTION.

It is well settled that an international norm must be specific, universal, and obligatory,

*Sosa v. Alvarez-Machain*, 542 U.S. 692, 732 (2004). In addition, the standard for *actus reus* is

"**practical assistance** to the principal which has a **substantial effect** on the perpetration of the

crime." *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 259 (2d Cir. 2009)

(emphasis added); *see also Liu Bo Shan v. China Const. Bank Corp.*, 421 F. App'x 89, 94 (2d Cir.

2011) (allegations failed to show practical assistance or substantial effect on the perpetration of

the crime). Moreover, to show practical assistance and substantial effect on the commission of the

crime, the plaintiff must make "detailed allegations." *In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig.*, 792 F. Supp. 2d 1301, 1347-48 (S.D. Fla. 2011).

Here, SMUG not only fails to make detailed allegations, but also fails to set forth **any** factual allegations that show practical assistance or substantial effect on the perpetration of the eight alleged acts of persecution. The closest SMUG comes to showing any assistance to the other four members of the alleged conspiracy (**but not to the actual perpetrators of the eight acts of persecution themselves**) is the allegation that Mr. Lively shared with Ugandan government officials his views on how to counteract the promotion of homosexuality. (Dkt. 27, ¶¶ 77-79). But advocating and lobbying the government on a matter of policy is quintessential protected First Amendment activity, and can by no means constitute "practical assistance" in furtherance of a conspiracy to commit a crime. Nor does the passage (much less mere consideration) of legislation constitute a criminal act. Indeed, SMUG utterly fails to show any connection or interaction whatsoever between Mr. Lively and the alleged perpetrators of the eight acts of persecution themselves, much less actual, practical assistance in committing the alleged crimes.

SMUG also alleges broadly that Mr. Lively "provid[ed] the means" for his alleged co-conspirators to commit "persecution." (Dkt. 27, ¶ 238). Setting aside the fact that the four co-conspirators to whom Mr. Lively allegedly "provided the means" **are not the same individuals who perpetrated the eight alleged acts of persecution**, SMUG utterly fails to provide any detail concerning what "means," beyond mere ideas, Mr. Lively supposedly provided. After all, SMUG has not suggested that Mr. Lively handed the hammer to Mr. Kato's homosexual lover. Once again, then, this allegation is nothing but a "naked assertion," and should not be countenanced by this Court. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

Similarly, SMUG's allegations fail to demonstrate that Mr. Lively's speech (or alleged "conduct") had a substantial effect on the alleged tort.[47] While SMUG vaguely attempts to connect Mr. Lively's speech to subsequent acts that allegedly constitute persecution (dkt. 27, ¶¶ 26-33), SMUG does not provide any detailed, factual allegations showing that Mr. Lively's speech actually caused such substantial effect. And although SMUG attempts to plead "but for" causation by conclusory allegations (*id*. at ¶¶ 5, 8), "such an argument is foreclosed by the requirement that, to be actionable, assistance must be **both** 'practical' **and** have 'a substantial effect on the perpetration of the crime,' which is not this case." *Liu Bo Shan v. China Const. Bank Corp.*, 421 F. App'x 89, 94 (2d Cir. 2011) (quoting *Presbyterian Church,* 582 F.3d at 258) (emphasis added). Given the absence of any detailed, factual allegations demonstrating that Mr. Lively's protected speech (or alleged "conduct") practically assisted or had a substantial effect on the alleged persecution, the claim cannot stand.

Claims for aiding and abetting crimes against humanity must fail unless supported by non-conclusory allegations. *Abecassis v. Wyatt*, 704 F. Supp. 2d 623, 655 (S.D. Tex. 2010). In *Abecassis*, plaintiffs brought claims under the Alien Tort Statute for aiding and abetting crimes against humanity. *Id.* at 635. Plaintiffs alleged that defendants knew that the kickbacks paid to Saddam Hussein through the Oil for Food Program were funding terrorist attacks in Israel. *Id.* The court dismissed the claims, finding that the underlying allegations were conclusory. *Id.* at 655. Furthermore, the court found that "[t]he complaint does not come close to alleging facts, either direct or circumstantial, that would establish that any of the defendants **intended** to facilitate or encourage terrorist attacks in Israel." *Id.* (emphasis added).

---

[47] Even if SMUG could show that Mr. Lively's speech had a substantial effect on his audience, which it cannot, SMUG's claim would nevertheless fail, because Mr. Lively's speech was wholly protected by the First Amendment. (*See* section II, *supra*.)

SMUG's Amended Complaint suffers from the same fatal flaw. There are simply no facts, direct or circumstantial, tying Mr. Lively's speech (or alleged "conduct") **to the individuals who committed the eight alleged acts of persecution**. Rather, SMUG alleges that Mr. Lively aided and abetted four **other** "co-conspirators" – Mr. Langa, Mr. Ssempa, Mr. Buturo and Mr. Bahati – simply by sharing his views with them on a matter of public concern. (Dkt. 27, ¶ 44). But even if this conclusory allegation were accepted as valid and true, it is undisputed that the eight alleged acts of persecution **were not committed by any of these men** but by others, whom SMUG has not alleged to have had any ties whatsoever to Mr. Lively. (*See*, pp. 4-8, *supra*).

SMUG's sweeping generalizations that Mr. Lively "deliberately invited, induced and encouraged . . . Ugandans . . . to fight back" with "severe repression, arrest, and . . . even violence" devoid of specifics, is premised on an article by Mr. Lively, which SMUG cites. (Dkt. 27, ¶¶ 92-93 n.39). In that article, however, Mr. Lively **never called on anyone to use force or violence**, let alone imminent violence, against SMUG or anyone else. Scott Lively, *Murdering Uganda*, Defend the Family International (Feb. 5, 2011) (available at http://www.defendthefamily.com/pfrc/newsarchives.php?id=5422609, last visited June 21, 2012). In fact, in that very article incorporated in SMUG's Amended Complaint, Mr. Lively strongly condemned the murder of David Kato, calling it "a horrific crime." *Id.* Additionally, Mr. Lively also pointed out that, contrary to the false narrative fostered by SMUG and its allies, the truth is that Mr. Kato was not murdered because of anything Mr. Lively or other advocates might have said, but by "a live-in male prostitute . . . [who] murdered Kato for failing to pay him as promised." *Id.* Nowhere in this article does Mr. Lively call for or condone violence. *Id.* The "murder" mentioned in the title of his article is what Mr. Lively described as the metaphysical "murder" of a God-fearing nation by those who oppose the rule of law. *Id.* Thus, SMUG's own "evidence" gives the lie to its claim.

Moreover, **moral support cannot constitute aiding and abetting**. *Liu Bo Shan v. China Const. Bank Corp.*, 421 F. App'x 89, 94 (2nd Cir. 2011) (holding that allegations of "encouragement and support" do not amount to practical assistance and substantial effect); *Doe v. Nestle, S.A.*, 748 F. Supp. 2d 1057, 1105 (C.D. Cal. 2010) ("**[A]iding and abetting by way of 'moral support' and 'tacit approval and encouragement' is a rare breed (and, in fact, a non-existent breed for purposes of the Alien Tort Statute**)") (emphasis added). As the court in *Nestle* observed, although the phrases "'moral support' or 'tacit encouragement and approval' are often quoted as part of the general aiding and abetting legal standard, [] there are simply **no holdings** that apply that portion of the standard." *Id.* at 1108 (emphasis added). The court further noted that "moral support is far too uncertain and inchoate a rule" to meet *Sosa*'s standard of specificity and universal acceptance among civilized nations to support a claim under the Alien Tort Statute. *Id.* (citation omitted) (quoting *Sosa*, 542 U.S. at 732, 738).

The characterizations of Mr. Lively's protected speech in SMUG's Amended Complaint, amount to nothing more than a claim that Mr. Lively provided moral support and tacit encouragement to certain Ugandans.[48] (Dkt. 27, ¶ 93). Even if true, no court has recognized such allegations as constituting aiding and abetting. Assistance that is far more direct and concrete has been found insufficient to establish *actus reus*. "[M]erely 'supplying a violator of the law of nations with funds' as part of a commercial transaction, without more, cannot constitute aiding and abetting a violation of international law." *Nestle*, 748 F. Supp. 2d at 1099 (quoting *In re S. African Apartheid Litig.*, 617 F.Supp.2d 228, 269 (S.D.N.Y. 2009)). A *fortiori*, merely exercising one's First Amendment rights by expressing opinions to government officials cannot constitute aiding and abetting. *See Aziz v. Alcolac, Inc.*, 658 F.3d 388, 401 (4th Cir. 2011); *Nestle*, 748 F.

---

[48] Unlike plaintiff's allegations in *Nestle*, SMUG's allegations cannot be understood to state that Mr. Lively approved of the alleged persecution, as explained *supra*.

Supp. 2d at 1099; *In re S. African Apartheid*, 617 F. Supp. 2d at 257 ("It is (or should be) undisputed that simply doing business with a state or individual who violates the law of nations is insufficient to create liability under customary international law. International law does not impose liability for declining to boycott a pariah state or to shun a war criminal.").

### B. SMUG'S CONCLUSORY ALLEGATIONS FAIL TO PLEAD THE REQUISITE INTENT.

Not only has SMUG failed to allege that Mr. Lively committed any specific act of aiding and abetting, but it has also failed to set forth any non-conclusory allegations that Mr. Lively acted with the **purpose** of aiding the perpetrators to persecute **specific victims**. Without meeting these basic requirements, the aiding and abetting claim fails on the *mens rea* ground alone.

Adhering to *Sosa*'s guiding principle, the *mens rea* standard for secondary liability, including aiding and abetting, requires a demonstration of purpose. *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 255 (2nd Cir. 2009) ("The decisive issue in this case is whether accessorial liability can be imposed absent a showing of purpose," a question the court emphatically answered in the negative); *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 400-01 (4th Cir. 2011) (adopting the purpose *mens rea* standard and noting that, although not dispositive, the Supreme Court "chose not to disturb the Second Circuit's specific intent analysis [in *Presbyterian Church*] when it declined" to grant certiorari); *Nestle*, 748 F. Supp. 2d at 1110-11 (citing *Presbyterian Church* and other sources in adopting the purpose *mens rea* standard); *Abecassis v. Wyatt*, 704 F. Supp. 2d 623, 655 (S.D. Tex. 2010) (applying *Presbyterian Church*) ("[T]he [Alien Tort Statute] will only confer jurisdiction if there are allegations of purposefulness.").[49]

---

[49] Even if the Court were to apply the minority standard and assume that the *mens rea* element is satisfied on the basis of mere knowledge of the persecution, SMUG's allegations nevertheless fail as a matter of law, because they do not show that Mr. Lively knew that his speech (or alleged "conduct") would provide practical assistance to, or substantially affect, the perpetrators of the alleged persecution.

To adequately allege secondary liability for crimes against humanity, a plaintiff must allege that the defendant actually **intended** for **specific** harm to occur to **specific** victims. *In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig.*, 792 F. Supp. 2d 1301, 1349 (S.D. Fla. 2011) ("With respect to [defendant]'s secondary liability for the [perpetrator]'s crimes against humanity, Plaintiffs must allege that [defendant] not only intended for the [perpetrator] to torture and kill, but that [defendant] intended for the [perpetrator] to torture and kill civilians"); *Nestle*, 748 F. Supp. 2d at 1111 ("Plaintiffs' allegations fail to raise a plausible inference that Defendants knew or should have known that the **general** provision of money, training, [and] tools . . . helped to further the **specific** wrongful acts committed by the Ivorian farmers") (emphasis added). In addition to showing particularized intent, a plaintiff must use **non-conclusory** allegations to show that intent. *Abecassis*, 704 F. Supp. 2d at 655.

In *Liu Bo Shan v. China Construction Bank Corp.*, plaintiff brought claims under the Alien Tort Statute against defendant for aiding and abetting (1) torture, (2) cruel, inhumane, and degrading treatment, and (3) prolonged arbitrary detention, by alleging that the defendant bank had aided the police in committing these torts. *Liu Bo Shan v. China Const. Bank Corp.*, 421 Fed. App'x 89, 90 (2d Cir. 2011). Specifically, plaintiff "allege[d] that the Bank falsified evidence and induced the police to arrest [plaintiff] in retaliation for his release of [an] audit [of the Bank]." *Id.* at 94. The Second Circuit nevertheless upheld the dismissal of the complaint:

> Notwithstanding Liu's assertions that the Chinese government exercised a 'high degree of control' over the Bank and 'shared the goal of silencing Liu,' . . . the amended complaint fails plausibly to allege that the Bank acted with the **purpose** that Liu be subjected to torture, cruel treatment, or prolonged arbitrary detention by the police. . . . Although 'intent must often be demonstrated by the circumstances,' **Liu's allegations do not support a reasonable inference that the Bank acted with the purpose to advance violations of customary international law** . . . .

*Id.* (emphasis added) (internal citations omitted) (quoting *Presbyterian Church*, 582 F.3d at 264).

Much like the plaintiff in *Liu*, SMUG's allegations imply that Mr. Lively's pure speech somehow induced the Ugandan perpetrators to persecute SMUG. (Dkt. 27, ¶¶ 92-93). However, even with the allegation of a "high degree of control" over the perpetrators, something SMUG failed to allege, the *Liu* plaintiff failed to warrant a plausible inference that the defendant "acted with the purpose to advance violations of customary international law." *Liu*, 421 Fed. App'x at 94. SMUG's reliance on vague and conclusory circumstantial allegations, premised on nothing more than protected speech, are similarly unavailing here. Even if Mr. Lively had encouraged a course of action **generally**, the failure to show an intent that the **specific** acts of persecution be committed against **specific** victims is fatal to SMUG's aiding and abetting claim.

