UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| SEXUAL MINORITIES UGANDA | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action |
| SCOTT LIVELY, individually and as | ) | |
| President of Abiding Truth Ministries | ) | 3:12-CV-30051 |
| | ) | |
| *Defendant*. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S "NOTICE OF SUPPLEMENTAL
AUTHORITY REQUIRING DISMISSAL OF PLAINTIFF'S FEDERAL LAW CLAIMS"**

Pamela C. Spees
*Admitted Pro Hac Vice*
Baher Azmy
*Admitted Pro Hac Vice*
Jeena Shah
*Admitted Pro Hac Vice*
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY  10012
212-614-6431 - Phone
212-614-6499 - Fax
pspees@ccrjustice.org

Luke Ryan
(Bar No. 664999)
100 Main Street, Third Floor
Northampton, MA 01060
Tel. (413) 586-4800
Fax (413) 582-6419
lryan@strhlaw.com

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

Table of Authorities .......................................................................... ii

Preliminary Statement ....................................................................... 1

I.   The Question of Extraterritorial Application of the ATS
     Does Not Relate to the Court's Subject Matter Jurisdiction,
     But to the Viability of a Cause of Action. ................................. 4

II.  *Kiobel* Rejected a Categorical Rule Against Extraterritoriality
     and Does Not Require Dismissal of Plaintiff's ATS Claims. ............... 6

     A.   Defendant Is a U.S. Citizen and Domiciled in This District. ............. 9

     B.   The Defendant's Conduct Substantially Affects an Important
          American National Interest. .......................................... 11

     C.   Defendant's Conduct in the U.S. is Also Sufficient
          to Displace the Presumption. ......................................... 15

Conclusion ................................................................................. 19

# TABLE OF AUTHORITIES

*Abur v. Republic of Sudan,*
437 F. Supp. 2d 166 (D.D.C. 2006) ............................................................................4

*Aluminum Bahr. B.S.C. v. Alcoa Inc.,*
2012 U.S. Dist. LEXIS 80478 (W.D. Pa. June 11, 2012) ...................................17

*Cedeño v. Castillo,*
733 F. Supp. 2d 471 (S.D.N.Y. 2010) ...................................................................17

*EEOC v. Arabian American Oil Co.,*
499 U.S. 244 (1991) .................................................................................................6

*European Community v. RJR Nabisco, Inc.,*
No. 02-CV-5771 (NGG)(VVP), 2011 U.S. Dist. LEXIS 23538
 (E.D.N.Y. Mar. 8, 2011) ......................................................................................17

*Filártiga v. Peña-Irala,*
630 F.2d 876 (2d Cir. 1980) ...............................................................................5, 14

*Kiobel v. Royal Dutch Petroleum Co.,*
569 U.S. __ (2013), 2013 U.S LEXIS 3159 (Apr. 17, 2013) ...................*passim*

*McBee v. Delica Co.*, 417 F.3d 107 (1ˢᵗ Cir. 2005) .....................................11, 16

*Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc.*,
871 F. Supp. 2d 933 (N.D. Cal. 2012) .................................................................17

*Morrison v. National Australia Bank Ltd.,*
561 U.S. __, 130 S. Ct. 2869 (2010) ..............................................................*passim*

*Sorota v. Sosa,*
842 F. Supp. 2d 1345 (S.D. Fla. 2012) ...............................................................17

*Sosa v. Alvarez-Machain,*
542 U.S. 692 (2004) .........................................................................................*passim*

 *Steele* v. *Bulova Watch Co.*,
344 U.S. 280, 97 L. Ed. 319, 73 S. Ct. 252 (1952) ...................................7, 11, 16

FOREIGN CASES

*Mukasa and Oyo v. Attorney General,*
Misc. Cause No. 257/06, (Dec. 22, 2008) ............................................................12

INTERNATIONAL CASES

*Prosecutor v. Kupreškić,*
Case No. IT-95-16-T, Judgment, (Jan. 14, 2000) .................................................. 12


STATUTES

15 U.S.C. 1051 ........................................................................................................ 10

28 U.S.C. § 1332 ...................................................................................................... 4

28 U.S.C. § 1350 .............................................................................................. *passim*


OTHER AUTHORITIES

International Covenant on Civil and Political Rights,
    art. 7, G.A. res. 2200A (XXI), 21 U.N. GAOR Supp. (No. 16) at 52,
    U.N. Doc. A/6316 (1966), 999 U.N.T.S. 171,
    *entered into force* Mar. 23, 1976 ...................................................................... 13

U.N. Human Rights Committee, 4th Periodic Report
    of the United States, U.N. Doc. CCPR/C/USA/4
    (May 22, 2012) ................................................................................................ 13

U.N. Human Rights Council, Working Group on the Universal
    Periodic Review, National Report of the United States,
    U.N. Doc. A/HRC/WG.6/9/USA/1 (Aug. 23, 2010) ......................................... 14

Antonio Cassese. Crimes Against Humanity in The Rome Statute
    of the International Criminal Court: A Commentary, Vol. 1A (2002) ................ 12

M. Cherif Bassiouni. International Crimes: Jus Cogens and Obligatio
    Erga Omnes, Law & Contemporary Problems, 59: 63-74 (1997) ..................... 12

