UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SEXUAL MINORITIES UGANDA, | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | C.A. No. 12-cv-30051-MAP |
| | ) | |
| SCOTT LIVELY, | ) | |
| Defendant | ) | |

MEMORANDUM AND ORDER REGARDING
DEFENDANT'S MOTIONS TO DISMISS
(Dkt. Nos. 21 & 30)

August 14, 2013

PONSOR, U.S.D.J.

## I. INTRODUCTION

Plaintiff Sexual Minorities Uganda is an umbrella organization located in Kampala, Uganda, comprising member organizations that advocate for the fair and equal treatment of lesbian, gay, bisexual, transgender, and intersex (LGBTI) people in that east African country.  Defendant Scott Lively is an American citizen residing in Springfield, Massachusetts who, according to the complaint, holds himself out to be an expert on what he terms the "gay movement." (Dkt. No. 27, Am. Compl. ¶ 1.)  Lively is also alleged to be

an attorney, author, and evangelical minister.

Plaintiff alleges that in concert with others Defendant -- through actions taken both within the United States and in Uganda -- has attempted to foment, and to a substantial degree has succeeding in fomenting, an atmosphere of harsh and frightening repression against LGBTI people in Uganda. The complaint asserts five counts, three invoking the jurisdiction of the federal Alien Tort Statute, 28 U.S.C. § 1350 ("ATS"), and two under state law.  Plaintiff seeks compensatory, punitive, and exemplary damages; declaratory relief holding that Defendant's conduct has been in violation of the law of nations; and injunctive relief enjoining Defendant from undertaking further actions, and from plotting and conspiring with others, to persecute Plaintiff and the LGBTI community in Uganda.

Defendant has filed two motions to dismiss, offering in essence five arguments.[1]  First, the court lacks

_____

[1] Defendant filed his first motion to dismiss (Dkt. No. 21) based on Plaintiff's original complaint (Dkt. No. 1). Subsequently, Plaintiff filed a First Amended Complaint. (Dkt. No. 27.)  Defendant has now moved to dismiss the Amended Complaint.  (Dkt. No. 30.)  Because the Amended Complaint is now the operative pleading, the court will focus on the arguments raised in Defendant's second motion to dismiss.

jurisdiction because international norms do not bar
persecution based on sexual orientation or gender identity
with sufficient clarity and historical lineage to make it
one of the narrow set of claims for which the ATS furnishes
jurisdiction.  Second, the court cannot recognize a claim
under the ATS for actions taken outside the United States,
as the Supreme Court has recently held in <u>Kiobel v. Royal</u>
<u>Dutch Petroleum</u>, 133 S. Ct. 1659 (2013).  Third, Plaintiff
lacks standing to bring this case either on behalf of itself
as an organization or on behalf of members of the LGBTI
community in Uganda.  Fourth, the right of free speech
described in the First Amendment to the United States
Constitution prohibits any attempt by Plaintiff to restrict
expression, however distasteful, through court action.
Finally, the two claims asserted under Massachusetts state
law lack any adequate legal foundation.

For the reasons set forth at length below, none of
these arguments is persuasive.  As to the first argument,
many authorities implicitly support the principle that
widespread, systematic persecution of individuals based on
their sexual orientation and gender identity constitutes a

crime against humanity that violates international norms. It is a somewhat closer question whether this crime constitutes what Justice Souter has termed one of the "relatively modest set of actions alleging violations of the law of nations" for which the ATS furnishes jurisdiction. Sosa v. Alvarez-Machain, 542 U.S. 692, 720 (2004). However, aiding and abetting a crime against humanity is a well-established offense under customary international law, and actions for redress of this crime have frequently been recognized by American courts as part of the subclass of lawsuits for which the ATS furnishes jurisdiction. Given this, the allegations set forth in the Amended Complaint are more than adequate at this stage to require denial of Defendant's motion to dismiss. Moreover, given the elasticity of the legal standard for ATS jurisdiction, it is fairer and more prudent to address the Sosa issue on a fully developed record, following discovery.

Second, the restrictions established in Kiobel on extraterritorial application of the ATS do not apply to the facts as alleged in this case, where Defendant is a citizen of the United States and where his offensive conduct is

-4-

alleged to have occurred, in substantial part, within this country.  Indeed, Defendant, according to the Amended Complaint, is alleged to have maintained what amounts to a kind of "Homophobia Central" in Springfield, Massachusetts. He has allegedly supported and actively participated in worldwide initiatives, with a substantial focus on Uganda, aimed at repressing free expression by LGBTI groups, destroying the organizations that support them, intimidating LGBTI individuals, and even criminalizing the very status of being lesbian or gay.[2]  Kiobel makes clear that its restrictions on extraterritorial application of American law do not apply where a defendant and his or her conduct are based in this country.

Third, clear authority supports Plaintiff's standing here.  Fourth, the argument that Defendant's actions have constituted mere expression protected under the First Amendment is, again, premature.  Accepting the allegations of the complaint, as the court must at this stage,

---

[2] It is important to emphasize that the court at this stage is drawing its summary of facts from the allegations of the Amended Complaint, some of which describe despicable opinions and conduct by Defendant.  Defendant denies a number of these claims; Plaintiff will bear the burden of proving them at trial.

sufficient facts are alleged, with specific names, dates, and actions, to support the claim that Defendant's behavior crossed well over any protective boundary established by the First Amendment.  Fifth, and finally, the arguments attacking the claims under Massachusetts state law have not been convincingly developed.  Having denied the motions to dismiss the federal claims, the court will retain the state law claims pending discovery and, if appropriate, reconsider them on a fuller record in connection with a motion for summary judgment.

## II. <u>FACTS</u>[3]

The essence of the claims before the court, expatiated in the Amended Complaint's detailed recitation of allegations, is that Defendant Scott Lively along with others in Uganda devised and carried out a program of persecution aimed at Plaintiff's organization and its

---

[3] The factual background is drawn from the allegations contained in Plaintiff's Amended Complaint (Dkt. No. 27). Because this is a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the court "accept[s] as true all well-pleaded facts, analyz[es] those facts in the light most hospitable to the plaintiff's theory, and draw[s] all reasonable inferences for the plaintiff."  <u>See</u> <u>United States ex rel. Hutcheson v. Blackstone Med., Inc.</u>, 647 F.3d 377, 383 (1st Cir. 2011), <u>cert. denied</u> 132 S. Ct. 815 (2011).

members based on their sexual orientation and gender
identity.  The Amended Complaint describes a campaign of
harassment and intimidation, and a resulting atmosphere of
fear, that Defendant is alleged, in active concert with
others, to have directed at the LGBTI community in Uganda.
According to Plaintiff, Defendant helped coordinate,
implement, and justify "strategies to dehumanize, demonize,
silence, and further criminalize the LGBTI community" in
Uganda.  (Dkt. No. 27, Am. Compl. ¶ 7.)

The Amended Complaint identifies a group of Ugandans
with whom Defendant is alleged to have worked closely to
carry out his "decade-long persecutory campaign." (Dkt. No.
27, Am. Compl. ¶ 25.) These individuals allegedly include:

- Stephen Langa, the Executive Director of the Family
  Life Network and the Director of the Ugandan branch of
  the Arizona-based Disciple Nations Alliance;

- Martin Ssempa, Ugandan pastor, involved in implementing
  Uganda's HIV/AIDS policy from as early as 2003;

- James Buturo, Ugandan Minister of Information and
  Broadcasting for the President (2001-2006) and Minister
  of Ethics and Integrity in the Office of the Vice-

President (2006-2011);

- David Bahati, member of Parliament and sponsor of legislation entitled the Anti-Homosexuality Bill; and

- Simon Lokodo, current Minister of Ethics and Integrity.

According to the Amended Complaint, Defendant came to Uganda in 2002 when he participated in the country's first anti-LGBTI conference.  In March 2002, Defendant spoke at a gathering organized by Langa about the supposed links between pornography and homosexuality.  Several months later in June 2002, Defendant returned to Uganda to participate in additional speaking events and media appearances organized by Langa.  These appearances were designed, again, to headline the purported link between pornography and homosexuality.

During this trip, Defendant and Langa also held an all-day invitation-only pastors' conference.  Defendant later wrote that the pastors in attendance "were very grateful for the insights I was able to give them about the way in which America was brought low by homosexual activism."  (Dkt. No. 27, Am. Compl. ¶ 50.)  Defendant also addressed students at several universities and high schools where he blamed the

so-called "gay movement" for the dangerous effects of a "porn culture."  (Dkt. No. 27, Am. Compl. ¶ 51.)  Defendant also met with the Kampala City Council.

Defendant has stated, according to the Amended Complaint, that these appearances and meetings in 2002 made him instrumental in the efforts by Langa and Ssempa, not only to create a rhetorical platform for Uganda's anti-LGBTI campaign of persecution, but to craft specific initiatives designed to repress and intimidate LGBTI people and organizations advocating on their behalf.  (Dkt. No. 27, Am. Compl. ¶ 56.)

Plaintiff alleges that between 2002 and 2009 Defendant continued to work from the United States with Langa and Ssempa to assist, encourage, and consult with them to design and then carry out specific actions to deny fundamental rights to the LGBTI community in Uganda.  During this time, Ssempa was involved in formulating the Ugandan HIV/AIDS policy.  In this role, he took action to exclude LGBTI persons from the program's assistance.  Ssempa also publicly posted the names of LGBTI rights advocates -- labeled as "homosexual promoters" -- as well as pictures of them with

their contact information, as part of a campaign of intimidation.

For his part, Defendant began developing and disseminating strategies to be used to discriminate against and persecute LGBTI communities in Uganda and elsewhere.   In pursuit of this, he published two books, <u>Defend the Family:</u> <u>Activist Handbook</u> and <u>Redeeming the Rainbow</u>.   The books presented a comprehensive plan of action designed to repress the so-called "gay movement," which he described as "the most dangerous social and political movement of our time." (Dkt. No. 27, Am. Compl. ¶¶ 57-60.)   The two primary tactics advocated by Defendant were criminalizing advocacy -- that is, subjecting any public expressions of support for the LGBTI community to criminal prosecution -- and attributing to LGBTI individuals a compulsion to sexually abuse children.

In July 2005, the police unlawfully raided the home of Victor Mukasa, a transgender LGBTI advocate and founder of Plaintiff Sexual Minorities Uganda, seized a number of documents as well as hard-copy and electronic files, and arrested Mukasa's guest, Yvonne Oyo.   Oyo was taken to the

police station where she was forced to remove her clothing in front of male officials to "prove her sex."  (Dkt. No. 27, Am. Compl. ¶ 30.)  Police then sexually assaulted Oyo by touching and fondling her breasts.

