UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| **SEXUAL MINORITIES UGANDA,** | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | 3:12-CV-30051-MAP |
| | : | |
| v. | : | JUDGE MICHAEL A. PONSOR |
| | : | |
| **SCOTT LIVELY,** | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM OF LAW IN SUPPORT
OF DEFENDANT SCOTT LIVELY'S MOTION TO RECONSIDER
ORDER DENYING CERTIFICATION FOR INTERLOCUTORY APPEAL**

Sexual Minorities Uganda's Opposition (dkt. 69) to Scott Lively's Motion to Certify Non-Final Order for Interlocutory Appeal (dkt. 64) rests on six (6) demonstrably flawed, deceptive and clearly erroneous premises. To the extent the Court's Order Denying Certification (dkt. 71) relied upon any one of these premises, the Court should reconsider its decision pursuant to its inherent authority. *Iglesias v. Mutual Life Ins. Co. of N.Y.*, 918 F. Supp. 31, 33 (D.P.R. 1996) ("Prior to a final judgment being entered, courts have the inherent authority to reconsider rulings issued throughout the proceedings").

1)  ***Kiobel*'s Extraterritorial Limitation Upon the Alien Tort Statute Presents a Threshold Question of Subject-Matter Jurisdiction, which is a Pure Question of Law, Not a Factual Merits Inquiry.**

SMUG does not dispute Lively's contention that questions of subject matter jurisdiction are quintessentially appropriate for interlocutory review. Indeed, SMUG apparently concedes this point, and attempts to counter it right up front with the disingenuous argument that *Kiobel*'s extraterritorial limitation is a factual merits inquiry, rather than a threshold jurisdictional question. (Dkt. 69 at 4). The deception in SMUG's argument is that it conflates the extraterritorial analysis for a statute that regulates **conduct**, which is indeed a merits inquiry, *Morrison v. Nat'l Australia*

*Bank Ltd.*, 130 S. Ct. 2869, 2877 (2010), with the extraterritorial limitation of a statute that **only confers subject matter jurisdiction**, which remains a threshold question of jurisdiction. *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1664 (2013). SMUG relies on *Morrison* (dkt. 69 at 4), which involved a statute (the Securities Exchange Act) that regulated **conduct** (securities fraud). 130 S. Ct. at 2875. The Supreme Court in *Kiobel* acknowledged that *Morrison* "held that the question of extraterritorial application was a 'merits question,' not a question of jurisdiction," but, in the very same breath, the *Kiobel* Court continued: "**The ATS, on the other hand, is strictly jurisdictional. It does not directly regulate conduct or afford relief**." *Kiobel*, 133 S. Ct. at 1664 (emphasis added) (internal quotes and citations omitted).

Unlike SMUG, post-*Kiobel* courts have universally understood this critical distinction. In *Jian Zhang v. Baidu.com Inc.*, 85 Fed. R. Serv. 3d 1140, 2013 WL 2458834 (S.D.N.Y. June 7, 2013), the court reiterated the difference between a merits and jurisdictional analysis:

> In *Kiobel,* the Supreme Court held that the Alien Tort Statute (the "ATS") **does not grant federal courts jurisdiction** over claims relating to conduct occurring outside the United States. But its decision was premised on the fact that the ATS "is strictly jurisdictional," and "does not directly regulate conduct or afford relief." Indeed, the Court expressly reaffirmed that **for statutes that *do* regulate conduct or afford relief**—as the statutes upon which Plaintiffs rely in this case do,—the "question of extraterritorial application" is "a merits question, not a question of jurisdiction" … **In light of that**, Baidu's argument about extraterritoriality goes to the merits, not this Court's jurisdiction, and is premature.

