UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| SEXUAL MINORITIES UGANDA | ) | |
| | ) | |
| *Plaintiff,* | ) | Civil Action |
| | ) | |
| *v.* | ) | 3:12-CV-30051 |
| | ) | |
| SCOTT LIVELY, individually and as | ) | |
| President of Abiding Truth Ministries, | ) | |
| | ) | |
| *Defendant.* | ) | |

PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
ITS MOTION FOR A PROTECTIVE ORDER

Plaintiff Sexual Minorities Uganda respectfully requests that the Court enter the attached proposed Protective Order to ensure that sensitive or confidential information produced in the course of discovery is not improperly disclosed. The proposed Protective Order permits producing parties, including third parties, to designate testimony or material as subject to the terms of the Protective Order if such party has a good faith basis to believe that it contains or reveals (a) highly personal information, including sexual orientation and/or gender identity, medical or financial information, or the home, office, or e-mail address or phone number for certain individuals; (b) the associational activity of any individual for whom disclosure of such activity is likely to expose them to threats, reprisal, or harassment; (c) information about Plaintiff's internal structure that would adversely affect its ability to advocate on behalf of its members; or (d) information that by law or by contract may not be publicly disclosed. The proposed Protective Order also establishes rules for use and disclosure of such materials. With the entry of the proposed Protective Order, both parties and third parties will have confidence that materials properly designated will not be disclosed without advance notice and an opportunity to contest such potential disclosure. Accordingly, its entry will facilitate the discovery process by preventing the withholding of relevant documents or testimony on the basis of confidentiality alone.

**ARGUMENT**

Pursuant to Federal Rule of Civil Procedure 26(c)(1), the Court, for good cause, may issue an order to protect a party or person from "annoyance, embarrassment, oppression, or undue burden or expense."  While district courts generally favor liberal pretrial discovery, the trial court has broad discretion to decide "when a protective order is appropriate and what degree of protection is required." *Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 36 (1986). *See also Poliquin v. Garden Way, Inc.,* 989 F.2d 527, 532 (1st Cir. 1993) ("[G]reat deference is shown to the district judge in framing and administering [protective] orders"). Protective orders are appropriate particularly where disclosure may endanger a party or where the public release of certain discovery could subject parties or witnesses to "harassment and reprisals." *Rhinehart*, 467 U.S. at 26-27. A finding of good cause must be based on a particular factual demonstration of potential harm, not on conclusory statements. *Anderson v. Cryovac, Inc.*, 805 F.2d 1, 7 (1st Cir. 1986).

## I. Witnesses could face annoyance, embarrassment, oppression, undue burden or expense.

As the First Amended Complaint (FAC) describes, and as Plaintiff will demonstrate in this litigation, the lesbian, gay, bisexual, transsexual, and intersex ("LGBTI") community in Uganda suffers from widespread and systematic persecution, including arbitrary arrests and detention and cruel, inhuman and degrading treatment, *see* FAC ¶¶ 30, 34, 186-89; public outings of persons' sexual orientation, gender identity, and/or associational activities, *see id*. ¶¶ 216-23; unlawful raids of gatherings and private homes*, see id.* ¶¶ 165-85, 209-10; and denial of critical services and forced evictions, *see id*. ¶¶190-93, 228.  This persecution has been noted by the United States Department of State, *see*, *e.g*., United States Department of State, 2012 Country Reports on Human Rights Practices - Uganda, Apr. 19, 2013, *available at* http://www.state.gov/documents/organization/204390.pdf (describing violence and discrimination against the LGBTI community); international media outlets, *see*, *e.g*., Naomi

