| SEXUAL MINORITIES UGANDA, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 12-cv-30051-MAP |
| | ) | |
| SCOTT LIVELY, | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER REGARDING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(Dkt. No. 248)

June 5, 2017

PONSOR, U.S.D.J.

### I. INTRODUCTION

Plaintiff Sexual Minorities Uganda, which uses the acronym "SMUG," is headquartered in Kampala, Uganda. It comprises member organizations seeking fair and equal treatment of lesbian, gay, bisexual, transgender, and intersex (LGBTI) people in that east African country. Defendant Scott Lively is an American citizen who has aided and abetted a vicious and frightening campaign of repression against LGBTI persons in Uganda.

Defendant's positions on LGBTI people range from the

1

ludicrous to the abhorrent.  He has asserted that "Nazism was in large part an outgrowth of the German homosexual movement,"[1] and that "[i]n seeking the roots of fascism we once again find a high correlation between homosexuality and a mode of thinking which we identify with Nazism."[2]  He has tried to make gay people scapegoats for practically all of humanity's ills, finding "through various leads, a dark and powerful homosexual presence in . . . the Spanish Inquisition, the French 'Reign of Terror,' the era of South African apartheid, and the two centuries of American slavery."[3]

This crackpot bigotry could be brushed aside as pathetic, except for the terrible harm it can cause.  The record in this case demonstrates that Defendant has worked with elements in Uganda who share some of his views to try to repress freedom of expression by LGBTI people in Uganda,

---

[1] Scott Lively, My Life in His Hands: A Testimony of God's Grace and Goodness (Ex. 24), Dkt. No. 293, Attach. 26 at 10.

[2] Scott Lively, The Pink Swastika 129 (4th ed.) (Ex. 177), Dkt. No. 293, Attach. 189.

[3] Scott Lively, The Poisoned Stream: "Gay" Influence in Human History (Ex. 71), Dkt. No. 293, Attach. 79.

2

deprive them of the protection of the law, and render their very existence illegal. He has, for example, proposed twenty-year prison sentences for gay couples in Uganda who simply lead open, law-abiding lives.

Plaintiff has filed this lawsuit under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, seeking monetary damages and injunctive relief based on Defendant's crimes against humanity. Defendant now seeks summary judgment in his favor arguing that, on the facts of record, the ATS provides no jurisdiction over a claim for injuries -- however grievous -- occurring entirely in a foreign country such as Uganda. Because the court has concluded that Defendant's jurisdictional argument is correct, the motion will be allowed.

Anyone reading this memorandum should make no mistake. The question before the court is not whether Defendant's actions in aiding and abetting efforts to demonize, intimidate, and injure LGBTI people in Uganda constitute violations of international law. They do. The much narrower and more technical question posed by Defendant's motion is whether the limited actions taken by Defendant on

3

American soil in pursuit of his odious campaign are
sufficient to give this court jurisdiction over Plaintiff's
claims. Since they are not sufficient, summary judgment is
appropriate for this, and only this, reason.[4]

## II.  FACTUAL BACKGROUND

The facts will be viewed in the light most favorable to
Plaintiff, as required by Fed. R. Civ. P. 56. Few facts are
actually in dispute.[5]  The summary below will concentrate
mainly on actions allegedly taken by Defendant within the
United States, since that is the focus of the ATS analysis.

It is undisputed that Defendant strongly opposes what
he calls the "gay movement" and has spoken in numerous
venues to express his view that "homosexual activism" is a
"very fast-growing social cancer" that has harmed America.
("Letter to the Russian People" (Ex. 3), Dkt. No. 293,

---

[4]  Defendant has offered several satellite arguments in
support of judgment in his favor in addition to lack of
jurisdiction. Because the jurisdictional argument prevails
and judgment must enter for Defendant on that basis, it is
not necessary to address any of Defendant's peripheral
contentions.

[5]  The facts are drawn from Defendant's Memorandum of
Law in Support of Summary Judgment (Dkt. No. 257) and the
exhibits relied on therein, as well as Plaintiff's Counter
Statement of Material Facts (Dkt. No. 270) and its exhibits
in support (Dkt. No. 293).