It is one thing to allege purpose in a formulaic allegation with a pro forma label; it is quite another to actually demonstrate purpose by detailed, non-conclusory allegations. *See Iqbal*, 556 U.S. at 678 ("[L]abels and conclusions or a formulaic recitation of the elements of a cause of action will not do") (quoting *Twombly*, 550 U.S. at 555) (internal quotation marks omitted). SMUG's naked allegations of purposive intent fail to include the detailed, non-conclusory elements necessary to support its claim. Accordingly, the claim for aiding and abetting persecution should be dismissed.

## VI.   SMUG'S CLAIM FOR CONSPIRACY TO PERSECUTE FAILS BOTH BECAUSE THE COURT LACKS SUBJECT-MATTER JURISDICTION AND BECAUSE SMUG FAILS TO STATE A CAUSE OF ACTION.

In its "Third Claim for Relief," SMUG purports to assert a claim for "Crime Against Humanity of Persecution: Conspiracy." (Dkt. 27, ¶¶ 246-250). This claim should be dismissed, both because the Court lacks subject-matter jurisdiction, and because it fails to state a cause of action against Mr. Lively.

57

A.   **THE COURT DOES NOT HAVE SUBJECT-MATTER JURISDICTION OVER SMUG'S CONSPIRACY CLAIM BECAUSE CONSPIRACY LIABILITY IS NOT UNIVERSALLY RECOGNIZED AND CLEARLY DEFINED UNDER INTERNATIONAL LAW.**

As demonstrated in section III, *supra*, alleged violations of international norms that are not universally accepted and clearly defined do not come within the reach of the Alien Tort Statute, and thus are outside the subject-matter jurisdiction of this Court. Conspiracy is such a violation, and, therefore, SMUG's claim must be dismissed.

Since the Alien Tort Statute is strictly "a jurisdictional statute creating no new causes of action," *Sosa*, 542 U.S. at 724, courts must look to international law to determine not only the **existence** of liability for the challenged conduct, *id*. at 733 ("Alvarez's detention claim must be gauged against the current state of international law"), but also the **scope** of that liability. *Id*. at 732 n.20 ("A related consideration is whether international law extends the **scope** of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual") (emphasis added). "**To find [Alien Tort Statute] jurisdiction over an alleged secondary tort, there must be a sufficient and sufficiently definite international consensus supporting not only the underlying tort but also the form of secondary liability for that tort**." *Abecassis v. Wyatt*, 704 F. Supp. 2d 623, 654 (S.D. Tex. 2010) (applying *Sosa*) (emphasis added).

Because it knows that international law does not recognize conspiracy claims, SMUG may entreat this Court to look to United States federal common law, which is much more hospitable to such claims.[50] However, numerous federal courts applying *Sosa* have properly rejected similar requests and looked only to international law, as *Sosa* requires. *See e.g.*, *In re S. African*

---

[50] Under federal common law, "a defendant who does not directly commit a substantive offense may nevertheless be liable if the commission of the offense by a co-conspirator in furtherance of the conspiracy was reasonably foreseeable to the defendant as a consequence of their criminal agreement." *United States v. Bruno*, 383 F.3d 65, 89 (2d Cir. 2004) (citing *Pinkerton v. United States*, 328 U.S. 640, 646-48 (1946)).

*Apartheid Litig.*, 617 F. Supp. 2d at 263 ("I again look to customary international law as the source of relevant authority" to determine whether conspiratorial liability may be asserted under the Alien Tort Statute); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 453 F. Supp. 2d 633, 665 n.64 (S.D.N.Y. 2006) ("this Court continues to believe that international law must supply the substantive law for plaintiffs' [conspiracy] claims") (rejecting request to apply *Pinkerton*), *aff'd*, 582 F.3d 244, 260 (2d Cir. 2009) ("As a matter of first principles, we look to international law to derive the elements for any such cause of action" [for conspiracy]); *Abecassis*, 704 F. Supp. 2d at 654 ("International law, according to [*Sosa*], also defines who may be sued for violating that norm. There is no reason to believe that international law determines whether private – as well as state – actors can be sued but not whether secondary – as well as primary – actors can be sued."). Fidelity to Supreme Court precedent necessitates that this Court likewise look exclusively to international law to determine whether SMUG can assert a claim of conspiracy to persecute under the Alien Tort Statute.

Fortunately, the Supreme Court has made this Court's task of divining the contours of international law on conspiratorial liability relatively easy. In *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006), the Supreme Court reviewed various sources of international law and held that:

> the only 'conspiracy' crimes that have been recognized by international war crimes tribunals (**whose jurisdiction often extends beyond war crimes proper to crimes against humanity** and crimes against the peace) are **conspiracy to commit genocide and common plan to wage aggressive war** …

*Id*. at 610 (emphasis added). The Supreme Court quoted with approval other international jurists who "made a persuasive argument that **conspiracy in the truest sense is not known to international law**." *Id*. at 611 (emphasis added) (internal quotes omitted). Finally, the Supreme Court quoted various United Nations War Crimes Commissions, which "observ[ed] that, although a few individuals were charged with conspiracy under European domestic criminal codes

59

following World War II, the United States Military Tribunals established at that time **did not recognise as a separate offence conspiracy to commit** war crimes or **crimes against humanity**." *Id.* at 611 n.40 (emphasis added) (internal quotes omitted).

As with all Supreme Court precedent, "this Court must [] apply the Supreme Court's assessment of the law of nations." *In re S. African Apartheid Litig.*, 617 F. Supp. 2d at 263. Thus, even though *Hamdan* was not decided under the Alien Tort Statute, the Supreme Court's determination that international law forecloses conspiratorial liability for all but two offenses, neither of which is claimed here, is binding. *Id.* Applying *Hamdan* specifically to conspiracy claims brought under the Alien Tort Statute, the court in *S. African Apartheid* held:

> **Jurists from the civil law tradition have long resisted the application of conspiracy to crimes under the law of nations**, as conspiracy is an Anglo–American legal concept. Importantly, the Supreme Court recently stated in *Hamdan v. Rumsfeld* that the law of war provides liability only for 'conspiracy to commit genocide and common plan to wage aggressive war.' While *Hamdan* did not address the [Alien Tort Statute], this Court must nevertheless apply the Supreme Court's assessment of the law of nations. ***Sosa* requires that this Court recognize only forms of liability that have been universally accepted by the community of developed nations. Conspiracy does not meet this standard. Therefore, this Court declines to recognize conspiracy as a distinct tort to be applied pursuant to [Alien Tort Statute] jurisdiction**.

*Id.* at 263 (emphasis added).

The *South African Apartheid* court is by no means unique in its application of the *Hamdan* - *Sosa* principle to reject conspiratorial liability for alleged human rights abuses under the Alien Tort Statute. *See e.g.*, *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 453 F. Supp. 2d at 664-65 ("As of today, therefore, liability under the ATS for participation in a conspiracy may **only attach where the goal of the conspiracy was either to commit genocide or to commit aggressive war** …. As described above, [plaintiffs] contend that [defendant] joined **a conspiracy to commit a crime against humanity** …. As a result, the defendants' motion for summary judgment on the conspiracy claim is granted") (emphasis added) (applying *Hamdan*), *aff'd*, 582

F.3d 244, 260 (2d Cir. 2009) ("plaintiffs have not established that international law universally recognizes a doctrine of conspiratorial liability") (internal quotes and alterations omitted).

Here, SMUG seeks to assert a claim of conspiracy not for the two torts allowed under *Hamdan*, but for a "crime against humanity," which was specifically dismissed in *South African Apartheid* and *Presbyterian Church of Sudan*. SMUG's claim should meet the same fate.[51]

**B.      SMUG'S CLAIM FOR CONSPIRACY TO PERSECUTE FAILS TO STATE A CAUSE OF ACTION BECAUSE SMUG FAILS TO ALLEGE THE REQUISITE *MENS REA*.**

Even if the Court could exercise jurisdiction over SMUG's conspiracy to persecute claim, which it cannot, the Court would have to dismiss it because it fails to state a cause of action. SMUG has not alleged the *mens rea* required to support a conspiracy claim.

"**A conspiracy claim requires the same proof of *mens rea* as an aiding and abetting claim.**" *Liu Bo Shan v. China Const. Bank Corp.*, 421 Fed. App'x 89, 93-94 & n.6 (2d Cir. 2011) (emphasis added) ("Assuming, without deciding, that [plaintiff] might assert a claim under the [Alien Tort Statute] for conspiracy," and affirming dismissal of such claim for failure to plead sufficient facts to infer requisite *mens rea*) (citing *Presbyterian Church*, 582 F.3d at 260). As demonstrated in section V, *supra*, SMUG has failed to plead sufficient facts from which the requisite *mens rea* could be inferred, either for aiding or abetting or for conspiracy. **SMUG does not allege that Mr. Lively "conspired" with the actual perpetrators of the eight alleged acts of persecution**, that is, the police who allegedly made unlawful arrests, the tabloids who

---

[51] SMUG will undoubtedly point to *Cabello v. Fernandez-Larios,* 402 F.3d 1148 (11th Cir. 2005) (per curiam), where the Eleventh Circuit recognized conspiracy liability under the Alien Tort Statute for a number of violations of international law including crimes against humanity. *Id.* at 1159. However, *Cabello* was decided before *Hamdan*. Moreover, the Eleventh Circuit ran afoul of the Supreme Court's instruction in *Sosa*, and looked to domestic rather than international law to determine whether conspiracy liability exists. *Id.* For these reasons the Second Circuit expressly rejected *Cabello*, agreeing instead with the lower court in *Presbyterian Church of Sudan*, "that *Sosa* required applying international law." *Presbyterian Church of Sudan*, 582 F.3d at 260 n.11 (affirming *Presbyterian Church,* 453 F. Supp. 2d at 665 n.64) ("the Eleventh Circuit erred … by drawing on domestic law, and not international law"). This court should likewise reject *Cabello*, and follow the Supreme Court's clear teaching in *Hamdan* and *Sosa*.

published incitements to violence, or the homosexual prostitute who confessed to killing David

Kato. The facts alleged by SMUG demonstrate that Mr. Lively's so-called "conspiracy" with two

members of the Ugandan government and two private citizens was, in reality, protected, non-

violent political speech.

Accordingly, SMUG's conspiracy to persecute claim fails to state a cause of action and

should be dismissed.

## VII.   SMUG'S CLAIM FOR JOINT CRIMINAL ENTERPRISE SHOULD BE DISMISSED FOR LACK OF SUBJECT-MATTER JURISDICTION AND FAILURE TO STATE A CAUSE OF ACTION.

In its "Second Claim for Relief," SMUG attempts to state a "claim" against Mr. Lively for

participating in a "Joint Criminal Enterprise" to commit persecution. (Dkt. 27, ¶¶ 240-245). This

claim also fails.

The Supreme Court has observed that **one** court, "[t]he International Criminal Tribunal for

the former Yugoslavia (ICTY), drawing on the Nuremberg precedents, has adopted a 'joint

criminal enterprise' theory of liability, but that is **a species of liability for the substantive**

**offense** (akin to aiding and abetting), **not a crime on its own**." *Hamdan v. Rumsfeld*, 548 U.S.

557, 611, n.40 (2006) (emphasis added) (citing *Prosecutor v. Tadíc,* Judgment, Case No. IT–94–

1–A (ICTY App. Chamber, July 15, 1999)). Because it lacks "universal recognition" in

international courts, the theory of joint criminal enterprise has been dismissed, along with

conspiracy claims, in Alien Tort Statute cases. *See e.g.*, *Presbyterian Church Of Sudan v.*

*Talisman Energy, Inc.*, 582 F.3d 244, 260 (2d Cir. 2009) (affirming dismissal of joint criminal

enterprise theory along with conspiracy claims because plaintiff had failed to establish universal

recognition, and, in any event, had failed to establish the requisite *mens rea*); *In re S. African*

*Apartheid Litig.*, 617 F. Supp. 2d 228, 263 (S.D.N.Y. 2009) (noting that "the ICTY recognized

Joint Criminal Enterprise as a crime derived from customary international law and comparable to

conspiracy, [h]owever, the ICC has repeatedly declined to apply a broad notion of conspiratorial liability under customary international law"). Because it lacks universal recognition and is not clearly defined, this Court should also dismiss for lack of subject matter jurisdiction SMUG's "claim" for joint criminal enterprise. (*See* section III, *supra*).

To the extent joint criminal enterprise is universally recognized and clearly defined, which it is not, it "**would require the same proof of *mens rea* as [SMUG's] claims for aiding and abetting**." *Presbyterian Church*, 582 F.3d at 260 (emphasis added). As demonstrated in section V, *supra*, SMUG has not adequately pled the requisite *mens rea* for aiding and abetting persecution or joint criminal enterprise. SMUG's factual allegations reveal, at most, that Mr. Lively engaged in non-violent political discourse and lobbied a government to enact legislation which SMUG does not like. SMUG does not allege that Mr. Lively was in any "joint enterprise" **with the actual perpetrators of the eight acts of alleged persecution**, nor could it do so in good faith. SMUG only alleges that Mr. Lively was in a "joint enterprise" with the two members of the Ugandan government he was advising on legislation, and two other private Ugandan citizens. Mr. Lively's (and other citizens') lobbying of legislators is not a "criminal enterprise," but a right guaranteed by the First Amendment (at least for Mr. Lively, who is a United States citizen).