Supplemental Brief For The United States As Amicus Curiae
    In Partial Support Of Affirmance, *Kiobel v. Royal Dutch Petroleum Co.*,
    No. 10-1491 (filed June 2012) .......................................................................... 5

# PRELIMINARY STATEMENT

In his notice to this Court of the Supreme Court's recent decision in *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. __ (2013), 2013 U.S LEXIS 3159 (Apr. 17, 2013), Defendant grossly mischaracterized both the reach and reasoning of the Court's decision. Contrary to Defendant's blanket characterization of the Court's holding that "the [Alien Tort Statute] does not 'reach conduct occurring in the territory of a foreign sovereign," Def. Not. 1, the Court did not adopt an absolute bar to all claims arising extraterritorially. Defendant conveniently omits from his notice to this Court the critical passage from the majority opinion that claims raised in a particular case under the Alien Tort Statute (ATS) can rebut, or "displace," the presumption against extraterritoriality if the claims "touch and concern the territory of the United States… with sufficient force." *Kiobel*, 2013 U.S. LEXIS 3159, at *26.[1]

In so holding, the majority opted to treat the ATS like other domestic statutes to which the Court applies a presumption against extraterritorial application, and determined that the specific facts of *Kiobel*, where the defendants were foreign, the plaintiffs were foreign, and the harm occurred abroad, fell beyond the reach of the statute. The Court did not overturn *Sosa v. Alvarez-Machain,* 542 U.S. 692, 124 S. Ct. 2739, 159 L. Ed. 2d 718 (2004), a case also brought under the ATS involving entirely extraterritorial conduct and harm with aspects of the planning and conspiracy to commit the violations undertaken within the U.S. Thus, as noted by the concurring opinions, the decision leaves open for future definition the circumstances under

---

[1]     The only opinion that arguably approximates the version espoused by Defendant is that of Justice Alito, which only garnered one additional vote. Justice Alito, joined by Justice Thomas, expressed a separate opinion because they sought a "broader standard" than the "narrow approach" of the majority. Under Justice Alito's broader standard, "a putative ATS cause of action will fall within the scope of the presumption against extraterritoriality—and will therefore be barred—unless the domestic conduct is sufficient to violate an international law norm that satisfies *Sosa*'s requirements of definiteness and acceptance among civilized nations." *Kiobel*, 2013 U.S. LEXIS 3159, at *27-29 (Alito, J., concurring).

which the presumption should be applied or displaced. *Kiobel*, 2013 U.S. LEXIS 3159, at *26 (Kennedy, J. , concurring) (the majority's opinion "is careful to leave open a number of significant questions regarding the reach and interpretation of the Alien Tort Statute"); *Id.* at *37 (Breyer, J., concurring in judgment) (the court's decision "leaves for another day the determination of just when the presumption against extraterritoriality may be 'overcome'") (quoting *id.* at *17 (opinion of Roberts, C.J.)); *Id.* at *27 (Alito, J., concurring) (the majority's test "leaves much unanswered").

Despite the absence of express guidance from *Kiobel,* the decision does offer significant guideposts by which this Court can assess whether the presumption should be displaced in a given case, including the underlying purpose of the presumption itself, i.e. to avoid negative "foreign policy implications" that may come from applying the statute to foreign defendants in a manner that conflicts with foreign laws, *Kiobel*, 2013 U.S. LEXIS 3159, at *10-11. This Court should also consider factors found in foreign relations law to determine when it is reasonable for a nation to apply its own law, i.e. whether the tort occurred on American soil, whether the defendant is an American national, or whether the defendant's conduct substantially and adversely affects an important American national interest, including a "distinct interest in preventing the United States from becoming a safe harbor (free of civil as well as criminal liability) for a torturer or other common enemy of mankind." *Id.* at *30-31 (Breyer, J.). *See infra* Secs. I.A and B. The Court may also look to cases in which courts have previously grappled with assessing whether the presumption against extraterritoriality should be displaced with respect to claims brought under other U.S. statutes. *See infra* Sec. I.C.

Plaintiff's ATS claims easily satisfy these considerations – separately as well as in combination – and should not be dismissed. First, as Defendant is a U.S. citizen domiciled in the

2

U.S., the risk of negative foreign policy implications in a court allowing claims for persecution effected abroad is minimal. Second, as the defendant is an American national, there is a strong national interest in ensuring that the U.S. does not become a safe harbor for its own citizens who have committed serious human rights violations abroad. Third, much of the defendant's conduct and activities, including planning and conspiring with others to carry out and effectuate the severe deprivation of Plaintiff's fundamental rights, as well as aiding and abetting those efforts, were carried out within the U.S.

Contrary to Defendant's assertion, Def. Not. 3, the question of the extraterritorial application of the ATS is properly analyzed as a merits question, to be determined on a case-by-case basis, pursuant to Fed. R. Civ. P. 12(b)(6), rather than as a question of subject-matter jurisdiction raised by Fed. R. Civ. P. 12(b)(1). *Morrison v. National Australia Bank Ltd.,* 561 U.S. __, 130 S. Ct. 2869, 2876-77 (2010). *See also Kiobel,* 2013 U.S. LEXIS 3159, at *12. The *Kiobel* decision applied the presumption against extraterritoriality to *claims* asserted under the ATS, and not the statute itself, as the ATS is a "strictly jurisdictional" statute and merely "allows federal courts to recognize certain causes of action based on sufficiently definite norms of international law." *Id.* at *11-12.