Over three years following the raid, in December 2008, the High Court of Uganda issued a well-publicized ruling arising out of the raid of Mukasa's home and the arrest and abuse of Oyo.  The High Court held that gays and lesbians, like anyone else, could challenge the unlawful conduct of authorities.  The High Court also awarded damages to Oyo for the violation of her right to protection from torture and cruel, inhuman, and degrading treatment under Article 24 of the Ugandan Constitution.  The High Court also awarded damages to Mukasa for the violation of his right to privacy of person, home, and property guaranteed by Article 27 of the Ugandan Constitution.

Plaintiff alleges that this High Court decision had the effect of spurring Defendant, in coordination with his co-conspirators in Uganda, to intensify the campaign of persecution against members of the LGBTI community.  Less than three months after the High Court decision, in March

2009, Langa hosted an anti-gay conference entitled, "Seminar on Exposing the Homosexual Agenda."  The conference was attended by a number of Ugandan religious and government leaders, parliamentarians, police officers, and teachers. Defendant traveled to Uganda to speak as one of the headliners at this conference.  During this visit, Defendant met with parliamentarians and government officials including Buturo, made media appearances, and spoke at seminars at schools and churches.

According to the Amended Complaint, Defendant continued his attacks on gay and lesbian people, some of them bordering on ludicrous.  Defendant charged, for example, that homosexuals were behind the rise of Nazism and the genocide in Rwanda. (Dkt. No. 27, Am. Compl. ¶¶ 8, 24, 54, 82, 93.)[4]  Other accusations were aimed at playing on parents' fears, such as the bogus claims that gay and

---

[4] In his book <u>The Pink Swastika: Homosexuality in the Nazi Party</u>, Defendant argued that the rise of Nazism, with its resultant horrors, was engineered and driven by a violent and fascistic gay movement in Germany.  In other works, he has blamed homosexuals for other historical atrocities including the Spanish Inquisition, the French Reign of Terror, South African apartheid, American slavery, and the Rwandan genocide. (Dkt. No. 27, Am. Compl. ¶ 24.)

lesbian people had a compulsion to sexually abuse children
and that they were engaged in a campaign to "recruit"
Ugandan children as homosexuals.  (Dkt. No. 27, Am. Compl.
¶¶ 36-39, 65, 72-74, 81, 82, 93.)

Defendant also allegedly formulated and promoted
specific strategies to further deprive the LGBTI community
of its basic human rights, including freedom of expression
and protection of life, liberty, and property.  Defendant,
according to Plaintiff, has acknowledged that his 2009
efforts in Uganda were based on his book <u>Redeeming the
Rainbow</u>, which advocates criminalizing advocacy on behalf of
LGBTI people and attributing acts of sexual violence against
children to LGBTI individuals' purported obsession with
pedophilia.  Nor were Defendant's efforts without effect.
Defendant boasted that an associate was told "that our
campaign was like a nuclear bomb against the 'gay' agenda in
Uganda." (Dkt. No. 27, Am. Compl. ¶ 88.)

According to the Amended Complaint, partly as a result
of Defendant's efforts to incite fear and hatred against
LGBTI people, on April 29, 2009, an Anti-Homosexuality Bill
was introduced in the Ugandan Parliament.  The bill proposed

the death penalty for crimes of "aggravated homosexuality,"
including execution for "repeat offenders" of
"homosexuality."  (Dkt. No. 27, Am. Compl. ¶ 37.)  The bill
also proposed to criminalize any advocacy on behalf of the
LGBTI community as the "promotion of homosexuality."  This
type of repression of any public support for equal treatment
of gays and lesbians was precisely what Defendant advocated
in his speeches and writings and the strategy he was helping
his co-conspirators in Uganda to promulgate.

The bill was revised and expanded in October 2009 by
co-conspirator and member of Parliament, David Bahati.  The
revised bill left the death penalty provisions and expanded
the criminalization of association with or advocacy for
LGBTI individuals.  The adoption of this legislation would
have turned Uganda into a virtual anti-gay police state,
making it a crime punishable by imprisonment, for example,
for a Ugandan to fail to report to the police any person
whom he or she suspects is a "homosexual" or involved in
advocacy related to homosexuality.  (Dkt. No. 27, Am. Compl.
¶ 9.)

The Amended Complaint alleges that Defendant has

acknowledged that he reviewed and commented on a draft of the Anti-Homosexuality Bill before it was introduced, communicating with the leadership in the Ugandan Parliament through Ssempa.  Defendant returned to Uganda in 2009 to help efforts to strengthen the law and embolden leaders "so that when the law came out they'd have an easier time" implementing it.  (Dkt. No. 27, Am. Compl. ¶ 85.)

The Amended Complaint notes that, while the Anti-Homosexuality Bill did not pass, the level of LGBTI persecution from governmental and media sources increased. With Defendant's active assistance Langa, Ssempa, Buturo, and Bahati continued to sensationalize in lurid terms the threat LGBTI individuals purportedly posed to children. Media outings of LGBTI individuals became more frequent and were accompanied with continued incendiary claims that LGBTI people posed a danger to children.  In one case, a tabloid accompanied the photos of gay and lesbian people with the headline "Hang Them."

The Ugandan High Court issued a permanent injunction in January 2011 to prevent newspapers from identifying LGBTI individuals and requiring the tabloid to pay damages to

persons whose photos were depicted.  Nevertheless, in the
wake of public disclosures and police harassment, a number
of activists, including Plaintiff's current Executive
Director, were forced to leave Uganda or go into hiding.

Despite the High Court rulings, Ugandan police and
government officials have more recently continued efforts to
repress any advocacy on behalf of LGBTI people, as
Defendant's writings urge.  In 2012, at least two gatherings
of LGBTI advocates were raided and disbanded.  Both raids
were ordered by Simon Lokodo, the current Minister of Ethics
and Integrity.  Lokodo has threatened advocates with arrest
for "promotion of homosexuality."  After the February 2012
raid, Lokodo referred to the advocates as "terrorists."
Lokodo has stated that the raids and arrests were ordered so
that "everybody else will know that at least in Uganda we
have no room here for homosexuals and lesbians."  (Dkt. No.
27, Am. Compl. ¶ 41, 165-85.)  Subsequently, Plaintiff has
not been permitted to register as a non-governmental
organization.

The five-count Amended Complaint asserts jurisdiction
under the Alien Tort Statute, 28 U.S.C. § 1350 ("ATS"), as

well as federal question jurisdiction (§ 1331), diversity
jurisdiction (§ 1332), and supplemental jurisdiction (§
1367).  The five counts allege: (I) crimes against humanity
of persecution, based on individual responsibility under the
ATS; (II) crimes against humanity of persecution, based on a
joint criminal enterprise under the ATS; (III) crimes
against humanity of persecution, based on conspiracy under
the ATS; (IV) civil conspiracy under Massachusetts state
law; and (V) negligence under Massachusetts state law.
Plaintiff seeks compensatory, punitive, and exemplary
damages; declaratory relief holding that Defendant's conduct
was in violation of the law of nations; and injunctive
relief enjoining Defendant from undertaking further actions,
and from plotting and conspiring with others, to persecute
Plaintiff and the LGBTI community in Uganda.

### III. DISCUSSION

As noted, Plaintiff has invoked jurisdiction for this
lawsuit, in part, under the Alien Tort Statute.  This
statute, passed as part of the Judiciary Act of 1789, is
terse, stating simply: "The district courts shall have
original jurisdiction of any civil action by an alien for a

tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. Defendant has raised two independent challenges to the court's ability to recognize a cause of action under the ATS in his motion to dismiss.

First, Defendant points out that the ATS furnishes jurisdiction only where the international law norm is sufficiently definite and historically rooted to support the asserted cause of action. Sosa v. Alvarez-Machain, 542 U.S. 692, 732 (2004). In other words, even where a colorable claim for a violation of current international norms is adequately set forth, a further question must be confronted: is this cause of action among "the modest number of international law violations with a potential for personal liability" for which jurisdiction adheres under the ATS? Sosa, 542 U.S. at 724. Defendant argues, in essence, that the Amended Complaint sets out no adequate claim for a violation of any international norm, and, even if it does, the alleged violation does not fall within the small group of claims for which the ATS furnishes jurisdiction.

Second, Defendant cites Kiobel v. Royal Dutch

<u>Petroleum</u>, 133 S. Ct. 1659 (2013), as support for the argument that Plaintiff has no claim under the ATS in any event, given the presumption against extraterritoriality described by Chief Justice Roberts in his majority opinion.

In addition to the two arguments specifically directed at the court's ability to recognize a claim under the ATS, Defendant contends that Plaintiff lacks standing to bring this suit.  He further takes the position that all of the allegations set forth in the Amended Complaint target speech protected by the First Amendment and therefore cannot form the basis of any lawsuit against him.  Finally, Defendant challenges the application of Massachusetts state law, based on the statute of limitations and the sufficiency of the pleadings.  The discussion below will begin by addressing the ATS-related arguments, then move to Defendant's other contentions.

A.   <u>"Persecution" Under the Alien Tort Statute</u>.

Plaintiff alleges that Defendant aided and abetted in the persecution of the LGBTI community in Uganda and that this persecution amounted to a crime against humanity.  The Supreme Court has held that a federal court can only

-19-

recognize a claim under the ATS if the claim seeks to enforce an underlying norm of international law that is as clearly defined and accepted as the international law norms familiar to Congress in 1789 when the ATS was enacted. Sosa, 542 U.S. at 732.  The analysis, therefore, must proceed in two steps: first, was there a violation of an international norm -- in this case, as Plaintiff alleges, a recognized crime against humanity committed by Defendant? Second, if so, is the crime against humanity within the limited group of claims for which the ATS furnishes jurisdiction?

The answer to the first question is straightforward and clear.  Widespread, systematic persecution of LGBTI people constitutes a crime against humanity that unquestionably violates international norms.  A review of applicable authorities makes the answer to the second question easily discernible as well.  Aiding and abetting in the commission of a crime against humanity is one of the limited group of international law violations for which the ATS furnishes jurisdiction.