*Id*. at * 5 (bold emphasis added; italics in original) (internal citations omitted). That **SMUG cites no ATS cases**, and certainly no post-*Kiobel* ATS cases, to support its "merits inquiry" argument is not at all surprising, because **every court** construing the ATS' extraterritorial limits under *Kiobel* **has done so explicitly in terms of subject-matter jurisdiction**.[1]

---

[1] The authorities are too numerous to list exhaustively. *See, e.g.*, *Muntslag v. D'Ieteren, S.A.*, 12-CV-07038 TPG, 2013 WL 2150686, *1-2 (S.D.N.Y. May 17, 2013) ("[t]he [Supreme C]ourt held [in *Kiobel*] that **the ATS does not provide the federal courts of the United States with subject matter jurisdiction** over torts that occur outside of the United States") (emphasis added) (dismissing ATS claims for lack of subject matter jurisdiction); *Ahmed-Al-Khalifa v. Queen Elizabeth II*, 5:13-CV-103-RS-CJK, 2013 WL 2242459, *1 (N.D. Fla. May 21, 2013) ("[i]n light of *Kiobel,* **the ATS cannot confer subject-matter jurisdiction onto plaintiff's claims** because the violations at issue all occurred outside of the United States") (emphasis added) (dismissing ATS claims for lack of subject matter jurisdiction); *Mohammadi v. Islamic Republic of Iran*,

2

Accordingly, it is a grievous error to transmute a crucial jurisdictional inquiry into a factual merits inquiry. *Kiobel*'s impact on SMUG's ATS claims remains a threshold jurisdictional question, a question of law that goes to the very power of this Court to hear this case. *In re Heddendorf*, 263 F.2d 887, 889 (1st Cir. 1959) (denial of motion to dismiss for lack of subject matter jurisdiction presents question of law appropriate for interlocutory appeal); *United States v. Lahey Clinic Hosp., Inc.*, 399 F.3d 1, 7 (1st Cir. 2005) (same).

### 2) *Kiobel*'s Extraterritorial Limitation Upon the Alien Tort Statute is a Sufficiently Pure Question of Law to Warrant Interlocutory Appeal.

Compounding its first error, SMUG next contends that no interlocutory appeals are possible after *Kiobel*, because the application of a legal standard is never a "pure" question of law. (Dkt. 69 at 10-14). This is just plain wrong. "**Decisions holding that the application of a legal standard is a controlling question of law within the meaning of section 1292(b) are numerous**." *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 626 (7th Cir. 2010) (POSNER, J.) (emphasis added) (collecting cases from six circuits). In *Text Messaging*, the Seventh Circuit accepted an

---

CIV.A. 09-1289 BAH, 2013 WL 2370594, *15 (D.D.C. May 31, 2013) ("[a]s a result [of *Kiobel*], **the Court does not have subject-matter jurisdiction** to hear such claims, and they must be dismissed") (emphasis added) (vacating default judgment and dismissing ATS claims for lack of subject matter jurisdiction); *Ahmed-Al-Khalifa v. Salvation Army*, 3:13CV289-WS, 2013 WL 2432947, *3 (N.D. Fla. June 3, 2013) ("[i]n light of *Kiobel*, **the ATS cannot confer subject matter jurisdiction** upon Plaintiff's claims") (emphasis added) (dismissing ATS claims for lack of subject matter jurisdiction); *Giraldo v. Drummond Co., Inc.*, 2:09-CV-1041-RDP, 2013 WL 3873960, *8, n.6 (N.D. Ala. July 25, 2013) ("Plaintiffs can no more contend that approval in the United States of conduct committed abroad **provides a basis for jurisdiction** [under the ATS] than could the plaintiffs in *Morrison* contend that fraudulent acts in the United States establish jurisdiction when the focus of the claim—purchases and sales of securities—occurred entirely abroad") (emphasis added); *Al Shimari v. CACI Int'l, Inc.*, 1:08-CV-827 GBL/JFA, 2013 WL 3229720, *1 (E.D. Va. June 25, 2013) ("the Court holds that **it lacks ATS jurisdiction** over Plaintiffs' claims … the Court cannot apply the ATS extraterritorially **to extend jurisdiction** over Plaintiffs' claims. *Kiobel* **precludes such a result**. Therefore, Plaintiffs' claims under the ATS are **dismissed for want of jurisdiction**.") (emphasis added); *Ahmed-Al-Khalifa v. Obama*, 1:13-CV-49-MW/GRJ, 2013 WL 3797287 (N.D. Fla. July 19, 2013) ("**[i]n light of *Kiobel*, the ATS cannot confer subject-matter jurisdiction** onto Plaintiff's claims") (emphasis added) (dismissing ATS claims for lack of subject matter jurisdiction); *Mwani v. Laden*, CIV.A. 99-125 JMF, 2013 WL 2325166, *2, 5 (D.D.C. May 29, 2013) ("I requested briefing from the plaintiffs regarding **whether or not subject matter jurisdiction remained over their claims in light of *Kiobel's* holdings** … I find that **there is subject matter jurisdiction** over this case under the ATS, but that **this finding presents a controlling question of law as to which there may be a substantial difference of opinion, such that this decision should be immediately appealed to the Court of Appeals** under 28 U.S.C. § 1292") (emphasis added).