Abraham, *Gay Africans flee persecution*, Salon, Oct. 29, 2011, *at*
http://www.salon.com/2011/10/29/gay_africans_flee_persecution/; Matt O'Brien, *Ugandan escapes anti-gay persecution in U.S.*, Seattle Times, Sept. 10, 2011, *available at*
http://seattletimes.com/html/nationworld/2016162095_gayugandan11.html; Jeffrey Gettleman, *Gay in Uganda, and Feeling Hunted*, N.Y. Times, Jan. 4, 2010, *available at*
http://www.nytimes.com/2010/01/04/world/africa/04gay.html; inter-governmental bodies, *see*, *e.g.*, United Nations Office of the High Commissioner for Human Rights, Laws criminalizing homosexuality are incompatible with international human rights standards and fuel homophobia, Mar. 10, 2011, *at* http://www.ohchr.org/EN/NewsEvents/Pages/Homophobia.aspx (noting persecution in Uganda); Court of Justice of the European Union, Homosexual applicants for asylum can constitute a particular social group who may be persecuted on account of their sexual orientation, PRESS RELEASE No 145/13, Luxembourg, Nov. 7, 2013, *available at*
http://curia.europa.eu/jcms/upload/docs/application/pdf/2013-11/cp130145en.pdf (ruling that LGBT persons fleeing persecution in Uganda should be granted asylum); and  international non-governmental organizations monitoring human rights violations globally, *see*, *e.g.*, Organization for Refuge, Asylum & Migration (ORAM), Blind Alleys: The Unseen Struggles of Lesbian, Gay, Bisexual, Transgender and Intersex Urban Refugees in Mexico, Uganda and South Africa - Part II: Country Findings: Uganda, Feb. 2013, *available at*
http://www.refworld.org/docid/524d45e84.html; Freedom House, Persecution of LGBTI Ugandans Continues Despite Court Decision on Theater Producer, Jan. 4, 2013, *at*
http://www.freedomhouse.org/article/persecution-lgbti-ugandans-continues-despite-court-decision-theater-producer; Amnesty International, Amnesty International Annual Report 2012 - Uganda, May 24, 2012, *available at* http://www.amnesty.org/en/region/uganda/report-2013.  The intense climate of hostility against the LGBTI community is encapsulated in this statement made during deliberations on the Anti-Homosexuality Bill in Uganda's Parliament: "We must exterminate homosexuals before they exterminate society." Statement by Shadow Minister of

Information and National Guidance (Mr. Christopher Kibanzanga), The Official Report of the Parliament of Uganda, Apr. 15, 2009, *available at* http://www.parliament.go.ug/hansard/hans_view_date.jsp?dateYYYY=2009&dateMM=04&dateDD=15.

In the aftermath of public outings in particular, the victims of such outings have experienced increased levels of threats, harassment and assaults as well as intensified discrimination, including in the form of housing evictions and termination of employment.  The annexed declaration of Pepe Julian Onziema, employed as an advocacy officer at Plaintiff Sexual Minorities Uganda, sets out the risks faced by members of the LGBTI community in Uganda as well as those who advocate on their behalf. From his position, Onziema has come to know other LGBTI persons and activists in Uganda who have faced "death threats, daily harassment by the police, shop-owners, persons on the street and others; evictions; and other discrimination as a result of being outed in the media." Declaration of Pepe Julian Onziema ("Onziema Decl.") ¶ 3. According to Onziema, some have faced so much insecurity that they have fled Uganda and sought asylum elsewhere. *Id.*

Onziema describes his own personal experiences with intensifying harassment and even death threats in the wake of such outings. *Id.* at ¶¶ 7-11, 14-15. Onziema and a number of colleagues were named in one tabloid publication, *Rolling Stone*, in 2010 under the headline "HANG THEM; THEY ARE AFTER OUR KIDS!!" and accusing Onziema and the others named in the tabloid as planning to recruit 1,000,000 "innocent kids by 2012."  *Id.* at ¶¶ 4-6 and Ex. A. Subsequently, Onziema and other colleagues featured in the article received death threats via phone and text. *Id.* at ¶ 8. Onziema was effectively evicted from his home as his landlord refused to renew his lease, and he had trouble finding new housing as landlords would often refuse to rent to him. *Id.* at ¶¶ 9-10.  Onziema also suffered such public outings by another tabloid publication, *Red Pepper*.  *Id.* at ¶ 14.  Following such outings, Onziema has been harassed and detained by police without charge.  *Id.* at ¶ 15.  During such encounters, police