4

Attach. 3.) He has, in addition, published several books on this topic, including Defend the Family: Activist Handbook (Ex. 9, Dkt. No. 293, Attach. 9) and Redeeming the Rainbow (Ex. 20, id. at Attach. 20), which expand on this theme. As noted above, in his book, The Pink Swastika: Homosexuality in the Nazi Party, he offers the bizarre argument that a fascistic and violent gay movement in pre-war Germany propelled the rise of Nazism. (Excerpts in Ex. 177, Dkt. No. 293, Attach. 189.) Some of his suggestions sink to bizarre depths, such as the following:

> We can see that the roots of Nazism are fundamentally interrelated with the homosexuality of its philosophers.... (Although it may be mere coincidence, we are reminded that the Latin root of fascism is *fasces*, "a bundle of rods." A diminutive of fasces is "faggot," a common pejorative for homosexuals.)

(The Pink Swastika 141 (Ex. 177), Dkt. No. 293, Attach. 189 141.)

More chillingly, he has stated, "[T]he Bible treats homosexuality as a form of rebellion against God even worse (from God's perspective) than mass murder." (Scott Lively, "Is Homosexuality Worse than Mass Murder in the Bible?" (posted Dec. 9, 2014) (Ex. 2), Dkt. No. 293, Attach. 2).

Defendant's first contact with Uganda, so far as the

5

record reveals, occurred in 2002, when he traveled there twice to participate in a conference, to give speeches, and to make media appearances in which he forcefully presented his execrable views about the supposed evils of homosexuality. No evidence suggests that the two appearances in Uganda in 2002 involved any significant activity in the United States, beyond -- it may be inferred -- receipt of the invitations and arrangements for travel.

In the years that followed these first trips to Uganda, Defendant traveled to other foreign countries attending meetings and making speeches to encourage persecution of LGBTI people. He eventually built somewhat of an international reputation for his virulently hateful rhetoric. During this period the record contains negligible evidence of actions taken by Defendant from the territory of the United States directed specifically at Uganda or the LGBTI community there.

In October of 2007, Defendant and Stephen Langa, Executive Director of the Family Life Network in Uganda, exchanged emails discussing another possible trip to Uganda by Defendant to attend a contemplated conference -- again,

on the supposed dangers of homosexuality. In December of
2007, they exchanged views on who should be invited to the
conference, and Defendant sent Langa a copy of his book,
Defend the Family: Activist Handbook.

At the end of 2008, the Ugandan High Court issued an
opinion awarding monetary damages to victims of police
violence that occurred at the home of the SMUG founder,
Victor Mukasa. The opinion also confirmed the right of
LGBTI people in Uganda to seek redress in the courts for
violations of their civil liberties. Plaintiff alleges that
as a result of this court decision, Defendant's associates
in Uganda became alarmed. An exchange of emails ensued in
December 2008, through which Defendant communicated with
Martin Ssempa, a United States citizen and Ugandan pastor
who, to some extent, shared Defendant's views. Ssempa
sought permission to make copies of Defendant's book Seven
Steps to Recruit Proof Your Child. The book laid out
Defendant's baseless and contemptible claim that gay people
present special risks to minors.[6]  Ssempa also requested

_____

[6]  The United States Supreme Court itself has
recognized the dignified and proper status of "tens of
thousands of children now being raised by same-sex couples."

additional resource materials from Defendant regarding the
dangers supposedly posed by gay persons generally.

In 2009, Langa organized the conference in Uganda
discussed by Defendant and him back in 2007. The event was
billed as a "Seminar on Exposing the Homosexual Agenda," and
Defendant again appeared and spoke. After his return,
Defendant had further email exchanges with Ssempa, as well
as with James Buturo, a Ugandan cabinet minister, and David
Bahati, a member of the Ugandan parliament. These internet
communications discussed a draft piece of legislation being
placed before the Ugandan parliament, called the "Anti-
Homosexuality Bill" ("AHB"), proposing the death penalty for
homosexuality. Defendant reviewed and offered suggestions
regarding the draft, recommending certain modifications to
soften public backlash, including a reduction of the penalty
from death to twenty years imprisonment.[7]

_____

United States v. Windsor, 133 S. Ct. 2675, 2694 (2013). As
the Court noted, these children do not deserve to be told by
anyone that their parents' "marriage is less worthy than the
marriages of others." Id. at 2696.