Accordingly, SMUG's "claim" for joint criminal enterprise must meet the same fate as its claim for aiding and abetting. *Presbyterian Church*, 582 F.3d at 260 (affirming dismissal of joint criminal enterprise theory for failure to satisfy same *mens rea* requirement as aiding and abetting); *Shan v. China Const. Bank Corp.*, 09 CIV. 8566 (DLC), 2010 WL 2595095 (S.D.N.Y. June 28, 2010), *aff'd sub nom. Liu Bo Shan v. China Const. Bank Corp.*, 421 Fed. App'x 89 (2d Cir. 2011) (same).

## VIII.   SMUG'S STATE LAW CLAIMS ARE TIME-BARRED AND FAIL TO STATE COGNIZABLE CLAIMS FOR RELIEF.

SMUG seeks to assert two brand new claims in its Amended Complaint, one for Civil Conspiracy ("Fourth Claim for Relief") (dkt. 27, ¶¶ 251-256), and one for Negligence. (*Id*. at ¶¶ 257-262). SMUG purports to bring these claims "under Massachusetts state law" (*id*. at ¶ 4), and invokes both diversity and supplemental jurisdiction. (*Id*. at ¶ 15).[52] SMUG's state law claims must be dismissed because: (A) they are time-barred, (B) they are not viable under Uganda law, and (C) they fail to state claims for relief under Massachusetts law.

### A.     SMUG'S STATE LAW CLAIMS ARE TIME-BARRED.

"When facing a claim that does not arise under the Constitution or the laws of the United States, a federal court must apply the substantive law of the forum in which it sits, including that state's conflict-of-laws provisions." *Dykes v. DePuy, Inc.*, 140 F.3d 31, 39 (1st Cir. 1998). Under Massachusetts' conflict-of-laws rules, the Massachusetts statute of limitations is applied whenever it would bar the claims in suit, even if the claims themselves are governed by the laws of another state. *Shamrock Realty Co., Inc. v. O'Brien*, 72 Mass. App. Ct. 251, 256 (2008) ("**The forum will apply its own statute of limitations barring the claim**") (emphasis added) (holding that shorter Massachusetts limitations period must be applied to bar claims brought in Massachusetts that were otherwise governed by Rhode Island law) (quoting Restatement (Second) of Conflict of Laws § 142(1) (1988 Revision)).[53]

---

[52] Since the Court has no subject-matter jurisdiction over SMUG's federal Alien Tort Statute claims (*see* section III, *supra*, and section XI, *infra*), there can be no "supplemental" jurisdiction over state law claims. 28 U.S.C. § 1367(a); *In re Nifedipine Antitrust Litig.*, 335 F. Supp. 2d 6, 19 (D.D.C. 2004) ("if the underlying [federal question] claim is dismissed on jurisdictional grounds, then the Court does not have available to it the option of maintaining supplemental jurisdiction over pendant state law claims").

[53] Incidentally, the limitations period for tort actions involving personal injuries under Uganda law is the same as in Massachusetts (three years). Uganda Limitations Act of 1959, Chapter 80, Section 3, Subsection 1 (available at http://www.ulii.org/ug/legislation/consolidated-act/80, last visited August 8, 2012).

64

1.      **SMUG's Civil Conspiracy Claim is Time-Barred.**

Under Massachusetts law, "civil conspiracy [is] subject to the three-year limitations period." *Pagliuca v. City of Boston*, 35 Mass. App. Ct. 820, 823 (1994) (citing Mass. Gen. Laws Ann. ch. 260, § 2A (West)). The three-year limitations period "begins to run when plaintiffs are aware of an overt violation." *Nieves v. McSweeney*, 9905457J, 2001 WL 1470497, *3 (Mass. Super. Oct. 3, 2001) *aff'd,* 60 Mass. App. Ct. 1107 (2003). "[T]he injury and the damage alleged in the tort of civil conspiracy **flow from the first overt act**." (*Id.*) (emphasis added). Accordingly, "**a civil conspiracy claim accrues on the date of the first allegedly wrongful act**." *Lamoureux v. Smith*, 07953B, 2007 WL 4633272, *2 (Mass. Super. Nov. 5, 2007) (emphasis added).

Here, SMUG alleges that Mr. Lively has engaged in a "decade-long campaign," and that he "has worked and schemed with others in Uganda for at least the past ten years." (Dkt. 27, ¶¶ 1, 25, 46). The "first allegedly wrongful act" supposedly took place in 2002, when Mr. Lively visited Uganda and delivered several public speeches on homosexuality that SMUG does not like. (*Id.* at ¶¶ 26, 47-52). SMUG became aware of this in 2002, because Mr. Lively's visit and speeches were very public and received "substantial media attention." (*Id.* at ¶ 26).[54] Because SMUG did not file this action until a decade later, on March 14, 2012 (dkt. 1), SMUG missed the limitations period **by more than seven (7) years**, and its civil conspiracy claim is time barred.

---

[54] Any claim by SMUG that the limitations period should be tolled on fraudulent concealment or other grounds would be absurd. SMUG readily admits, repeatedly throughout the Amended Complaint, that Mr. Lively's advocacy in Uganda was done in public, involved large public audiences, and often times received great media attention. (*E.g.*, dkt. 27, ¶¶ 26, 47-52, 75-84). SMUG alleges that Mr. Lively's supposedly tortious speeches and activities were publically "promote[d]" and "advertised" on the Internet and elsewhere. (*Id.* at ¶ 76). SMUG alleges that its own employees and members were mistreated by police and other Ugandan actors in 2005, 2007 and 2008, and that it had to come to their assistance at those times. (*Id.* at ¶¶ 186-214). Accordingly, SMUG's own Amended Complaint precludes any argument that SMUG did not or could not know of the alleged wrongs sufficiently early to bring a timely suit.

SMUG may attempt to breathe new life into its untimely and hastily-minted civil conspiracy claim, with a "continuing conspiracy" theory, under which SMUG would seek to hold Mr. Lively liable for the **last** (not first) overt act **committed by his alleged "co-conspirators."** However, the First Circuit has "explicitly repudiated the notion … that the statute of limitations for civil conspiracy should run from the date of the last overt act." *Nieves v. McSweeney*, 241 F.3d 46, 51 (1st Cir. 2001). "Injury and damage in a civil conspiracy action flow from the overt acts, **not from the mere continuance of a conspiracy**." *Kadar Corp. v. Milbury*, 549 F.2d 230, 234 (1st Cir. 1977) (emphasis added). *See also*, *Nieves*, 2001 WL 1470497 at *3 (limitations period "in the tort of civil conspiracy flow[s] from the first overt act, **not from the mere continuation of the conspiracy**") (emphasis added); *Lamoureux*, 2007 WL 4633272 at *2 ("**another wrongful act in that same conspiracy does not reset the time period during which a plaintiff may file suit**") (emphasis added).

Moreover, the First Circuit has categorically barred attempts to extend the limitations period against one conspirator based on the subsequent acts of other co-conspirators:

> Plaintiffs present the theory that a cause of action for civil conspiracy accrues only on the date of the last overt act committed by anyone in furtherance of the conspiracy. **They rely upon the purported overt acts of other co-conspirators** in 1973-75 to hold open against [defendants] a conspiracy cause of action that would embrace, inter alia, the 1971-72 acts. **This proposition is incorrect**. … [D]efendants cannot be held liable for acts allegedly committed in 1971 and 1972. As for the post-1972 period, no overt acts **specifically implicating these defendants** are alleged.

*Kadar*, 549 F.2d at 235 (emphasis added) (internal alterations, quotes and citations omitted). As a result, "plaintiff must allege and prove that **each defendant to be charged** committed an action … in furtherance of the conspiracy **within the limitation period**." *Gual Morales v. Hernandez Vega*, 579 F.2d 677, 681 (1st Cir. 1978) (emphasis added).

Accordingly, even if the Court were to adopt a last (rather than first) overt act theory, which it should not do, SMUG could still only rely upon Mr. Lively's alleged conduct, and not any of his "co-conspirators." *Id.* SMUG's civil conspiracy claim would therefore fail, because it has not alleged any wrongful act **by Mr. Lively** within the limitations period (that is, after March 14, 2009). SMUG alleges that Mr. Lively's last visit to Uganda, and the so-called "2009 Anti-Gay Conference," **ended on March 7, 2009**. (Dkt. 27, ¶ 75). The conference that lies at the very heart of SMUG's Amended Complaint is therefore outside the limitations period. SMUG does not allege that Mr. Lively ever returned to Uganda. The **only** five (5) post-2009 "actions" SMUG alleges of Mr. Lively are that:

(1)     Mr. Lively gave an interview in North America on April 17, 2012, in which he discussed "**his activities during the 2002 visits**" and **the 2009 visit** to Uganda (dkt. 27, ¶¶ 56, 85 & n.15, n.33) (emphasis added);

(2)     Mr. Lively gave speeches "**to audiences in Moldova**," and engaged in advocacy on homosexual issues "**in Moldova, Latvia, Russia [and] Lithuania**" in 2011 (*id.* at ¶¶ 61-64) (emphasis added);

(3)     Mr. Lively issued a press statement in 2010 discussing "**his 2009 efforts and teachings in Uganda**" (*id.* at ¶ 66) (emphasis added);

(4)     Mr. Lively stated in a 2012 interview that he "review[ed] and comment[ed] upon the draft" of the homosexuality bill considered by the Ugandan Parliament, "**before it was introduced**" in early 2009 (*id.* at ¶¶ 86-87) (emphasis added); and

(5)     Mr. Lively wrote an Internet blog article about Uganda in February 2011, **the same article in which he called Mr. Kato's murder "a horrific crime."** (*Id.* at ¶ 92 & fn.39).

None of these actions are actionable. They are protected, non-violent political speech. Post-limitations discussion of pre-limitations conduct cannot possibly bring the latter within the

former. SMUG does not purport to have operations in former Soviet countries, nor does it purport to represent anyone outside Uganda. Commenting upon the draft of a bill as part of an open political process (even if it occurred during the limitations period, which, apparently it did not) is core First Amendment speech. It would not be actionable "conspiracy" even if the bill had passed, and much less so since the bill never passed and is not expected to ever pass.

Because SMUG does not allege any actionable conduct by Mr. Lively after March 14, 2009, and because SMUG waited over 10 years to file this lawsuit after it became aware of Mr. Lively's first allegedly wrongful act, SMUG's civil conspiracy claim is time-bared. The Court should dismiss it with prejudice.

### 2.     SMUG's Negligence Claim is Time-Barred.

SMUG's negligence claim fares no better. The Massachusetts limitations period for negligence actions is also three years. Mass. Gen. Laws Ann. ch. 260, § 2A (West). "The statutory period begins to run[] when the plaintiff knows or reasonably should have known that it sustained appreciable harm as a result of the defendant's negligence." *Int'l Mobiles Corp. v. Corroon & Black/Fairfield & Ellis, Inc.*, 29 Mass. App. Ct. 215, 218 (1990). SMUG alleges that, as a result of the "virulently hostile environment" negligently created by Mr. Lively's speech (dkt. 27, ¶ 258), its own employees and members were mistreated (or "persecuted") by police and other Ugandan actors in 2005, 2007 and 2008. (*Id*. at ¶¶ 186-214). SMUG claims that it suffered harm at those times, by having to divert resources to assist its employees and members. (*Id*. at ¶¶ 189, 194, 208, 213, 214). But SMUG did not file this action until March 14, 2012. (Dkt. 1). And, as demonstrated in the preceding section, SMUG has not alleged any actionable, non-protected speech or conduct of Mr. Lively within the limitations period. SMUG's negligence claim is therefore time-barred and should be dismissed.

**B.      SMUG'S STATE LAW CLAIMS FAIL UNDER UGANDA LAW.**

Even if SMUG's civil conspiracy and negligence claims were not time-barred, and they are, they should still be dismissed because they are not viable under Ugandan law. "Massachusetts has adopted a functional choice-of-law approach [which] is explicitly guided by the Restatement (Second) of Conflict of Laws (1971)." *Clarendon Nat. Ins. Co. v. Arbella Mut. Ins. Co.*, 60 Mass. App. Ct. 492, 495-96 (2004). That Restatement, in turn, provides that:

> In an action for a personal injury, **the local law of the state where the injury occurred** determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.

Restatement (Second) of Conflict of Laws § 146 (1971) (emphasis added).

Here, all of the injuries alleged by SMUG occurred in Uganda. SMUG cannot show that Massachusetts has a more significant relationship to those alleged injuries and the parties, because: (a) all of the eight alleged acts of persecution took place, if at all, in Uganda; (b) SMUG, its employees, its constituent member organizations and the "LGBTI community" it purports to represent are all in Uganda; (c) any speech or "conduct" by Mr. Lively of which SMUG complains took place in Uganda; (d) all four of Mr. Lively's alleged co-conspirators are in Uganda; (e) all of the alleged perpetrators of the eight acts of persecution are in Uganda; and (f) by its own admission, SMUG has "received justice" in Uganda courts and under Ugandan law. Accordingly, SMUG's civil conspiracy and negligence claims are governed by Uganda law.

While Uganda law recognizes **criminal** conspiracies, including conspiracy to commit a felony, conspiracy to commit a misdemeanor, and conspiracy to commit various other crimes,[55] **Uganda law does not recognize civil conspiracy as a cause of action**. It is difficult for Mr.

---

[55] Uganda Penal Code Act of 1950, Chapter 120, Sections 390, 391 and 392 (available at http://www.ulii.org/ug/legislation/consolidated-act/120, last visited August 8, 2012).

Lively to demonstrate a negative, but the burden here is on SMUG, the proponent of the cause of action, to demonstrate that it exists under Uganda law. SMUG cannot do so.