**ARGUMENT**

I.     **THE QUESTION OF EXTRATERRITORIAL APPLICATION**
       **OF THE ATS DOES NOT RELATE TO THE COURT'S SUBJECT**
       **MATTER JURISDICTION, BUT TO THE VIABILITY OF A CAUSE**
       **OF ACTION.**

Defendant incorrectly suggests that the question of whether Plaintiffs' ATS claims

survive *Kiobel*'s presumption against extraterritoriality goes to this Court's subject matter

jurisdiction.  Def. Not. 3.  The question of the extraterritorial reach of the Alien Tort Statute is

properly analyzed as a merits question pursuant to Fed. R. Civ. P. 12(b)(6), rather than as a

question of subject matter jurisdiction raised by Fed. R. Civ. P. 12(b)(1).[2]  *Morrison*, 130 S. Ct.

at 2876-77.  *See also Kiobel*, 2013 U.S. LEXIS 3159, at *12 (citing *Morrison*, a case not related

to subject matter jurisdiction, and explaining, "we think the principles underlying the canon of

interpretation *similarly* constrain courts considering *causes of action* that may be brought under

the ATS" (emphasis added)).

The Supreme Court explained, "The principles underlying the presumption against

extraterritoriality thus constrain courts exercising their power under the ATS." *Id*. In other

words, the *Kiobel* decision applied the presumption against extraterritoriality to *claims* asserted

under the ATS, not the statute itself, as the ATS is a "strictly jurisdictional" statute and merely

---

[2]     Indeed, the Court already has jurisdiction to hear the claims asserted in this case based on
28 U.S.C. § 1332 (diversity jurisdiction). *See*, *e.g*., *Abur v. Republic of Sudan*, 437 F. Supp. 2d
166, 169 n.4 (D.D.C. 2006) (finding that the court only needed subject matter jurisdiction under
the ATS over the claims asserted by alien plaintiffs against alien defendants, as "there is no
alien-alien diversity jurisdiction," but could rely on diversity jurisdiction over the claims asserted
by U.S. plaintiffs against alien defendants).

"allows federal courts to recognize certain causes of action based on sufficiently definite norms of international law." *Id.* at *11-12 (*quoting Sosa*, 542 U.S. at 713).[3]

The question of subject matter jurisdiction under the ATS consists of an abstract assessment of the norm alleged to have been violated (i.e., a determination as to whether the norm meets the *Sosa* standard). Yet, once a court determines an alien plaintiff has stated claims that trigger ATS jurisdiction (*i.e.*, claims that meet the *Sosa* standard), only then does it analyze whether that norm may be enforced in the particular circumstances of the case under Fed. R. Civ. P. 12(b)(6). *See Kiobel*, 2013 U.S. LEXIS 3159, at *10 ("The question here is not whether petitioners have stated a proper claim under the ATS, but whether a claim may reach conduct occurring in the territory of a foreign sovereign."). Like forms of liability (*i.e.,* aiding and abetting, conspiracy) and questions of who may be held liable (*i.e.*, corporations, individuals, non-state actors) for the particular cause of action alleged, extraterritoriality goes to the reach of the statute. *See Morrison,* 130 S. Ct. at 2877 ("to ask what conduct [a statute] reaches is to ask what conduct [it] prohibits, which is a merits question"). [4]

---

[3]     This is supported by the framing of the question posed on re-argument in *Kiobel*: "whether and *under what circumstances* courts may recognize a *cause of action* under the Alien Tort Statute, for violations of the law of nations occurring within the territory of a sovereign other than the United States." *Id.* at *6 (emphasis added).

[4]     The Supreme Court essentially adopted the U.S. government's position in *Kiobel*:

> There is no need in this case to resolve across the board the circumstances under which a federal common-law cause of action might be created by a court exercising jurisdiction under the ATS for conduct occurring in a foreign country. In particular, the Court should not articulate a categorical rule foreclosing any such application of the ATS. *Filártiga v. Peña-Irala*, 630 F.2d 876 (2d Cir. 1980), for example, involved a suit by Paraguayan plaintiffs against a Paraguayan defendant based on alleged torture committed in Paraguay. The individual torturer was found residing in the United States, circumstances that could give rise to the prospect that this country would be perceived as harboring the perpetrator….*Other claims based on conduct in a foreign country should be considered in light of the circumstances in which they arise*.

5

II.   **_KIOBEL_ REJECTED A CATEGORICAL RULE AGAINST EXTRATERRITORIALITY AND DOES NOT REQUIRE DISMISSAL OF PLAINTIFF'S ATS CLAIMS.**

In *Kiobel*, a group of Nigerian nationals brought suit under the ATS against certain Dutch, British and Nigerian corporations – whose only connection to the U.S. was a New York office owned by a separate corporate affiliate – alleging that the defendants aided and abetted the Nigerian government in committing various human rights violations in Nigeria. *See* 2013 U.S. LEXIS 3159, at *7-8. Reaffirming its ruling in *Sosa* – a case involving entirely extraterritorial conduct and harm with only aspects of planning and conspiracy taking place within the U.S. – that the ATS authorizes federal court jurisdiction over certain international law violations, including violations occurring abroad, the *Kiobel* Court reiterated "that the First Congress did not intend the provision to be 'stillborn,'" 2013 U.S. LEXIS 3159, at *9 (quoting *Sosa*, 542 U.S. at 714). Nevertheless, the Court unanimously held that the ATS could not reach the claims asserted in *Kiobel*, based on the status of the parties, the location of the torts and the absence of "sufficient ties to the United States." *See id.* at *31 (Breyer, J., concurring).