A variety of sources can be used to determine the

content of international law: treaties, judicial decisions
of the "courts of justice of appropriate jurisdictions," and
controlling legislative or executive decisions.  The Paquete
Habana, 175 U.S. 677, 700 (1900); see also Sosa, 542 U.S. at
734.  In the absence of these controlling authorities, the
Supreme Court has counseled that the existence and content
of international law may be derived by reference to:

> the customs and usages of civilized nations; and,
> as evidence of these, to the works of jurists and
> commentators, who by years of labor, research and
> experience, have made themselves peculiarly well
> acquainted with the subjects of which they treat.
> Such works are resorted to by judicial tribunals,
> not for the speculations of their authors
> concerning what the law ought to be, but for
> trustworthy evidence of what the law really is.

Sosa, 542 U.S. at 734 (citing The Paquete Habana, 175 U.S.
at 700).

　　　In analyzing the existence of the international legal
norm proffered by Plaintiff in this case, it is helpful to
begin by differentiating among three terms: discrimination,
persecution, and crimes against humanity.  These three
concepts measure the increasing severity of the
discriminatory activity against a targeted group.

　　　The Human Rights Committee of the United Nations has

defined discrimination as:

> [A]ny distinction, exclusion, restriction, or
> preference based on certain motives . . . that
> seeks to annul or diminish the acknowledgment,
> enjoyment, or exercise, in conditions of equality,
> of the human rights and fundamental freedoms to
> which every person is entitled.

UN Human Rights Comm., CCPR Gen. Comment 18, Non-

Discrimination (1989), available at

http://www.unhchr.ch/tbs/doc.nsf/%28Symbol%29/3888b0541f8501

c9c12563ed004b8d0e?Opendocument.

Persecution is a harsher subset of discrimination,

comprising "intentional and severe deprivation of

fundamental rights contrary to international law by reason

of the identity of the group or collectivity."  Rome Statute

on the International Criminal Court art. 7(2)(g), July 1,

2002, 2187 U.N.T.S. 38544.  Persecution can be a crime

against humanity, but it may not always rise to that level.

For persecution to amount to a crime against humanity,

it must be "part of a widespread or systematic attack

directed against any civilian population."  Rome Statute

art. 7(1)(h).

It is doubtful whether the ATS would furnish

jurisdiction for a claim of persecution alone; this claim

under the common law would appear to lack the "definite
content and acceptance among civilized nations" within the
"historical paradigms familiar when § 1350 was enacted."
See Sosa, 542 U.S. at 732 (citation omitted).  On the other
hand, persecution that rises to the level of a crime against
humanity has repeatedly been held to be actionable under the
ATS.  See Presbyterian Church of Sudan v. Talisman Energy,
Inc., 582 F.3d 244, 256 (2d Cir. 2009); Cabello v.
Fernandez-Larios, 402 F.3d 1148, 1154 (11th Cir. 2005)
(noting that crimes against humanity have been recognized as
actionable under United States and international law since
long before the 1970's); Flores v. Southern Peru Copper
Corp., 414 F.3d 233, 244 n.18 (2d Cir. 2003) (noting that
"customary international law rules proscribing crimes
against humanity . . . have been enforceable against
individuals since World War II"); Kadić v. Karadžić, 70 F.3d
232, 236 (2d Cir. 1995); In re Chiquita Brands Int'l, Inc.,
792 F. Supp. 2d 1301, 1344 (S.D. Fla. 2011); Doe v. Saravia,
348 F. Supp. 2d 1112, 1156-57 (E.D. Cal. 2004) (holding that
persecution that constitutes a crime against humanity is
actionable under the ATS); Mehinovic v. Vuckovic, 198 F.

Supp. 2d 1322, 1352 (N.D. Ga. 2002) ("Crimes against humanity have been recognized as a violation of customary international law since the Nuremberg trials and therefore are actionable under the ATCA."), abrogated in part Aldana v. Del Monte Fresh Produce, N.A., Inc., 416 F.3d 1242, 1247 (11th Cir. 2005).

For persecution to reach the level of a crime against humanity, it typically must involve more than the "intentional and severe deprivation of fundamental rights contrary to international law by reason of the identity of the group or collectivity." Rome Statute art. 7(2)(g). It must be demonstrated, in addition, that the persecution has been "part of a widespread or systematic attack" to qualify as a crime against humanity. Saravia, 348 F. Supp. 2d at 1156; see also Rome Statute art. 7(1)(h).

To properly plead persecution as a crime against humanity, Plaintiff must allege both the proper actus reus -- denial of fundamental rights -- and mens rea -- the intentional targeting of an identifiable group. The allegations set forth in the Amended Complaint offer evidence of both aspects of criminal intent. It has been

-24-

noted that "the crime of persecution encompasses a variety of acts, including, <u>inter alia</u>, those of a physical, economic or judicial nature, that violate an individual's right to the equal enjoyment of his basic rights." <u>Prosecutor v. Tadić</u>, Trial Judgment, IT-94-1-T ¶ 710 (May 7, 1997).  In determining what constitutes a basic right, international courts have looked to the Universal Declaration of Human Rights and the International Covenant on Civil and Political Rights.  <u>Id.</u> at 703; <u>Prosecutor v. Kupreškić</u>, Judgment, IT-95-16-T, ¶ 621 (Jan. 14, 2000).

Persecution on the level of a crime against humanity must be based on the identity of a specific targeted group. Defendant argues that persecution based on sexual orientation or gender identity has not been sufficiently recognized under international law to be actionable under the ATS.  It is true that many of the international treaties and instruments that provide jurisdiction over crimes against humanity list particular protected groups without specifying LGBTI people.  <u>See</u>, <u>e.g.</u>, Nuremberg Charter art. 6(c) (encompassing "persecutions on political, racial or religious grounds"); Rome Statute art. 7(1)(h) (defining an

actionable crime against humanity as "persecution against

any identifiable group or collectivity on political, racial,

national, ethnic, cultural, religious, gender as defined in

paragraph 3, or other grounds that are universally

recognized as impermissible under international law");

Updated Statute of the Int'l Criminal Tribunal for the

Former Yugoslavia art. 5(h), Sept. 2009 (providing

jurisdiction over "persecutions on political, racial and

religious grounds"); Statute of the Int'l Tribunal for

Rwanda art. 3(h), Jan. 1, 2007 (providing jurisdiction over

"persecutions on political, racial and religious grounds").

    It is noteworthy, however, that virtually all of these

instruments provide savings clauses.  See Rome Statute art.

7(1)(h) (including "other grounds that are universally

recognized as impermissible under international law" in the

definition).  Even when they do not, international courts

have interpreted the identity of the group requirement

broadly to encompass persecution of a discrete identity.

See Prosecutor v. Naletilić and Martinović, Judgment, IT-98-

34-T, ¶ 636 (Mar. 31, 2003) (instructing that the

jurisdictional limit to prosecute persecution based on race,

politics, and religion must be "interpreted broadly");

Prosecutor v. Nahimana, Trial Judgment, ICTR-99-52-T ¶ 1071
(Dec. 3, 2003).

Significantly, the boundaries of persecution are almost
always defined by those carrying out the persecution against
a particular group.  In other words, the perpetrator
"defines the victim group while the targeted victims have no
influence of the definition of their status."  Naletilić and
Martinović Judgment ¶ 636.  This fact strongly argues in
favor of a generous interpretation of what groups enjoy
protection under international norms.

Customary international law does not in general limit
the type of group that may be targeted for persecution.  As
the International Criminal Tribunal for the Former
Yugoslavia (ICTY) has observed, "There are no definitive
grounds in customary international law on which persecution
must be based and a variety of different grounds have been
listed in international instruments."  Tadić Trial Judgment
¶ 711.

In light of the savings clauses in the international
instruments and the expansive boundaries of customary law,

the argument that international norms do not bar systematic persecution of LGBTI people, because -- in contrast to racial, ethnic or religious minorities -- they are not explicitly mentioned is unpersuasive.  It is enough that Plaintiff alleges that the denial of fundamental rights it suffered was based on an "unjustifiable discriminatory criterion."  Id. at ¶ 697.

One argument offered by Defendant in this regard may be dismissed out of hand.  Defendant appears to contend that because LGBTI people suffer discrimination in many countries, acts of persecution committed by him against this community cannot be viewed as violating international norms. (Dkt. No. 33, Def.'s Mem. 31-34.)  This argument is utterly specious.  First, Defendant concedes that the highest court in Uganda has itself recognized the entitlement of gay and lesbian people to fair and equal treatment under the law, including protection of their basic rights to free expression, life, liberty, and property.  More importantly, even a glance at the history of treatment of gays and lesbians makes it clear that the discrimination suffered by them is on a par with the treatment meted out to other

groups, defined by religion, race, or some other accepted characteristic.

The history and current existence of discrimination against LGBTI people is precisely what qualifies them as a distinct targeted group eligible for protection under international law.  The fact that a group continues to be vulnerable to widespread, systematic persecution in some parts of the world simply cannot shield one who commits a crime against humanity from liability.

As noted, the critical feature that elevates a campaign of persecution to a crime against humanity is its expression as a widespread, systematic attack on the targeted community.  In determining whether actions are part of a systematic attack, the former President of the International Criminal Tribunal for the former Yugoslavia,  Antonio Cassesse set out the following test:

> [O]ne ought to look at these atrocities or acts in their context and verify whether they may be regarded as part of an overall policy or a consistent pattern of inhumanity, or whether they instead constitute isolated or sporadic acts of cruelty or wickedness.

Saravia, 348 F. Supp. 2d at 1156.  To be widespread and systematic, acts do not have to "involve military forces or

armed hostilities, or any violent force at all."  Rodney

Dixon, "Crimes Against Humanity: Analysis and Interpretation

of Elements," in <u>Commentary on the Rome Statute of the</u>

<u>International Criminal Court: Observer's Notes, Article by</u>

<u>Article</u> 124-25 (Otto Triffterer ed. 1999).  The

International Criminal Tribunal for Rwanda (ICTR) has

observed:

> An attack may also be non violent in nature, like
> imposing a system of apartheid . . . or exerting
> pressure on the population to act in a particular
> manner, may come under the purview of attack, if
> orchestrated on a massive scale or in a systematic
> manner.

<u>Prosecutor v. Akayesu</u>, Opinion and Judgment, Case No. ICTR-

96-4-T, ¶ 581 (Sept. 2, 1998).

Plaintiff has stated a claim for persecution that

amounts to a crime against humanity, based on a systematic

and widespread campaign of persecution against LGBTI people

in Uganda.  The allegations feature Defendant's active

involvement in well orchestrated initiatives by legislative

and executive branch officials and powerful private parties

in Uganda, including elements of the media, to intimidate

LGBTI people and to deprive them of their fundamental human

rights to freedom of expression, life, liberty, and

-30-

property.