interlocutory appeal to review the district court's **application** of the pleading standard announced in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007) **to the particular facts alleged in that case**. *Text Messaging*, 630 F.3d at 624-25. While "**routine** applications of well-settled legal standards to facts alleged in a complaint" are not appropriate for interlocutory appeal, **where the legal standard is "recent … and its scope unsettled"** certification of interlocutory review is proper. *Id*. at 626 (emphasis added). The Seventh Circuit thus accepted review, even though it ultimately concluded that the trial court's application of *Twombly* was correct, and the complaint at issue pled sufficient facts to survive dismissal. *Id*. at 629. Notably, the First Circuit has cited with approval this particular aspect of *Text Messaging*. *See Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 44 (1st Cir. 2013) (noting that the *Text Messaging* court "certif[ied] for interlocutory appeal the question of an antitrust complaint's adequacy because while the Seventh Circuit had issued **dozens** of decisions concerning the application of *Twombly,* **the contours of the Supreme Court's ruling, and particularly its application in the present context, remain unclear**") (emphasis added) (internal quotes omitted).

      Whatever SMUG might say about the Supreme Court's decision in *Kiobel*, it cannot credibly argue that its legal standards are not "recent," nor that its "scope" and "contours" are well settled. To the extent *Kiobel*'s scope and contours are "well-settled," it is only because every court that has applied it has concluded that neither the U.S. citizenship of a defendant, nor his alleged management or aiding and abetting of a foreign tort from the U.S. are sufficient to trigger ATS jurisdiction.

      Moreover, try as it might, SMUG cannot transform the controlling questions of law presented here into fact-intensive inquiries that might preclude interlocutory appeal. Whether *Kiobel* permits ATS jurisdiction over a U.S. citizen, by virtue of either his citizenship or alleged aiding and abetting from the U.S. of crimes on foreign lands, can be decided **as a matter of law**, without the need for discovery or an extensive review of facts. Indeed, post-*Kiobel* courts have done just that. *See, e.g.*, *Balintulo v. Daimler AG*, 09-2778-CV L, 2013 WL 4437057, *7, n.24, *9 (2d

Cir. Aug. 21, 2013) (concluding "**as a matter of law**" that *Kiobel* "plainly bars" jurisdiction over ATS claims against U.S. citizens **who allegedly took "affirmative steps in this country"** to aid and abet international law violations abroad) (emphasis added). Here, Lively would **not** be asking the First Circuit to review this Court's determination of any **facts**. Instead, Lively would ask the First Circuit to determine whether, **as a matter of law**, *Kiobel* allows the exercise of subject matter jurisdiction over a U.S. citizen who allegedly managed or assisted or encouraged from the United States other actors to violate international law on foreign lands. *See Text Messaging*, 630 F.3d at 625 (granting permission for immediate appeal because "[t]he interlocutory appeal that we are asked to authorize in this case does not seek to overturn any findings of fact").