officers have made comments indicating their treatment of him was based on his advocacy for LGBTI rights and status as an LGBTI person.  *Id. See also*, *e.g.*, *Gays Reportedly Attacked in Uganda After Newspaper Publishes List of 'Top 100' Homosexuals*, FoxNews.com, Oct. 20, 2010, *at* http://www.foxnews.com/world/2010/10/20/ugandan-embassy-defends-equal-rights-gay-list-appears-newspaper/; Chris Rovzar, *Ugandan Newspaper Publishes Names of 'Top 100' Homosexuals, Calls for Their Hanging*, N.Y. Magazine, Oct. 19, 2010, *at* http://nymag.com/daily/intelligencer/2010/10/ugandan_newspaper_publishes_na.html.

Public knowledge of attempts by LGBTI persons and advocates to vindicate their rights has similarly lead to increased levels of threats and harassment.  For example, Onziema and two of his colleagues brought suit against *Rolling Stone* in a Ugandan court for its outings of them in 2010.  *See* Onziema Decl. ¶ 12.  In December 2010, the court ruled that the publication threatened the rights of the complainants to respect for human dignity and protection from inhuman treatment and the right to privacy of the person and home and ordered an injunction against the tabloid. *See id*. Ex. B (Judgment of Ugandan High Court).  Nevertheless, as Onziema's declaration describes, their initiation of this suit caused them to suffer from further threats and harassments. *Id*. at ¶¶ 12-13.

Similarly, here, disclosure of some witnesses' names and other identifying information without adequate confidentiality protections could cause those witnesses to suffer increased levels of persecution either based on their perceived sexual orientation and/or gender identity[1] or advocacy around these issues or based on their participation in this litigation implicating as co-conspirators several civil society leaders and well-known persons in Uganda.

---

[1]     This Court has recognized privacy concerns related to "the exposure of one's sexual orientation." *Liberty Media Holdings v. Swarm Sharing Hash File*, 821 F. Supp. 2d 444, 453 n.8 (D. Mass. 2011) (Young, D.J.).  Courts have even permitted plaintiffs to proceed anonymously "[w]here the issues involved are matters of a sensitive and highly personal nature," such as homosexuality.  *S. Methodist Univ. Ass'n of Women Law Students v. Wynne & Jaffe*, 599 F.2d 707, 712-13 & n.10 (5th Cir. 1979) (collecting cases).

**II.  Witnesses' rights to freedom of association could be violated through disclosure of their membership in certain advocacy groups or participation in certain activities.**

Restrictions on disclosure surrounding the associational activities of certain witnesses may be necessary to protect their fundamental rights to associate freely, particularly where it can be shown that "on past occasions" such revelations exposed an association's members to "economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility," including from "*private* community pressures." *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 462-63 (1958) (emphasis in original). *See also Sherwin-Williams Co. v. Spitzer*, 2005 U.S. Dist. LEXIS 18700, at *14 (N.D.N.Y. Aug. 24, 2005) ("Should there be a showing of reasonable probability that compelling disclosure will lead to some form or specter of harassment, threat, or reprisal of the organization and/or its members, such commanded disclosure runs afoul of the First Amendment.").  Should Plaintiff adequately assert an associational privilege in response to a specific discovery request, the "burden shifts to the party seeking the disclosure to demonstrate a compelling need for the information that will survive 'exacting scrutiny.'" *Sherwin-Williams*, 2005 U.S. Dist. LEXIS 18700, at *15.  Should Defendant meet that burden in a particular instance, restrictions as to whom such information may be disclosed will be necessary to balance the interests of both parties. *See*, *e.g.*, *Christ Covenant Church v. Town of Southwest Ranches*, 2008 U.S. Dist. LEXIS 49483, at *33 (S.D. Fla. June 29, 2008) (where plaintiff had adequately asserted associational privilege, the court assessed the compelling need for the information, the availability of the information from alternative sources and whether the discovery request constituted the means least restrictive on the individuals' associational rights, among other factors, and determined that it should be

produced "subject to a protective order" and "disclosed to no one other than counsel for the

[defendant]").  Plaintiff's proposed Protective Order facilitates this process.