[7] The Anti-Homosexual Bill (AHB) was first introduced
into Uganda's parliament in 2009. The earliest version
included the penalty of death for certain "aggravated" acts
of homosexuality. During the four years that the
legislation was under consideration, that provision was

8

The record thereafter contains evidence of a dozen or
so substantive emails in the 2009-2014 time frame between
Defendant and individuals in Uganda discussing ways to move
the AHB forward, to draft modified legislation aimed at
repressing LGBTI people in Uganda, and to deter advocacy on
behalf of LGBTI people and exercise by them of their civil
rights. So far as the record indicates, these substantive
emails were not numerous or frequent. A larger number of
social, non-substantive emails were also exchanged, as well
as emails communicating internet links to articles or
attaching copies of written material.   Plaintiff's counsel
has identified specific emails sent by Defendant in aid of
the Ugandan campaign in December 2009; July and August 2010;
February, July, August, and December 2012; August 2013; and
April 2014.⁸

---

modified to life imprisonment. The revised bill ultimately
passed the Ugandan parliament on December 20, 2013, and was
signed into law the following February, upon which it became
the Anti-Homosexuality Act of 2014 (AHA).   However, on
August 1, 2014, the Constitutional Court of Uganda ruled the
AHA invalid on the ground that it was not passed by a
sufficient quorum of legislators.   (Tuhaise Decl. ¶¶ 9-12,
Dkt. No. 249, Attach. 3.)

⁸   As Defendant's counsel points out, it is unclear
exactly where Defendant was when he sent these emails.

To summarize now that discovery has closed, the
evidence that the actions of the Defendant have "touched and
concerned" the territory of the United States is that
Defendant is a citizen of the United States living in
Massachusetts, that he traveled from the United States to
Uganda twice in 2002 and once in 2009, that he sent copies
of his writings and other material to Uganda on a few
occasions, and that over twelve years he transmitted
emails, probably from the United States, to various people
in Uganda. Of these perhaps a score, at most, included
encouragement, advice, and guidance regarding the campaign
to intimidate and repress the Ugandan LGBTI community.

### III.  DISCUSSION

As noted above, Plaintiff relies for jurisdiction
entirely on the Alien Tort Statute ("ATS"), 28 U.S.C. §
1350. After the complaint was filed in March of 2012,
Defendant responded with threshold motions to dismiss

Plaintiff points to contextual details in some emails that
suggest that Defendant hit the "SEND" button while he was
physically within the territory of the United States. As to
others, Defendant's location cannot be discerned. Defendant
notes that during this time he was frequently traveling
outside the United States for various reasons.

10

pursuant to Fed. R. Civ. P 12(b) (Dkt. Nos. 21 and 30),
attacking this court's jurisdiction under the ATS on two
grounds.

First, Defendant argued that aiding and abetting
persecution of LGBTI people, no matter how unhinged and
malignant, simply did not violate international norms with
sufficient clarity to place it within the narrow class of
claims subject to ATS jurisdiction. This court emphatically
rejected that argument, holding that "[w]idespread,
systematic persecution of LGBTI people constitutes a crime
against humanity that unquestionably violates international
norms." Sexual Minorities of Uganda v. Lively, 960
F.Supp.2d 304, 316 (D. Mass. 2013). Aiding and abetting the
commission of this crime, this court held, "is one of the
limited group of international law violations for which the
ATS furnishes jurisdiction." Id. at 316-321 (discussing
persecution of LGBTI people as a crime against humanity).

Second, Defendant argued that, even if his conduct fell
substantively under the ATS umbrella, the exercise of
jurisdiction by this American court when the injury occurred
in a foreign country was improper under the ATS as construed

11

by the Supreme Court in <u>Kiobel v. Royal Dutch Petroleum Co.</u>,
133 S. Ct. 1659 (2013). In other words, the argument ran,
even if a crime against humanity may have been committed,
this court could not exercise jurisdiction under the ATS
where the crime occurred in Uganda. In denying Defendant's
motions to dismiss on this ground, the court found that the
allegations of the complaint were sufficient at that
preliminary stage to clear the relatively low Rule 12
hurdle. 960 F.Supp.2d at 310-311. The court emphasized,
however, that it was reaching this conclusion based on the
summary of facts <u>as alleged in the complaint</u>. 960 F.Supp.2d
at 311 n.2.

     With discovery now completed, the court is in a
position to weigh this second argument on a fully developed
record. The parties agree that the jumping-off place for
this analysis is the Supreme Court's <u>Kiobel</u> decision, which
came down after the complaint was filed.