As for negligence, while Uganda law may recognize traditional negligence as a cause of action, there is no indication that it recognizes the novel duty of care principles proposed by SMUG – *i.e.*, that a duty to act or warn can somehow spring, not out of a hazardous condition or product, but out of "a virulently hostile environment" created through speech and advocacy. There is also no indication that Uganda recognizes any duty of care towards one who advocates or engages in an illegal act. As SMUG alleges, homosexual conduct is unlawful in Uganda. It was unlawful long before Mr. Lively's first visit to Uganda in 2002, so SMUG cannot blame Mr. Lively for that fact.

As the proponent of unique and novel causes of action, SMUG cannot demonstrate that its theories are actionable under Uganda law. SMUG's civil conspiracy and negligence claims should be dismissed.

## C.   SMUG FAILS TO STATE A CLAIM FOR CIVIL CONSPIRACY OR NEGLIGENCE UNDER MASSACHUSETTS LAW.

The same result obtains if the Court decides to apply Massachusetts instead of Uganda law. There is no such thing as a duty of care arising out of a "virulently hostile environment" (dkt. 27, ¶ 258), in Massachusetts (or any other State of the Union), and certainly not when the alleged "hostile environment" was created through the civil, peaceful expression of political speech and ideas on a matter of public concern. SMUG's cause of action is a brazen attempt to punish Mr. Lively for ideas that SMUG finds offensive. As demonstrated in section II(C), *supra*, unless Mr. Lively incited someone to **imminent violence** – which SMUG does not and cannot allege – he is immune from tort liability in Massachusetts and everywhere else. Speech likely to cause **imminent violence** is actionable. Speech likely to cause a "virulently hostile environment" is not.

As for civil conspiracy, SMUG apparently attempts to state a claim for "coercive type" conspiracy, *Aetna Cas. Sur. Co. v. P & B Autobody*, 43 F.3d 1546, 1563 (1st Cir. 1994), which is "sometimes called 'true conspiracy.'" *Massachusetts Laborers' Health & Welfare Fund v. Philip Morris, Inc.*, 62 F. Supp. 2d 236, 244 (D. Mass. 1999). This is a "rare and very limited cause of action in Massachusetts." *Id*. (quoting *Aetna*, 43 F.3d at 1563) (internal citations and quotes omitted). "The plaintiff must allege and prove that by mere force of numbers acting in unison the defendants exercised some peculiar power of coercion of the plaintiff which any individual standing in a like relation to the plaintiff would not have had." *Id*. (quoting *Fleming v. Dane*, 304 Mass. 46 (1939)) (internal quotes omitted). "The 'peculiar power' conspiracy is rarely proven." *Wajda v. R.J. Reynolds Tobacco Co.*, 103 F. Supp. 2d 29, 37 (D. Mass. 2000).

SMUG attempts to recite the elements of "coercive" or "true" conspiracy in a threadbare and conclusory fashion. (Dkt. 27, ¶¶ 252).[56] Its claim fails for at least two reasons.

First, Massachusetts courts have applied the "rare and very limited" coercive conspiracy cause of action "principally to remedy **direct economic coercion**, as in the combined action of groups of employers or employees, where through the power of combination pressure is created and results brought about different in kind from anything that could have been accomplished by separate individuals or in other kinds of concerted refusals to deal." *Philip Morris*, 62 F. Supp. 2d

---

[56] Because SMUG attempts to recite the elements for "coercive type" or "true" conspiracy (*id.*), SMUG does **not** appear to be alleging a second, "concerted action" type of conspiracy cognizable under Massachusetts law, which "is more akin to a theory of common law joint liability in tort." *Philip Morris*, 62 F. Supp. 2d at 244 (quoting *Aetna*, 43 F.3d at 1564). Nevertheless, if SMUG intended to claim the "concerted type" of conspiracy, it has failed to state a cause of action. "The 'concerted action' version depends on proof of underlying tortious conduct for which liability can be assigned." *Phillip Morris*, 62 F. Supp. 2d at 244. It is **not** "an independent cause of action," but merely "defines who may be liable for other torts." *Id*. As such, to state a claim for "concerted action" conspiracy, SMUG would have to also plead an independent tort cognizable under Massachusetts law (*id.*), and that tort **must be intentional**. *Taylor v. Airco, Inc.*, 503 F. Supp. 2d 432, 448 (D. Mass. 2007) (PONSOR J.) ("Plaintiffs must prove an underlying *intended* tort") (italics in original), *aff'd sub nom. Taylor v. Am. Chemistry Council*, 576 F.3d 16 (1st Cir. 2009). Here, the only other claims pled by SMUG are "persecution" (Counts I, II and III), and negligence. (Count V). The former is not a recognized tort under Massachusetts law, while the latter is not an intentional tort. Accordingly, a "concerted action" conspiracy claim would have to be dismissed.

71

at 244 (emphasis added). SMUG does not specify exactly what Mr. Lively coerced it to do, which is by itself reason for dismissing the claim. *Wajda*, 103 F. Supp. 2d at 37 (dismissing complaint because "the pleadings fail to explain how this conspiracy had a 'coercive' effect upon plaintiff"). But whatever SMUG has in mind, it has not alleged anything close to direct economic coercion. As the First Circuit instructed when it affirmed this Court in a recent decision, a federal court "cannot in the context of a diversity case expand the tort law of Massachusetts beyond its present state." *Taylor v. Am. Chemistry Council*, 576 F.3d 16, 37 (1st Cir. 2009).

Second, to be actionable, the coercion **must be directed specifically at, and "peculiarly focused against" the plaintiff**. *Philip Morris*, 62 F. Supp. 2d at 245 (emphasis added). **Where the alleged coercion is "directed at the public generally," or even to an entire segment of the population that engages in particular conduct (*e.g.*, "all smokers"), rather than specifically at the plaintiff itself, the coercion is not actionable even if many of the individuals in the targeted group are members of the plaintiff**. *Id.* at 245 & fn.6. (emphasis added). In *Philip Morris*, plaintiff was an employee benefit plan which claimed that defendant cigarette manufacturer conspired with others to coerce all smokers into smoking. *Id.* Plaintiff contended that the coercion was directed at it, because some smokers were members of its plan. *Id.* This District dismissed the coercive conspiracy claim, because it found that any coercion would have been directed at smokers in general, and was not "peculiarly focused" against the individual plaintiff. *Id.* "**There is no question that an allegation of a generally exerted and generally felt power of coercion is not sufficient to plead the independent tort of 'true conspiracy' as recognized in Massachusetts**." *Id.* (emphasis added).

The same outcome must obtain here. SMUG consistently alleges that Mr. Lively's efforts were directed **at an entire segment of the Uganda population** (*e.g.*, "the LGBTI community"). (Dkt. 27, ¶¶ 7, 12, 13, 25, 35, 36, 53, 61, 74, 93, 128, 129, 153, 214, 258). Even the injunction

SMUG seeks is to stop Mr. Lively from "persecuting" "the LGBTI community." (*Id*. at p. 60, Prayer for Relief (e)). There is no doubt that not every person in the "LGBTI community" is an employee or member of SMUG, just like not all smokers were members of the plaintiff organization in *Philip Morris*. Nowhere in the Amended Complaint does SMUG allege that Mr. Lively's so-called coercion (whatever it may have been) was laser-sharp, directly and "peculiarly focused" on SMUG itself, as opposed to all homosexuals, all lesbians, all bisexuals, all transgender and all intersex people. As in Philip Morris, SMUG's claim for coercive conspiracy should be dismissed.

**IX.    SMUG LACKS ASSOCIATIONAL STANDING.**

    **A.    SMUG LACKS ASSOCIATIONAL STANDING TO BRING THIS ACTION ON BEHALF OF ITS MEMBERS, EMPLOYEES OR THE "LGBTI COMMUNITY" BECAUSE ITS TORT CLAIMS REQUIRE INDIVIDUALIZED PARTICIPATION OR PROOF.**

SMUG seeks to assert various **tort** claims against Mr. Lively, not only on its own behalf for alleged harms it supposedly suffered as an organization, but also (and especially) on behalf of "its individual staff-members and member organizations" as well as the "LGBTI community" at large. (Dkt. 27, ¶¶ 5, 13, 21, 230, 232, 239, 245, 250, 258, 261). SMUG seeks to recover **primarily money damages** on its tort theories, as demonstrated by the first three out of the five remedies requested in its Prayer for Relief. (*Id*. at pp. 59-60, Prayer for Relief (a)-(c)) (requesting "compensatory damages," "punitive and exemplary damages," and "attorney's fees and costs"). SMUG's fourth requested relief is for "declaratory judgment holding that Defendant's conduct was in violation of the law of nations." (*Id*. at p. 60, Prayer for Relief (d)). Although it omitted injunctive relief entirely from its original Complaint (dkt. 1, p. 47), SMUG now requests, as an afterthought, "injunctive relief enjoining [Mr. Lively] from … persecute[ing] [SMUG] and the LGBTI community in Uganda." (Dkt. 27, p. 60, Prayer for Relief (e)).

As shown below, SMUG lacks standing to bring tort claims for either damages or equitable relief in a representative capacity, because both the claims it asserts and the relief it requests require the participation of, and proof from, its individual members.

### 1. SMUG's Representative-Capacity Claims for Money Damages Are Barred as a Matter of Well-Settled Law.

"[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) **neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit**." *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977) (emphasis added). "[W]hether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought." *Warth v. Seldin*, 422 U.S. 490, 515 (1975) (affirming dismissal of association's representative-capacity claims for money damages, because, "to obtain relief in damages, each member of [the association] who claims injury as a result of respondents' practices must be a party to the suit, and [the association] has no standing to claim damages on his behalf").

In the four decades since *Warth* and *Hunt*, "federal courts have consistently rejected association assertions of standing to seek monetary, as distinguished from injunctive or declaratory, relief on behalf of the organization's members." *Telecomm. Research & Action Ctr. on Behalf of Checknoff v. Allnet Commc'n Serv., Inc.*, 806 F.2d 1093, 1095 (D.C. Cir. 1986) (collecting cases). Indeed, "**no federal court has allowed an association standing to seek monetary relief on behalf of its members**." *United Union of Roofers, Waterproofers, & Allied Trades No. 40 v. Ins. Corp. of Am.*, 919 F.2d 1398, 1400 (9th Cir. 1990) (emphasis added). This is because "claims for monetary relief necessarily involve individualized proof and thus the

individual participation of association members, thereby running afoul of the third prong of the *Hunt* test." *Id.*; *see also Nat'l Coal. Gov't of Union of Burma v. Unocal, Inc.*, 176 F.R.D. 329, 344 (C.D. Cal. 1997) ("**It is generally accepted that associational standing is precluded where the organization seeks to obtain damages on behalf of its members**") (emphasis added).

SMUG is not the first organizational entity to seek money damages on behalf of its members specifically under the Alien Tort Statute. Several other organizations have asserted such claims, but the result has always been the same: **every single court that has considered them has dismissed them for lack of standing**. *See e.g.*, *Bano v. Union Carbide Corp.*, 361 F.3d 696, 714-15 (2d Cir. 2004) (affirming dismissal of alien association's claims for money damages, medical monitoring and property remediation under the Alien Tort Statute, because "[n]ecessarily, each of [the] individual[] [members] would have to be involved in the proof of his or her claims"); *Nat'l Coal. Gov't of Union of Burma*, 176 F.R.D. at 343-44 (dismissing alien association's claim for money damages under Alien Tort Statute for lack of standing, because damages could only be ascertained through individualized participation and proof); *Doe v. Islamic Salvation Front*, 257 F. Supp. 2d 115, 119-20 (D.D.C. 2003) (dismissing alien association's representative claims for damages under the Alien Tort Statute "because individualized proof would be required from each member to determine the correct amount of damages"); *Alperin v. Vatican Bank*, C-99-04941 MMC, 2008 WL 509300, *8 (N.D. Cal. Feb. 21, 2008) (dismissing conversion, unjust enrichment, restitution and other tort claims brought by alien associational plaintiffs under the Alien Tort Statute, because "[a]n associational plaintiff lacks standing to seek monetary relief … because such claims would require individual members to participate in the lawsuit"); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 01 CIV.9882 (DLC), 2005 WL 1060353, *1-2 (S.D.N.Y. May 6, 2005) (dismissing alien association's claims for money

damages under Alien Tort Statute "[g]iven the necessity for individual proof of proximate causation").

In *Islamic Salvation Front*, an alien association sued an Algerian political group and one of its leaders, alleging various tort claims under the Alien Tort Statute, including, as here, persecution and other crimes against humanity. 257 F. Supp. 2d at 117, 119. The association, as does SMUG, sought to recover money damages on behalf of its members. *Id*. at 119-20. The court applied "traditional principles of representational standing," and concluded that:

> [w]hether the [association] has standing to sue depends on whether the claims against [defendant] require individualized proof from each [association] member. **The fact that the [association] seeks money damages is dispositive: it does not have associational standing, because individualized proof would be required from each member to determine the correct amount of damages if [defendant] were found liable**.

*Id.* (emphasis added). The alien plaintiff in *Islamic Salvation Front* was represented by the same firm representing SMUG in this action, *id*. at 116, therefore SMUG ought to know that its representative-capacity claims for damages are barred.

Similarly, in *Bano*, the Second Circuit affirmed the dismissal of an alien association's claims for money damages under the Alien Tort Statute,[57] concluding that *Hunt*'s third prong for associational standing precludes representative-capacity claims for money damages. *Bano*, 361 F.3d at 714. In so holding, the Second Circuit remarked: "**We know of no Supreme Court or federal court of appeals ruling that an association has standing to pursue damages claims on behalf of its members**." *Id*. (emphasis added).