Contrary to Defendant's blanket assertion, *Kiobel's* five-justice majority opinion did not adopt a categorical bar to claims arising extraterritorially.[5]   The majority opinion applied the "canon of statutory interpretation known as the presumption against extraterritorial application" to the ATS.  *Kiobel*, 2013 U.S. LEXIS 3159, at *10, reasoning that the presumption has particular force in such cases, in order "to protect against unintended clashes between our laws and those of other nations with could result in international discord." *Id.* at *10, quoting *EEOC*

_____

Supplemental Brief For The United States As Amicus Curiae In Partial Support Of Affirmance, at 4-5, *Kiobel v. Royal Dutch Petroleum Co.*, No. 10-1491 (filed June 2012) (emphasis added) ("U.S. Suppl. *Kiobel* Br.").

*v. Arabian American Oil Co.,* 499 U.S. 244, 248 (1991) (*Aramco*).   However, the majority found that the presumption can be overcome or "displaced," "where the claims touch and concern the territory of the United States . . . with sufficient force." *Id.* at *26.

Even though the ATS is unlike other statutes in that it is "strictly jurisdictional," and "does not directly regulate conduct or afford relief," the majority opted to treat ATS like other domestic statutes to which the Court has applied a presumption against extraterritorial application. *Id.* at *13. *See, e.g., Morrison,* 130 S. Ct. 2869 (applying presumption to claims arising abroad under the Securities and Exchange Act of 1934); *EEOC v. Arabian American Oil Co.,* 499 U.S. 244, 248 (1991) (*Aramco*) (applying the presumption to cases arising abroad under Title VII of the Civil Rights Act of); *Steele* v. *Bulova Watch Co.*, 344 U.S. 280, 97 L. Ed. 319, 73 S. Ct. 252 (1952) (applying the presumption to claims brought under the Lanham Act for extra-territorial violations thereof and allowing the claim to proceed against a U.S. citizen defendant because the U.S. could "govern the conduct of its own citizens upon the high seas or even in foreign countries when the rights of other nations or their nationals are not infringed") (internal citations omitted).

The majority opinion did not provide detailed guidance on the factors that would displace the presumption against extraterritoriality, other than the recognition that the "foreign-cubed" facts in *Kiobel* (foreign plaintiffs, foreign defendant, and foreign harm) do not present sufficient ties to the U.S.  However, as seven justices on the Court expressly observed, the Court recognized that ATS causes of action would have to be evaluated on a case-by-case basis.

Justice Kennedy's concurring opinion observes:

> [t]he opinion for the Court is careful to leave open a number of significant questions regarding the reach and interpretation of the Alien Tort Statute….Other cases may arise with allegations of serious violations of international law principles protecting

7

>persons, cases covered neither by the TVPA nor by the reasoning
>and holding of today's case; and in those disputes the proper
>implementation of the presumption against extraterritorial
>application may require some further elaboration.

*Id.* at \*26-27.  Justice Breyer's four-justice concurrence, similarly observed that the majority's

standard "leaves for another day the determination of just when the presumption against

extraterritoriality may be 'overcome.'" *Id.* at \*37 (quoting *id.* at \*17 (opinion of Roberts, C.J.)).

Justice Alito's concurrence, in turn, describes the majority's test as "leav[ing] much

unanswered." *Id.* at \*27.

Nevertheless, the decision provides significant guideposts by which the Court can assess

the applicability, or lack thereof, of the presumption against extraterritoriality in this case.  The

Court can and should examine the underlying purpose of the extraterritoriality presumption –

which is to avoid negative "foreign policy implications" that may come from applying the statute

to foreign defendants in a manner that conflicts with foreign laws.  *Kiobel*, 2013 U.S. LEXIS

3159, at \*13-14. *See infra* Section II(A), (B).  In light of the majority's concern that because the

ATS allows "federal courts to recognize certain causes of action based on sufficiently definite

norms of international law," the "danger of unwarranted judicial interference in the conduct of

foreign policy is magnified… ," *id.* at \*12, this Court should consider factors derived from

traditional foreign relations law long used to determine when it is reasonable for a nation to

apply its own laws. Three factors identified in Justice Breyer's concurrence are derived from

traditional foreign relations law (and were in no way disputed by the majority) and support

application of the ATS, including extraterritorially, when:

>(1) the alleged tort occurs on American soil, (2) the defendant is an
>American national, or (3) the defendant's conduct substantially and
>adversely affects an important American national interest, and that
>includes a distinct interest in preventing the United States from

becoming a safe harbor (free of civil as well as criminal liability)
for a torturer or other common enemy of mankind.

*Id.* at *30-31.[6]

Finally, the Court can also consider the approach taken by other courts in determining

whether the presumption should be displaced with regard to claims brought under other statutes,

following the majority's reasoning in *Kiobel* and its reliance on *Morrison*. 2013 U.S. LEXIS

3159, at *10.