Plaintiff rests its claim of individual liability in large part on Defendant's accessory role in aiding and abetting the persecutory campaign amounting to a crime against humanity.  (Dkt. No. 27, Am. Compl. ¶¶ 237-38; Dkt. No. 38, Pl.'s Mem. 44.)  Aiding and abetting is a well-established basis for liability in international customary law.  Numerous authorities confirm that a cause of action exists under international law for aiding and abetting a crime against humanity.  Indeed, aiding and abetting liability was accepted as part of the customary international law that was applied by the war tribunals after World War II.  Khulumani v. Barclay Nat'l Bank Ltd., 504 F.3d 254, 270-75 (2d Cir. 2007) (Katzmann, J. concurring), adopted in Presbyterian Church of Sudan, 582 F.3d at 258.

Aiding and abetting has been subsequently recognized as an established basis for liability in international law instruments including the Rome Statute and the statutes creating the ICTY and the ICTR.  Id.

Beyond current customary international law, the United

States Congress itself in 1789 appeared to recognize a cause of action for aiding and abetting violations of international law.  Doe v. Exxon Mobil Corp., 654 F.3d 11, 29 (D.C. Cir. 2011).  The year after the passage of the Judiciary Act, Congress passed a piracy law providing for aiding and abetting liability.  Crimes Act of 1790, ch. 9, § 10, 1 Stat. 112, 114 (1790) (deeming "an accessary [sic] to ... piracies" anyone who shall "knowingly and willingly aid and assist, procure, command, counsel, advise" any person to commit piracy).  An early federal circuit court case acknowledged that U.S. citizens could be liable for aiding and abetting a violation of U.S. treaties or the law of nations.  Henfield's Case, 11 F. Cas. 1099 (C.C. Pa. 1793) (No. 6360) (noting that "they who commit, aid, or abet hostilities against these powers, or either of them, offend against the laws of the United States, and ought to be punished; and consequently, that it is your duty, gentlemen, to inquire into and present all such of these offences, as you shall find to have been committed within this district"); see also Talbot v. Jensen, 3 U.S. 133, 167-68 (1795).

Aiding and abetting liability under the ATS has been accepted by every circuit court that has considered the issue.  Exxon Mobil Corp., 654 F.3d at 29-30; Presbyterian Church of Sudan, 582 F.3d at 259; Khulumani, 504 F.3d at 260 (per curiam); Cabello, 402 F.3d at 1157-58.

To obtain a verdict based on a theory of aiding and abetting, a plaintiff must prove that a defendant provided "practical assistance to the principal which has a substantial effect on the perpetration of the crime."  Exxon Mobil Corp., 654 F.3d at 39; Presbyterian Church of Sudan, 582 F.3d at 259.  The circuits are currently divided as to whether a plaintiff must show that a defendant acted only with knowledge of the criminal enterprise or that his explicit purpose was to facilitate the criminal activity. Compare Exxon Mobil Corp., 654 F.3d at 39 (requiring that plaintiff commit the act with knowledge of the criminal purpose); Presbyterian Church of Sudan, 582 F.3d at 259 (requiring that plaintiff show that defendant committed the act with "the purpose of facilitating the commission of the crime"); Cabello, 402 F.3d at 1157-58 (adopting the federal common law standard of knowledge).  Because Plaintiff has

-33-

pleaded the more stringent "purpose" standard, it is unnecessary for the court to resolve the "knowledge/purpose" controversy.

The Amended Complaint sets forth detailed factual allegations supporting Count One's claim that Defendant bears individual liability for aiding and abetting the commission of a crime against humanity. Essentially, Defendant's role is alleged to be analogous to that of an upper-level manager or leader of a criminal enterprise. He participated in formulating the enterprise's policies and strategies. He advised other participants on what actions might be most effective in achieving the enterprise's goals, such as criminalizing any expressions of support for the LGBTI community and intimidating its members through threats and violence. He generated and distributed propaganda that falsely vilified the targeted community to inflame public hatred against it.

In particular, Plaintiff has set out plausibly that Defendant worked with associates within Uganda to coordinate, implement, and legitimate "strategies to dehumanize, demonize, silence, and further criminalize the

[Ugandan] LGBTI community." (Dkt. No. 27, Am. Compl. ¶ 27.)
In both 2002 and 2009, as part of this alleged campaign,
Defendant met with Ugandan governmental leaders. (Dkt. No.
27, Am. Compl. ¶¶ 36, 52, 77, 78.) Defendant's intentional
activities, according to the Amended Complaint, succeeded in
intimidating, oppressing, and victimizing the LGBTI
community. Indeed, as noted, according to the Amended
Complaint Defendant acknowledged that his efforts made him
instrumental in detonating "a nuclear bomb against the 'gay'
agenda in Uganda." (Dkt. No. 27, Am. Compl. ¶¶ 56 & 88.)

Of course, all these allegations will need to be proved
at trial to entitle Plaintiff to a verdict, and they may not
be. But, as this lengthy discussion demonstrates, they are
sufficient, as allegations, to state a claim for the
commission of a crime against humanity against Defendant.

Similarly, the overwhelming weight of authority
establishes that this crime against humanity is one of the
relatively few violations of international norms for which
the ATS furnishes jurisdiction.[5] It is true, as Sosa makes

---

[5] Defendant argues that he cannot be liable for
persecution because he is not a state actor. However, there
is no requirement that aiding and abetting be done by a state

clear, that not all violations of international norms, even if properly alleged, can be pursued under the ATS.  The further question is whether, as Justice Souter put it, Plaintiff's claim rests "on a norm of international character accepted by the civilized world <u>and</u> defined with specificity comparable to the features of the 18th-century paradigms [the Court has] recognized."  542 U.S. at 725 (emphasis added).

Put more concretely, is aiding and abetting a crime against humanity tantamount to piracy, or one of the other narrowly defined crimes for which the ATS provided jurisdiction in 1789?

Again, the weight of authority confirms that it is.  As noted, both crimes against humanity and aiding and abetting liability are well-established and accepted in customary international law.  Moreover, an ATS cause of action for this type of international law violation has been widely recognized in the lower courts.  As <u>Sosa</u> noted, "the door is still ajar," to federal common law claims for some violations of customary law, if only because "[i]t would

---

actor.

take some explaining to say now that federal courts must avert their gaze entirely from any international norm intended to protect individuals." Id. at 728, 732.

In sum, then, for the reasons stated Plaintiff has adequately pled both that a crime against humanity has been committed by Defendant and that this crime rests among the relatively small group of violations of international norms for which the ATS provides jurisdiction.[6]

B.   Claims Related to Extraterritorial Conduct Under the Alien Tort Statute.

Defendant argues that this court cannot recognize Plaintiff's ATS claims because Plaintiff cannot overcome the presumption that causes of action recognized under the ATS do not extend to extraterritorial conduct.  Subsequent to oral argument, the Supreme Court clarified an aspect of this issue in Kiobel v. Royal Dutch Petroleum, 133 S. Ct. 1659

---

[6] It is important to note that, in addition to Count I, Counts II and III of the Amended Complaint have, apparently in the alternative, charged Defendant as a participant in a joint criminal enterprise and as a co-conspirator respectively. Because Plaintiff has clearly set forth its claim in Count I against Defendant based on his individual responsibility, it is unnecessary, at least at this stage, to address the sufficiency of the legal and factual support for these two counts.

(2013).  The Court's decision addressed whether a federal
court could recognize a cause of action for claims by
Nigerian citizens living in the United States against Dutch
and British corporations.  Neither corporation had more than
a negligible presence in the United States, and all the
tortious conduct alleged to have been committed by them
occurred outside the United States, in Nigeria.  The Supreme
Court held that in this context, the plaintiffs did not have
a cause of action, based on the presumption against
extraterritorial application.  133 S. Ct. at 1669.

Two facts alleged in this case distinguish it from
Kiobel.  First, unlike the British and Dutch corporations,
Defendant is an American citizen residing within the venue
of this court in Springfield, Massachusetts.  Second, read
fairly, the Amended Complaint alleges that the tortious acts
committed by Defendant took place to a substantial degree
within the United States, over many years, with only
infrequent actual visits to Uganda.

The fact that the impact of Defendant's conduct was
felt in Uganda cannot deprive Plaintiff of a claim.
Defendant's alleged actions in planning and managing a

-38-

campaign of repression in Uganda from the United States are analogous to a terrorist designing and manufacturing a bomb in this country, which he then mails to Uganda with the intent that it explode there.  The Supreme Court has made clear that the presumption against the extraterritorial application of a statute comes into play only where a defendant's conduct lacks sufficient connection to the United States.  See Morrison v. Nat'l Australia Bank Ltd., 130 S. Ct. 2869, 2884 (2010); Pasquantino v. United States, 544 U.S. 349 (2005).

Kiobel elaborated on this theme.  As Chief Justice Roberts stated in his opinion, the issue in that case was "whether a claim may reach conduct occurring in the territory of a foreign sovereign." Kiobel, 133 S. Ct. at 1664.  In the final paragraph of his decision, he emphasized that the Court's holding applied to a factual scenario where "all the relevant conduct took place outside the United States." Id. at 1669.  Where conduct occurred solely abroad, "mere corporate presence," he concluded, did not touch and concern the United States "with sufficient force to displace the presumption against extraterritorial application." Id.

The separate concurrence of Justice Kennedy made the limited reach of Kiobel manifest.  "Other cases," he noted, "may arise with allegations of serious violations of international law principles protecting persons . . . ; and in those disputes the proper implementation of the presumption against extraterritorial application may require some further elaboration and explanation."  133 S. Ct. at 1669.

Even the narrowest construction of the Kiobel holding, set forth in the separate concurrence of Justice Alito on behalf of himself and Justice Thomas, made clear that an ATS cause of action will lie where the "domestic conduct is sufficient to violate an international law norm that satisfies Sosa's requirements of definiteness and acceptance among civilized nations."  Kiobel, 133 S. Ct. at 1670 (emphasis added).