SMUG's own authorities also refute its contention. SMUG's reliance on *United Air Lines, Inc. v. Gregory*, 716 F. Supp. 2d 79, 91 (D. Mass. 2010), (dkt. 69 at 4), is quite odd, because there the court actually **rejected** the very argument SMUG advances here. To defeat interlocutory certification, plaintiff in *United Air Lines* argued that the federal preemption defense at issue "requires an inherently factual analysis" and the application of First Circuit precedent to a particular set of facts. 716 F. Supp. 2d at 91. **The court rejected this argument**, and concluded that the preemption question was sufficiently controlling and sufficiently legal in nature to warrant certification, even though it required analysis of the "relatedness" and "significant effects" of the specific complaint at issue to and on the federal regulation in question. *Id*. The court ultimately denied certification, but on the entirely different ground that there were no other courts disagreeing with the decision sought to be reviewed (*id*. at 92), which is certainly not the case here.

Similarly, SMUG relies heavily upon *Dahl v. Bain Capital Partners, LLC*, 597 F. Supp. 2d 211, 213 (D. Mass. 2009). (Dkt. 69 at 9, 12, 14). But in *Dahl*, the court denied certification because it was absolutely certain that the complaint at issue pled sufficient facts to meet *Twombly*'s plausibility standard, and concluded that no court could disagree with its holding on that particular set of facts. 597 F. Supp. 2d at 213. The court did not hold that a difference of opinion could never be possible on *Twombly*'s application in other instances, as to other complaints. *Id*.

SMUG's contention that post-*Kiobel* certification of extraterritorial questions would never be proper defies the *sua sponte* certification in *Mwani v. Bin Laden*, CIV.A. 99-125 JMF, 2013 WL 2325166 (D.D.C. May 29, 2013). SMUG tries to wish away the *Mwani* certification on the ground that it was "the first opinion interpreting the *Kiobel* decision." (Dkt. 69 at 14, n.5). However, just because other courts have since then also interpreted *Kiobel* is no reason to deny certification, particularly since **all of those courts have disagreed with this Court's extension of *Kiobel***. Indeed, the subsequent interpretations of *Kiobel* are the very reason why this Court should grant certification, so that the difference of opinion on this pivotal jurisdictional question can be resolved.

Finally, SMUG only makes its "pure question of law" argument against the extraterritorial issue, and not any of the other controlling questions identified by Lively (*e.g.*, universality and free speech). (Dkt. 69 at 10-14). The presence of **even one** controlling question as to which there is substantial ground for difference of opinion is sufficient for certification of an interlocutory appeal. 28 U.S.C. § 1292(b).

### 3) SMUG Misrepresents the Holding and Import of *Balintulo*.

As shown by Lively, the Second Circuit has recently held that "the clear holding of the Supreme Court's decision in *Kiobel*" "plainly bars" ATS subject-matter jurisdiction "**as a matter of law**" for international law violations outside the United States, **even where U.S. citizens are alleged to have taken "affirmative steps in this country" to aid and abet those violations**. (Dkt. 65 at 6-7). SMUG attempts to maneuver around the clear holding and import of *Balintulo* in two ways, neither of which is effective.

First, SMUG seeks to relegate *Balintulo*'s central holding to mere "*dicta* because the court had denied mandamus." (Dkt. 69, at 12, n.2). But SMUG ignores the fact that the Second Circuit concluded it had appellate jurisdiction within the context of a mandamus petition to "identify the clear holding of the Supreme Court's decision in *Kiobel* and explain why it plainly bars the plaintiffs' claims as a matter of law." *Balintulo*, 2013 WL 4437057 at *6, n.21. SMUG also ignores **why** the Second Circuit denied mandamus: defendants' mandamus petition was filed **before *Kiobel***

**was decided**, and thus the Second Circuit afforded the district court the opportunity to dismiss the action as a matter of law pursuant to *Kiobel*. *Id*. at *9. The Second Circuit left nothing for the district court to do, other than to grant judgment on the pleadings for the defendants, and made unmistakable its intention to resort to mandamus relief if the action was not dismissed. *Id*. Thus, the Second Circuit's interpretation of *Kiobel* to preclude ATS jurisdiction over claims that U.S. citizens took "affirmative steps in this country" to aid and abet international law violations abroad is not mere "*dicta*," but its central holding.