### III. An "attorneys' eyes only" designation of certain disclosures will be necessary to protect some witnesses.

As set out in the FAC, by his own admissions, Defendant has worked closely with key

actors in Uganda who have either themselves outed or endorsed efforts to publicly out members

of Uganda's LGBTI community. In his answer to the FAC, Defendant admitted that he has

called alleged co-conspirator Stephen Langa "a good friend and ministry partner." Def.'s Answer

(dkt. 83) at ¶ 94.  Plaintiff has alleged that Langa has called for "investigation into private lives

to determine the prominence and impact of homosexuality in Uganda," in order to punish LGBTI

persons.  FAC ¶ 109.  Plaintiff has further alleged Defendant's long and close association with

Martin Ssempa since 2002, *id*. at ¶¶ 119-140, and Defendant admits to having associated with

Ssempa, *see* dkt. 83 at ¶¶ 129, 139.  Ssempa has personally posted the names, photos and contact

information of LGBTI advocates who he called "homosexual promoters." FAC ¶ 126 (citing

Human Rights Watch, Letter to Congressional Caucus about US support for Ugandan

Homophobia, Oct. 12, 2007, *available at* http://www.hrw.org/news/2007/10/10/letter-

congressional-caucus-about-us-supportugandan-homophobia).  The *Rolling Stone* tabloid

described above was started by two individuals affiliated with Ssempa, and Ssempa was featured

in an exclusive interview in the issue outing LGBTI activists, in which he was quoted as saying

with respect to homosexuality, "We shall fight on until we rescue our country from the hands of

evil…This war has just started." Onziema Decl. Ex. A.  Finally, Defendant has admitted to

associating with James Nsaba Buturo, *see* dkt. 83 at ¶ 143; FAC ¶ 143, who has called for

government "catalogu[ing] of people we think are involved in perpetuating the vice of

homosexuality," FAC ¶ 152 (citing Tough Anti-Gay Law Due, Interview by Alfred Wasike with

Minister for Ethics and Integrity, James Nsaba Buturo, Sunday Vision, Aug. 25, 2007), and

ominously stated that "the days of homosexuals are over," FAC ¶ 156 (citing Anna Smith and

Geof Magga, *Uganda's Anti-Pornography Law to Fight Homosexual Vice*, Afrik News, Sept. 8, 2010, *available at* http://www.afrik-news.com/article18213.html).

Plaintiff expects that this designation will only be necessary with respect to highly sensitive information, which, if Defendant were to even inadvertently share with his alleged co-conspirators or anyone else, could result in irreparable harm. In such cases, courts have even found such sensitivities grounds for protecting the information from disclosure altogether. *See*, *e.g.*, *Dinler v. City of New York (In re City of New York)*, 607 F.3d 923, 935-37 (2d Cir. 2010) (distinguishing disclosure of confidential information on an "attorneys' eyes only" basis as "a routine feature of civil litigation involving trade secrets" where if the information were inadvertently shared with the opposing party, the injury may "usually be remedied by an injunction or money damages" from disclosure on this restricted basis of police field reports, which if inadvertently disclosed more widely could result in endangering individual lives, which is "far more difficult to remedy").

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court enter Plaintiff's proposed Protective Order.

Dated:  November 22, 2013

Luke Ryan
(Bar No. 664999)
100 Main Street, Third Floor
Northampton, MA 01060
Tel. (413) 586-4800
Fax (413) 582-6419
lryan@strhlaw.com

*Attorneys for Plaintiff*

Respectfully submitted,

___*/s/ Pamela Spees*___
Pamela C. Spees, *admitted pro hac vice*
Baher Azmy, *admitted pro hac vice*
Jeena Shah, *admitted pro hac vice*
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY  10012
212-614-6431 - Phone
212-614-6499 - Fax
pspees@ccrjustice.org

8

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that the foregoing was filed electronically, that it will be served electronically upon all parties of record who are registered CM/ECF participants via the NEF, and that paper copies will be sent to any parties indicated on the NEF as non-registered participants on November 22, 2013.

*/s/Pamela Spees*
Pamela Spees