     The petitioners in <u>Kiobel</u> were residents of Ogoniland
in Nigeria, where the respondents Royal Dutch Petroleum and
Shell Transport and Trading Company -- incorporated in the
Netherlands and England respectively -- were conducting oil

exploration and production.  After local residents began

protesting the destruction of the environment caused by a

joint subsidiary of the respondents, the respondents

enlisted the help of the Nigerian government to violently

suppress this opposition.  For years, the two respondent

corporations, acting outside the United States, aided and

abetted the Nigerian military and police -- providing

supplies, transportation, and compensation -- in carrying

out beatings, rapes, murders, and arbitrary arrests of

residents, including the four petitioners.  Suit was filed

in the Southern District of New York, asserting jurisdiction

under the Alien Tort Statute and alleging crimes against

humanity aided and abetted by the respondent corporations.

Chief Justice Roberts's majority opinion began by

noting the brief text of the ATS, passed as part of the

Judiciary Act of 1789, which simply states that "[t]he

district courts shall have original jurisdiction of any

civil action by an alien for a tort only, committed in

violation of the law of nations or a treaty of the United

States."  28 U.S.C. § 1350.  He noted that the statute did

not provide any substantive cause of action but was "enacted

13

on the understanding that the common law would provide a
cause of action for [a] modest number of international law
violations." Kiobel, 133 S. Ct. at 1663 (citing Sosa v.
Alvarez-Machain, 542 U.S. 692, 714 (2004)) (quotations
omitted and alterations in original).

As in the case now before this court, the question in
Kiobel was not whether petitioners stated a substantive
cause of action under the ATS. A claim for aiding and
abetting a crime against humanity, both in this case and in
Kiobel, could potentially state a proper substantive cause
of action under the ATS. The question -- again, here as
well as in Kiobel -- was whether the ATS provided a court
with jurisdiction over such a claim when the offensive
conduct and the injury occurred "in the territory of a
foreign sovereign." Id. at 1664.

Chief Justice Roberts held that the ATS did not provide
such jurisdiction. His analysis began with the recognition
of "a canon of statutory interpretation known as the
presumption against extraterritorial application." Id.
Under this canon, unless a particular law contains a "clear
indication of an extraterritorial application, it has none."

14

Id. (citing Morrison v. National Australia Bank Ltd., 561
U.S. 247, 255 (2010)) (quotations omitted). The Chief
Justice found that there was "no indication that the ATS was
passed to make the United States a uniquely hospitable forum
for the enforcement of international norms." Id. at 1668.
Where neither respondent was an American citizen and where
neither was alleged to have taken any action in the United
States directed at Nigeria, the mere fact that the
respondents had a corporate presence in this country was
insufficient to provide a jurisdictional foundation under
the ATS.

It must be recognized that Kiobel presents, in some
ways, a weaker case for extraterritorial application of the
ATS than the case now before this court. Neither respondent
corporation in Kiobel was a citizen of the United States,
whereas Defendant here is. Moreover, beyond "mere corporate
presence," id. at 1669, neither corporation had any
connection to the United States, and neither committed acts
in this country related to the outrages in Nigeria. In
contrast, Defendant in this case resides in Springfield,
Massachusetts, and at least some of the emails he sent to

15

Uganda to aid and abet the campaign of repression against
LGBTI people in that country originated in the United
States.

It is important to note, however, that even where a
plaintiff's claims "touch and concern the territory of the
United States," Kiobel holds that jurisdiction under the ATS
will not lie unless this contact has "sufficient force to
displace the presumption against extraterritorial
application." Id. (citing Morrison, 561 U.S. at 266-74).
As the Court noted in Morrison, "the presumption against
extraterritorial application would be a craven watchdog
indeed if it retreated to its kennel whenever some domestic
activity is involved in the case." Morrison, 561 U.S. at
266 (emphasis in original). The question before the court
now is whether the sporadic emails sent by Defendant from
the United States offering encouragement, guidance, and
advice to a cohort of Ugandans prosecuting a campaign of
repression against the LGBTI community in their country
constitutes the sort of forceful contact with the United
States that would overcome the presumption against
extraterritoriality.