---

[57] Although it is not readily apparent from the Second Circuit's opinion in *Bano* that the various tort claims dismissed therein had been brought under the Alien Tort Statute, that fact is plainly stated in the first sentence of the "Procedural History" section of the district court's opinion being reviewed and affirmed: "On November 15, 1999, plaintiffs filed a class action complaint against defendants asserting claims under the Alien Tort Claims Act, 28 U.S.C. § 1350, for alleged human rights violations arising out of the Bhopal gas Disaster in India on December 2-3, 1984." *Bano v. Union Carbide Corp.*, 99 CIV.11329 JFK, 2003 WL 1344884, *1 (S.D.N.Y. Mar. 18, 2003), *aff'd in part, vacated in part on other grounds,* 361 F.3d 696 (2d Cir. 2004).

These authorities plainly preclude SMUG from seeking money damages (whether "compensatory," or "punitive and exemplary") on behalf of its "individual staff-members and member organizations" or the "LGBTI community." As was the case in *Islamic Salvation Front*, *Bano*, *Burma*, *Alperin*, and *Presbyterian Church*, determining both the existence and extent of any damages allegedly incurred by persons SMUG seeks to represent will require their individual participation and proof. Each individual member would have to participate in these proceedings, not only to testify how and to what extent he, she or it was hurt by Mr. Lively's speech, but also to partake in any judgment (or be bound by a no-liability determination). As the above courts have observed, repeatedly, no federal court has **ever** permitted an association to pursue these types of individualized money damages on behalf of its members. This Court should not be the first to stretch the limits of associational standing beyond their breaking point and should, therefore, dismiss with prejudice SMUG's representative-capacity claims for damages.

> **2.    SMUG Lacks Associational Standing to Bring a Representative-Capacity Claim for Declaratory or Injunctive Relief Sounding in Tort, Because the Claim Requires Individualized Participation or Proof.**

Unlike claims for money damages, claims for injunctive or declaratory relief have **sometimes** been allowed to be brought in a representative capacity. "This does not mean, however, that an association automatically satisfies the third prong of the *Hunt* test simply by requesting equitable relief rather than damages." *Bano*, 361 F.3d at 714. Indeed, "**plenty of injunction cases have been dismissed because of the need for individualized proof**." *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 314 (1st Cir. 2005) (emphasis added) (collecting cases) (BOUDIN, C.J. concurring). Thus, the Court must examine not only whether "the relief requested," but also whether "**the claim asserted**" … requires the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343 (emphasis added). If that inquiry reveals that "the organization seeks **a purely legal ruling** without requesting that the federal court award

individualized relief to its members, the *Hunt* test may be satisfied." *Bano*, 361 F.3d at 714 (emphasis added). On the other hand, "[t]he organization lacks standing to assert claims of injunctive relief on behalf of its members where 'the fact and extent' of the injury that gives rise to the claims for injunctive relief 'would require individualized proof.'" *Id.* (quoting *Warth,* 422 U.S. at 515–16).

Here, SMUG's representative-capacity claims for declaratory and injunctive relief fail for at least two separate reasons: (a) SMUG does not seek a "purely legal" ruling, and (b) SMUG's claims are brought in tort, and necessarily require individualized proof.

### a.      SMUG Does Not Seek a Purely Legal Ruling.

SMUG most certainly does **not** seek "a purely legal ruling" divorced from any individualized relief to its members. *Bano*, 361 F.3d at 714. Instead, SMUG goes out of its way to allege, repeatedly after each of its three "Claims for Relief," that it is seeking **money damages** for its individual member organizations and employees "in an amount to be determined at trial." (Dkt. 27, ¶¶ 239, 245, 250, 256, 262). In fact, while it trumpets the alleged money damages of its members and employees, **SMUG says nothing about equitable relief (declaratory or injunctive) in any of its five "Claims for Relief."** (*Id.* at ¶¶ 236-262). Evidently, SMUG is seeking money damages, but has thrown in ancillary declaratory and injunctive relief requests (the latter only as an afterthought in the Amended Complaint) to survive a representational standing challenge. (*Id.*)

This is quite different from the typical case in which associational standing is found for equitable claims **because plaintiff seeks only equitable, or "purely legal" relief**. *See e.g.*, *Rowe*, 429 F.3d at 314 ("That **only** injunctive relief is sought here distinguishes this case from damages cases; … [w]here **only** injunctive relief is sought, an association may sometimes be allowed to sue") (emphasis added) (BOUDIN, C.J. concurring); *Alaska Fish & Wildlife Fed'n v. Dunkle,* 829

F.2d 933, 938 (9th Cir. 1987) (allowing association standing "because the [association] seeks declaratory and prospective relief **rather** than money damages [and thus] its members need not participate directly in the litigation") (emphasis added).

Because SMUG does not seek a "purely legal ruling," it does not have associational standing to bring a declaratory judgment claim on behalf of its members and employees.

> **b.**     **SMUG's Claims for Declaratory and Injunctive Relief Sound in Tort and Necessarily Require Individualized Proof.**

SMUG's representative-capacity claims for equitable relief also fail because "the fact and extent of the injury that gives rise to the claims for injunctive [and declaratory] relief would require individualized proof." *Bano*, 361 F.3d at 714. SMUG's claims for declaratory and injunctive relief are **grounded in tort**, just like its claims for money damages. This is because the Alien Tort Statute, on which SMUG premises its persecution claims, provides federal jurisdiction for "any civil action by an alien **for a tort only**." 28 U.S.C. § 1350 (emphasis added). SMUG's two new claims – civil conspiracy and negligence – also clearly sound in tort. As such, the only claims that SMUG asserts are tort claims. *Id.* But "**tort claims can only be adjudicated by considering the testimony and other evidence of the people allegedly [injured]**." *Nat'l Coal. Gov't of Union of Burma*, 176 F.R.D. at 344 (emphasis added). "**The [association] is simply not a suitable proxy**." *Id.* (emphasis added) (dismissing representative-capacity claims for injunctive relief brought by association under Alien Tort Statute for failure to satisfy the third prong of *Hunt*, because injunctive relief claims sounded in tort).

In the "typical" declaratory relief action brought by an association, plaintiff seeks a declaration that a statute or regulation is unconstitutional. *Dealer Store Owners Ass'n, Inc. v. Sears, Roebuck & Co.*, CIV05-1256 ADM/JSM, 2006 WL 91335, *5 (D. Minn. Jan. 12, 2006) (dismissing associational declaratory claim for lack of standing because it involved individual

contract claims, not "**the typical associational standing case, where a statute or regulation is being challenged**") (emphasis added). While an association may, in "typical" cases, have standing to seek equitable relief **against a statute or regulation which uniformly applies to all its members**, it does not have representative standing to seek declaratory or injunctive relief for its members **against tortious conduct, which affects different members in different ways**:

> Unlike most prior associational standing cases, this action does not challenge a statute, regulation or ordinance …. Instead, **the Amended Complaint sets forth allegations of tortious conduct** …. As such, **the Amended Complaint requires individual determinations as to whether [defendant] committed various torts** against certain of its members …. Accordingly, **the Complaint does not raise a "pure question of law," which can be considered without the individual participation of [the association]'s members**.

*DDFA of S. Florida, Inc. v. Dunkin' Donuts, Inc.*, 00-7455-CIV, 2002 WL 1187207, *7 (S.D. Fla. May 22, 2002) (emphasis added) (dismissing associational claims for lack of standing).

Here, SMUG does not seek a declaration that a statute or regulation is unconstitutional, and to enjoin its enforcement. Instead, SMUG seeks a declaration that "Defendant's [allegedly tortious] **conduct** [towards its individual members and employees] was in violation of the law of nations," and SMUG seeks to enjoin that tortious **conduct** against individual members in the future. (Dkt. 27, p. 60, Prayer for Relief (d)-(e)) (emphasis added). In other words, SMUG is not simply seeking a declaration to clarify "the law of nations," and the rights of all people under "the law of nations," but rather a declaration that Mr. Lively's specific **conduct** against specific individuals violated that law and harmed its individual members. (*Id.*) As such, "the fact and extent of the injury that gives rise to [its] claims for injunctive [and declaratory] relief" – that is Mr. Lively's allegedly tortious conduct and its effects on SMUG's individual members – "would require individualized proof" in a manner that destroys associational standing under *Hunt. Bano*, 361 F.3d at 714. This is because not every alleged member of SMUG alleges to have been injured in the same way, at the same time and to the same extent, by Mr. Lively's conduct.

The diverse and highly individualized nature of "the injury that gives rise to [SMUG's] claims for injunctive [and declaratory] relief" is plainly evident on the face of SMUG's Amended Complaint. The eight specific acts of "persecution" which give rise to SMUG's claims for declaratory and injunctive relief, involved **different** alleged perpetrators, **different** alleged victims, and **different** alleged conduct, occurring at **different** times, in **different** places. (Dkt. 27, ¶¶ 165-228). Not surprisingly, these different variables are alleged to have caused widely different injuries for SMUG's "member organizations and their staff members." (*Id.* at ¶ 230). SMUG claims that some of its members were deprived of the right to "equality and non-discrimination," while others were deprived of the right to "expression, association, assembly, and the press," and others were subjected to "arbitrary arrest and detention," while others were subjected to "torture, and other cruel, inhuman and degrading treatment," and still others had their homes invaded and their honor and reputation "attacked." (*Id.*) If the fact and extent of the alleged injuries that give rise to SMUG's claim for equitable relief are not sufficiently "individualized" to preclude associational standing here, the limitation has no meaning.

Because Alien Tort Statute claims necessarily sound in tort, it is not surprising that courts which have examined associational standing for equitable claims (injunctive or declaratory) under this law have dismissed them for lack of standing. *See e.g.*, *Bano*, 361 F.3d at 714-15 (affirming dismissal of associational claims for injunctive relief (as well as money damages) under Alien Tort Statute, because injunctive relief claims grounded in tort require individualized participation or proof); *Nat'l Coal. Gov't of Union of Burma*, 176 F.R.D. at 344 ("even the [association]'s claim for injunctive relief fails to satisfy the third prong of the *Hunt* test [because] all the claims asserted in the First Amended Complaint are tort claims"); *Presbyterian Church of Sudan*, 01 CIV.9882 (DLC), 2005 WL 1060353, *1-2 (holding that association lacked standing to seek either damages or injunctive relief on behalf of its members under the Alien Tort Statute, because

81

the claims required individualized proof) (reversing contrary decision of predecessor judge in the same case, 244 F. Supp. 2d 289 (S.D.N.Y. 2003), because it was erroneously decided and it preceded and contradicted the Second Circuit's dispositive holding in *Bano*).

This Court should hold likewise, and dismiss with prejudice SMUG's representative-capacity claims for declaratory and injunctive relief.

### B.  SMUG LACKS ASSOCIATIONAL STANDING TO BRING CLAIMS FOR DECLARATORY AND INJUNCTIVE RELIEF BECAUSE THEY ARE NOT REDRESSABLE.

Even if the Court concludes that SMUG's representative-capacity claims for declaratory and injunctive relief do not required individualized participation or proof, which it should not do, the Court should still dismiss these claims because they are not redressable.

To assert equitable claims on behalf of its individual members, SMUG would have to show that the members have Article III standing to assert such claims themselves. *Hunt*, 432 U.S. at 343. This, in turn, would require satisfaction of the familiar standing triad: a concrete injury, fairly traceable to the challenged conduct, which "**likely will be redressed by a favorable decision from the court**." *New Hampshire Right to Life Political Action Comm. v. Gardner*, 99 F.3d 8, 13 (1st Cir. 1996) (emphasis added). The requirement of showing redressability "applies with undiminished force to actions for declaratory judgment." *Igartua-De La Rosa v. United States*, 417 F.3d 145, 153 (1st Cir. 2005) (LIPEZ, J. concurring).

To establish redressability, SMUG has the burden of showing that it is "likely, **as opposed to merely speculative**, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (emphasis added) (internal quotes omitted) (plaintiff failed to establish redressability on its injunctive relief claim because remedy for its injury required action from absent parties over whom the court had no power). "Redressability requires … the '**substantial likelihood**' that the requested relief will remedy the alleged injury in

82

fact." *Bonas v. Town of N. Smithfield*, 265 F.3d 69, 73 n.4 (1st Cir. 2001) (emphasis added) (quoting *Vermont Agency of Natural Res. v. U.S. ex rel. Stevens,* 529 U.S. 765, 771 (2000)).

SMUG cannot meet its burden of satisfying the redressability requirement for its equitable relief claims. The declaratory and injunctive relief sought by SMUG on behalf of its members and employees is not "substantially likely" to redress the alleged persecution of which SMUG complains. **Neither the four alleged "co-conspirators" of Mr. Lively, nor the Ugandan Parliament, nor the Ugandan Police, nor Ugandan Minister of Ethics Simon Lokodo, nor the Ugandan tabloids, nor any of the other individuals which SMUG blames for the eight acts of alleged "persecution" are before this Court**. Even if the Court were to grant the declaratory and injunctive relief requested by SMUG **against Mr. Lively, a private American citizen**, such measures would have no legal effect whatsoever on the sovereign government of Uganda or any of the Ugandan state and private actors alleged to be actively "persecuting" SMUG's constituents. Unless they are enjoined **by Ugandan courts**, the Ugandan newspapers would remain free to publish what they want, the Ugandan police would remain free to arrest, detain and mistreat whomever they want, Minister Lokodo would remain free to "raid" whatever gatherings or homes he wants, the sovereign Ugandan Parliament would remain free to consider and enact whatever bills its wants, and Ugandan "private actors" would remain free to "discriminate" against whomever they want "in housing, employment, health and education."