**A.  Defendant is a U.S. Citizen and Domiciled in this District and Application of U.S.
     Law to a U.S. Defendant Does Not Present a Risk of Diplomatic Strife.**

In *Kiobel*, the Court was concerned that the defendants were foreign corporate entities

with only a minimal presence in the United States. The defendants' only connection with the

United States was an office in New York owned by a separate corporate affiliate.  2013 U.S.

LEXIS 3159, *6; *Id.* at *51-51 (Breyer, J. concurring).  The Court signaled that U.S. individuals

or corporations are differently situated.  For example, the Court considered a 1795 opinion by the

then-U.S. Attorney General William Bradford which had recognized that the ATS could apply to

violations of the law of nations in Sierra Leone.  The majority found the opinion irrelevant to the

facts before it in *Kiobel* as the opinion "deals with *U.S. citizens*, who by participating in an attack

taking place both on the high seas and on a foreign shore, violated a treaty between the United

---

[6]     The Defendant also misreads Justice Breyer's concurrence, Def. Not. 2.  Justices Breyer,
Ginsburg, Sotomayor, and Kagan did not join in the majority's reasoning (nor Justice
Kennedy's) not because the majority would not accept the three factors they set forth, but
expressly because Justice Breyer, and those who joined his opinion, did not believe that the
presumption against extraterritoriality should apply to the ATS. *Kiobel*, 2013 U.S. LEXIS 3159,
at *30-31 ("Unlike the Court, I would not invoke the presumption against extraterritoriality,"
instead being guided "by principles and practices of foreign relations law").  The three factors
they identified were not expressly disavowed by the majority, and thus, may still be used by
courts to apply the majority's holding.

States and Great Britain." *Id.* at *23 (emphasis added). Thus, the Court contemplates that conduct by U.S. citizens occurring on a "foreign shore" is still within the ambit of the ATS.[7]

Second, the majority noted, "Corporations are often present in many countries, and it would reach too far to say that mere corporate presence suffices," suggesting that an individual's presence in the U.S. would be adequate. *See Id.* at *26. *See also id.* at *39 (Breyer, J., concurring) (ATS should apply extraterritorially if defendant is American).

Third, there is minimal risk of "diplomatic strife," *id.* at *25, where this Court's judgment would only apply against a U.S. defendant, instead of against a foreign defendant. *See also id.* at *39 (Breyer, J., concurring) (where a defendant is an American national extraterritorial application of ATS would not conflict with "*Sosa's* basic caution," *i.e.*, "to avoid international friction"). Indeed, as Justice Breyer noted, "Many countries permit foreign plaintiffs to bring suits against their *own* nationals based on unlawful conduct that took place abroad"; it is "uncontroversial" that the "United States may… exercise jurisdiction over ATS claims involving conduct committed by its own nationals within the territory of another sovereign, consistent with international law." 2013 U.S. LEXIS 3159, at *45. (citing *amicus* briefs submitted by The Netherlands, the United Kingdom and the European Commission).

Consistent with this logic, the First Circuit has adopted separate tests for cases brought against U.S. citizen defendants and foreign defendants when determining whether the presumption against extraterritorial application should be displaced for claims brought under the Lanham Act, 15 U.S.C. 1051, *et seq*, prohibiting trademark infringement, dilution and false

---

[7]     Justice Breyer's examination of international practice arrives at the same result: "Many countries permit foreign plaintiffs to bring suits against their own nationals based on the unlawful conduct that took place abroad." 2013 U.S. LEXIS 3159, at *45.

advertising. In *McBee v. Delica Co*., 417 F.3d 107 (1st Cir. 2005), the Court of Appeals

explained:

> Our framework asks first whether the defendant is an American
> citizen; that inquiry is different because a separate constitutional
> basis for jurisdiction exists for control of activities, even foreign
> activities, of an American citizen.

*Id.* at 111. Thus, according to the First Circuit, if the defendant is a U.S. citizen, "the domestic

effect of the international activities may be of lesser importance and a lesser showing of

domestic effects may be all that is needed." *Id*. at 118. In such situations, exercising jurisdiction

"over American citizens is a matter of domestic law that raises no serious international concerns,

even when the citizen is located abroad." *Id.* at 118, citing *Steele*, 344 U.S. at 285-286 (Congress

has power to regulate "the conduct of its own citizens," even extraterritorial conduct, "when the

rights of other nations or their nationals are not infringed").

Here, Plaintiff seeks to hold Defendant, a U.S. citizen, accountable for his role in the

persecution of the LGBTI community in Uganda and the resultant harms suffered by Plaintiff,

under a U.S. law that provides the Plaintiff with a forum to bring claims for violations of

international law that are clearly defined and widely accepted. Allowing Plaintiff's claims to

proceed would not adversely affect international concerns.