This is not a case where a foreign national is being hailed into an unfamiliar court to defend himself. Defendant is an American citizen located in the same city as this court.  The presumption against extraterritoriality is based, in large part, on foreign policy concerns that tend

-40-

to arise when domestic statutes are applied to foreign
nationals engaging in conduct in foreign countries.  Kiobel,
133 S. Ct. at 1664-65; Morrison, 130 S. Ct. at 2885-86
(noting the obvious "probability of incompatibility with the
applicable laws of other countries" and concluding that the
defendants' connection to the United States was
insufficient); EEOC v. Arabian American Oil Co., 499 U.S.
244, 248 (1991) (noting that presumption "serves to protect
against unintended clashes between our laws and those of
other nations which could result").[7]

An exercise of jurisdiction under the ATS over claims
against an American citizen who has allegedly violated the
law of nations in large part through actions committed
within this country fits comfortably within the limits
described in Kiobel.

Indeed, the failure of the United States to make its
courts available for claims against its citizens for actions
taken within this country that injure persons abroad would

---

[7] In extreme cases, piracy for example, Kiobel noted that
the ATS would provide jurisdiction over claims against foreign
nationals for tortious conduct committed wholly in a foreign
country, on the ground that it carried "less direct foreign
policy consequences."  Id. at 1667.

itself create the potential for just the sort of foreign policy complications that the limitations on federal common law claims recognized under the ATS are aimed at avoiding. Under the law of nations, states are obliged to make civil courts of justice accessible for claims of foreign subjects against individuals within the state's territory.  "If the court's decision constitutes a denial of justice, or if it appears to condone the original wrongful act, under the law of nations the United States would become responsible for the failure of its courts and be answerable not to the injured alien but to his home state."  <u>Tel Oren v. Libyan Arab Republic</u>, 726 F.2d 774, 783 (D.C. Cir. 1984) (Edwards, J. concurring), cert. denied, 470 U.S. 1003 (1985).

One such episode, occurring shortly after the passage of the ATS, underlines the role of United States courts in precisely this situation.  In 1794, several U.S. citizens joined a French privateer fleet to aid the French in the war on Great Britain despite the official American policy of neutrality.  These Americans formed part of a force that attacked and plundered the British colony of Sierra Leone. When the British Ambassador protested and demanded that the

Americans be punished, then Attorney General William
Bradford responded that it was unlikely that the Americans
could be criminally prosecuted for actions abroad or on the
high seas.  But, he noted, "[t]here can be no doubt that the
company or individuals who have been injured by these acts
of hostility have a remedy by a civil suit in the courts of
the United States; jurisdiction being expressly given to
these courts in all cases where an alien sues for a tort
only, in violation of the laws of nations, or a treaty of
the United States."  Kiobel, 133 S. Ct. at 1668 (quoting
Breach of Neutrality, 1 Op. Atty. Gen. 57 (1795)).

     It is true, as Defendant points out, that the Amended
Complaint, which was filed prior to Kiobel, highlights
actions taken by Defendant in Uganda.  Defendant's
contention that all his alleged misconduct took place in
Uganda, however, offers a distorted picture of the pleading.
As noted, Plaintiff alleges that Defendant's tortious
behavior unfolded over at least a decade, during which time
he was actually present in Uganda only a few times.  The
actual claim of individual responsibility against Defendant
is rooted in a contention that Defendant aided and abetted

-43-

the tortious conduct.  The relevant question therefore is whether Plaintiff has alleged that substantial "practical assistance" was afforded to the commission of the crime against humanity from the United States.

The Amended Complaint adequately sets out actionable conduct undertaken by Defendant in the United States to provide assistance in the campaign of persecution in Uganda. To review these allegations, and at the risk of repetition, the Amended Complaint alleges that Defendant resides and operates out of Springfield, Massachusetts.  (Dkt. No. 27, Am. Compl. ¶ 8.)  It describes how, after Defendant traveled to Uganda in 2002, he continued to assist, manage, and advise associates in Uganda on methods to deprive the Ugandan LGBTI community of its basic rights.  (Id. at ¶¶ 47, 55-56.)  Defendant's Ugandan co-conspirators then contacted him in the United States in 2009 to craft tactics to counter the Ugandan High Court ruling confirming that LGBTI persons enjoyed basic protections of the law.  (Id. at ¶ 36.)  After going to Uganda in 2009, Defendant continued to communicate from the United States through Martin Ssempa to members of the Ugandan Parliament about the legislation proposing the

-44-

death penalty for homosexuality.  From his home in the

United States, he reviewed a draft of the legislation and

provided advice on its content.  (Id. at ¶¶ 140, 161.)

Given that Defendant is a United States citizen living in

this country and that the claims against him "touch and

concern the territory of the United States . . . with

sufficient force to displace the presumption against

extraterritoriality," a cause of action is appropriate under

the ATS.  <u>Kiobel</u>, 133 S. Ct. at 1669.[8]

C.  <u>Standing</u>.

_____

        [8] This conclusion is in line with most of the cases that
have considered the presumption against extraterritoriality
post-<u>Kiobel</u>.  <u>See</u> <u>Muntslag v. Dieteren, S.A.</u>, 2013 WL 2150686,
at *2 (S.D.N.Y. May 17, 2013) (holding that jurisdiction did
not exist over foreign defendants when allegedly tortious acts
all occurred abroad); <u>Mohammadi v. Islamic Republic of Iran</u>,
-- F. Supp. 2d ----, 2013 WL 2370594, at *15 (D.D.C. May 31,
2013) (holding that there was an insufficient nexus to the
territory or interests of the United States when the
defendants were leaders of Iran and activities occurred in the
sovereign territory of Iran); <u>Mwani v. bin Laden</u>, -- F. Supp.
2d ----, 2013 WL 2325166, at *4 (D.D.C. May 29, 2013) (holding
that presumption against extraterritoriality displaced when a
foreign defendant bombed an American embassy abroad and overt
acts in furtherance of the conspiracy took place in the United
States).  In one case, a district court has dismissed a claim
against an American corporation based on alleged torture and
war crimes occurring in Iraq.  <u>al Shimari v. CACI Int'l, Inc.</u>,
-- F. Supp. 2d ----, 2013 WL 3228720, at *7-10 (E.D. Va. June
25, 2013).  Arguably, a different rationale may apply to a
natural U.S. citizen than an American corporation.  If not,
this court finds the reasoning in <u>al Shimari</u> unpersuasive.

Defendant argues that Plaintiff, as an umbrella organization, lacks standing to bring this suit either in its own right or as a representative of its members.  The argument will not withstand scrutiny.  Plaintiff has standing to seek monetary and equitable relief for Defendant's actions that have caused direct damage to it. Moreover, it also has associational standing to bring claims on behalf of its members and the LGBTI community for injunctive relief to prevent Plaintiff from continued actions "to strip away and/or deprive Plaintiff and LGBTI community in Uganda of their fundamental rights."  (Dkt. No. 27, Am. Compl. ¶ 13.)

### 1.   Organizational Standing.

It is well-established that an organization can sue to obtain compensation for injuries it sustains.  <u>Warth v. Seldin</u>, 422 U.S. 490, 511 (1975); <u>Havens Realty Corp. v. Coleman</u>, 455 U.S. 363, 379 n.19 (1982); <u>Mass. Delivery Ass'n v. Coakley</u>, 671 F.3d 33, 44-45 (1st Cir. 2012).  Article III standing exists where three criteria are satisfied: (1) an injury in fact, which is (2) fairly traceable to the defendant's misconduct, and which can be (3) redressed

through a favorable decision of the court.  <u>Lujan v.</u>
<u>Defenders of Wildlife</u>, 560 U.S. 555, 560-61 (1992).

Defendant does not argue that Plaintiff has failed to
meet the first prong -- injury in fact.  The Amended
Complaint sets forth two distinct harms to Plaintiff's
organization.  First, Plaintiff's operations, conferences,
and staff have allegedly been targeted as part of the
persecutory campaign.  Plaintiff alleges that, as a result,
it has had to retain the services of security personnel,
take additional security measures for its premises, and
relocate its offices and operations.  All this has obviously
cost money.  Second, Plaintiff has had to expend
considerable resources and efforts to counteract Defendant's
campaign of repression; the need for these efforts has
impaired Plaintiff's ability to carry out its own
organizational objectives.  Defendant correctly concedes
that the allegations of injury in fact are sufficient.

Defendant does challenge the sufficiency of the
evidence to satisfy the second element, the connections
between the injury and Defendant's conduct.  For the court
to find that Plaintiff has standing, "there must be a causal

-47-

connection between the injury and conduct complained of --
the injury has to be 'fairly trace[able] to the challenged
action of the defendant, and not . . . th[e] result [of] the
independent action of some third party not before the
court." Lujan, 504 U.S. at 560 (quoting Simon v. Eastern
Ky. Welfare Rights Org., 526 U.S. 26, 41-42 (1976)).

In addressing this factor, it is important to bear in
mind that Defendant's actions need not be "the very last
step in the chain of causation for the injury.  It suffices
if the plaintiff can show injury produced by determinative
or coercive effect upon the action of someone else."
Weaver's Cove Energy, LLC v. R.I. Coastal Res. Mgmt.
Council, 589 F.3d 458, 467 (1st Cir. 2009) (internal
quotation and citation omitted).[9]

At this stage, Plaintiff has adequately pled that
Defendant was one of the "principal strategists and actors
behind this decade-long persecutory campaign."  (Dkt. No.

---

[9] Defendant contends that the "fairly traceable" element
is only met if Plaintiff can show that his speech was directed
at producing or inciting imminent lawless action and is likely
to produce or incite such action. However, this is a
substantive test for whether speech is protected by the First
Amendment and not a test for standing. See NAACP v. Claiborne
Hardware Co., 458 U.S. 886, 928 (1982).

27, Am. Compl. ¶ 25.)  While some of the actions that
Plaintiff describes in the Amended Complaint may not be
directly traceable to Defendant, Defendant may nevertheless
be held liable, as the previous discussion notes, for his
conduct as an aider and abettor.  According to the Amended
Complaint, Defendant himself has acknowledged that he has
been instrumental in launching the anti-LGBTI movement in
Uganda and developing strategies for its ongoing operation
-- the "nuclear bomb" previously noted.  Given all this, the
allegations of the complaint sufficiently support a finding
that Plaintiff's injury is directly traceable to Defendant's
conduct.

Finally, Plaintiff has met its burden to plead
plausibly that it is "likely, as opposed to merely
speculative, that the injury will be redressed by a
favorable decision."  Lujan, 504 U.S. at 561.  To a
substantial extent the injuries to Plaintiff as an
organization are quantifiable and may be remedied by an
award of monetary damages.