Second, SMUG contends that *Balintulo* is somehow distinguishable because there, the "complaint did not 'tie' [the U.S. citizens' domestic conduct] to the relevant human rights violations" abroad. (Dkt. 69 at 9). While SMUG is absolutely correct that the requisite connection between domestic conduct and foreign torts was found wanting in *Balintulo*, this was **not** for lack of trying. The *Balintulo* plaintiffs alleged that Ford, Daimler and IBM – all of them U.S. citizens – **had taken "affirmative steps in this country"** to aid and abet crimes against humanity in South Africa. *Balintulo*, 2013 WL 4437057 at *8. Plaintiffs specifically alleged that these U.S. citizens **manufactured products in the U.S.**, expressly at the request of the foreign perpetrators of crimes against humanity, and with the knowledge and intent that those products would be used in the commission of those crimes on foreign soil. *Id*. at *2-3. Plaintiffs also alleged that the U.S. citizens **provided technical and logistical support from the United States** to the international law violators in South Africa. *Id*. It was **these** allegations that the Second Circuit found insufficient to trigger ATS jurisdiction "**as a matter of law**," since the "focus" and place of the alleged crimes against humanity themselves was outside of the United States. *Id*. at *7, n.24, *9 (emphasis added).

In sum, *Balintulo*'s holding that, "as a matter of law," neither the U.S. citizenship of the defendants, nor their alleged aiding and abetting from the United States of crimes against humanity on foreign soil, is sufficient to confer subject-matter jurisdiction under the ATS, demonstrates that there is substantial ground for difference of opinion on this controlling question of law. Certification is therefore warranted.

7

### 4) SMUG Misrepresents the Jurisdictional Requirement of Universally Accepted and Clearly Defined International Norms.

SMUG continues to rely upon the Rome Statute to establish the existence and content of a supposed international norm against "persecution" on sexual orientation and transgender grounds. (Dkt. 69 at 18-19). SMUG cites two cases for the proposition that an international treaty can supply the existence and terms of such norms for ATS claims, even if that treaty was expressly rejected by the United States. (*Id.*) The only thing this accomplishes, however, is to highlight the existence of substantial grounds for difference of opinion on this controlling question of law, since an even greater number of authorities have unequivocally rejected this proposition generally, and the Rome Statute specifically. (*See* dkt. 65 at 16).[2]

SMUG then tries to supplement the Rome Statue's definition of "persecution" solely with decisions of a regional tribunal, the International Criminal Tribunal for the Former Yugoslavia ("ICTY"). (Dkt. 69 at 16-17). This, in and of itself, triggers yet another pure question of controlling law as to which there is substantial ground for difference of opinion, because regional tribunals are not "empowered to create binding norms of customary international law." *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 263-64 (2d Cir. 2003) ("the international tribunal decisions cited by plaintiffs are not primary sources of customary international law").

More importantly, SMUG **still** cannot produce a **single** international treaty (whether binding on the United States or not) that specifically prohibits the "denial of fundamental rights" (*i.e.*, "persecution") **based upon sexual orientation or transgender status**, nor a **single** decision of a regional international tribunal that has actually imposed liability for such deprivation of rights. The "savings-clause" theory which SMUG advances here could just as easily be employed to find a

---

[2] SMUG quibbles with Lively's reading of *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), on this point (dkt. 69 at 13, n.10), but the Supreme Court's holding there is unmistakably clear. After holding that international norms must be "specific, universal and obligatory" to be actionable under the ATS, the Supreme Court in *Sosa* concluded that "two well-known international agreements …, despite their moral authority, **have little utility under the standard set out in this opinion**," because they were not binding upon the United States. 542 U.S. at 734-35 (emphasis added). The Supreme Court thus did not accept those unratified agreements, either as binding sources of international law, **or as evidence of customary international law**. *Id.*