The clear import of <u>Kiobel</u> is that the level of contact presented in this case is not enough. Justice Alito offered a concurrence for himself and Justice Thomas suggesting a stricter view of the ATS than the majority opinion describes. Justice Alito would permit an action to escape the presumption against extraterritorial application "only if the event or relationship that was the "focus" of congressional concern under the relevant statute takes place within the United States." <u>Kiobel</u>, 133 S. Ct. at 1670 (internal quotations omitted). While it is difficult to discern exactly how this "focus" test might be applied, it is equally hard to see how the scenario revealed here, no matter how disturbing, could pass muster.

Justice Breyer's separate concurrence on behalf of himself and three other justices is also very unhelpful to Plaintiff here. He agreed that jurisdiction under the ATS did not lie in <u>Kiobel</u>.

> The plaintiffs are not United States nationals but nationals of other nations. The conduct at issue took place abroad. And the plaintiffs allege, not that the defendants directly engaged in acts of torture, genocide, or the equivalent, but that they helped others (who are not American nationals) to do so.

<u>Id.</u> at 1678.

17

All three of the factors identified by Justice Breyer's concurrence as deterrents to the exercise of ATS jurisdiction are present in this case. Thus, at least six of the nine justices in Kiobel seem to line up against Plaintiff.

Circuit court opinions subsequent to Kiobel, while not precisely on point, support the conclusion that no ATS jurisdiction adheres in this case. The most instructive are Al Shimari v. CACI Premier Technology, Inc., 758 F.3d 516 (4th Cir. 2014); Mastafa v. Chevron Corp., 770 F.3d 170 (2d Cir. 2014); and Adhikari v. Kellogg Brown & Root, Inc., 845 F.3d 184 (5th Cir. 2017).

Al Shimari involved a corporate defendant that trained and supervised the non-military, contract employees who committed acts of torture at the Abu Ghraib detention facility during the Iraq war. 758 F.3d 516. Extensive relevant conduct within the United States included that the defendant (an American corporation based in the United States) actually hired the employees who directly perpetrated the acts of torture, received substantial payments based on contracts issued by the U.S. government in

18

the United States, was aware of its employees' misconduct,
encouraged the misconduct, and attempted to cover it up when
it was discovered. Based on this, the Fourth Circuit found
that the plaintiffs' claims touched and concerned the
territory of the United States with sufficient force to
rebut the presumption against extraterritorial application
of the ATS. Defendants' conduct in Al Shimari went far
beyond simply aiding and abetting; they had direct
responsibility through actions taken in the United States
for the crimes against humanity committed by their
employees. Nothing approaching this level of conduct based
in the United States can be found in the record of the case
now before this court.

In Mastafa, the plaintiffs were victims of human rights
abuses committed by the regime of Saddam Hussein. 770 F.3d
170. They brought suit against American corporations who
aided Hussein in obtaining illegal payments in violation of
the United Nations Oil-for-Food program. Chevron's conduct
included "multiple domestic purchases and financing
transactions" in the United States that facilitated
kickbacks and surcharge payments to the Hussein regime. Id.

at 191. This conduct, the Second Circuit found, touched and concerned the United States with sufficient force to displace the presumption against extraterritorial application of the ATS.[9] Again, no domestic conduct by Defendant here approaches the level found on the part of the defendants in Mastafa.

In Adhikari, the plaintiffs accused the defendant, a U.S. military contractor, of aiding and abetting in unlawful human trafficking to obtain cheap labor to work at the Al Asad Air Base, a U.S. military installation near Ramadi, Iraq. 845 F.3d 184. The plaintiffs were family members of Nepali workers who were dragooned and forced against their will to work in Iraq. Tragically, most were eventually murdered by Iraqi insurgents. The record reflected payments by the defendant from the United States to middlemen who arranged the illegal trafficking, as well as knowledge on the part of the defendant of the trafficking. Nevertheless, the Fifth Circuit upheld the ban against the exercise of

_____

[9] Despite this finding, the court ultimately concluded that the allegations of the complaint were insufficient to demonstrate that the defendants acted with the purpose of violating international law and therefore affirmed the dismissal of the complaint. Mastafa, 770 F.3d at 194.

20

extraterritorial jurisdiction, finding that "all the conduct
comprising the alleged international law violations occurred
in a foreign country." Id. at 197. The financial
transactions, the court held, were insufficient to displace
the presumption against extraterritoriality, and the actual
knowledge of trafficking was limited to the defendant's
overseas employees. Id. at 198.