Where, as is clearly the case here, the requested injunctive or declaratory relief cannot reach independent third parties who are also responsible for the harm alleged, the equitable relief claim is not redressable and plaintiff has no standing to assert it. *Lujan*, 504 U.S. at 561 (holding that plaintiff failed to establish redressability on its injunctive relief claim because the remedy for its alleged injury required action from parties not before the court, over whom the court had no power). This is especially true where, as here, the independent third party is a sovereign

government or legislature. *Igartua-De La Rosa*, 417 F.3d at 155 (LIPEZ, J. concurring) ("If a legislative body would be within its rights to ignore the court's decision, and the plaintiff cannot convince the court that it is 'likely, as opposed to merely speculative,' that the legislature will react in the way that he hopes, the redressability requirement has not been met") (quoting *Lujan*, 504 U.S. at 561).

This precise result obtained in *Doe v. Unocal Corp.*, 67 F. Supp. 2d 1140 (C.D. Cal. 1999), an Alien Tort Statute case. Plaintiffs in *Unocal* were Burmese residents who claimed that the construction of a gas pipeline in Burma was causing human rights abuses, including forced relocation, forced labor and torture. *Id*. at 1141. Plaintiffs asked the court to enjoin Unocal Corporation, a joint venturer in the pipeline project, from contributing funds to the venture. *Id*. Relying on *Lujan*, the court found that plaintiffs had no standing to seek injunctive relief, because they could not establish redressability. *Id*. at 1144-47. Unocal was but one of many actors involved in the pipeline project, and none of the other independent actors were before the court. *Id*. at 1146. As such, "**any relief afforded plaintiffs depends nevertheless on the independent actions of individuals or corporate entities who are not parties to this lawsuit**." *Id*. (emphasis added). As a result, "any equitable relief enjoining Unocal's participation would not be likely to effect … the elimination of human rights violations in furtherance of the project." *Id*. at 1147. For exactly the same reason, SMUG's equitable relief claims must meet with the same fate here.

SMUG may speculate that a declaration that Mr. Lively's speech violated international law, and an injunction against him alone, may provide some sort of emotional vindication and perhaps deter others in the future, but the Supreme Court has made it clear that neither "deter[ring] the risk of future harm," nor "psychic satisfaction" is "an acceptable Article III remedy," because "such a principle would make the redressability requirement vanish." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 106-07 (1998). "**Relief that does not remedy the**

84

**injury suffered cannot bootstrap a plaintiff into federal court**; that is the very essence of the redressability requirement." *Id*. at 107 (emphasis added).

In sum, without the accompanying claims for money damages, which SMUG is constitutionally barred from seeking on behalf of its members, the equitable relief sought against Mr. Lively "is not only worthless to [SMUG], it is seemingly worthless to all the world." *Steel Co.*, 523 U.S. at 106. By itself, the equitable relief is not at all likely, much less "substantially likely," to redress the persecution alleged by SMUG. Accordingly, SMUG does not have standing to seek equitable relief on behalf of its members and employees, so its representative-capacity claims should be dismissed, with prejudice.

### C. SMUG LACKS ASSOCIATIONAL STANDING BECAUSE IT CANNOT PLEAD SUFFICIENT CAUSATION.

In addition to redressability, SMUG also cannot meet the traceability element of Article III standing. A complaint must be dismissed where, as here, it fails to plead sufficient facts to show an injury that is fairly traceable to specific conduct by the defendant. *Lujan* 504 U.S. at 560. Such a connection "cannot be overly attenuated." *Donahue v. City of Boston,* 304 F.3d 110, 115 (1st Cir. 2002). Because the opposing party must be the source of the harm, **causation is absent if the injury stems from the independent action of a third party**. *Katz v. Pershing, LLC*, 672 F.3d 64, 71-72 (1st Cir. 2012). "In other words, the 'case or controversy' limitation of Art. III still requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." *Simon v. E. Kentucky Welfare Rights Org.,* 426 U.S. 26, 41-42 (1976).

An alleged injury is not fairly traceable to mere advocacy by the defendant unless the advocacy is directed to produce or incite **imminent** lawless action and is likely to produce or incite such action. *N. A. A. C. P. v. Claiborne Hardware Co*., 458 U.S. 886, 927-28 (1982).  As

demonstrated throughout this memorandum, SMUG has utterly failed to plead that Mr. Lively incited anyone to imminent violence.

Moreover, SMUG fails to "fairly trace" any conduct by Mr. Lively to the eight alleged incidents of persecution. Chronologically, the first injury alleged in the Amended Complaint is the 2005 raid by Ugandan police of the home of Victor Mukasa, a founder of SMUG. (Dkt. 27, ¶¶ 30, 209-214). However, SMUG pleads no facts to show a causal connection between Mr. Lively's 2002 Uganda trip, or any subsequent action, and the raid. While the *Claiborne* court found "**days or months**" too long to support "imminent" incitement, the police raid alleged here took place **years** after Mr. Lively's first visit to Uganda. Further, the alleged raid was an "independent action of some third party not before the court," meaning the Ugandan police. SMUG fails to allege that Mr. Lively, or even any of his four alleged "co-conspirators," had a "fairly traceable" causal connection to the police who implemented the alleged raid. Instead, SMUG reveals **another** intervening action by yet **another** independent party, alleging that the raid took place two weeks after the state-owned newspaper ran an article urging action by police. (*Id*. at ¶ 212). SMUG fails to plead even an attenuated connection between Mr. Lively and the state-owned newspaper that allegedly urged action, or the police who carried out the alleged 2005 Mukasa raid.

Similarly, SMUG details a 2008 police arrest of a SMUG staff member and a "founding member" of a purported member organization. (*Id*. at ¶¶ 186-193). In the lengthy description, SMUG fails to trace any connection between the arrests and Mr. Lively, **who had last visited Uganda six years before**.

Again, SMUG details two police raids on two separate conferences in 2012. (*Id*. at ¶¶ 165-185). Yet, in the detailed description, SMUG fails to trace any connection between the raids and Mr. Lively, **who had last visited Uganda three years before**. "Causation is absent if the injury stems from the independent action of a third party." *Katz*, 672 F.3d at 71-72. As with all of

the other instances of alleged "persecution," the allegedly bad actors in these two raids – the Ugandan police and Minister of Ethics Lokodo – are not even alleged "co-conspirators" of Mr. Lively. (Dkt. 27, ¶¶ 44, 94-164). Their independent actions preclude SMUG from showing the requisite causation.

Even less concrete and more attenuated are the generalized grievances concerning the media in Uganda. (*Id*. at ¶¶ 199-208, 215-225). SMUG links the so-called "crack-down on media" to its 2007 press conference. (*Id*. at ¶ 199). SMUG asserts that, in direct response to its press conference, **five years after Mr. Lively's previous visit to Uganda**, Deputy Attorney General Fred Ruhindi, who is **not** named as an alleged "co-conspirator," called on agencies "to take appropriate action because homosexuality is an offence under the laws of Uganda." (*Id*. at ¶ 200). SMUG alleges statements **by Mr. Buturo and Mr. Ssempa** advocating a different view (*id*. at ¶¶ 201-202), alleges the suspension of a third party radio station manager **by a government agency** (*id*. at ¶ 205), and alleges the publishing of newspaper stories **by a tabloid**. (*Id*. at ¶¶ 206, 217-219). SMUG then connects various threats and harassment received by various individuals **to the "outing" in the tabloids**. (*Id*. at ¶¶ 220-221). However, none of these third parties are before this Court. SMUG fails to plead any plausible causal connection between the independent conduct of these third parties and **Mr. Lively**. SMUG can't rest alone on Mr. Lively's advocacy and opinions about homosexuality that he shared with Ugandans, because "emotional and persuasive appeals" and "threats of vilification or social ostracism" do not ever constitute "imminent lawless action," let alone when they are months or years removed from alleged injuries, and therefore cannot be "fairly traced" to any injury. *Claiborne*, 458 U.S. at 926.

At bottom, the undeniable and enormously revealing fact is that no statement or action by Mr. Lively appears **even once** in the section of the Amended Complaint where SMUG details the eight acts of "persecution." (Dkt. 27, ¶¶ 165-228). This is not accidental. SMUG cannot plead a

fairly traceable causal connection between the injuries claimed by its members and Mr. Lively. Therefore SMUG lacks standing to bring suit on their behalf.

### D. SMUG LACKS ASSOCIATIONAL STANDING BECAUSE IT HAS NOT ALLEGED ASSOCIATIONAL AUTHORITY.

A final and independent reason why SMUG lacks associational standing is its failure to plead that it has been authorized to bring this suit on behalf of its members, employees or the "LGBTI community" at large. "[A]n organization only has associational standing when it has a clear mandate from its membership to take the position asserted in the litigation." *Nat'l Coal. Gov't of Union of Burma*, 176 F.R.D. at 344 n.16. "In other words, [SMUG] cannot have associational standing without an allegation that its members 'have either requested to be represented or consented to be represented' by [SMUG]." *Id.* (quoting *Natural Resources Defense Council, Inc. v. United States EPA,* 507 F.2d 905, 910 (9th Cir.1974); *Associated General Contractors v. Coalition for Economic Equity,* 950 F.2d 1401, 1408–09 (9th Cir. 1991)). This principle arises out of the prudential concerns in representing third-parties:

> Federal courts must hesitate before resolving a controversy, even one within their constitutional power to resolve, on the basis of the rights of third persons not parties to the litigation. The reasons are two. First, the courts should not adjudicate such rights unnecessarily, and it may be that in fact the holders of those rights either **do not wish to assert them**, or will be able to enjoy them regardless of whether the in-court litigant is successful or not. Second, **third parties themselves usually will be the best proponents of their own rights**.

*Singleton v. Wulff*, 428 U.S. 106, 113-14 (1976) (emphasis added).

SMUG fails to allege anywhere in its Amended Complaint that it has a clear mandate even from its members and employees, let alone the non-member "LGBTI community" at large, to pursue this litigation on their behalf. This glaring omission is particularly relevant here, because SMUG claims that it is not merely a membership association with individual members, but an "umbrella organization" with "constituent member organizations" which themselves presumably

have their own leadership and individual members. (Dkt. 1, p. 1, ¶ 1). In the absence of an allegation from SMUG, these organizations cannot be presumed to have authorized this suit.

Having been previously put on notice of this defect (dkt. 22, pp. 79-80), SMUG could have theoretically corrected it in its Amended Complaint, if it could in good faith allege "a clear mandate" to bring this action on behalf of others. Tellingly, SMUG did not do so.

In sum, as aptly put by the Ninth Circuit, "[t]here is no escaping the fact that [SMUG] in this case cannot overcome the [standing] hurdle placed before it by Supreme Court precedent." *United Union of Roofers*, 919 F.2d at 1400. The Court should dismiss all of SMUG's representative-capacity claims for lack of standing.

## X.   SMUG LACKS STANDING TO BRING THIS ACTION ON ITS OWN BEHALF.

SMUG also attempts to assert in its own right the same claims it asserts on behalf of its members, employees and the "LGBTI community" at large. But these individual-capacity claims fail for the same reason: lack of standing. "Like any other plaintiff, when an organization brings an action in its own behalf, rather than on behalf of its members, the organization must show that it has standing to assert its claims." *Nat'l Coal. Gov't of Union of Burma*, 176 F.R.D. at 340. "[T]he organization must … show[] actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision." *In re S. African Apartheid Litig.*, 617 F. Supp. 2d 228, 294 (S.D.N.Y. 2009) (quoting *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 649 (2d Cir. 1998)) (internal quotes omitted).

The injury-in-fact alleged by SMUG to itself is that it devoted time and resources to assist homosexuals who have been "arbitrarily arrested and harassed and/or mistreated **by the police**" (dkt. 27, ¶ 227), and who have been "forcibly evicted from their homes **by landlords**." (*id.* at ¶ 228) (emphasis added). Assuming, for the sake of argument, that these alleged organizational

expenditures are sufficient to establish the requisite injury-in-fact, SMUG still lacks individual standing to sue because it cannot satisfy the second and third prongs of Article III standing.

As demonstrated in section IX(C), *supra*, SMUG fails the causation or traceability prong of Article III standing, which means SMUG has no standing to bring **any** of its claims. The eight acts of persecution alleged by SMUG took place many months or years after Mr. Lively's visits to Uganda, and were allegedly perpetrated by independent third parties absent from this litigation, not by Mr. Lively or even any of his four alleged "co-conspirators." Factually, and certainly constitutionally, SMUG cannot connect the dots between Mr. Lively's non-violent, protected political speech and SMUG's alleged organizational injuries. (*See*, pp. 4-8, *supra*).

SMUG may have standing to bring claims in Uganda against the third parties it alleges to have perpetrated acts of persecution (*e.g.*, Minister Lokodo, or Ugandan police, or Ugandan tabloids), as it has successfully done thus far. But SMUG has no standing to sue Mr. Lively in a United States court. A "climate of hostility" is much too generalized and attenuated to serve as a basis for Article III standing, but even if it were adequate, the independent actions of these third parties preclude SMUG from showing a causal connection between **Mr. Lively** and its alleged harm. *Simon v. E. Kentucky Welfare Rights Org.,* 426 U.S. 26, 41-42 (1976) (federal court cannot act to redress injury caused by "independent action of some third party not before the court"). Indeed, SMUG readily attributes the "climate of hostility" in Uganda to "the combination of **legal proscriptions against and criminalization of homosexuality**, along with discriminatory policies and practices relating to government services, media outings and statements and policies of government officials and their non-governmental counterparts." (Dkt. 27, ¶ 226) (emphasis added). Homosexuality was illegal in Uganda (as in many other parts of the world) long before Mr. Lively's first visit there in 2002, and thus SMUG cannot possibly lay the "legal proscriptions against and criminalization of homosexuality" at Mr. Lively's feet.