**B.  The Defendant's Conduct Substantially Affects an Important American
     National Interest.**

The United States also has a significant interest in enforcing universal prohibitions

against crimes against humanity like that of the persecution – especially where, as here, the

alleged perpetrator is present in, and a citizen of, the United States.  As briefed more fully in

Plaintiff's Opposition to Defendant's Motion to Dismiss the Amended Complaint, crimes against

humanity are among the most serious violations and the prohibition against them has long been

recognized as a *jus cogen* norm of customary international law, which is binding on all States.[8] *See* Dkt. 38 at 21-22. The prohibition against the crime against humanity of persecution embodies and codifies a central aim of international law, as well as domestic U.S. law, to protect the rights to equality and non-discrimination, particularly of vulnerable minorities; or in the words of the International Criminal Tribunal for the Former Yugoslavia, to prevent and protect against the "[exclusion of] a person from society on discriminatory grounds." *See Prosecutor v. Kupreškić, Judgement, IT-95-16-T, ¶ 621 (Jan. 14, 2000).* The rights to equality and non-discrimination are universally recognized principles, indeed central tenets, of law and are reflected in international treaties, national laws, state practice, and are explicitly and extensively codified in U.S. law, which, *inter alia,* provides a domestic cause of action for similar, though isolated, instances of deprivation of civil rights by private actors via 42 U.S.C. §1985(3).[9] These principles are also embodied and reflected in Ugandan law.[10]  As the Inter-American Commission on Human Rights has observed, the principles of equality and non-discrimination lay at the very foundation of domestic and international law: "The juridical framework of

---

[8]      *See, e.g., B. et al.,* Case, 4 May 1948, in Entscheindungen des Obersten Gerichtshofes für die Britische Zone in Strafsachen, Vol. 1 (1950) 3 (quoted in Antonio Cassese, Crimes Against Humanity in The Rome Statute of the International Criminal Court: A Commentary, Vol. 1A 355 (Antonio Cassese et al. eds., 2002) ("Crimes against humanity in the end offend against and injure a transcendent good, the value of the human being in the moral code, a value that cannot be compromised")). *See also,* M. Cherif Bassiouni, International Crimes: Jus Cogens and Obligatio Erga Omnes, Law & Contemporary Problems, 59: 63-74 (1997). The Restatement defines jus cogens as rules of international law "recognized by the international community of states as peremptory, permitting no derogation" and further advises that "these rules prevail over and invalidate international agreements and other rules of international law in conflict with them." Rest. (Third) on Foreign . Law, §102, cmt. k.

[10]     In Uganda in a case in which state agents justified their unlawful actions on the basis that plaintiffs were "homosexual," the High Court confirmed that plaintiffs were entitled, like everyone else, to equal dignity under Art. 1 of the Universal Declaration of Human Rights and to the rights to protection from inhuman treatment, personal liberty and privacy of the person, home and property. *Mukasa and Oyo v. Attorney General,* Misc. Cause No. 257/06, (Dec. 22, 2008), available at http://icj.wpengine.netdna-cdn.com/wp-content/uploads/2012/07/Mukasa-and-Oyo-v.-Attorney-General-High-Court-of-Uganda-at-Kampala.pdf.

national and international public order rests on this principle [of equality and non-discrimination] and permeates the entire legal system." *Atala Riffo and daughters v. Chile,* Inter-Am. Ct. H.R. (ser. C) No. 239, ¶ 79 (Feb. 24, 2012).

As one of the Allied powers, the United States played a leading role in the development of the law on persecution (which is discrimination in its more advanced stages) and other crimes against humanity subsequent to World War II, insisting upon applying the rule of law through international military tribunals for high-level architects of the Nazi regime. At the same time, the United States played a leading role in drafting a number of human rights instruments which codified and firmly grounded the principles of equality and non-discrimination, including the Universal Declaration of Human Rights.[11]  In addition to its constitutional and statutory law prohibiting discrimination, the U.S. has ratified international treaties and conventions that specifically prohibit discrimination in all its forms.  *See also* International Covenant on Civil and Political Rights, art. 7, G.A. res. 2200A (XXI), 21 U.N. GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966), 999 U.N.T.S. 171, *entered into force* Mar. 23, 1976. In reporting to the various bodies of the United Nations charged with overseeing States parties' compliance with their treaty obligations, the United States has consistently cited the Alien Tort Statute as one mechanism by which it upholds its obligations to punish and provide a remedy for serious violations of international law.[12]

---

[11]     *See, generally,* U.N. Human Rights Council, Working Group on the Universal Periodic Review, National Report of the United States, ¶ 5, U.N. Doc. A/HRC/WG.6/9/USA/1 (Aug. 23, 2010) available at:
http://lib.ohchr.org/HRBodies/UPR/Documents/session9/US/A_HRC_WG.6_9_USA_1_United%20States-eng.pdf  ("From the UDHR to the ensuing Covenants and beyond, the United States has played a central role in the internationalization of human rights law and institutions.").

[12]     *See, e.g.,*  U.S. Dep't of State, United States Report to the Committee Against Torture, ¶¶ 51, 61-63, 277-280 (reporting on "measures giving effect to its undertakings under [CAT]", cites ATS cases for torture that occurred in territory of foreign sovereigns), U.N. Doc.