2.  Associational Standing.

While Plaintiff may seek monetary damages for the

-49-

injuries it has suffered to itself as an organization,
Defendant argues that Plaintiff cannot seek monetary damages
for its members, based on its associational standing.
Defendant contends that proof of these claims, and
particularly the determination of monetary damages, will
require participation by individuals whose interests the
organization does not have standing to assert.  The simple
answer to this is that Plaintiff seeks monetary damages only
for injury to itself as an organization, not for its
individual members, as to whom only equitable relief is
requested.

Associational standing allows an organization to bring
suit "solely as the representative of its members" "[e]ven
in the absence of injury to itself."  Warth, 422 U.S. at
511.  To assert associational standing, a plaintiff must
show: (1) its members would otherwise have standing to sue
in their own right; (2) the interests it seeks to protect
are germane to the organization's purpose; and (3) neither
the claim asserted nor the relief requested requires the
participation of individual members in the lawsuit.  Hunt v.
Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977).

Defendant does not directly argue that Plaintiff fails
to meet the first two requirements.  Plaintiff is "an
umbrella organization that was founded in 2004 by a
coalition of Ugandan organizations advocating on behalf of
lesbian, gay, bisexual, transgender, and intersex ('LGBTI')
communities, to unify and support sexual minority groups in
Uganda."  (Dkt. No. 27, Am. Compl. ¶ 18.)  Plaintiff asserts
that "individual members of its constituent organizations"
have suffered persecution and associated harms as a result
of Defendant's actions.  (Dkt. No. 27, Am. Compl. ¶ 21.)
Plaintiff also asserts that the interests it seeks to
protect in this case -- preventing persecution of the LGBTI
community in Uganda -- are germane to its agenda to
advocate, unify, and support this community.

While not contesting either of these points directly,
Defendant does argue that Sexual Minorities Uganda has not
adequately alleged associational <u>authority</u>.  To support the
need to show associational authority, Defendant cites an ATS
case where a defendant, Unocal, Inc., argued that "an
organization only has associational standing when it has a
clear mandate from its membership to take the position

-51-

asserted in the litigation." <u>Nat'l Coal. Gov't Union Burma v. Unocal, Inc.</u>, 176 F.R.D. 329, 344 n.16 (C.D. Cal. 1997). Here, Defendant argues, no such clear mandate has been alleged.

Defendant has misread the <u>Unocal</u> decision.  In that case, the district court denied the Federated Trade Unions of Burma standing based on the fact that all of the tort claims were based on harm to individual plaintiffs, and none to the organization itself.  The court's holding on the standing issue was not anchored on whether the organization had a clear mandate from its membership.  Authority from the District of Massachusetts makes clear that an organization represents a "defined and discrete constituency" even if that constituency is different from the formal members of the organization.  <u>NAACP v. Harris</u>, 567 F. Supp. 637, 640 (D. Mass. 1983).

It is true that authorities generally reject associational standing where an organization seeks monetary relief on behalf of its members, on the ground that these claims require individualized proof of claims.  <u>See</u> <u>Bano v. Union Carbide Corp.</u>, 361 F.3d 696, 714 (2d Cir. 2004).

However, Plaintiff here seeks to assert associational standing solely to obtain <u>injunctive</u> relief on behalf of its members.  Because Plaintiff is not requesting monetary damages for its members, there is normally "no need . . . for the members to participate as parties."  <u>Pharm. Care Mgmt. Ass'n v. Rowe</u>, 429 F.3d 294, 307 (1st Cir. 2005).

Admittedly, all requests for injunctive relief do not automatically grant a plaintiff associational standing.  Courts have rejected claims for injunctive relief that seek, in effect, remedies applicable only to specific individuals.  <u>Bano</u>, 361 F.3d at 716 (rejecting associational standing where the group sought an injunction ordering remediation of individual private properties).

Here, however, Plaintiff is not requesting injunctive relief that is particular to any individual in Uganda.  Instead, the injunctive relief in this case only requests that the Defendant cease certain general activities.  This equitable relief will not require participation of Plaintiff's members.  "[The] relief, if granted, would inure to the benefit of all the affected [members] equally, regardless of their individual circumstances."   <u>Coll.</u>

-53-

Dental Surgeons P.R. v. Conn. Gen. Life Ins. Co., 585 F.3d 33, 41 (1st Cir. 2009).

Defendant points to two district court opinions purportedly supporting the proposition that associational representation is not suitable for civil tort claims because those claims "can only be adjudicated by considering the testimony and other evidence of the people allegedly [injured]." Nat'l Coal. Gov't Union Burma, 176 F.R.D. at 344; see also Presbyterian Church of Sudan v. Talisman Energy, Inc., 2005 WL 1060353 (S.D.N.Y. May 6, 2005). These decisions are, of course, not binding on this court. More importantly, the language of these decisions describing the limits of associational standing for tort claims appears to be overbroad.

The fact that a claim requires individual proof does not necessarily defeat associational standing. See Playboy Entm't v. Public Service Comm'n Puerto Rico, 906 F.2d 25, 35 (1st Cir. 1990) (holding that the need for individual proof does not necessitate that members be parties); Coll. Dental Surgeons P.R., 585 F.3d at 41 (noting that even though some fraudulent practice claims may require evidence from

-54-

individual members those claims are not a "fact-intensive-individual inquiry"). "Even though [a claim] is intensely fact specific and [plaintiff] will be required to introduce proof of specific [member] practices and effects [] on specific [members], we see no reason that [plaintiff's members] would be required to participate as parties." Pharm. Care Mgmt. Ass'n, 429 F.3d at 306. Because the claim here -- persecution -- is a group-based claim, it is well-suited to be brought by a representative association like Plaintiff, even though some of the evidence will come from individual testimony. Plaintiff has associational standing to bring its claims for injunctive relief.

Plaintiff also meets the Article III requirements for standing as a representative of its members. The analysis for injury and causation in this context is virtually the same as the analysis applicable to determine an organization's entitlement to bring a suit in its own right. Defendant contends, however, that even if Plaintiff has adequately pled injury and causation, the allegations of the Amended Complaint fail to satisfy the third requirement -- redressability -- when the only relief it seeks for its

members is an injunction.  No injunctive or declaratory
relief that this court could issue, Defendant says, could
possibly provide Plaintiff's members any remedy, since the
initiatives against the LGBTI community in Uganda have an
independent momentum beyond any control by Defendant.

This argument has force but, at least at this stage, is
unpersuasive.  It is well-established that, while Plaintiff
must show that a favorable resolution would likely redress
the injury, "[r]edressability is a matter of degree" and
Plaintiff need not show that the potential remedies within
the court's power would completely alleviate its members'
injuries.  Katz v. Pershing, LLC, 672 F.3d 64, 72 (1st Cir.
2012).

Certainly there is no doubt that Defendant is only one
of several actors allegedly persecuting the LGBTI community
in Uganda.  As Defendant notes, enjoining Defendant does not
guarantee that his co-conspirators will cease their
repression against Plaintiff and its members.  It is quite
true that this court does not have either the jurisdiction
or power to stop all possible harm against Plaintiff in
Uganda.  Nevertheless, Plaintiff has sufficiently alleged

that Defendant played a crucial role in developing
strategies to deny basic rights to Plaintiff's members over
the last decade.  With the failure (so far) of the Anti-
Homosexuality Bill, Plaintiff has a justified fear that
Defendant will be called upon to help devise new strategies
to deny the rights of Plaintiff's members.  Plaintiff has
shown that "a favorable ruling could potentially lessen its
injury; it need not definitively demonstrate that a victory
would completely remedy the harm."  <u>Antilles Cement Corp. v.
Fortuño</u>, 670 F.3d 310, 318 (1st Cir. 2012).

　　　　For all the foregoing reasons, the Amended Complaint
contains sufficient allegations to support both
organizational and associational standing.

D.　　<u>First Amendment Concerns</u>.

　　　　Defendant has vigorously argued that all his actions
are protected by the First Amendment to the United States
Constitution.  Discovery may, or may not, reveal that the
argument is correct, and this issue will almost certainly be
front and center at the summary judgment stage of this case.
What is quite clear now, however, is that the Amended
Complaint adequately <u>alleges</u> that Defendant's actions have

-57-

fallen well outside the protections of the First Amendment.

Defendant is correct that the First Amendment places limits on the imposition of tort liability linked to offensive speech, and that the protection of free expression, including the protection of "thought we hate," is a centerpiece of our democracy.[10]  Snyder v. Phelps, 131 S. Ct. 1207, 1215 (2011); Hustler Magazine v. Falwell, 485 U.S. 46, 50-51 (1988).

For example, intentional infliction of emotional distress claims -- which ask a jury to consider whether speech was "outrageous" -- are too subjective to meet the requirements of the First Amendment when applied to public figures or topics of public concern.  Snyder, 131 S. Ct. at 1219; Hustler, 485 U.S. at 55.  "[H]urtful speech" is protected when it "address[es] matters of public import on public property, in a peaceful manner, in full compliance with the guidance of local officials."  Snyder, 131 S. Ct. at 1220.

---

[10] An ardent exposition of all the reasons why protection of "thought we hate" is so central to the genius of our Constitution is contained in the late Anthony Lewis's superb book, Freedom for the Thought We Hate: A Biography of the First Amendment (2010).

In the criminal context, even if speech advocates for the use of force or for violations of law, it receives First Amendment protection "except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."  <u>Brandenburg v. Ohio</u>, 395 U.S. 444, 447-48 (1969).

On the other hand, when noxious words become part of a criminal enterprise, the First Amendment provides limited protection.  As Justice Black, an unsurpassed supporter of the First Amendment, wrote:

> It rarely has been suggested that the constitutional freedom for speech and press extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute.  We reject the contention now. . . .
> . . . [I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written or printed. Such an expansive interpretation of the constitutional guaranties of speech and press would make it practically impossible ever to enforce laws against agreements in restraint of trade as well as many other agreements and conspiracies deemed injurious to society.

<u>Giboney v. Empire Storage & Ice Co.</u>, 336 U.S. 490, 498, 502 (1949) (internal citations omitted).

It is well-established that speech that constitutes criminal aiding and abetting is not protected by the First Amendment.  See, e.g., United States v. Bell, 414 F.3d 474, 483-84 (3d Cir. 2005); Nat'l Org. for Women v. Operation Rescue, 37 F.3d 646, 656 (D.C. Cir. 1994); United States v. Freeman, 761 F.2d 549, 552 (9th Cir. 1985) (Kennedy, J.) (noting that "[c]ounseling is but a variant of the crime of solicitation, and the First Amendment is quite irrelevant if the intent of the actor and the objective meaning of the words used are so close in time and purpose to a substantive evil as to become part of the ultimate crime itself"); United States v. Kelley, 769 F.2d 215, 217 (4th Cir. 1985); United States v. Barnett, 667 F.2d 835, 842-43 (9th Cir. 1982) ("The first amendment does not provide a defense to a criminal charge simply because the actor uses words to carry out his illegal purpose.  Crimes including that of aiding and abetting, frequently involve the use of speech as part of the criminal transaction."); cf. Giboney, 336 U.S. at 498 (holding that speech integral to criminal conduct is not protected).  It is equally well supported that the same logic extends to civil actions for aiding and abetting.