"universal" and "clearly defined" international norm against the prohibition of polygamy. That is, **no** international accords or tribunals have **ever** prohibited the denial of "fundamental rights" to polygamists, but, since the list of impermissible discriminatory grounds is open-ended and does not exclude polygamists, they too are a protected class under SMUG's version of international law. As such, any nation that outlaws the "fundamental rights" to marry, to live according to one's own conscience, and to promote the benefits of polygamy, is engaged in a "widespread or systematic attack against a civilian population," and it – and the "co-conspirators" who "aid and abet" the passage of its polygamy-phobic laws – are guilty of the "crime against humanity of persecution." However, no one doubts, or there is at least substantial ground for difference of opinion, that a proposed international norm against the deprivation of "fundamental rights" to (*i.e.*, the "persecution" of) polygamists would not meet the "clearly defined and universally accepted" standard under *Sosa*. This is why there is substantial ground for difference of opinion as to whether this Court can be the **first** to recognize, within the context of an ATS claim, **the actual existence** of a "universal" and "clearly defined" norm against persecution **based upon sexual orientation or transgender status**.

SMUG undoubtedly understands this problem, and has no choice but to retreat to its emotive argument that the failure of **some nations** to recognize sexual orientation and transgender identity as protected classes **should not** justify the continued absence of these classes from international norms. (Dkt. 69 at 21). SMUG, however, cannot dispute its own statistics which demonstrate that "some nations" in this case does not mean a handful of rogue states, but rather **fully half or more of the nations on earth**. (*See* dkt. 65 at 18-19 and n.9). SMUG also says nothing of the Supreme Court's admonishment in *Sosa* that federal courts lack jurisdiction to recognize a norm that is "far from **full** realization," **no matter how just, fair or necessary such recognition might seem**. *Sosa*, 542 U.S. at 738 & n.29 (emphasis added). SMUG's silence on this point speaks volumes.

### 5) SMUG Intentionally Ignores the Real First Amendment Issue at Hand.

SMUG continues to vigorously attack a defenseless strawman, and devotes its entire First Amendment argument to "demonstrating" what no one disputes – that speech integral to **the commission of a crime** is not protected. (Dkt. 69 at 21-24). In so doing, SMUG says absolutely nothing about the real question at issue here: is there substantial ground for difference of opinion that Lively's U.S. conduct found by this Court in SMUG's Amended Complaint – "vilifying" homosexuals and encouraging and assisting legislatures and citizens to enact laws restricting homosexual rights (Order Denying Motion to Dismiss, dkt. 59 at 34-35) – is itself "criminal"? SMUG thus says **nothing** about the authorities that hold such conduct is **not** criminal, but protected as a matter of law. (*See* dkt. 65 at 19-20). To the extent there is no difference of opinion on this question, it is only because no court has ever found such conduct to be unlawful. That SMUG now admits it is indeed attempting to criminalize such conduct in the United States (dkt. 69 at 21, n.12) is reason enough to pause and give the First Circuit an opportunity to consider this issue.

### 6) SMUG Does Not Deny that it Intends to Pursue Transnational Discovery Against a Sovereign Government and its Officials.