In this case, now that discovery is complete, the
record reveals that Defendant supplied no financial backing
to the detestable campaign in Uganda, he directed no
physical violence, he hired no employees, and he provided no
supplies or other material support. His most significant
efforts on behalf of the campaign occurred within Uganda
itself, when he appeared at conferences, meetings, and media
events. The emails sent from the United States providing
advice, guidance, and rhetorical support for the campaign on
the part of others in Uganda simply do not rise to the level
of "force" sufficient to displace the presumption against
extraterritorial application.

The world is now wrapped in a vast network of internet
communications. If emails -- or at least emails of the

21

number and type disclosed on the record here -- were enough to supply the "force" sufficient to justify the exercise by American courts of jurisdiction over wrongs committed in foreign countries, the presumption against extraterritoriality described in Kiobel would be a fiction.

Moreover, the record reveals that in this case serious potential "foreign policy concerns" exist -- a problem explicitly identified in Kiobel. 133 S. Ct. at 1664. Plaintiff's complaint accuses highly placed members of the Ugandan legislative and executive branches of complicity with Defendant. Moreover, the Ugandan judicial system has weighed in vigorously on the local issues that Plaintiff wishes to have this court adjudicate here in the United States. More than in Al Shimari, Mastafa, Adhikari -- and even, perhaps in Kiobel -- this case presents the potential for conflict with the sovereignty of a foreign nation. This counsels a "need for judicial caution." Kiobel, 133 S. Ct. at 1664.

For the reasons described above, the court will allow Defendant's motion to dismiss, finding no jurisdiction under the Alien Tort Statute over Plaintiff's federal claims.

Given the absence of jurisdiction over the federal law claims, the court will decline to exercise supplemental jurisdiction over the state law claims. 28 U.S.C. § 1367(c)(3). See United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966). While the court has the discretion to address these claims, the sensitivity of the issues raised makes it more prudent to allow a court of the Commonwealth of Massachusetts to take the lead. The state law claims will therefore be dismissed, without prejudice to their refiling in state court, if Plaintiff wishes to take this route.

## IV. CONCLUSION

Several features emerge from the discussion above.

First, the allegations in the complaint fully supported the court's 2013 denial of Defendant's threshold motion to dismiss. Concrete averments set forth the extremity of Defendant's homophobia and his determination to vilify, repress, and injure the LGBTI community, both generally and in Uganda particularly. Specific allegations confirmed that Defendant took some action from inside the United States in pursuit of his goal. The ruling that the complaint passed

muster under Fed. R. Civ. P. 12, however, "d[id] not obviate
the district court's continuing obligation to ensure its own
jurisdiction as the case proceed[ed] to discovery."
Mustafa, 770 F.3d at 187.  Where the record as it evolved
during discovery cast doubt on the court's jurisdiction, the
court had an obligation to revisit the issue.

     Second, discovery confirmed the nature of Defendant's,
on the one hand, vicious and, on the other hand, ludicrously
extreme animus against LGBTI people and his determination to
assist in persecuting them wherever they are, including
Uganda.  The evidence of record demonstrates that Defendant
aided and abetted efforts (1) to restrict freedom of
expression by members of the LBGTI community in Uganda, (2)
to suppress their civil rights, and (3) to make the very
existence of LGBTI people in Uganda a crime.  The record
also confirms that these efforts to intimidate and injure
the LGBTI community in Uganda were, unfortunately, to some
extent successful.

     Third, Defendant's status as an American citizen and
his physical presence in the United States is clearly not
enough under controlling authority to support ATS

24

extraterritorial jurisdiction. The sporadic trail of emails sent by Defendant to Uganda does not add enough to the record to demonstrate that Plaintiff's claims "touch and concern the territory of the United States . . . with sufficient force to displace the presumption against extraterritorial application." Kiobel, 133 S. Ct. at 1669.

For the foregoing reasons, Defendant's motion for summary judgment (Dkt. No. 248) based on lack of jurisdiction is hereby ALLOWED. As noted, the court will decline to exercise supplemental jurisdiction over the two purely state law claims. As to them, the motion for summary judgment is ALLOWED, without prejudice to re-filing in state court if Plaintiff desires. The clerk will enter judgment of dismissal. This case may now be closed.

It is so ordered.

MICHAEL A. PONSOR
U. S. District Judge