90

In addition, as demonstrated in section IX(B), *supra*, SMUG also fails the redressability prong for its equitable relief claims, because no declaration or injunction from this Court against Mr. Lively could bind the independent third parties absent from this case which SMUG blames for its alleged persecution. This incontestable fact deprives SMUG not only of associational standing, but also of standing to assert equitable claims in its own right.

Because SMUG lacks standing to assert any claims in its individual capacity, its entire Amended Complaint should be dismissed, with prejudice.

## XI.  THIS COURT LACKS SUBJECT-MATTER JURISDICTION OVER SMUG'S PERSECUTION CLAIMS BECAUSE THE ALIEN TORT STATUTE DOES NOT REACH EXTRATERRITORIAL CONDUCT.

SMUG's sole basis for invoking the subject-matter jurisdiction of this Court over its persecution claims (Counts I, II and III) is the Alien Tort Statute. (Dkt. 27, ¶¶ 2, 15). However, because the alleged acts of persecution took place outside the sovereign territory of the United States, in Uganda, the Alien Tort Statute does not provide jurisdiction. There is a well-established, longstanding and exceedingly strong presumption against the extraterritorial application of any statute, and SMUG cannot overcome its heavy burden of demonstrating that the Alien Tort Statute was intended to reach extraterritorial conduct. Although other courts have assumed without deciding that the statute covers extraterritorial acts, none of those decisions are binding on this Court. Accordingly, this Court starts with a clean slate and has a unique opportunity to reaffirm constitutional jurisdictional boundaries and the limited-jurisdiction nature of federal courts. The Court should dismiss SMUG's persecution claims (Counts I, II and III) for lack of subject-matter jurisdiction.

A.       THE SUPREME COURT, THE FIRST CIRCUIT AND THIS DISTRICT
         ALL RECOGNIZE AND ENFORCE THE LONGSTANDING AND
         STRONG PRESUMPTION AGAINST EXTRATERRITORIAL
         APPLICATION OF FEDERAL STATUTES.

"It is a longstanding principle of American law 'that legislation of Congress, unless a

contrary intent appears, is meant to apply only within the territorial jurisdiction of the United

States.'" *E.E.O.C. v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) (quoting *Foley Bros. v.

Filardo*, 336 U.S. 281, 285 (1949)). Where a statute lacks a clear and affirmative congressional

intention to reach extraterritorial conduct, the statute has no extraterritorial effect **even if such an**

**effect is otherwise a possible interpretation of the statute**. *Morrison v. Nat'l Australia Bank

Ltd.*, 130 S. Ct. 2869, 2877-883, __ U.S. __ (2010). In *Morrison*, plaintiffs, who were foreign

shareholders in the defendant company, brought suit in federal district court for violation of §

10(b) of the Securities and Exchange Act of 1934. *Morrison*, 130 S. Ct. at 2873. The Supreme

Court held that the Act did not apply extraterritorially. *Id.* at 2883. The Court reasoned that,

absent an affirmative indication within the Act to the contrary, there could be no extraterritorial

application. *Id.* at 2884. This was so even though **the defendant committed some domestic acts**

relating to the perpetration of the fraud, because the fraud itself was concluded abroad, and thus

plaintiff's claims lacked the necessary domestic basis for suit. *Id.*

The party asserting federal subject-matter jurisdiction, in this case SMUG, has the burden

of proving it. *Able Sales Co., Inc. v. Compania de Azucar de Puerto Rico*, 406 F.3d 56, 61 (1st

Cir. 2005); *Bull HN Info. Sys., Inc. v. Hutson*, 229 F.3d 321, 328 (1st Cir. 2000). This District has

repeatedly recognized that only the clearest showing of extraterritorial intent will overcome the

presumption. *Smith v. Raytheon Co.*, 297 F. Supp. 2d 399, 403 (D. Mass. 2004) (presumption

against extraterritoriality can only be overcome with "**clear** evidence of congressional intent")

(emphasis added); *Telford v. Iron World Mfg., LLC*, 680 F. Supp. 2d 337, 342 (D. Mass. 2010)

(Massachusetts statutes "are presumed **not** to apply extraterritorially unless there is **clear** legislative intent") (emphasis added) (internal quotation marks omitted); *Northland Cranberries, Inc. v. Ocean Spray Cranberries, Inc.*, 382 F. Supp. 2d 221, 227 (D. Mass. 2004) (federal legislation only applies domestically absent "a **clear** expression of congressional intent to the contrary") (emphasis added).

The Supreme Court has counseled that, "in case of doubt" courts must apply a "construction of any statute as intended to be confined in its operation and effect to the territorial limits over which the lawmaker has general and legitimate power." *Am. Banana Co. v. United Fruit Co.*, 213 U.S. 347, 355-57 (1909) (quotes omitted). The reason for erring on the side of caution is simple: "**All legislation is prima facie territorial**." *Id*. at 357 (emphasis added).

B. **NOTHING IN THE TEXT, CONTEXT, STRUCTURE OR LEGISLATIVE HISTORY OF THE ALIEN TORT STATUTE AFFIRMATIVELY AND CLEARLY INDICATES THAT CONGRESS INTENDED EXTRATERRITORIAL APPLICATION.**

In *Carnero v. Boston Scientific Corp.*, the First Circuit identified the relevant sources that could be examined to divine congressional intent on extraterritoriality, but not before cautioning that "the presumption can be overcome **only** if there is an **affirmative** intention of the Congress **clearly** expressed." 433 F.3d 1, 7 (1st Cir. 2006) (emphasis added) (internal quotation marks omitted) (quoting *Arabian Am. Oil Co.*, 499 U.S. at 248). The First Circuit held that evidence of Congressional intent can be found, if at all, in the particular statute's "**text, context, structure, and legislative history**." *Carnero*, 433 F.3d at 7 (emphasis added) (citing *Sale v. Haitian Ctrs. Council, Inc.,* 509 U.S. 155, 177 (1993)). None of these indicators provide **any** evidence that the first Congress intended the Alien Tort Statute to reach conduct outside of the United States.

1.     **The Text of the Alien Tort Statute Does Not Affirmatively and Clearly Evidence Extraterritorial Intent.**

The plain text of the Alien Tort Statute fails to lend even a scintilla of proof that it was intended by Congress to apply extraterritorially. The statute provides: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350 (West).[58]

SMUG may argue that the use of the term "**any**" (emphasis added) in the reference to "civil action by an alien" impliedly includes all claims under the sun, including extraterritorial conduct. The Supreme Court, however, has repeatedly foreclosed this argument, holding that such general terms, which **could** be interpreted broadly in other contexts, are not sufficient to overcome the strong presumption against extraterritoriality. *See e.g.*, *Foley Bros.,* 336 U.S. at 285 (holding that federal labor statute requiring an eight-hour day provision in "**[e]very** contract made to which the United States ... is a party" did not apply to contracts for work performed in foreign countries because extraterritorial reach cannot be inferred from general terms) (emphasis added); *United States v. Palmer*, 16 U.S. 610, 631 (1818) (holding that language applying a statute to "**any** person or persons" cannot overcome the presumption against extraterritorial application) (emphasis added); *Am. Banana Co.*, 213 U.S. at 357 (holding that "[w]ords having universal scope, such as '**every** contract in restraint of trade,' '**every** person who shall monopolize,' etc., **will be taken, as a matter of course, to mean only everyone subject to such legislation, not all that the legislator subsequently may be able to catch**") (emphasis added).

Another equally unavailing argument that SMUG may advance is that inclusion of the word "alien" in the statute somehow demonstrates that any alien can sue for any tort that took place anywhere under the sun. But the statutory language clearly shows that the term "alien"

_____

[58] "The [Alien Tort Statute's] content has not been materially amended since its enactment." *Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 21 (D.C. Cir. 2011).

describes only the individual who can bring a claim, **not** the site of the tort. The statute provides a mechanism for "an alien" to bring an action in a United States court, for a tort that took place within the United States. The Supreme Court has also foreclosed this argument, in *Arabian Am. Oil Co.*, where it held that the use of the term "alien" in an exemption clause of Title VII, even coupled with the broad "jurisdictional terms" of the statute, did not constitute clear evidence of extraterritorial congressional intent. *Arabian Am. Oil Co.*, 499 U.S. at 248-49, 255. *See also*, *Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 76 (D.C. Cir. 2011) ("Nor does the ATS's specific reference to alien plaintiffs establish that the statute applies extraterritorially. That language merely ensures that alien plaintiffs can sue under customary international law for injuries suffered *within the United States*") (KAVANAUGH, J., dissenting in part) (italics in original).[59]

That the words "any" or "alien" **could** plausibly be construed more broadly in other contexts is of no moment when contending with the strong presumption against extraterritoriality. The Supreme Court has made clear that **the mere possibility, and even plausibility, that the language of a statute could be read to include extraterritorial application does not overcome the presumption against it**. *Arabian Am. Oil Co.*, 499 U.S. at 253 (holding that to allow for even "plausible" interpretations in favor of extraterritorial application would negate the presumption against extraterritoriality to the point that there would be little left of it).

In sum, nothing in the text of 28 U.S.C. §1350 affirmatively, let alone clearly, expresses any congressional intent to reach conduct outside the sovereign borders of the United States.

> ### 2. The Context of the Alien Tort Statute Does Not Affirmatively and Clearly Evidence Extraterritorial Intent.

The context in which the Alien Tort Statute was drafted and enacted provides even less support for any notion of extraterritoriality. The statute was enacted by the First Congress "as part

---

[59] The majority's decision in *Exxon Mobil* is discussed in detail in section XI(C), *infra*.

of the Judiciary Act of 1789, ch. 20, § 9, 1 Stat. 73, 77 (1789)." *Exxon Mobil Corp.*, 654 F.3d at 20. The Supreme Court has noted that "the jurisdiction [of the Alien Tort Statute] was originally understood to be available to enforce a small number of international norms that a federal court could properly recognize as within the common law enforceable without further statutory authority." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 729 (2004). The court in *Sosa* explained that "[w]hen § 1350 was enacted, the accepted conception was of the common law as 'a transcendental body of law outside of any particular State but obligatory within it unless and until changed by statute.'" *Id.* (quoting *Black and White Taxicab & Transfer Co. v. Brown and Yellow Taxicab & Transfer Co.,* 276 U.S. 518, 533 (1928)). In other words, the Congress that enacted § 1350 did so in the firm belief that the common law principles that informed the statute were relatively fixed. *Sosa*, 542 U.S. at 725.

Because the Congress that enacted §1350 did so in light of relatively constant common law principles, an examination of the common law causes of action that were brought in the early tenure of the Alien Tort Statute reveals its inherently domestic application and context. The statute was enacted "on the understanding that the common law would provide a cause of action for the modest number of international law violations thought to carry personal liability at the time: offenses against ambassadors, violation of safe conducts, and piracy." *Sosa*, 542 U.S. at 694. Indeed, the conduct that inspired the creation of the Alien Tort Statute was the mistreatment of foreign officials **on U.S. soil**. Jason Jarvis, *A New Paradigm for the Alien Tort Statute Under Extraterritoriality and the Universality Principle*, 30 Pepp. L. Rev. 671, 678 (2003).

SMUG may be tempted to point to the inclusion of piracy in the list of early Alien Tort Statute claims as evidence of extraterritorial application, but such an argument ignores the fact that "jurisdiction over ships and persons on the high seas was considered **domestic** jurisdiction by early United States courts." *Id.* (emphasis added) (citing *State v. Carter*, 27 N.J.L. 499 (N.J.

96

1859)) ("When [a crime is committed] upon our vessels, in whatever solitary corner of the ocean … the vessel and all it contains is still within our jurisdiction … But we have never treated **acts done upon the vessels of other governments** as within our jurisdiction, nor has such ever been done by any civilized government") (emphasis added). As with the other potential arguments in favor of extraterritoriality, the Supreme Court has also conclusively foreclosed this one, when it held that, on the high seas, only the crime of piracy or crimes by United States citizens occurring **on a United States vessel** could be actionable in a United States court under a 1790 law. *Palmer*, 16 U.S. at 610. "The crime of robbery committed by a person who is not a citizen of the U[nited] States, on the high seas, on board of a ship belonging exclusively to subjects of a foreign state, **is not piracy under the act**, and **is not punishable in the courts of the United States**." *Id.* (emphasis added).

While the *Palmer* Court ruled on a separate act of the First Congress, that law was enacted only one year after the Alien Tort Statute, and thus the Court's interpretation of it reveals the decidedly domestic "context" of the Alien Tort Statute. The inclusion of piracy in the list of actionable torts evidenced **domestic**, not extraterritorial context, because jurisdiction over the high seas did **not** include acts committed by foreigners onboard foreign vessels. It included only piracy as defined by the law of nations and committed by United States citizens, because such piracy was considered domestic in nature.[60]

In sum, nothing in the context of the Alien Tort Statute reveals any intent by the First Congress to extend its reach beyond the United States borders.

---

[60] Furthermore, the crime of piracy as a violation of the law of nations (the court in *Palmer* dealt with a definition of piracy as codified by Congress) had the effect of causing a "vessel [to lose] her national character … [and] a piracy committed by a foreigner, from on board such a vessel, upon any other vessel whatever, is punishable …." *United States v. Furlong*, 18 U.S. 184, 185 (1820). In other words, pirates were considered subjects of no sovereign, and as such jurisdiction exercised over acts committed by them on the high seas was not extraterritorial because it did not encroach into the jurisdiction of a foreign nation. *Id*.