Allowing claims to proceed against a *United States* defendant actually helps the U.S. prevent international discord by meeting its obligations to the international.  As the Court observed in *Kiobel*, the United States has had since its founding a national interest in meeting its international obligations, and the ATS is one tool by which it does so. *Kiobel*, 2013 U.S. LEXIS 3159, at *24-25.  *See also Sosa*, 542 U.S. 715-718. As Justice Breyer noted, it is an international legal obligation of states "not to provide safe harbors for their own nationals who commit such serious crimes abroad." *Id.* at *45 (Breyer, J., quoting E. de Vattel, Law of Nations, Book II, p. 163 (§76) (a sovereign should not "suffer his subjects to molest the subjects of other states, or to do them an injury," but should "compel the transgressor  to make reparation for the damage or injury"). *See also Filártiga v. Peña-Irala*, 630 F.2d 876 (holding that foreign citizen defendant residing in the United States could not take safe haven inside the United States to avoid liability for egregious human rights violations committed abroad).[13] This is particularly so when the transgressor is a U.S. citizen committing acts abroad that are illegal in the United States, illegal in the place where they are committed and absolutely prohibited as a matter of clearly defined and widely accepted international law.

Accordingly, this Court should find that recognizing a cause of action for the crime against humanity of persecution, against a U.S. citizen defendant domiciled in the United States

---

CAT/C/28/Add.5 (Feb. 9, 2000), available at
http://www.state.gov/documents/organization/100296.pdf. *See also* U.N. Human Rights Committee, 4th Periodic report of the United States, ¶ 185, U.N. Doc. CCPR/C/USA/4 (May 22, 2012).

[13]     *Sosa*, 542 U.S. at 732 (endorsing the reasoning of *Filártiga*); Tr. of Feb. 28, 2012 Oral Argument in Kiobel v. Royal Dutch Petroleum, No. 10-1491, at 12:21-23 (describing *Filártiga* as "binding precedent"); Supplemental Brief For The United States As Amicus Curiae In Partial Support Of Affirmance, at 4-5, Kiobel v. Royal Dutch Petroleum Co., No. 10-1491 (filed June 2012) ("The individual torturer was found residing in the United States, circumstances that could give rise to the prospect that this country would be perceived as harboring the perpetrator.").

is in the national interest, and that the presumption against extraterritorial application is displaced.

### C.  Defendant's Conduct in the U.S. is Also Sufficient to Displace the Presumption

Applying any of the relevant guideposts set out above, the facts in this case are sufficient to displace the presumption against extraterritoriality. Nevertheless, as Plaintiff's Amended Complaint ("Complaint") sufficiently alleges, Defendant's conduct undertaken inside the United States contributed to and exacerbated the torts occurring abroad.

The Defendant mischaracterizes the Plaintiff's argument on the issue of extraterritoriality in its opposition to the Defendant's Motion to Dismiss First Amended Complaint. *See* Dkt. 38. In arguing that the Court has the authority under the ATS to adjudicate torts that occur outside the United States, the Plaintiff did not concede that the conduct at issue "took place…entirely outside the United States," as the Defendant asserts.  Def. Not. at 2. Rather, Plaintiff argued that because the Supreme Court in *Sosa* as well as every other court in the country has specifically held or otherwise uncontroversially assumed that the ATS reaches conduct and harm that occurs abroad, dkt. 38 at 84-86 – which is still true in certain cases after *Kiobel* –  it did not need to address the Defendant's mischaracterization of the Complaint to the effect that "SMUG does not allege any domestic actionable conduct by Mr. Lively," dkt. 22 at 102-103.

Indeed, the Complaint alleges actionable conduct undertaken by Defendant in the United States toward the fulfillment of the object of the conspiracy over a period of years. While the object of the conspiracy led by Defendant was the persecution of the LGBT community in Uganda, the Complaint contains a number of allegations describing his work and conduct in furtherance of the persecution from within the United States. *See e.g.,* First Amended Complaint (FAC) at ¶¶ 22-23 (Defendant resides in, works and operates out of the United States). The

Complaint also alleges that for at least ten years he aligned and plotted with key Ugandan associates and co-conspirators in the persecution, by not only traveling to Uganda to further this effort, but also through continued work toward these ends when he was not present in Uganda and, by extension, when he was home in the United States. FAC ¶46:

- After Defendant traveled to Uganda twice in 2002 to solidify relationships, he maintained his relationships with Langa and Ssempa after his return to the U.S. at which point he continued to assist, promote, encourage and consult with them about ways to further deprive the LGBTI community of fundamental rights, FAC ¶¶ 47, 55;

- Defendant was called upon in the U.S. in 2009 to help counter Ugandan High Court ruling finding LGBTI people enjoy basic protections of the law and ramp up efforts to strip away those basic protections, FAC ¶ 36;

- Defendant continued to communicate – i.e. from the U.S. – through Martin Ssempa to leadership of Ugandan Parliament, FAC ¶ 140;

- Defendant continued to advise about the contents of anti-gay legislation, from the U.S., FAC ¶ 161;

- Defendant continued to work to sustain and build support for stripping away fundamental rights protections for LGBTI people within Uganda, from the U.S., FAC ¶¶ 55, 56.

This Court can look for guidance to cases in which other courts have grappled with whether the presumption should be displaced in a given case brought under other statutes. In particular, as discussed *supra*, the First Circuit has developed a test for determining whether the presumption should be displaced in Lanham Act cases that treats cases involving U.S. citizen defendants differently than cases involving foreign defendants. *See McBee v. Delica Co*., 417 F.3d at 111 (when the defendant is a U.S. citizen, for purposes of the Lanham Act, "the domestic effect of the international activities may be of lesser importance and a lesser showing of domestic effects may be all that is needed") citing *Steele,* 344 U.S. at 285-286 (Congress has

power to regulate "the conduct of its own citizens," even extraterritorial conduct, "when the rights of other nations or their nationals are not infringed").