Rice v. Palladin Enterprises, Inc., 128 F.3d 233, 242-43 (4th Cir. 1997).

In determining whether speech that is related to political advocacy receives First Amendment protection, the Supreme Court has distinguished between "theoretical advocacy," Scales v. United States, 367 U.S. 203, 235 (1961), meaning advocacy of "principles divorced from action," Yates v. United States, 354 U.S. 298, 320 (1957), and speech that is meant to induce or precipitate illegal activity.  See also United States v. Williams, 553 U.S. 285, 298-99 (2008).  As the court in Brandenburg recognized, "[T]he mere abstract teaching . . . of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action."  395 U.S. at 448 (quoting Noto v. United States, 367 U.S. 290, 297-98 (1961)).  Merely advocating for reform is quite different constitutionally from preparing for criminal activity.

Based on these authorities it is clear that the Amended Complaint sets forth sufficient allegations to support a claim for activity outside the protection of the First

-61-

Amendment.  Plaintiff contends that Defendant's conduct has gone far beyond mere expression into the realm not only of advocacy of imminent criminal conduct, in this case advocacy of a crime against humanity, but management of actual crimes -- repression of free expression through intimidation, false arrests, assaults, and criminalization of peaceful activity and even the status of being gay or lesbian -- that no jury could find to enjoy the protection of the First Amendment.

Apart from his right to free expression, Defendant also contends that his actions are protected by the Petition Clause of the First Amendment.  Generally, Defendant points out, "there is no remedy against private persons who urge the enactment of laws, regardless of their motives." Tomaiolo v. Mallinoff, 281 F.3d 1, 11 (1st Cir. 2002).  It is well-established, however, that the Petition Clause does not immunize a defendant's interactions with foreign governments.  Australia/Eastern U.S.A. v. United States, 557 F. Supp. 807, 812 (D.D.C. 1982); Occidental Petroleum Corp. v. Buttes Gas & Oil Co., 331 F. Supp. 92 (C.D. Cal. 1971),

<u>aff'd</u> 461 F.2d 1261 (9th Cir. 1972).[11]  In other words, the Petition Clause protects the right of Americans to seek legislation by the United States government, not by governments of foreign countries.

Even if the Petition Clause applied, the court could not dismiss the action as a matter of law, given that the petition clause cannot protect activities taken for unlawful purposes or toward unlawful ends.  <u>Cal. Motor Transp. Co. v. Trucking Unlimited</u>, 404 U.S. 508, 514 (1972) (quoting <u>Giboney</u>, 336 U.S. at 502) (recognizing that activity that is an integral part of illegal conduct does not receive petitioning clause protection).  Here, the Amended Complaint makes precisely that allegation.

Speech can undoubtedly sometimes fall within grey areas.  When this occurs, and where a jury needs to resolve contested factual issues to determine whether speech or

---

[11] Defendant cites cases which grant companies   <u>Noerr-Pennington</u> immunity from prosecution for their petitioning activity even if they are aimed at foreign governments. However, those cases rest their conclusions on the scope of the Sherman Act itself and not on the First Amendment petition clause.  <u>Coastal States Mktg., Inc. v. Hunt</u>, 694 F.2d 1358 (5th Cir. 1983); <u>Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc.</u>, 256 F. Supp. 2d 249 (D.N.J. 2003); <u>Luxpro Corp. v. Apple Inc.</u>, 2011 WL 1086027 (N.D. Cal. Mar. 24, 2001).

conduct is constitutionally protected, the court is well equipped to provided the jury appropriate instructions to handle this task.  <u>Freeman</u>, 761 F.2d at 551, 552-53; <u>United States v. White</u>, 610 F.3d 956, 962 (7th Cir. 2010) ("Based on the full factual record, the court may decide to instruct the jury on the distinction between solicitation and advocacy, and the legal requirements imposed by the First Amendment.").  Courts have regularly found it preferable to tackle a First Amendment defense with a more complete evidentiary record at the summary judgment stage or at trial, rather than at the motion to dismiss stage.  <u>Curley v. North Am. Man Boy Love Ass'n</u>, 2001 WL 1822730, at *2 (D. Mass. Sept. 27, 2001); <u>cf.</u> <u>White</u>, 610 F.3d at 962 ("Based on the full factual record, the court may decide to instruct the jury on the distinction between solicitation and advocacy, and the legal requirements imposed by the First Amendment.").  At this stage, it is far from clear that the First Amendment will foreclose liability on any set of facts that Plaintiff might show.

In making this decision, the court is mindful of the chilling effect that can occur when potential tort liability

-64-

is extended to unpopular opinions that are expressed as part of a public debate on policy. However, at this stage, the Amended Complaint sets out plausible claims to hold Defendant liable for his role in systematic persecution, rather than merely for opinions that Plaintiff finds abhorrent. The complexion of the case at this stage entitles Plaintiff to discovery and requires the court to deny Defendant's motion to dismiss.

E.    <u>State Law Claims</u>.

Counts IV and V of the Amended Complaint assert Massachusetts common law claims for civil conspiracy and negligence. Defendant seeks dismissal of these counts on several grounds. First, he contends that under a proper choice of law analysis, Massachusetts law simply does not apply to the facts alleged. Ugandan law, if any, should govern. Second, he argues that both the civil conspiracy and negligence claims are barred by the three-year statute of limitations. Finally, he takes the position that the facts as set forth in the Amended Complaint are insufficient to make out claims under either theory. The court will deny the motion to dismiss because (1) Massachusetts law governs

-65-

this litigation and (2) the arguments asserting violation of the statute of limitations and failure to state a claim require development through discovery and may be re-assessed at the summary judgment stage on a fuller record.

1.   <u>Choice of Laws</u>.

It is well-settled that district courts hearing state law claims apply the substantive law of the state in which the court sits, including that state's choice-of-law rules. <u>Servicios Comerciales Andinos, S.A. v. General Elec. Del Caribe, Inc.</u>, 145 F.3d 463, 478 (1st Cir. 1998); <u>Erie Railroad Co. v. Tompkins</u>, 304 U.S. 64, 78 (1938). Massachusetts employs a functional choice of laws approach that is guided by the Restatement (Second) of Conflict of Laws (1971).  <u>Clarendon Nat'l Ins. Co. v. Arbella Mut. Ins. Co.</u>, 803 N.E.2d 750, 752 (Mass. App. Ct. 2004).

The Restatement instructs courts to apply the law of the state with the "most significant relationship to the occurrence and the parties under the principles stated in § 6."  Restatement (Second) of Conflict of Laws § 145 (1971). Section 6 of the Restatement cites the following factors as relevant to choice of law decisions:

-66-

> (a) the needs of the interstate and international
> systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested
> states and the relative interests of those states
> in the determination of the particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular
> field of law,
> (f) certainty, predictability and uniformity of
> result, and
> (g) ease in the determination and application of
> the law to be applied.

<u>Id.</u> at § 6.

In the tort context, the Restatement also sets out four

factors to help determine which jurisdiction has the most

significant relationship:

> (a) the place where the injury occurred,
> (b) the place where the conduct causing the injury
> occurred,
> (c) the domicil, residence, nationality, place of
> incorporation and place of business of the
> parties, and
> (d) the place where the relationship, if any,
> between the parties is centered.

<u>Id.</u> at § 145.

Defendant is correct to note that the jurisdiction

where the injury occurred normally has a significant

interest in having its law apply because "persons who cause

injury in a state should not ordinarily escape liabilities

imposed by the local law of that state on account of the injury." Restatement (Second) of Conflict of Laws § 145(2), cmt. 2. However, even when the injury (and, indeed, even the conduct that caused the injury) occurs in a foreign location, Massachusetts choice-of-laws doctrine does not automatically apply foreign law. See, e.g., Robidoux v. Muholland, 642 F.3d 20, 28 (1st Cir. 2011); Lou v. Otis Elevator Co., 933 N.E.2d 140, 150-51 (Mass. App. Ct. 2010). The court must weigh all the Restatement factors to determine the proper law to apply.

Several factors other than the place of injury tip the balance in favor of Massachusetts law. First, Defendant is a Massachusetts resident and an American citizen. Plaintiff is not asking the court to apply a law that is foreign to Defendant, but rather the rules prevailing in his home country and Commonwealth. Second, as noted previously, Plaintiff alleges that much of the actionable conduct occurred in Massachusetts.

On the civil conspiracy claim particularly, a powerful, independent consideration supports application of Massachusetts law. Plaintiff, as Defendant concedes, would

-68-

have no forum for this claim in Uganda.  Ugandan law apparently does not recognize a cause of action for civil conspiracy.  (Dkt. No. 33, Def.'s Mem. 69.)  In the absence of any remedy for Plaintiff in Uganda, the interest of the Commonwealth of Massachusetts in adjudicating Plaintiff's civil conspiracy claim, recognized under its law, becomes more prominent.  As the Supreme Judicial Court has recognized, the state has an interest in maintaining a cause of action for this type of civil conspiracy which ensures that "influence and power" are not combined to interfere with individual rights.  See Willett v. Herrick, 136 N.E. 366, 370 (Mass. 1922).  This is particularly true when a substantial part of the conduct supporting the conspiracy is alleged to have occurred within the Commonwealth.

Problems in applying Ugandan law also plague the adjudication of the negligence claim, not because no Ugandan law is applicable, as with the civil conspiracy claims, but because the Ugandan law is unclear.  One of the factors the court can consider in determining the proper choice of law is the "ease in the determination and application of the law to be applied."  Restatement (Second) of Conflict of Laws §

-69-

6.  For this reason, the party seeking to apply foreign law, here Defendant, must outline the substance of that law with reasonable certainty.  See In re Avantel, S.A., 343 F.3d 311, 321-22 (5th Cir. 2003); cf. Carey v. Bahama Cruise Lines, 864 F.2d 201, 205 (1st Cir. 1988) (holding that parties who fail to give the court requisite notice of foreign law have waived their right to have foreign law applied).