Through the Declaration of its counsel, SMUG now claims that its recollection of the parties' discovery conference is vastly different from Lively's. (Dkt. 69 at 19-20). Attorney Spees' Declaration, however, is much more revealing in what it does **not** say. **SMUG does not deny** that it has every intention to seek discovery in Uganda from sitting members of the sovereign Ugandan government. (Dkt. 69-1 at 1-2). This surprises no one, because establishing the liability of the alleged principal actors – the Ugandan Parliament and current and former heads of Uganda government agencies – for crimes against humanity is a key element of SMUG's aiding and abetting claim against Lively (dkt. 65 at 22 & n.11), another contention that SMUG does not dispute. Thus, the Court can be certain that, once it re-opens the doors of discovery, SMUG will use this Court's imprimatur to pursue discovery **against a foreign sovereign**. The discovery plan drafted by SMUG with no input (yet) from Lively confirms this intention. (Dkt. 69-2, pp. 4-5, ¶ I(f))

("non-party deposition[s]" may commence immediately, will involve "witnesses residing abroad" and require "trips that counsel must make outside the United States"); (*id.* at p. 5) (providing that discovery may be extended "depending on issues that arise in seeking discovery, either in the form of documents or witnesses, in Uganda").

It is precisely **this** element of ATS claims that makes them peculiarly well suited for immediate appellate review, either through interlocutory certification or mandamus. *Balintulo*, 2013 WL 4437057 at *5 (because "ATS suits often create particular risks of adverse foreign policy consequences"… "**a ruling that raises substantial questions of judicial power under the ATS … cannot be insulated from immediate review simply because a lower court refuses to certify the order for appeal**") (emphasis added); *Mamani v. Berzain*, 654 F.3d 1148, 1152 (11th Cir. 2011) (granting interlocutory appeal because "[w]e know and worry about the foreign policy implications of civil actions in federal courts against the leaders (even the former ones) of nations").

SMUG says nothing about the obvious foreign policy implications of burdening a foreign sovereign with discovery, and of having this Court find that the foreign sovereign has committed crimes against humanity. (Dkt. 69 at 18). Instead, SMUG claims that it will be prejudiced by the delay of an immediate appeal. (*Id.*) SMUG cites a general "risk of lost evidence and witnesses" attendant in any litigation, without any specific threat or other indication that the risk will materialize in this case. (*Id.*) It is SMUG who has chosen to bring in this Court the kind of case that routinely takes many years, often over a decade, to resolve.[3] The inherent complexity and length of ATS cases has never been an impediment to immediate appellate review, given all of the other serious considerations at issue. *See e.g.*, *Kiobel*, 133 S. Ct. at 1663 (noting that the decade-old case

---

[3] *See e.g.*, "Timeline, Kiobel v. Royal Dutch Petroleum Co." (http://ccrjustice.org/ourcases/current-cases/kiobel, last visited September 23, 2013) (indicating that the *Kiobel* litigation was filed in September 2002, almost **11 years** prior to being decided by the Supreme Court); *Sosa*, 542 U.S. at 698 (noting that, **11 years** prior to the date of the opinion, "[i]n 1993 . . . Alvarez began the civil action before us here"); *Balintulo*, WL 4437057 at *1 ("[t]he plaintiffs brought these suits **over ten years ago** in federal court under the ATS") (emphasis added); *Al Shimari v. CACI Int'l, Inc.*, 1:08-CV-827 GBL/JFA, 2013 WL 3229720, *2 (E.D. Va. June 25, 2013) ("[t]he pendency of this litigation approaches its **fifth anniversary**") (emphasis added).

arrived at the Supreme Court on interlocutory appeal, after denial of defendants' motion to dismiss in the district court).

Finally, even as it claims prejudice from the delay of an immediate appeal, SMUG attempts to justify its own delay in bringing this suit by claiming that it was "the victim of severe repression [and thus unable] to advocate on [its] own behalf." (Dkt. 69 at 18-19, n.15). This contention flies in the face of SMUG's admitted ability to vigorously advocate on its own behalf through **successful** litigation at all levels of the Ugandan judiciary, including its 2008 victory at the Ugandan High Court in the case resulting from the alleged "invasion" of Victor Mukasa's home (Amd. Compl, dkt. 27, ¶ 34), and its 2011 victory at the Ugandan High Court in the case against Ugandan tabloids. (*Id*. at ¶ 221). SMUG waited **another four years** and **one year**, respectively, after those victories to bring this action here. **During (and before) that delay, SMUG's principals traveled routinely and freely outside of Uganda, but only to deliver speeches about, and to receive international awards for, their supposedly impossible advocacy in Uganda, not to file this suit**.[4]