**3.      The Structure of the Alien Tort Statute Does Not Affirmatively and Clearly Evidence Extraterritorial Intent.**

Neither can SMUG find any support (much less affirmative and clear support) for extraterritoriality within the structure of the Alien Tort Statute. The structure of the statute is relatively simple. It was enacted as part of the Judiciary Act of 1789, which, among other things, established the federal judiciary and defined the bounds if its jurisdiction. *Exxon Mobil Corp.*, 654 F.3d at 45 ("The Judiciary Act of 1789 ensured that there would be no gap in federal subject-matter jurisdiction with regard to torts in violation of treaties or the law of nations"). *See also*, William S. Dodge, *The Historical Origins of the Alien Tort Statute: A Response to the "Originalists"*, 19 Hastings Int'l & Comp. L. Rev. 221, 222 (1996) ("the Alien Tort Statute was enacted as the Alien Tort Clause – a provision in Section 9 of the Judiciary Act of 1789"). And, "[w]hile the whole of the Judiciary Act served to confer broad jurisdiction over aliens upon the federal courts, the [Alien Tort Statute] conferred a unique type of jurisdiction: the power of an alien to sue another alien." Jarvis, 30 Pepp. L. Rev. at 676.

Because the Judiciary Act was primarily devoted to defining the bounds of the judiciary, and particularly the bounds of federal subject-matter jurisdiction, its silence with respect to any extraterritorial application of the Alien Tort Clause is even more telling – no such application was ever intended.

**4.      The Legislative History of the Alien Tort Statute Does Not Affirmatively and Clearly Evidence Extraterritorial Intent.**

Because the Alien Tort Statute was an act of the First Congress, it is no surprise that there is no actual legislative history behind it. Dodge, 19 Hastings Int'l & Comp. L. Rev. at 222. In the absence of any clear legislative intent on a given statute, some courts have looked to the nature of the particular offense prescribed by that statute and the extent to which "other legislative efforts" had attempted to eliminate that same conduct. *United States v. Bredimus*, 234 F. Supp. 2d 639,

649 (N.D. Tex. 2002), *aff'd,* 352 F.3d 200 (5th Cir. 2003). As discussed above, the Alien Tort Statute, as part of the Judiciary Act, was the culmination of a series of legislative efforts designed to remedy the federal government's inability to deal with **domestic** infractions against the law of nations, specifically harms committed against ambassadors. Jarvis, 30 Pepp. L. Rev. at 677-79.

The first and most significant event that prompted the need for such federal power involved the assault of a French official by a French citizen named Chevalier De Longchamps, **on United States soil.** *Id.* at 677. In response to this event, and "[b]eing bereft of power to succor the enraged international community, Congress merely offered a reward for the miscreant's apprehension and encouraged state authorities to prosecute him." *Id.* This modest effort by Congress to remedy this particular type of harm is strong evidence that the final culmination of the efforts, the Alien Tort Statute, was created for the purpose of conferring federal subject-matter jurisdiction over domestic claims by aliens.[61]

At bottom, SMUG bears the burden of proving extraterritorial intent, and nothing in the text, context, structure or legislative history of the Alien Tort Statute provides **any** evidence, let alone the required affirmative and clear evidence, that the First Congress intended the statute to have extraterritorial effect. Accordingly, this Court must presume that there was no such intent, and should conclude that it has no subject-matter jurisdiction over SMUG's persecution claims.

C.  **THIS COURT SHOULD NOT FOLLOW THE DECISIONS OF OTHER COURTS THAT HAVE OVERLOOKED OR DISREGARDED THE STRONG PRESUMPTION AGAINST EXTRATERRITORIALITY.**

Bereft of any evidence of extraterritorial intent, SMUG's only recourse thus far has been, and will likely continue to be, to seek refuge in the decisions of other courts (not the First Circuit) that have either **assumed** extraterritoriality without actually considering it, or have disregarded

---

[61] In addition to being relevant to the legislative history, the domestic De Longchamps incident provides additional powerful evidence that the "context" of the Alien Tort Statute, the second *Carnero* indicator, is decidedly domestic, not extraterritorial.

the presumption against extraterritoriality altogether. (*See* SMUG's Opposition to Mr. Lively's Motion to Stay Proceedings, dkt. 18, pp. 7-9) (arguing that other courts have applied the Alien Tort Statute to extraterritorial conduct). However, this Court's analysis of its subject-matter jurisdiction under the Alien Tort Statute begins with a clean slate, for two reasons: (1) the First Circuit has not yet decided whether the statute reaches extraterritorial conduct; and (2) this Court need not follow the decisions of other courts that have overlooked or disregarded the strong presumption against extraterritoriality.

The Supreme Court in *Morrison* dictated that no deference should be given to any case that has wrongly "ignored or discarded the presumption against extraterritoriality." *Id.* at 2887-88; *see also*, *Arabian Am. Oil Co.*, 499 U.S. at 260. More importantly, to the extent that courts have already applied the Alien Tort Statute extraterritorially, **without expressly considering whether they could do so**, the Supreme Court has held that those decisions are not binding on a subsequent court that eventually decides to expressly consider the issue. *Arizona Christian Sch. Tuition Org. v. Winn*, 131 S. Ct. 1436, 1448, __ U.S. __ (2011) ("**when questions of jurisdiction have been passed on in prior decisions *sub silentio*, this Court has never considered itself bound when a subsequent case finally brings the jurisdictional issue before us**") (emphasis added) (internal quotation marks omitted) (quoting *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952)).

The Supreme Court has cautioned strongly against blindly relying "on assumptions that have gone unstated and unexamined." *Winn*, 131 S. Ct. at 1449. In fact, the High Court has recently gone even further, holding that the length of time during which courts have misapplied or failed to apply a canon of statutory construction is "immaterial." *Milner v. Dep't of Navy*, 131 S. Ct. 1259, 1268, __ U.S. __ (2011). In *Milner*, a canon of statutory construction had been erroneously set-aside, misapplied and even ignored completely for **thirty years**. *Id*. The

100

proponent of that same erroneous position in *Milner*, as SMUG has done in this case, attempted to seize upon that fact, arguing that its position "had been consistently relied upon and followed for thirty years by other lower courts." *Id.* The Supreme Court, however, was not impressed:

> this claim … trips at the starting gate. It would be immaterial even if true, because **we have no warrant to ignore clear statutory language on the ground that other courts have done so**.

*Id.* (emphasis added) (internal quotation marks omitted). Here too, SMUG "trips at the starting gate" by relying on non-binding Alien Tort Statute decisions which have either silently assumed extraterritorial jurisdiction, or have ignored the strong presumption against extraterritoriality. This Court should not make the same error.

For example, SMUG has previously relied on the D.C. Circuit's holding in *Exxon Mobil*, 654 F.3d 11. (Dkt. 18 at pp. 8-9). SMUG's reliance is misplaced for several reasons. First, decisions of the D.C. Circuit are not binding in the First Circuit. Second, the D.C. Circuit in *Exxon Mobil* was confused about the domestic nature of piracy claims actionable under the Alien Tort Statute, and assumed, mistakenly, that they were extraterritorial. *Id.* at 21. (*See* section XI(B)(2), *supra*, for discussion of piracy as a domestic crime). Third, and most importantly, although it gave lip-service to the presumption against extraterritoriality, the court in *Exxon Mobil* ultimately disregarded it, and certainly failed to engage in the text-context-structure-history analysis delineated by the First Circuit in *Carnero*. 654 F.3d at 20. Instead, the D.C. Circuit relied heavily on **the extent to which other courts have been silent on the issue of extraterritoriality**. *Id.* at 26 ("[g]iven … the Supreme Court's failure to disapprove of such lawsuits in *Sosa…* "). As discussed above, this is exactly the wrong approach, and the Supreme Court has specifically counseled against it.

SMUG has also relied on the Seventh Circuit's decision in *Flomo v. Firestone Nat. Rubber Co.*, 643 F.3d 1013, 1025 (7th Cir. 2011), (dkt. 18, p. 8), but *Flomo* is equally unavailing. The *Flomo* court dispensed with the centuries-old presumption against extraterritorial application in one paragraph. 643 F.3d at 1025. Even there, the Seventh Circuit, like the D.C. Circuit in *Exxon Mobil*, relied **not** on evidence of a clear and affirmative congressional intent, but **solely on the extent to which other courts have been silent on the issue of extraterritoriality**. *Id.*, at 1025. Not only is the Seventh Circuit's decision *per se* not binding in the First Circuit, but the decision should be given no deference, because it "relied on [a case] … which ignored or discarded the presumption against extraterritoriality." *Morrison*, 130 S. Ct. at 2887-88.

SMUG's previous reliance (dkt. 18, p. 9) on this District's decision in *Xuncax v. Gramajo*, 886 F. Supp. 162, 193 (D. Mass. 1995) (WOODLOCK, J.) is also unavailing, because the district court there did not consider or apply the presumption against extraterritorial application. This court is not bound by a "*sub silentio*" exercise of jurisdiction. *Winn*, 131 S. Ct. at 1448.[62]

Finally, SMUG has also relied on the Supreme Court's decision in *Sosa* as a basis for concluding that extraterritorial application of the Alien Tort Statute is acceptable. (Dkt. 18, p. 8). *Sosa*, however, did not address, much less decide, the issue of extraterritoriality. *Exxon Mobil Corp.*, 654 F.3d at 20 ("**The issue of extraterritoriality, although briefed, was not decided in *Sosa***") (emphasis added). Like other courts, the *Sosa* Court ultimately assumed subject-matter jurisdiction over extraterritorial conduct "*sub silentio*," which is in no way binding on it or other courts that choose to expressly examine the issue. *Winn*, 131 S. Ct. at 1448. However, while it left

---

[62] In addition, the decisions of one judge within this District are not binding on the subsequent decisions of other judges. *Camreta v. Greene*, 131 S. Ct. 2020, 2033 n.7, __ U.S. __ (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case") (quoting 18 J. Moore *et al.*, Moore's Federal Practice § 134.02[1] [d], p. 134–26 (3d ed.2011)) (internal quotation marks omitted).

the extraterritoriality question open in *Sosa*, the Supreme Court now finally appears poised to decide it definitively in *Kiobel v. Royal Dutch Petroleum*, No. 10-1491. [63]

In sum, none of the authorities upon which SMUG relies are binding on this Court or otherwise demonstrate that the First Congress intended for the Alien Tort Statute to apply outside of the United States.

### D.   SMUG DOES NOT ALLEGE ANY DOMESTIC ACTIONABLE CONDUCT BY MR. LIVELY.

In its Opposition to Mr. Lively's Motion to Stay, SMUG alleged for the first time that "much of [Mr. Lively's] actionable conduct took place in Springfield, Massachusetts." (Dkt. 18, p. 9). But the operative pleading here is SMUG's Amended Complaint, not its motion papers. Nowhere in the Amended Complaint does SMUG allege any actionable conduct by Mr. Lively "in Springfield, Massachusetts," or anywhere else outside of Uganda, for that matter.

Moreover, SMUG's insinuation that Mr. Lively has various contacts in this District by virtue of his residence ignores the Supreme Court's recent emphasis in *Morrison* that: "it is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States. But the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case."

---

[63] As detailed in Mr. Lively's Motion to Stay, the Supreme Court has placed *Kiobel* on the calendar for re-argument, specifically on the question of "whether and under what circumstances the Alien Tort Statute, 28 U.S.C. § 1350, allows courts to recognize a cause of action for violations of the law of nations occurring within the territory of a sovereign other than the United States." (Dkt. 17, p. 4). SMUG has attempted to distinguish *Kiobel* on the grounds that it involves corporate (not individual) defendants, who are headquartered outside of the United States. (Dkt. 18, p. 2). The fact remains, however, that the Supreme Court's extraterritoriality concern in *Kiobel* correctly focuses on **where the challenged conduct took place**, and not where the defendants – who, like Mr. Lively, have sufficient contacts with the United States to be subject to general jurisdiction here – are headquartered. *See e.g.*, *Kiobel*, No. 10-1491, Tr. Of Feb. 28, 2012 Oral Argument, at 7:7-9) (Justice Alito remarking "there's no particular connection between **the events** here and the United States") (emphasis added). Moreover, if the Supreme Court finds that the Alien Tort Statute cannot be applied extraterritorially, such decision will foreclose not only claims against corporate defendants, such as the ones in *Kiobel*, but also claims against individuals, such as SMUG's claims against Mr. Lively here. Undoubtedly, *Kiobel* has at least the potential to significantly alter the course of this litigation, if not to derail it completely. (Dkt. 17).

*Morrison*, 130 S. Ct. at 2884 (italics in original). Mr. Lively's residence is therefore irrelevant. *Id.* What matters is where the alleged "persecution" took place, and SMUG unequivocally alleges that all eight acts of alleged "persecution" took place in Uganda. (*See* pp. 4-8, *supra*).

For the foregoing reasons, the Court should find that SMUG cannot overcome the strong presumption that the Alien Tort Statute does not reach extraterritorial conduct. The Court should dismiss with prejudice SMUG's persecution claims (Counts I, II and III) for lack of subject-matter jurisdiction.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiff's Amended Complaint with prejudice.

Respectfully submitted,

Philip D. Moran                               /s/ Horatio G. Mihet
   (MA Bar # 353920)               Mathew D. Staver
265 Essex Street, Suite 202                 *Admitted Pro Hac Vice*
Salem, Massachusetts 01970           Horatio G. Mihet
Tel: (978) 745-6085                            *Admitted Pro Hac Vice*
Fax: (978) 741-2572                         LIBERTY COUNSEL
Email: philipmoranesq@aol.com      P.O. Box 540774
                                                  Orlando, FL 32854-0774
                                                  800-671-1776 Telephone
                                                  407-875-0770 Facsimile
Attorneys for Defendant Scott Lively   court@lc.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed electronically with the Court on August 10, 2012. Service will be effectuated by the Court's electronic notification system upon all counsel or parties of record.

/s/ Horatio G. Mihet
Horatio G. Mihet
Attorney for Defendant Scott Lively

104