The analysis used by courts applying *Morrison,* a case upon which the *Kiobel* majority relied in part, to RICO cases may also be helpful. In cases where the domestic activity was more than merely "incidental" to the enterprise, courts since *Morrison* have found the domestic contact sufficient to consider the domestic application of RICO.  For example, in *Aluminum Bahr. B.S.C. v. Alcoa Inc.*, 2012 U.S. Dist. LEXIS 80478 (W.D. Pa. June 11, 2012), the court found sufficient domestic activity even where the tortious conduct was the payment of bribes to officials of Bahraini oil company and in the Bahraini government because "the decision-making vital to the sustainability of the enterprise, came from Pittsburgh." *Compare Cedeño v. Castillo*, 733 F. Supp. 2d 471, 472 (S.D.N.Y. 2010), *aff'd by* 457 F. App'x 35, 37-38 (2d Cir. 2012) (denying extraterritorial application of RICO statute where the connection between the Venezuelan perpetrators and the United States was "limited to the movement of funds into and out of U.S.-based bank accounts"); *Sorota v. Sosa*, 842 F. Supp. 2d 1345, 1350 (S.D. Fla. 2012) (concluding that the RICO enterprise was foreign where it was "operated entirely in Peru, with its only connection to the United States being that the funds it possessed originated from (and possibly returned to) a Florida bank account").

Similarly, under a "nerve center" analysis, courts focus on the RICO enterprise's "brains" as opposed to its "brawn," that is, on "the decisions effectuating the relationships and common interest of its members, and how those decisions are made," as compared to the location where the consequences of those decisions transpire. *European Community v. RJR Nabisco, Inc.*, No. 02-CV-5771 (NGG)(VVP), 2011 U.S. Dist. LEXIS 23538, at *20 (E.D.N.Y. Mar. 8, 2011).  *See also Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc.*, 871 F. Supp. 2d 933, 942 (N.D. Cal.

17

2012) (applying "nerve center" test in determining whether case required extraterritorial

application of RICO, finding the fact that all three moving Defendants are U.S. corporations

"tends to show, however, that the decision making necessary to effectuate the alleged

association-in-fact enterprise's common purpose occurred substantially within the territory of the

United States").

Here, the Complaint contains a number of allegations describing Defendant's role at the

"nerve center" of the conspiracy, acting as the "brains" of the operation as opposed to the

"brawn" where his conspiratorial plans and objectives were implemented and carried out, i.e.

where the violations were committed. Defendant's leading role in this effort is described

throughout the complaint:

- acknowledging his gratitude for being known as the "father" of Uganda's anti-gay movement but sharing the honorific title with his co-conspirator Stephen Langa, FAC ¶ 90;

- claiming to be one of the world's leading experts on the "evil" "gay movement", FAC ¶ 23;

- serving as an expert and consultant at the hastily-organized, emergency Anti-Homosexuality Conference held in 2009 to counter the High Court's ruling that LGBTI persons were entitled to basic protections of law and further advance the persecutory plan, FAC ¶ 36-40, 80-93, 101-106;

- working with his co-conspirators as a "principal strategist" behind the persecution of the LGBTI community in Uganda, FAC ¶ 24; and

- giving strategic direction to co-conspirators which they followed, including instructions to equate LGBTI orientation and gender identity with child rape and violence, which his co-conspirators carried out, FAC ¶¶ 95, 106, 107, 112, 114.

That Defendant has been a key architect of and "brains" behind the persecutory plans and

policies he has pursued with his Ugandan counterparts is also described in the Complaint in

allegations concerning his extensive and detailed strategies for defeating the "evil" "gay movement." *See* FAC ¶¶ 54, 58, 60, 66, and 92. Moreover, Defendant's ownership and pride over the "nuclear bomb-like" results of his 2009 efforts in Uganda with Stephen Langa also demonstrate his role at the epicenter of the decision-making and strategy behind the persecution conspiracy. See FAC ¶ 88.

## CONCLUSION

Accordingly, this Court should allow these claims to proceed as they touch and concern the U.S. with sufficient force to displace the presumption against extraterritorial application of the ATS: Defendant is a U.S. citizen, domiciled in this district, and claims such as these are in the national interest.

Dated:  May 7, 2013                              Respectfully submitted,


                                                 /s/Pamela Spees
                                                 Pamela C. Spees
Luke Ryan                                        *Admitted Pro Hac Vice*
(Bar No. 664999)                                 Baher Azmy
100 Main Street, Third Floor                     *Admitted Pro Hac Vice*
Northampton, MA 01060                            Jeena Shah
Tel. (413) 586-4800                              *Admitted Pro Hac Vice*
Fax (413) 582-6419                               Center for Constitutional Rights
lryan@strhlaw.com                                666 Broadway, 7th Floor
                                                 New York, NY  10012
*Attorneys for Plaintiff*                        212-614-6431 - Phone
                                                 212-614-6499 - Fax
                                                 pspees@ccrjustice.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing was filed electronically, that it will be served electronically upon all parties of record who are registered CM/ECF participants via the NEF, and that paper copies will be sent to any parties indicated on the NEF as non-registered participants on May 7, 2013.

/s/Pamela Spees
Pamela Spees
Counsel for Plaintiff