Defendant has done little to meet that burden here.  In the one paragraph in his memorandum describing Ugandan negligence law, Defendant notes only that "Uganda law may recognize traditional negligence as a cause of action" but that there is no indication that any "novel duty of care principles apply."  (Dkt. No. 33, Def.'s Mem. 70.)  Because Defendant has not described the substance of Ugandan negligence law in any detail, the court cannot take the first step in any choice of laws analysis; it cannot determine whether any actual conflict exists between the laws.  See Cohen v. McDonnell Douglas Corp., 450 N.E.2d 581, 584 n.7 (Mass. 1983).

In sum, although arguments exist on both sides, the

-70-

functional choice of law approach counsels applying

Massachusetts law to Counts IV and V.  This conclusion

leaves Defendant's arguments regarding statute of

limitations and failure to state a claim.  The discussion

below will address these contentions as they apply, first,

to civil conspiracy and then to negligence.

    2.  <u>Civil Conspiracy</u>.

       a.  <u>Statute of Limitations</u>.

   Massachusetts applies a three-year statute of

limitations to civil conspiracy claims.  Mass. Gen. Laws ch.

260, § 2A; <u>Pagliuca v. City of Boston</u>, 626 N.E.2d 625, 627-

28 (Mass. App. Ct. 1994).  Defendant argues that the

limitations period begins to run with the first overt act.

However, this accrual rule only applies to federal and state

statutory civil rights claims, which are not asserted here.

<u>Pagliuca</u>, 626 N.E.2d at 627-28 (distinguishing between the

time-of-first-wrongful-act standard applicable to federal

and state civil rights statutes and time-of-injury standard

applicable to common law civil conspiracy).

   For a common law civil conspiracy claim, the cause of

action accrues at the time the plaintiff is injured, or when

-71-

he discovers or reasonably should have discovered the cause
of the injury.  <u>Genereux</u>, 577 F.3d at 359-63; <u>Pagliuca</u>, 626
N.E.2d at 627-28.  Plaintiff filed its complaint on March
14, 2012.  To obtain dismissal of a complaint based on the
statute of limitations, an affirmative defense, Defendant
must point to sufficient facts offered in the complaint, or
in other allowable sources of information, to show with
certitude that Plaintiff knew or could have reasonably
discovered the source of its injury before March 14, 2009.
<u>Cf.</u> <u>Gray v. Evercore Restructuring L.L.C.</u>, 544 F.3d 320, 324
(1st Cir. 2008); <u>see also</u> <u>LaChapelle v. Berkshire Life Ins.</u>
<u>Co.</u>, 142 F.3d 507, 509 (1st Cir. 1998) (noting that "a
motion to dismiss based on a limitations defense is entirely
appropriate when the pleader's allegations leave no doubt
that an asserted claim is time-barred").

     To prevail on his statute of limitations affirmative
defense, Defendant must show that Plaintiff had "(1)
knowledge or sufficient notice that she was harmed and (2)
knowledge or sufficient notice of what the cause of the harm
was." <u>Bowen v. Eli Lilly & Co.</u>, 557 N.E.2d 739, 742 (Mass.
1990).  While Plaintiff was undoubtedly aware that some

injuries occurred prior to 2009, Defendant has not
adequately shown that Plaintiff had adequate notice before
March 14, 2009, that Defendant contributed to these harms.
As Plaintiff has noted in the Amended Complaint, Defendant
did not publicly acknowledge his pivotal role in the anti-
LGBTI efforts in Uganda until after the March 2009
conference.

Plaintiff has also alleged several harmful incidents
that occurred within the last three years.  The most recent
incidents, including the deliberately intimidating, mass
disclosures of the identities of LGBTI peoples, as well as
the arrests and raids targeted at Plaintiff and its
activities, all occurred after March 2009.  Given these
allegations, any assessment of the statute of limitations
defense must await full discovery and possibly trial.

b.   <u>Failure to State a Claim</u>.

Massachusetts recognizes two types of civil conspiracy.
The more typical kind is akin to a theory of joint liability
in tort.  <u>Aetna Cas. Sur. Co. v. P & B Autobody</u>, 43 F.3d
1546, 1564 (1st Cir. 1994).  However, Plaintiff argues that
the second, more exceptional, type of civil conspiracy

applies to Defendant.  With the second type, a plaintiff
need not allege an underlying tort, because the mere force
of numbers acting in unison to injure a plaintiff
constitutes a wrong.  <u>Weiner v. Lowenstein</u>, 51 N.E.2d 241,
243 (Mass. 1943).  However, a plaintiff must show "that
there was some peculiar power of coercion" used by a
combination of individuals on the plaintiff "which any
individual [alone,] standing in a like relation to the
plaintiff would not have had."  <u>DesLauries v. Shea</u>, 13
N.E.2d 932, 935 (Mass. 1938) (internal quotation omitted).

In other words, the injury to a plaintiff must be the
result of <u>the combination</u> of the defendants and not just the
product of actions taken by more than one individual.  In
one of the few successful civil conspiracy actions of this
sort, the Massachusetts Supreme Judicial Court held that the
plaintiffs had properly pled the claim when they alleged
that the defendants had worked together to manipulate the
plaintiffs' business holdings to acquire certain obligations
for themselves.  <u>Willett</u>, 136 N.E. at 368-70.  None of the
defendants could have accomplished the injurious result by
themselves.  Additionally, even if each of the individual

-74-

actions were benign, the defendants were able to use their combined power and influence to destroy the plaintiffs' credit and holdings.  Id.

In successful claims offered under this theory, the plaintiff has shown that defendants had a "peculiar commanding influence" either through some type of unique power or fiduciary relationship or even "mere numbers acting simultaneously" that injured a plaintiff and lacked "an excuse or justification."  Johnson v. East Boston Savings Bank, 195 N.E. 727, 729-30 (Mass. 1930).  In Johnson, for example, it was not enough to allege that several board members had worked together to defame the plaintiff after his termination.  The court held that the reputational import of termination was the same whether it was done by a board with many members or by one person.  Johnson, 195 N.E. at 730.  The court must determine here if Plaintiff has alleged that there was "added force due to combination"; that is, that the injury is greater specifically because of the combined force.  Johnson, 195 N.E. at 730.

One decision has pointed out that the most common form of this kind of conspiracy "is to be found in the combined

-75-

action of groups of employers or employees, where through the power of combination pressure is created and results brought about different in kind from anything that could have been accomplished by separate individuals." Fleming v. Dane, 22 N.E.2d 609, 611 (Mass. 1939).

Defendant argues that this sort of civil conspiracy is limited to the kind of direct economic coercion described in Fleming. It is true that some sort of economic coercion is typically the goal of this type of civil conspiracy. See Mass. Laborers' Health & Welfare Fund v. Philip Morris, Inc., 62 F. Supp. 2d 236, 244 (D. Mass. 1999). At the same time, nothing in the case law suggests that a plaintiff is limited to pleading purely economic coercion. Participation in the kind of widespread, systematic campaign alleged in the Amended Complaint appears to fall within the possible boundaries of this cause of action.

Alternatively, Defendant argues that Plaintiff has not adequately alleged that the coercive force exhibited by the conspiracy was "peculiarly focused against" Plaintiff. See Mass. Laborers', 62 F. Supp. 2d at 245. This contention flies in the face of the allegations of the Amended

Complaint, which charges that Defendant and his co-conspirators took actions that deliberately singled out Plaintiff and its members for persecution.  If the Amended Complaint is accepted, the public in general was never the target; Plaintiff and the LGBTI community in Uganda were. This conspiracy-based coercion obviously had far more power than anything any one individual could have wielded, particularly in light of coordinated governmental and media initiatives associated with the conspiracy.  At this motion to dismiss phase, Plaintiff's Amended Complaint has sufficiently alleged that Defendant and his co-conspirators were exploiting a "peculiar coercive power" with the goal of injuring Plaintiff and its members.

    3.   <u>Negligence</u>.

        a.   <u>Statute of Limitations</u>.

Massachusetts also applies a three-year statute of limitations to negligence claims.  Mass. Gen. Laws ch. 260, § 2A; <u>Genereux v. Am. Beryllia Corp.</u>, 577 F.3d 350, 359 (1st Cir. 2009) (citing <u>Olsen v. Bell Tel. Labs, Inc.</u>, 445 N.E.2d 609 (Mass. 1983)).  Like the civil conspiracy claim, this cause of action accrues at the time the plaintiff is

Case 3:12-cv-30051-MAP  Document 59  Filed 08/14/13  Page 78 of 79

injured, or reasonably discovers the cause of an injury.
Genereux, 577 F.3d at 359-63; John Beaudette, Inc. v. Sentry
Ins. A Mut. Co., 94 F. Supp. 2d 77, 108 (D. Mass. 1999).  As
discussed in the civil conspiracy section, the Amended
Complaint sets out that Plaintiff has been injured in the
last three years and may not have had sufficient notice of
Defendant's involvement in the earlier alleged injurious
actions until three years before the filing of the
complaint.  The facts of record are insufficient to permit
the court to allow the motion to dismiss based on this
affirmative defense at this stage.

      b.   **Failure to State a Claim**.

Defendant argues that there is no duty of care to avoid
creating a "virulently hostile environment."  (Dkt. No. 33,
Def.'s Mem. 70 (quoting Dkt. No. 27, Am. Compl. ¶ 258).)
This argument certainly has force, and the state law
negligence claim appears to be substantively the most
fragile of Plaintiff's asserted causes of action.  It will
be difficult for Plaintiff to assemble facts during
discovery to justify a finding of liability based on the
negligent creation of a "dangerous situation."  (Dkt. No.

-78-

27, Am. Compl.¶ 259.)  Nevertheless, for now, the Amended

Complaint has offered the standard articulation of a

negligence claim, alleging that Defendant failed to act with

reasonable care, with resulting harm to Plaintiff.  <u>Onofrio</u>

<u>v. Dep't of Mental Health</u>, 562 N.E.2d 1341, 1344-45 (Mass.

1990).  The protection of free speech set forth in the First

Amendment may make this count particularly difficult to

defend at the summary judgment stage.  That, however, is a

decision for another day.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, Defendant's motions to

dismiss (Dkt. Nos. 21 and 30) are hereby DENIED.  The case

is hereby referred to Magistrate Judge Kenneth P. Neiman for

a pretrial scheduling conference pursuant to Fed. R. Civ. P.

16.

It is So Ordered.

 /s/ Michael A. Ponsor
MICHAEL A. PONSOR
U. S. District Judge