---

[4] For example (all websites were last visited on September 23, 2013): **(1)** in 2007, Victor Mukasa, SMUG's co-founder and president emeritus took a job in the South African office of the International Gay and Lesbian Human Rights Commission, headquartered in New York (http://www.iglhrc.org/content/iglhrc-prominent-ugandan-activist-victor-juliet-mukasa-joins-staff; and http://protectionline.org/2007/10/26/victor-mukasa-prominent-ugandan-activist-joins-iglhrc-staff/); **(2)** in 2007, Frank Mugisha, SMUG's Executive Director, traveled to South Africa to participate in "the arch dialogue" (http://old.rafto.no/publish_files/RaftoPrize2011-CV-FrankMugisha.pdf); **(3)** in 2009, Mr. Mugisha traveled to London, England, to speak at the House of Parliament (*id*.); **(4)** in 2009, Mr. Mukasa traveled to New York to speak at the United Nations (http://www.iglhrc.org/content/victor-mukasa-un-speaking-grave-human-rights-violations-against-lgbt-people); **(5)** in 2010, Pepe Julian Onziema, SMUG's Programme Coordinator, traveled to the Hague, Netherlands, to deliver a keynote speech at the African Conference (http://africanconference.weebly.com/general-information.html; and http://africanconference.weebly.com/key-note-speakers.html); **(6)** in January 2011, more than a year before SMUG filed this suit, Mr. Mugisha traveled to Philadelphia to speak at the LGBT Community Center, and to "further strengthen ties between U.S. and Uganda" (http://phillygaycalendar.com/pages/calendar.php?id=11517); **(7)** later in 2011, Mr. Mugisha traveled to Washington, D.C. to receive the 2011 Robert F. Kennedy Human Rights Award (http://rfkcenter.org/media-coverage-of-2011-rfk-human-rights-award-ceremony?lang=en); and **(8)** also in 2011, Mr. Mugisha traveled to Bergen, Norway, to receive (on behalf of SMUG) the 2011 Rafto Prize (http://humanrightshouse.org/Articles/16999.html), which was awarded to SMUG because it "has **successfully used the legal system** to fight harassment and violence from government and private actors" (http://www.rafto.no/article/382/Sexual_Minorities_Uganda_SMUG_Frank_Mugisha) (emphasis added).

Compared to the typical ATS case, this litigation is still in its infancy. A moderate pause while the parties seek the First Circuit's guidance on the paramount issues at hand will prejudice no one.

## CONCLUSION

For the foregoing reasons, the Court should reconsider its Denial of Certification for Interlocutory Appeal (dkt. 71) of its Order Denying Lively's Motion to Dismiss.

Respectfully submitted,

| | |
|---|---|
| Philip D. Moran | /s/ Horatio G. Mihet_____ |
|    (MA Bar # 353920) | Mathew D. Staver |
| 265 Essex Street, Suite 202 |    Admitted Pro Hac Vice |
| Salem, Massachusetts 01970 | Stephen M. Crampton |
| Tel: (978) 745-6085 |    Admitted Pro Hac Vice |
| Fax: (978) 741-2572 | Horatio G. Mihet |
| Email: philipmoranesq@aol.com |    Admitted Pro Hac Vice |
| | LIBERTY COUNSEL |
| | P.O. Box 540774 |
| | Orlando, FL 32854-0774 |
| | 800-671-1776 Telephone |
| | 407-875-0770 Facsimile |
| | court@lc.org |

Attorneys for Defendant Scott Lively

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed electronically with the Court on September 24, 2013. Service will be effectuated by the Court's electronic notification system upon all counsel or parties of record.

/s/ Horatio G. Mihet_____
Horatio G. Mihet
Attorney for Defendant Scott Lively